VENABLE LLP
Rockefeller Center, 24th Floor
1270 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 307-5500
Facsimile:    (212) 307-5598
Attn:    Carollynn H.G. Callari
        Mitchell Y. Mirviss (pro hac vice)
        Edmund M. O'Toole
        Michael Schatzow


    - and -


VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
Telephone:    (410) 244-7400
Facsimile:    (410) 244-7742
Attn:  Gregory A. Cross (pro hac vice)

*Counsel for Plaintiffs, the Extended Stay
Litigation Trust and Finbarr O'Connor, as Successor
Trustee of the Extended Stay Litigation Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>EXTENDED STAY, INC. *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-13764 (JMP)<br><br>(Jointly Administered) |
| FINBARR O'CONNOR, as Trustee for and on behalf of the EXTENDED STAY LITIGATION TRUST, and<br><br>THE EXTENDED STAY LITIGATION TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>DL-DW Holdings, L.L.C., Lightstone | Adv. Proc. No. 11-2254 (JMP),<br>Adv. Proc. No. 11-2255 (JMP),<br>Adv. Proc. No. 11-2256 (JMP),<br>Adv. Proc. No. 11-2398 (JMP) |

Holdings L.L.C., The Lightstone Group, L.L.C., PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II, L.L.C., Arbor Commercial Mortgage, L.L.C., Princeton ESH, L.L.C., Atmar Associates, L.L.C., Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C., ABT-ESI L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, Dae Hum Kim (a/k/a David Kim), and Gary DeLapp,

Defendants.

## AMENDED COMPLAINT

Plaintiffs Finbarr O'Connor, as Successor Trustee (the "Trustee") for and on behalf of the Extended Stay Litigation Trust (the "Trust"), and the Trust, by the undersigned counsel, hereby file this Amended Complaint and allege as follows:

## NATURE OF ACTION

1.      This is an action to recover illegal and otherwise improper dividends and distributions to equity and other wrongful transfers totaling more than $139 million made by the direct or indirect owners of the Extended Stay hotel chain, as well as damages associated with such payments, at a time when the company was insolvent or was rendered insolvent by these payments.

2.      These dividends and distributions were made following a "leveraged buyout transaction" of Debtor Extended Stay, Inc. ("ESI") on June 11, 2007 (the "LBO"). The net economic effect of the LBO was that the sellers effectively siphoned $2 billion of value out of

2

the Debtors (as defined below), leaving ESI and its affiliated companies in precarious financial condition and in desperate need of cash.

3.    Despite their knowledge of ESI's financial difficulties, the entities and individuals that owned, controlled, dominated, or otherwise managed all aspects of the Debtors' post-LBO businesses, all of whom are Defendants in this action, used that ownership, control, and management authority to improperly withdraw cash and assets from the financially distressed Debtors to benefit equity holders and their affiliates.    The other Defendants in this action authorized, aided, or abetted those actions or decisions.    The insider Defendants facilitated this control by disregarding the corporate forms for the numerous Debtor entities (including only one corporate board making key decisions for all the Debtor entities), which the insider Defendants owned and operated at all pertinent times as a single business.

4.    Through this control, insider Defendants diverted valuable assets (financial instruments known as the "Libor Floor Certificates") to their control and benefit without providing any compensation to the Debtors in return.    By the time the Libor Floor Certificates finally were extinguished, they had generated more than $74 million in value for the insider Defendants that belonged to the cash-starved Debtors.    Defendants similarly arranged for more than $62 million in dividends and distributions to be paid to equity holders despite the Debtors' insolvency.

5.    These actions were facilitated by a cash management system that was devised to provide a certain return to the equity holders, while placing some creditors at great risk.    By design, and with the approval of Defendants, this cash management system provided a route for payments to be made to equity holders directly, appearing to circumvent the normal process for corporate directors to determine in advance, before the payments were made, whether the

3

company had the financial wherewithal to make such distributions to equity.  Eventually, the payments were brought to a vote after the fact, and the directors (Defendants in this action) approved the payments retroactively.  The directors finally ordered a halt to the payments only a half year before the Debtors petitioned for bankruptcy protection.

6.      As this cash management system was devised to benefit insiders and other equity holders to the detriment of creditors, depleting corporate reserves at a time when cash was desperately needed, use of it to make the payments was a fraudulent ruse to hinder, delay, or defraud creditors.  Further, at the time of the transfers, the Debtors were in grave economic condition.  Despite this crisis, the payments and transfers were not made for reasonably equivalent value and thus were constructively fraudulent.  Ultimately, the Debtors' insolvency left the Debtors' creditors with approximately $3.5 billion in claims against the Debtors that remain unpaid.

7.      This action seeks to redress the harm caused by Defendants through a judgment imposing liability and awarding damages for these breaches of fiduciary duty and fraudulent acts, restitution for unjust enrichment, and recovery of the value that was looted from the Debtors through the diversion of the Libor Floor Certificates and from the other illegal dividends and distributions that Defendants caused the Debtors to issue.

**THE PARTIES**

**A.      The Trust, Trustee and the Debtors.**

**1.      The Trust.**

8.      The Trust is a post-confirmation litigation trust established by the Extended Stay Litigation Trust Agreement, dated as of October 8, 2010 (the "Litigation Trust Agreement") in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-13764

(JMP) (the "Bankruptcy Court"). The Litigation Trust Agreement was executed as part of the Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of June 8, 2010 and confirmed on or about July 20, 2010 (the "Plan") in the chapter 11 bankruptcy case of *In re Extended Stay, Inc., et al.* (the "Chapter 11 Cases").

9. The Trust was established for the benefit of the creditors of the Debtors (collectively, the "Litigation Trust Beneficiaries"). Pursuant to the Plan and the Bankruptcy Court Order approving the Plan, the Trust has title to all assets described in Section 1.89 of the Plan as well as all assets transferred to the Trust pursuant to the "ESI Settlement Agreement," incorporated into the Plan. These assets include, but are not limited to, any potential claims, causes of action, charges, suits, or rights of recovery of the Debtors referenced in the Examiner's Report of Ralph R. Mabey, Examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010. In the Examiner's Report, the Examiner set forth the facts leading up to the Chapter 11 Cases, and claims and causes of action that could be asserted against various parties arising therefrom, including the claims and causes of action asserted against the Defendants herein.

## 2. The Trustee.

10. Finbarr O'Connor was duly appointed as the Successor Litigation Trustee of the Trust in accordance with and pursuant to the Amendment to the Litigation Trust Agreement, dated as of September 12, 2012. The Trustee and the Trust are authorized to commence all claims and causes of action formerly owned by the Debtors, which have now been indefeasibly vested in the Trust, including all causes of action asserted herein. The Trustee and the Trust exercise all pertinent rights of the Debtors that may be relevant to this Complaint.

11. The Trustee's principal place of business is located at 104 West 40th Street, 16th

Floor, New York, NY 10018.  The Trustee was appointed as Successor Trustee of the Trust in

New York County, effective as of September 12, 2012.

### 3. Debtors.

12.    For purposes of this Complaint, the following entities are the "Debtors": ESA

2005 Operating Lessee Inc.; ESA 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA

2005-Waltham L.L.C.; ESA 2007 Operating Lessee Inc.; ESA Acquisition Properties L.L.C.;

ESA Alaska L.L.C.; ESA Business Trust; ESA Canada Beneficiary Inc.; ESA Canada

Operating Lessee Inc.; ESA Canada Properties Borrower L.L.C.; ESA Canada Properties Trust;

ESA Canada Trustee Inc.; ESA FL Properties L.L.C.; ESA Management L.L.C.; ESA MD

Beneficiary L.L.C.; ESA MD Borrower L.L.C.; ESA MD Properties Business Trust; ESA Mezz

10 L.L.C.; ESA Mezz 2 L.L.C.; ESA Mezz 3 L.L.C.; ESA Mezz 4 L.L.C.; ESA Mezz 5 L.L.C.;

ESA Mezz 6 L.L.C.; ESA Mezz 7 L.L.C.; ESA Mezz 8 L.L.C.; ESA Mezz 9 L.L.C.; ESA Mezz

L.L.C.; ESA MN Properties L.L.C.; ESA Operating Lessee Inc.; ESA P Mezz 10 L.L.C.; ESA P

Mezz 2 L.L.C.; ESA P Mezz 3 L.L.C.; ESA P Mezz 4 L.L.C.; ESA P Mezz 5 L.L.C.; ESA P

Mezz 6 L.L.C.; ESA P Mezz 7 L.L.C.; ESA P Mezz 8 L.L.C.; ESA P Mezz 9 L.L.C.; ESA P

Mezz L.L.C.; ESA P Portfolio Holdings L.L.C.; ESA P Portfolio L.L.C.; ESA P Portfolio MD

Beneficiary L.L.C.; ESA P Portfolio MD Borrower L.L.C.; ESA P Portfolio MD Trust; ESA P

Portfolio Operating Lessee Inc.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC

GP L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties

L.L.C.; ESA TX Properties L.P.; ESA TXGP L.L.C.; ESA UD Properties L.L.C.;

ESH/Homestead Mezz 10 L.L.C.; ESH/Homestead Mezz 2 L.L.C.; ESH/Homestead Mezz 3

L.L.C.; ESH/Homestead Mezz 4 L.L.C.; ESH/Homestead Mezz 5 L.L.C.; ESH/Homestead Mezz

6 L.L.C.; ESH/Homestead Mezz 7 L.L.C.; ESH/Homestead Mezz 8 L.L.C.; ESH/Homestead

Mezz 9 L.L.C.; ESH/Homestead Mezz L.L.C.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX GP L.L.C.; ESH/MSTX Property L.P.; ESH/TN Member Inc.; ESH/TN Properties L.L.C.; ESH/TX Properties L.P.; ESH/TXGP L.L.C.; Extended Stay Hotels L.L.C.; Extended Stay, Inc.; and Homestead Village L.L.C.

13.     Despite this surfeit of Debtors resulting from a labyrinthine corporate structure, the Debtors were owned and operated at all pertinent times as a single business.  Although many of the lower level Debtor entities had "independent" board members, only one board of directors (the "Company Board") met to make corporate decisions for the Debtors.  None of the lower corporate level independent board members attended those meetings, and the Company Board had no independent directors.  The Company Board's corporate minutes consistently refer to a single entity, which they denote as the "Extended Stay Hotels family of companies" or "the Company."

14.     As discussed in detail below, the insiders who owned and managed the Debtor companies consistently and regularly disregarded their corporate forms, such that the Debtors may and should be treated as a single corporate entity.

15.     The Debtors commenced their respective Chapter 11 Cases on June 15, 2009 and thereafter.  Their Chapter 11 Cases are administratively consolidated.

16.     Debtor ESI is a Delaware corporation.  At all pertinent times, ESI was managed by a board of directors that was comprised exclusively by insiders, all of whom were affiliated with direct or indirect equity holders of ESI.  ESI had no outside directors at any time material to this Complaint.

17.     At all pertinent times, ESI directly or indirectly owned a majority of the other Debtors, both before and after the LBO, including, without limitation, all or substantially all of

the real estate investment trust ("REIT") portion of the Debtors' businesses.

18.    Debtor Homestead Village, L.L.C. ("Homestead") is a Delaware limited liability company.  At all pertinent times before and after the LBO, Homestead directly or indirectly owned those Debtors who did not fall within the ESI corporate chain and was managed by a board of directors that was comprised exclusively by insiders (it had no independent board members).

19.    At all times relevant to this Complaint, Homestead was managed by a corporate-style board of directors consisting of insiders – with no outside directors – affiliated with direct or indirect equity holders of Homestead.  Those insiders were empowered to, and did, carry out all aspects of Homestead's business.

20.    Through a series of entities, the ultimate direct and indirect owner of the controlling interest in both ESI and Homestead prior to the LBO was the Blackstone Group ("Blackstone"), a publicly traded limited partnership organized under the laws of the State of Delaware.  Blackstone was the indirect owner of two entities, BHAC IV, L.L.C. ("BHAC IV") and BRE/HV Holdings L.L.C. ("BRE/HV Holdings"), the nominal sellers of ESI in the LBO (collectively, the "Sellers").  After the LBO, ESI and Homestead were directly or indirectly owned by the "Lightstone Group Defendants" (defined below), the "Arbor Group Defendants" (defined below), and Polar Extended Stay (USA) L.P.

21.    The ESI certificate of incorporation establishes that, pursuant to § 102(b)(7) of the Delaware General Corporation Law ("DGCL"), its directors may be liable in damages (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of the DGCL (providing liability for the unlawful payment of dividends);

or (iv) for any transaction from which the director derived an improper personal benefit. ESI's officers have no exculpated fiduciary duties under the certificate of incorporation and thus may be liable to the full extent permitted under the DGCL and the common law.

22.     Homestead's post-LBO LLC operating agreement requires its board of directors to act in good faith for so long as Homestead beneficially or constructively owned capital stock of ESI and so long as ESI was a REIT. It imposed Homestead's duties of good faith and fair dealing on Homestead's directors and officers and also imposed corporate law fiduciary duties upon Homestead's directors and officers to the extent that their acts or omissions rose to the level of fraud, gross negligence, or willful misconduct.

23.     Most of the direct or indirect subsidiaries of ESI and Homestead were limited liability companies. On information and belief, with the exception of ESA Management L.L.C. and ESA P Portfolio Holdings L.L.C., the LLC operating agreements of those companies imposed fiduciary duties of loyalty and care on directors and officers similar to those of directors and officers of business corporations organized under the DGCL.

### B.    Lightstone Group Defendants.

#### 1.    Lightstone Entities.

24.     The "Lightstone Entities" consist of Defendants DL-DW Holdings, L.L.C.; BHAC Capital IV, L.L.C.; Lightstone Holdings, L.L.C.; Lightstone Group, L.L.C.; Lightstone Commercial Management; Park Avenue Funding L.L.C.; and PGRT ESH Inc.

#### a.    DL-DW Holdings, L.L.C.

25.     Defendant DL-DW Holdings, L.L.C. ("DL-DW") was the nominal buyer of the stock in ESI's LBO through its acquisition of the stock of Homestead and its acquisition of indirect ownership of the stock of ESI from the Sellers, BHAC IV and BRE/HV Holdings. DL-

DW is a limited liability company organized under Delaware law with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022. It was formed to carry out the LBO and, at all pertinent times, was owned or controlled by Defendant David Lichtenstein. Following the closing of ESI's LBO, DL-DW was the sole direct member of Homestead and thus, along with the Arbor Group Defendants, owned and had control over BHAC Capital IV, L.L.C., the majority shareholder of ESI, and thus controlled ESI through its indirect ownership interest.

### b.    BHAC Capital IV, L.L.C.

26.    After the LBO, Defendant BHAC Capital IV, L.L.C. ("BHAC Capital IV") was the majority shareholder of ESI and, at all pertinent times, held no less than approximately 99% of the equity of ESI. BHAC Capital IV is a limited liability company organized under Delaware law with its principal place of business at 326 Third Street, Lakewood, New Jersey 08701.

### c.    Lightstone Holdings, L.L.C.

27.    Defendant Lightstone Holdings, L.L.C. ("Lightstone Holdings") was a member of DL-DW and, through this ownership interest, shared control with the Arbor Group Defendants over BHAC Capital IV, and thus over ESI, and Homestead, following the LBO and at all pertinent times thereafter. It is a limited liability company organized under Delaware law with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022. At all pertinent times, Lightstone Holdings was indirectly controlled by Defendant David Lichtenstein and his affiliates.

### d.    The Lightstone Group, L.L.C.

28.    The Lightstone Group, L.L.C. ("Lightstone Group") was a corporate parent or grandparent of DL-DW and, through this ownership interest, had control over BHAC Capital IV,

10

ESI, and Homestead after the LBO.  Lightstone Group is a limited liability company organized under New Jersey law with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  At all pertinent times, Lightstone Group was controlled by Defendant David Lichtenstein and his affiliates.

### e.    Lightstone Commercial Management.

29.    Defendant Lightstone Commercial Management ("Lightstone Commercial"), an affiliate of Lightstone Group and Lightstone Holdings, is a limited liability company organized under New Jersey law with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York 10022.  Lightstone Commercial was, at all pertinent times, controlled by Defendant David Lichtenstein and his affiliates.  In 2009, it received certain proceeds of the LIBOR Floor Certificates as assignee and successor to the rights of Defendant Park Avenue Funding L.L.C. regarding those certificates.

### f.    Park Avenue Funding L.L.C.

30.    Defendant Park Avenue Funding L.L.C. ("Park Avenue") is an affiliate and insider of DL-DW.  It is a limited liability company organized under New York law with its principal place of business at 460 Park Avenue, New York, New York 10022.  At all pertinent times, Park Avenue was controlled by Defendant David Lichtenstein and his affiliates.  As a lender on the 25% Note (defined below), Park Avenue received certain proceeds of the LIBOR Floor Certificates until the transfer of its pertinent interests to Lightstone Commercial.

### g.    PGRT ESH Inc.

31.    Defendant PGRT ESH Inc. ("PGRT") is a limited liability company organized under Delaware law with its principal place of business at 330 W. Wabash Ave # 2800, Chicago,

11

Illinois 60611. Upon information and belief, PGRT was owned or controlled, directly or indirectly, by Lichtenstein at all pertinent times.

32.     PGRT was a member of BHAC Capital IV and through that interest exercised control over BHAC Capital IV and ESI after the LBO closed. Through this control, and due to the Defendants' failure to observe the corporate boundaries of the various Debtor entities, PGRT also exercised indirect control over the other Debtor entities.

### 2.     Lightstone Individuals.

33.     The "Lightstone Individuals" consist of Defendants David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., and Joseph Teichman.

### a.     David Lichtenstein.

34.     Defendant David Lichtenstein was the Chairman and Chief Executive Officer of all or substantially all of the Lightstone Entities. He is a resident of the State of New Jersey and, on information and belief, resides at 20 Autumn Road, Lakewood, New Jersey 08701-1619.

35.     At all pertinent times after the LBO, Lichtenstein held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" (as identified in the minutes of consolidated Meetings of the Board of Directors of the "Extended Stay Hotels family of companies"), which, as identified in those minutes, included DL-DW, BHAC Capital IV, Homestead, ESI, and each of their direct and indirect subsidiaries. All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the board of directors of the "Extended Stay Hotels family of companies."

36.     As Chairman, CEO, and President of the entities within the "Extended Stay Hotels family of companies," Lichtenstein had general supervisory authority over the daily business operations and affairs of those companies and was empowered to give counsel and

12

advice to the board of directors on all subjects concerning the welfare of those companies and the conduct of their business.

37.    Lichtenstein was also a director, Chairman of the board of directors, CEO, and President of some sixty-five Debtor entities and affiliates listed above.  He was an insider director and President of all mortgage borrower Debtors, mezzanine borrower Debtors, and operating lessee Debtors at all relevant times following the closing of the LBO.

38.    Lichtenstein regularly attended and, in most cases, chaired all meetings of the "Extended Stay Hotels family of companies" board of directors as a director, the Chairman, President, and CEO of those companies, including, without limitation, board meetings that were held on the following dates: November 15, 2007; February 14, 2008; May 15, 2008; August 14, 2008; November 13, 2008; December 11, 2008; December 16, 2008; December 23, 2008; January 6, 2009; January 15, 2009; January 27, 2009; January 29, 2009; February 10, 2009; February 25, 2009; March 3, 2009; March 11, 2009; March 17, 2009; April 21, 2009; April 28, 2009; May 14, 2009; May 20, 2009; June 12, 2009; and June 14, 2009.

39.    All of the in-person board meetings identified in the preceding paragraph were conducted in New York City.  Some meetings were conducted via telephone.  At these board meetings, Lichtenstein voted as a director regarding all material decisions made by the board concerning DL-DW, BHAC Capital IV, Homestead, ESI, and other Debtors.

40.    Lichtenstein led the group of individuals who managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies."  As a result of his position, and as an attendee at pertinent board meetings of the "Extended Stay Hotels family of companies" from 2007 through 2009, Lichtenstein regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems,

and other material business issues relating to the Debtors.  Thus, Lichtenstein was aware of the Debtors' financial and other difficulties at all pertinent times.  Lichtenstein also approved, caused, or allowed the Debtors to pay and make improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders, including affiliates of ESI and Homestead that were owned or controlled by Lichtenstein.  As a high-ranking member of senior management, Lichtenstein knew or should have known of all relevant material facts and events alleged herein.

### b.    Bruno de Vinck.

41.    Defendant Bruno de Vinck was, at all pertinent times, Senior Vice President for Special Projects of one or more of the Lightstone Entities identified herein and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies."  He is a resident of the State of New Jersey and may be served at 128 S. Central Avenue, Ramsey, New Jersey 07446-2408.

42.    De Vinck regularly attended meetings of the "Extended Stay Hotels family of companies" board of directors as a director, including, without limitation, meetings on November 15, 2007; February 14, 2008; May 15, 2008; August 14, 2008; November 13, 2008; December 11, 2008; December 16, 2008; December 23, 2008; January 6, 2009; January 15, 2009; January 27, 2009; January 29, 2009; February 10, 2009; February 25, 2009; March 3, 2009; March 11, 2009; March 17, 2009; March 31, 2009; April 21, 2009; April 28, 2009; May 5, 2009; May 14, 2009; May 20, 2009; June 12, 2009; and June 14, 2009 (by proxy given to Joseph Teichman).

43.     De Vinck sometimes also acted as the secretary for those meetings, recorded the minutes of such meetings, and voted as a director regarding all material decisions made by the board for DL-DW, BHAC Capital IV, Homestead, ESI, and other Debtors.

44.     De Vinck was a member of the group of individuals who managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies."  As a result of his position, and as an attendee at and secretary of pertinent board meetings of the "Extended Stay Hotels family of companies" from 2007 through 2009, De Vinck regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, de Vinck was aware of the Debtors' financial and other difficulties at all pertinent times.  De Vinck also approved, caused, or allowed the Debtors to pay and make improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders, including affiliates of ESI and Homestead.  As a high-ranking member of senior management, de Vinck knew or should have known of all relevant material facts and events alleged herein.

### c.     Peyton "Chip" Owen, Jr.

45.     Defendant Peyton "Chip" Owen, Jr. was, at all pertinent times, President and Chief Operating Officer of one or more of the Lightstone Entities.  He is a resident of the State of Illinois and, on information and belief, resides at 1150 W. Keswick Lane, Lake Forest, Illinois 60045-1132.

46.     Since November 15, 2007, Owen held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies."  Owen regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, meetings on November 15, 2007; February 14, 2008; May 15,

2008; August 14, 2008; November 13, 2008; December 11, 2008; December 16, 2008; December 23, 2008; January 6, 2009; January 15, 2009; January 27, 2009; January 29, 2009; February 10, 2009; February 25, 2009; March 3, 2009; March 11, 2009; March 17, 2009; March 31, 2009; April 21, 2009; April 28, 2009; May 5, 2009; May 14, 2009; May 20, 2009; June 12, 2009; and June 14, 2009.  At those meetings, Owen voted as a director regarding all material decisions made by the board for DL-DW, BHAC Capital IV, Homestead, ESI, and other Debtors.

47.    Owen was a member of the group of individuals who managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies."  As a result of his position, and as an attendee at pertinent board meetings of the "Extended Stay Hotels family of companies" from 2007 through 2009, Owen regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Owen was aware of the Debtors' financial and other difficulties at all pertinent times.  Owen also approved, caused, or allowed the Debtors to pay and make improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders, including affiliates of ESI and Homestead.  As a high-ranking member of senior management, Owen knew or should have known of all relevant material facts and events alleged herein.

### d.    Joseph Teichman.

48.    Defendant Joseph Teichman held, from and after no later than May 15, 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies."  Teichman also was the secretary and General Counsel of sixty-five of the Debtor entities, including Homestead and ESI.  He was an insider director of numerous mortgage

borrower Debtors, mezzanine borrower Debtors, and operating lessee Debtors, and he served as the Senior Corporate Counsel for DL-DW at all pertinent times after the LBO.

49.    Teichman regularly attended meetings of the "Extended Stay Hotels family of companies" board of directors as either a director or high-ranking senior officer of those companies, including meetings on November 15, 2007; February 14, 2008; May 15, 2008; August 14, 2008; November 13, 2008; December 16, 2008; December 23, 2008; January 6, 2009; January 15, 2009; January 27, 2009; January 29, 2009; February 25, 2009; March 17, 2009; April 21, 2009; May 20, 2009; June 12, 2009; and June 14, 2009.  At the May 15, 2008 meeting and thereafter, Teichman voted as a director regarding material decisions made by the board for DL-DW, BHAC Capital IV, Homestead, ESI, and other Debtors.  At board meetings prior to May 15, 2008, Teichman made recommendations to the board regarding facts and events material to this action.

50.    Teichman was a member of the group of individuals who managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies."  As a result of his position, and as an attendee at pertinent board meetings of the "Extended Stay Hotels family of companies" from 2007 through 2009, Teichman regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Teichman was aware of the Debtors' financial and other difficulties at all pertinent times.  Teichman also approved, caused, or allowed the Debtors to pay and make improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders, including Lightstone entities that he served as an officer.  As a high-ranking member of senior management, Teichman knew or should have known of all relevant material facts and events alleged herein.

17

### C.    Arbor Group Defendants.

#### 1.    Arbor Entities.

51.    The "Arbor Entities" consist of Defendants Arbor ESH II L.L.C.; Arbor Commercial Mortgage, L.L.C.; Princeton ESH L.L.C.; Atmar Associates, L.L.C.; Glida One LLC; Ron Invest LLC; ABT-ESI L.L.C.; and Mericash Funding, LLC.

#### a.    Arbor ESH II L.L.C.

52.    Defendant Arbor ESH II L.L.C. ("Arbor ESH") was a member of BHAC Capital IV and through that interest exercised control over BHAC Capital IV and ESI after the LBO closed.  Through this control, and due to the Defendants' failure to observe the corporate boundaries of the various Debtor entities, Arbor ESH also exercised indirect control over the other Debtor entities.  Arbor ESH is a limited liability company organized under Delaware law with its principal place of business at 333 Earle Ovington Boulevard, Uniondale, New York 11553.

53.    Upon information and belief, Arbor ESH was an affiliate of Ivan Kaufman.  It was treated as a member of the so-called "Arbor Group," which included various Arbor entities owned or controlled by Kaufman.  Other Defendant individuals and entities included in the Arbor Group were Joseph Chetrit, Joseph Martello, Guy Malone and the other Arbor Entities.

54.    Upon information and belief, Arbor ESH was a direct or indirect wholly-owned subsidiary of Arbor Realty Limited Partnership, which was itself a wholly-owned operating subsidiary of Arbor Realty Trust, Inc., a publicly traded REIT with managed assets well in excess of $1.5 billion.

55.    Arbor ESH was an affiliate of Defendant Arbor Commercial Mortgage, L.L.C. Due to Arbor ESH's membership in BHAC Capital IV, Arbor ESH and its affiliates had the right

to appoint one or more Arbor designees to the consolidated board of directors for the "Extended Stay Hotels family of companies."

### b.      Arbor Commercial Mortgage, L.L.C.

56.      Defendant Arbor Commercial Mortgage, L.L.C. ("Arbor Commercial") was the manager and advisor for Arbor Realty Trust, Inc. and performed loan originating, underwriting, and other related services on behalf of Arbor Realty Limited Partnership.  Arbor Commercial is a limited liability company organized under Delaware law with its principal place of business at 333 Earle Ovington Blvd., Suite 900, Uniondale, New York 11553.

57.      Arbor Commercial was an affiliate of Arbor ESH.

58.      Upon information and belief, Kaufman served as the Chairman and CEO of Arbor Commercial and Arbor Realty Trust, Inc., and he owned, either individually or indirectly through various entities he wholly owns, no less than approximately 90% of Arbor Commercial. Kaufman attended and participated in the "Extended Stay Hotels family of companies" board of directors meetings held on November 13, 2008 and January 29, 2009, and also attended and participated in certain executive sessions of board of directors meetings.  Upon information and belief, Kaufman's attendance at those meetings was to ensure that improper equity distributions would continue to be made from the Debtors, either directly or through other entities, to the Arbor entities Kaufman owned or controlled.

59.      Kaufman and Arbor ESH and its affiliates were heavily involved in planning and negotiating the LBO.

### c.      Princeton ESH L.L.C.

60.      Defendant Princeton ESH L.L.C. ("Princeton") was a member of DL-DW and through that interest exercised control over BHAC Capital IV and ESI after the LBO closed.

Through this control, and due to the Defendants' failure to observe the corporate boundaries of the various Debtor entities, Princeton also exercised indirect control over the other Debtor entities.  Princeton is a limited liability company organized under Delaware law with its principal place of business at 375 Park Avenue, Suite 3401, New York, New York 10152.

61.     Princeton was treated as a member of the "Arbor Group."

### d.     Atmar Associates, L.L.C.

62.     Defendant Atmar Associates, L.L.C. ("Atmar") was a member of DL-DW and through that interest exercised control over BHAC Capital IV and ESI after the LBO closed. Through this control, and due to the Defendants' failure to observe the corporate boundaries of the various Debtor entities, Atmar also exercised indirect control over the other Debtor entities. Atmar is a limited liability company organized under Delaware law with its principal place of business at 404 Fifth Avenue, 4th Floor, New York, New York 10018.

63.     Atmar was treated as a member of the "Arbor Group."  Upon information and belief, Atmar is indirectly owned or controlled by Joseph Chetrit or members of his family.

### e.     Glida One LLC.

64.     Defendant Glida One LLC ("Glida") was a member of BHAC Capital IV and through that interest exercised control over BHAC Capital IV and ESI after the LBO closed. Through this control, and due to the Defendants' failure to observe the corporate boundaries of the various Debtor entities, Glida also exercised indirect control over the other Debtor entities. Glida is a limited liability company organized under Delaware law with its principal place of business at 404 Fifth Avenue, 4th Floor, New York, New York 10018.

65.    Glida One was treated as a member of the so-called "Arbor Group."  At all pertinent times, Glida One was owned or controlled, directly or indirectly, by Joseph Chetrit or members of his family.

### f.    Ron Invest LLC.

66.    Defendant Ron Invest LLC ("Ron Invest") was a member of BHAC Capital IV and through that interest exercised control over BHAC Capital IV and ESI after the LBO closed. Through this control, and due to the Defendants' failure to observe the corporate boundaries of the various Debtor entities, Ron Invest also exercised indirect control over the other Debtor entities.  Ron Invest is a limited liability company organized under Delaware law with its principal place of business at 404 Fifth Avenue, 4th Floor, New York, New York 10018.

67.    Ron Invest was treated as a member of the "Arbor Group."  Upon information and belief, Ron Invest is indirectly owned or controlled by Joseph Chetrit or members of his family.

### g.    ABT-ESI L.L.C.

68.    Defendant ABT-ESI L.L.C. ("ABT-ESI") is an affiliate and insider of Arbor ESH and Arbor Commercial.  ABT-ESI is a limited liability company organized under Delaware law with its principal place of business at c/o Arbor Commercial Mortgage LLC, 333 Earle Ovington Boulevard, Uniondale, New York 11553.

69.    ABT-ESI served at all pertinent times as Lead Lender/Servicer of a note referenced in this Amended Complaint as the "25% Note."  As Lead Lender/Servicer of the 25% Note, ABT-ESI received subsequent transfers based on the LIBOR Floor Certificates and their proceeds.

### h.    Mericash Funding, LLC.

70.    Defendant Mericash Funding, LLC ("Mericash") is an affiliate of Arbor. Mericash is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, 4th Floor, New York, New York 10018.

71.    Mericash was a lender on the 25% Note.  In that capacity, Mericash received subsequent transfers based on the LIBOR Floor Certificates and their proceeds.

### 2.    Arbor Individuals.

72.    The "Arbor Individuals" consist of Defendants Joseph Martello, Guy R. Milone, Jr., and Joseph Chetrit.

### a.    Joseph Martello.

73.    Defendant Joseph Martello is a resident of the State of New York and may be served at 430 East 58th Street, New York, New York 10022-2330.

74.    From June 11, 2007 until, upon information and belief, approximately May of 2008, Martello held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies."  Martello was a designee of Arbor ESH or one or more of its affiliates to the board of directors of the "Extended Stay Hotels family of companies" and was an affiliate or insider of one or more Arbor Entities and affiliates.

75.    Martello resigned from the board of directors for the "Extended Stay Hotels family of companies" on or around May 15, 2008, after which time Guy R. Milone, Jr. occupied one of the "Arbor seats" on that board.

76.    During his tenure as a director of the "Extended Stay Hotels family of companies," Martello attended board meetings on November 15, 2007 and February 14, 2008,

and, possibly, on other dates.  At those meetings, Martello voted as a director on decisions made

by the board for DL-DW, BHAC Capital IV, Homestead, ESI, and other Debtors.

77.    During his tenure as director, Martello was a member of the group of individuals

who managed or controlled all aspects of the post-LBO operations and activities of the

"Extended Stay Hotels family of companies."  As a result of his position, and as an attendee at

pertinent board meetings of the "Extended Stay Hotels family of companies" in 2007 and 2008,

Martello regularly received detailed reports regarding the Debtors' financial and operational

performance, their extensive problems, and other material business issues relating to the Debtors.

Thus, Martello was aware of the Debtors' financial and other difficulties at all pertinent times

during his tenure as a director.  Martello also approved, caused, or allowed the Debtors to pay

and make improper post-LBO dividends and distributions to, and to engage in other improper

transactions with, insiders as described herein, including with Arbor related entities with which

he was affiliated at the time.  As a director, Martello knew or should have known of all relevant

material facts and events alleged herein that occurred prior to around May of 2008.

### b.    Guy R. Milone, Jr.

78.    Defendant Guy R. Milone, Jr. is a resident of the State of New York and may be

served at 29 Tremont Street, Garden City, New York 11530-6413.

79.    On May 15, 2008, Milone replaced Martello as a member of the board of directors

of the "Extended Stay Hotels family of companies."  He was appointed to his director position as

a designee of Arbor ESH.  From that date, Milone held interlocking director positions with

numerous entities in the "Extended Stay Hotels family of companies."

23

80.    Upon information and belief, at all relevant times to this Amended Complaint, Milone also served as General Counsel for Arbor Realty Trust, Inc., an indirect owner of equity in the Company.

81.    During his tenure as director of the "Extended Stay Hotels family of companies" board of directors, Milone attended board meetings on May 15, 2008; August 14, 2008; November 13, 2008; December 11, 2008; December 16, 2008; December 23, 2008; January 6, 2009; January 15, 2009; January 27, 2009; January 29, 2009; February 10, 2009; February 25, 2009; March 3, 2009; March 11, 2009; April 21, 2009; April 28, 2009; March 5, 2009; May 14, 2009; May 20, 2009; June 12, 2009; and June 14, 2009.  At those meetings, Milone voted as a director on decisions made by the board for DL-DW, BHAC Capital IV, Homestead, ESI, and other Debtors.

82.    During his tenure as director, Milone was a member of the group of individuals who managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies."  As a result of his position, and as an attendee at pertinent board meetings of the "Extended Stay Hotels family of companies" in 2008 and 2009, Milone regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors. Thus, Milone was aware of the Debtors' financial and other difficulties at all pertinent times during his tenure as a director.  Milone also approved, caused or allowed the Debtors to pay and make improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein, including with Arbor-related entities with which he was affiliated at the time.  As a director, Milone knew or should have known of all relevant material facts and events alleged herein that had occurred as of May 2008 and thereafter.

24

c.    **Joseph Chetrit.**

83.    Defendant Joseph Chetrit is a resident of the State of New York and may be served at 55 East 74th Street, New York, New York 10021-2734.

84.    Upon information and belief, Chetrit was a direct or indirect owner or member of senior management of Atmar, Glida One, Ron Invest, and affiliates of those entities.  Chetrit held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies."  He attended board meetings of the "Extended Stay Hotels family of companies" as a director and, in some cases, as an "invited guest" (even though he was a director) on November 13, 2008 (as an "invited guest"); December 11, 2008; December 16, 2008; December 23, 2008; January 6, 2009; January 15, 2009; January 27, 2009; January 29, 2009 (as an "invited guest"); February 25, 2009; March 11, 2009; March 17, 2009 (by proxy given to Teichman); April 21, 2009; April 28, 2009; May 20, 2009; June 12, 2009; and June 14, 2009.  At those meetings, Chetrit voted as a director regarding decisions made by the board for DL-DW, BHAC Capital IV, Homestead, ESI, and other Debtors.

85.    Chetrit was a member of the group of individuals who managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies."  As a result of that position, as an attendee at pertinent board meetings of the "Extended Stay Hotels family of companies," or in his capacity as a substantial indirect holder of preferred equity in BHAC Capital IV, Chetrit regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Chetrit was aware of the Debtors' financial and other difficulties at all pertinent times.  Chetrit also approved, caused, or allowed the Debtors to pay and make improper post-LBO dividends and distributions to, and other improper

transactions with, insiders as described herein, including entities owned or controlled by him.  As a director, a high-ranking member of senior management and an insider, Chetrit knew or should have known of all relevant material facts and events alleged herein.

### D.    HVM Defendants.

86.    Prior to the LBO, the Debtors' hotel properties were managed by HVM, L.L.C. ("HVM").  HVM was an affiliate of Blackstone that managed the day-to-day operations of the Extended Stay Hotels family of companies.  HVM was sold along with ESI and Homestead in the LBO to Lichtenstein and other Lightstone Defendants.  After the LBO, the Lightstone Defendants continued to utilize HVM to manage the day-to-day operations of the Debtors' hotel properties.  At all pertinent times, HVM and its Canadian affiliate, HVM Canada, had day-to-day responsibility for operating the Debtors' hotels.

87.    After the LBO, HVM was managed by another entity, HVM Manager, L.L.C. ("HVM Manager"), which was solely owned by David Lichtenstein.  HVM's LLC agreement gives HVM Manager exclusive authority to manage the affairs of HVM, and HVM's members have no right to remove HVM Manager, even for cause.

88.    Several principals of HVM are Defendants in this action: F. Joseph Rogers, Dae Hum Kim (a/k/a David Kim), and Gary DeLapp.

### 1.    F. Joseph Rogers.

89.    Defendant F. Joseph Rogers is a resident of the State of South Carolina and may be served at 405 Carleton Circle, Spartanburg, South Carolina 29301.

90.    Rogers was the Executive Vice President of HVM and owned a 10-15% stake in it.

91.    Rogers also was a high-ranking member of senior management of the "Extended Stay Hotels family of companies," serving as the Executive Vice President of Finance. He also served as the Assistant Secretary or Vice President of fifty-five of the Debtors and was a high-ranking officer of all or substantially all of the mortgage borrower Debtors and the mezzanine borrower Debtors.

92.    Rogers attended board of directors meetings for the "Extended Stay Hotels family of companies" as an "invited guest" on November 15, 2007; February 14, 2008; May 15, 2008; August 14, 2008; and November 13, 2008. At one or more of those meetings, Rogers received detailed reports regarding the Debtors' financial and operational performance, their extensive problems; and other material business issues relating to the Debtors. Thus, Rogers was aware of the Debtors' financial and other difficulties at all relevant times. Rogers likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, and other improper transactions with insiders, as described herein. As a high-ranking member of senior management, and through his position at HVM (which operated the Debtors), Rogers knew or should have known of all relevant material facts and events alleged herein.

### 2.    Dae Hum Kim.

93.    Defendant Dae Hum Kim (a/k/a David Kim) was an employee of HVM and also was a high-ranking member of senior management of the "Extended Stay Hotels family of companies," serving at all pertinent times as the Executive Vice President and Chief Investment Officer since approximately August 2007.

94.    Kim attended board of directors meetings for the "Extended Stay Hotels family of companies" as an "invited guest" on November 15, 2007; February 14, 2008; May 15, 2008;

August 14, 2008; and November 13, 2008.  At one or more of those meetings, Kim delivered detailed reports of management to the board regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Kim was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a high-ranking member of senior management.  Kim likewise was aware of, but did nothing to attempt to stop, the improper post-LBO dividends and distributions to insiders, and the other improper transactions with insiders, as described herein.  As a high-ranking member of senior management, Kim knew or should have known of all relevant material facts and events alleged herein.

### 3.    Gary DeLapp.

95.    Defendant Gary DeLapp is a resident of the State of South Carolina and may be served at 409 Sweetbay Terrace, Spartanburg, South Carolina 29306-6682.

96.    DeLapp was the President and CEO of HVM and owned a 60% stake in HVM. Prior to the LBO, DeLapp was the President and CEO of ESI, and after the LBO, he served as the President of the "Extended Stay Hotels family of companies."  DeLapp also held officer-level positions with several other post-LBO Debtor entities and affiliates.

97.    DeLapp attended board of directors meetings for the "Extended Stay Hotels family of companies" on November 15, 2007; February 14, 2008; May 15, 2008; August 14, 2008; and November 13, 2008.  At one or more of those meetings, DeLapp received detailed reports regarding the Debtors' financial and operational performance, their extensive problems and other material business issues relating to the Debtors.  Thus, DeLapp was aware of the Debtors' financial and other difficulties at all relevant times.  DeLapp likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to

insiders, as described herein.  As a high-ranking member of senior management, DeLapp knew or should have known of all relevant, material facts and events alleged herein.

### E.    Other Entity Defendant - Polar Extended Stay (USA) L.P.

98.    Defendant Polar Extended Stay (USA) L.P. ("Polar Extended Stay") is a limited partnership company organized under Delaware law with its principal place of business at 21 Haarbaah St., Tel Aviv, Israel 64739.    Polar Extended Stay's general partner is Polar International Trading Ltd.

99.    Polar Extended Stay was a member of BHAC Capital IV and through that interest exercised control over BHAC Capital IV and ESI after the LBO closed.  Through this control, and due to the Defendants' failure to observe the corporate boundaries of the various Debtor entities, Polar Extended Stay also exercised indirect control over the other Debtor entities.

### F.    Status of Defendants.

100.    Each Defendant is sued individually and in his or its role as an officer, director, member, or other controlling person or entity of one or more of the Debtors.  As described herein, each of the Defendants committed, participated in, approved, adopted, instructed, ratified, or acquiesced in various acts or failures to act.  In the case of the named defendants who are individuals, the misconduct that proximately caused damages to the Debtors took place prior to any individual Defendant's resignation from the high-ranking director, officer, member, or other controlling positions each individual Defendant held.

101.    To the extent that any of the identified conduct occurred while any of the Defendants was acting in his or its capacity as a director, officer, member, or other controlling person of any other corporate entity, including any direct or indirect parent of the Debtors, that

Defendant should be held equally responsible as though he or it was acting in his or its capacity

as a director, officer, member, or other controlling person of one or more of the Debtors.

102.     The individual Defendants, to the extent they may purport to have acted or

omitted to act in their capacities as directors, officers, members, or other controlling persons of

any non-Debtor entity, (i) acted for all practical and functional purposes as directors, officers,

members, or other controlling persons of one or more of the Debtors; (ii) were de facto directors,

officers, members, or other controlling persons of one or more of the Debtors; or (iii) assumed

fiduciary and other duties to one or more of the Debtors and the Debtors' affiliates as a result of

their affirmative acts of controlling, dominating, and otherwise directing one or more of the

Debtors at all pertinent times.

103.     At all pertinent times in which a Defendant assumed or held the high-ranking

officer, director, member, or other controlling positions identified herein, the Defendant was the

co-conspirator, agent, servant, representative, ostensible agent, partner, joint venturer, employee,

trustee, trust, or beneficiary of each of the other Defendants.  In acting or omitting to act, as

described herein, each Defendant was acting within the course and scope of his or its authority as

such co-conspirator, agent, servant, representative, ostensible agent, partner, joint venturer,

employee, trustee, trust, or beneficiary and authorized, consented to, acquiesced in, or ratified

each act and omission of each of the other Defendants.

104.     At all pertinent times, each entity Defendant was the alter ego, joint venturer,

successor-in-interest, parent, or successor of each of the remaining Defendant entities, and as

such was jointly, severally, or otherwise responsible for the acts, omissions, and liability of each

of the remaining Defendants.  Except as may be otherwise expressly alleged herein, (i) each

Defendant is liable for each and every wrong committed by each and every other Defendant; (ii)

30

each Defendant is responsible for the events herein alleged; and (iii) each Defendant's acts and omissions proximately caused the damages suffered by the Debtors.  Each Defendant, as a result of his or its respective acts and omissions, is liable either by agency, joint and several liability, joint liability, several liability, joint enterprise liability, co-conspirator liability, alter ego liability, proportionate liability, or direct liability for the damages suffered by the Debtors.

## JURISDICTION AND VENUE

105.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1334 and principles of pendent and ancillary jurisdiction.  This action constitutes a civil proceeding arising under Title 11 of the United States Code or arising in or related to the Chapter 11 Cases pending before the Bankruptcy Court.    This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).   Venue is proper in this Court and this District under 28 U.S.C. §§ 1391(a)(2), (b)(2) and (c), and § 1409(a) because (a) this is the District in which ESI's jointly administered Chapter 11 Cases are pending, and (b) all or substantially all of the events and omissions giving rise to the plaintiff's claims occurred in this District.

## FACTS PERTAINING TO IMPROPER DIVIDENDS AND DISTRIBUTIONS

**A.    The Company.**

106.    During the years prior to the LBO, the Debtors owned and, through HVM, managed, the leading mid-priced extended-stay hotel business in the U.S., with 684 hotels located in 44 states.  The Debtors were profitable and able to pay their debts (which included secured debt totaling approximately $3.3 billion and mezzanine debt totaling approximately $1.9 billion) in the ordinary course of business.

107.    Blackstone had acquired this business in March 2004, when two Blackstone investment funds purchased Extended Stay America, Inc., a publicly traded corporation, and took it "private."  After this acquisition, Extended Stay America, Inc. and other related entities were merged into various Blackstone entities.

108.    Both prior and subsequent to the LBO, all or substantially all of the Debtors' entities and operations ran through either the Homestead or ESI corporate ownership chain. Prior to the LBO, Homestead and ESI were directly and nominally owned by BRE/HV Holdings and BHAC IV, respectively.  BHAC IV and BRE/HV Holdings, in turn, were directly or indirectly owned and controlled by Blackstone, their ultimate parent.

109.    After the Blackstone acquisition, the Debtors' hotel properties were managed by HVM and HVM Canada.   The hotels were then operated under six different brand names, and Blackstone commenced re-branding the portfolio to change all of the properties to one of three names: Extended Stay Deluxe, Extended Stay America, or Extended Stay Economy.   By the beginning of 2007, around one-third of the portfolio remained to be re-branded at the time.   The cost of finishing the re-branding was expected to be substantial.

110.    Despite having a generally profitable business, by the beginning of 2007, many of the Debtors' hotels were approximately nine years old and were showing signs of significant wear and tear.   As a result, substantial capital expenditures would be needed in the near future. Indeed, in 2005, the Debtors' total capital expenditures as a percentage of revenues were 8.3%, and that figure rose to approximately 10.2% for 2006.   These numbers were substantially higher than what was projected for the Debtors in an information memorandum distributed in 2007 about the potential LBO.   If DL-DW had conducted adequate due diligence it should have uncovered that the information memorandum did not disclose certain negative financial

information and overstated other information, thus underestimating the needed capital expenditures and presenting the Extended Stay Hotels family of companies in much stronger financial health than actually was the case.

111.    While economic trends in the hospitality industry generally had been positive in the years leading up to the LBO, certain of those trends reversed in late 2006 and continued to decline in early 2007.  This led some analysts to project a downturn in the hospitality industry as a whole for the near-term.  In certain key industry performance metrics at the time, the Debtors lagged behind their competitors during 2006.

112.    Thus, the Debtors' financial performance was declining in early 2007 in part due to industry and economic trends that had begun in 2006.  The Debtors were already lagging behind their competitors by that time, and those trends were likely to continue.

### B.    The LBO.

113.    In early 2007, Blackstone made two related decisions.  First, it elected to explore an initial public offering ("IPO") of its equity, going public for the first time.  Second, it explored selling the Debtors and their ESI and Homestead business to another buyer.  The sale of ESI and Homestead, presumably at a significant profit, would help generate interest in the IPO that would occur shortly thereafter.

114.    In February 2007, Blackstone solicited interest for the sale of ESI and Homestead, using the inflated figures of the information memorandum.  The solicitation came with "stapled" financing, *i.e.*, advance commitments by lenders to finance the transaction, which was capped at $6.8 billion.  It drew four expressions of interest by March 1, including a response from David Lichtenstein offering to buy ESI and Homestead for $7.6 billion, even though Lichtenstein had commissioned an independent valuation of ESI and Homestead, which had contradicted the

information and projections in the information memorandum.  Eventually, in April 2007, Lichtenstein made a definitive offer through the Lightstone group of entities, the only definitive offer Blackstone received.  Blackstone accepted the offer six days later.

115.    The total purchase price for the LBO was $8 billion, a conveniently round figure. Lightstone financed the overwhelming majority of the purchase price with debt of $7.4 billion ($600 million above the stapled-financing limit) and put cash of only $400 million into the deal. This cash component was used to pay Blackstone and closing costs. The amount was therefore woefully insufficient to support the artificially inflated purchase price and the future needs of the now highly leveraged companies. Lichtenstein added an additional equity amount of $200 million as "rollover equity" provided to BRE/ESH Holdings, L.L.C. for Blackstone's benefit and to reach the $8 billion total purchase price.  The transaction closed on June 11, 2007, ten days before Blackstone's IPO, which occurred on June 21, 2007.

116.    On or around June 29, 2007, the Debtors' ownership structure was "restructured," as had been contemplated previously by one or more of the Defendants.  Pursuant to that planned "restructuring," DL-DW's direct membership interests in BHAC Capital IV were transferred to Homestead.  In addition, several of the Defendants invested in BHAC Capital IV and therefore received a percentage of BHAC Capital IV's membership interests, resulting in DL-DW's, and, indirectly, Homestead's membership interests in BHAC Capital IV, being reduced.

117.    A chart showing the Debtors' corporate organizational structure following the restructuring described in the preceding paragraph is attached as Exhibit A and incorporated herein by reference.  Upon information and belief, the corporate organizational structure described in Exhibit A hereto existed until the Debtors eventually (and inevitably) filed for bankruptcy protection beginning on June 15, 2009.

34

118.    As part of the LBO, revenue and other cash received for the Debtors' operations were funneled into an integrated cash management account, pursuant to a Cash Management Agreement.  The Cash Management Agreement sought to protect certain lenders and equity owners by imposing a set waterfall payout structure.

119.    The loan agreements entered into by the Debtors to finance the LBO provided for a "Cash Trap Event," whereby, upon the occurrence of one of three possible financial triggers, excess cash from operations (after taxes, reserves, and debt service) was "trapped" as additional collateral for the lenders.  The cash was not available to pay costs of operations outside of the annual budget approved by the lenders under the Cash Management Agreement, including capital expenditures beyond a small reserve.  The annual budget did not allow for the payment of crucial expenses such as occupancy taxes, reserves, and management fees, among other things.  Moreover, if the debt yield fell below a certain threshold, the borrowers had to make substantial amortization payments to the lenders beginning on June 12, 2009.  Finally, no equity distributions could be made (except to holders of Series A-1 preferred equity in BHAC Capital IV) by either the mortgage borrowers, the property owner entities, the operating lessee entities, or the mezzanine borrowers unless the debt yield equaled or exceeded 7.75%.

120.    The Cash Trap Event would occur upon: (a) an event of default under the mortgage loan agreement or any mezzanine loan agreement; (b) a Debt Yield Event; or (c) HVM's filing for bankruptcy.  A Debt Yield Event, in turn, occurred when a defined relationship between income and debt fell below certain designated levels.  Specifically, the loan agreements defined "Debt Yield" roughly as a fraction: (a) the numerator of which was net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by

leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and mezzanine loans. In essence, the Debt Yield calculation was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties, and to measure the Debtors' ability to generate enough cash to service the LBO debt. The Debtors' failure to meet specific Debt Yield benchmarks under the LBO loan agreements would cause the Debtors to have insufficient cash to pay their obligations. Once a Debt Yield Event occurred, the "cash trap" would remain in place until the Debt Yield was maintained above the cure amount of 7.6% for a period of six months.

121.   The initial Debt Yield Event percentage was 7.5%. Under the loan agreements, a Cash Trap Event would not occur until the Debt Yield fell below that percentage for seven consecutive payment periods, *i.e.*, in January 2008 at the earliest. Thereafter, the Debt Yield Event percentage would become even more difficult to achieve over time, as the required percentage was scheduled to rise from 7.5% (on the seventh payment date) to 8.1% (on the LBO loans' maturity date if certain options to extend the loans had been exercised by the Debtors).

### C.   The LBO Left the Company in Precarious Financial Condition.

122.   The LBO saddled the Company with more than $1.65 billion in additional debt at a time when the Company, and the hospitality industry generally, were facing declining revenues as the Great Recession approached. Specifically, the Debtors' mortgage debt increased over pre-LBO levels by $749.4 million and the total mezzanine debt increased by $905.3 million. Virtually none of the cash paid out in the LBO went to the Debtors. Instead, $1.9 billion was paid to Blackstone.

123.    Three rating agencies, Fitch Ratings, Standard & Poor's, and Moody's Investors Service, issued presale reports relating to the securitization of the $4.1 billion of senior secured debt.  In these reports, the rating agencies determined that the total debt of the LBO substantially exceeded the value of the assets, determining, respectively, that debt constituted 141.6%, 153.4% and 158.4% of the value of the assets.  The loan-to-value ratio of the senior secured debt alone was estimated as falling in the range of 78.4% to 87.8% of the value of the Company's underlying assets.  Each rating agency estimated that the $8 billion purchase price exceeded actual value by approximately $3 billion.

124.    Indeed, the LBO itself immediately put the Debtors into technical default of their loan covenants.  On June 30, 2007, the Debt Yield was only 7.09%. Therefore, the Debt Yield was less than 7.5% immediately after the LBO closed, and there was, in substance if not form, a continuous Cash Trap Event Period within the meaning of the mortgage loan agreement. For the first six months after the LBO's closing (including the day the LBO closed) the only reason there was no technical Cash Trap Event Period was because a Debt Yield Event had no consequences under the pertinent loan agreements until the seventh payment date, scheduled to occur in January 2008. The Debt Yield percentage, however, was required to be reported to the Debtors' lenders on a monthly basis, including during the first six months after the LBO closed, but the Debtors failed to do so.  Upon information and belief, this failure to report was intentional and allowed improper distributions to continue to be made to equity holders.  In short, the Debtors immediately failed the Debt Yield test on the date the LBO closed, were unlikely to meet the test at the first trigger date in January 2008, and concealed this fact from the Lenders.  The Defendants knew or should have known of all of these facts.

125.    The LBO sale allowed DL-DW's insiders (which included the preferred equity shareholders of BHAC Capital IV) to siphon value thereafter, post-LBO, from the Debtors regardless of their performance.  Through the cash management system instituted after the sale, post-LBO equity holders could receive improper dividends or distributions from the Debtors even as the Debtors' financial condition deteriorated into insolvency.

126.    The LBO further impaired operations by altering the priority of payment in the "cash waterfall" scheme governing the distribution of income.  The pre-LBO cash management agreement provided that management fees, through which operating expenses were paid, were higher in priority on the so-called "waterfall" than debt service on the mezzanine loans, and thus management fees would be paid before mezzanine loan debt service if there were insufficient funds to pay both.  The post-LBO Cash Management Agreement provided just the opposite: mezzanine loan debt service was higher in priority than management fees to HVM, and was paid first if there were insufficient funds to pay both. This severely threatened the post-LBO Debtors' ability to maintain operations because management fees are not discretionary expenses for a hotel chain.  Most of the hotels were indirectly owned by ESI, which was a REIT.  A REIT is required to have an outside management company operate its hotels, but, under the post-LBO Cash Management Agreement, management fees could be paid only if cash was available after debt service under the post-LBO structure.  Also, the operating expenses for the hotel chain were paid through the management fees.  Therefore, any cash difficulties, and especially a Cash Trap Event, made it likely the Debtors would be unable to pay critical management fees and operating costs necessary to keep the Debtors' hotels open.  If those fees and operating costs were not paid, the Debtors' hotels would close and the Debtors' entire business would abruptly shut down.  A

chart showing the flow of funds through the Debtors' post-LBO cash management system is attached as Exhibit B and incorporated herein by reference.

### D.    The Company's Declining Post-LBO Performance.

127.    Immediately after the LBO, the Debtors' financial performance continued to decline, performance metrics set forth in budgets were missed, and the Debtors encountered significant but predictable economic problems.  Defendants received regular financial and other reports on both a weekly and monthly basis (depending on the nature of the reports) after the LBO and therefore knew or should have known of material events relating to the Debtors' performance and inevitable downward spiral.

128.    For example, post-LBO revenues for 2007 fell 5% ($32 million) below the pro-forma budget of approximately $655 million prepared in connection with the LBO.  The 2007 post-LBO EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin).  During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the key monthly metrics (occupancy rate, average daily rate, and revenue per room) were at or below budget in every month following the LBO in 2007.  Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue and property-level EBITDA in each of the last three quarters of 2007.  According to regular industry reports, the Company's revenue and room rates were below the rates of the Company's peers by a significant amount: 10 to 22%.

129.    Senior management received frequent updates on this declining performance. Weekly reports showed how this deteriorating performance compared to the Debtors' peer group in the second half of 2007.  During the November 15, 2007 board of directors meeting for the "Extended Stay Hotels family of companies," it was reported that revenue per room was below

budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter of 2007. Thus, Defendants were aware that performance was not only below their peer group, but was also below internal targets.

130.    The Debtors already were in violation of their loan covenants and requirements at this time. For example, no monthly Debt Yield reports were prepared or furnished during 2007 following the LBO; the first such report was not prepared and provided as required by the loan agreements until January 2008. Also, Rogers routinely submitted officer's certificates falsely certifying each month after the LBO closed that ordinary course liabilities had not exceeded certain amounts and had been paid within 60 days of their incurrence when, in fact, ordinary course liabilities were outstanding for longer than 60 days on the date the LBO closed and each month thereafter until the Debtors' eventual bankruptcy filing. Each of these events was an event of default under the loan agreements.

131.    At a November 15, 2007 board meeting of the "Extended Stay Hotels family of companies," Defendant Dae Hum Kim "anticipated" double-digit corporate EBITDA growth for 2008 and 2009, driven by anticipated revenue per room growth of more than 7% in both years, based on the Debtors' "re-branding" strategy. This re-branding strategy, however, required spending substantial funds for capital expenditures and marketing and advertising costs during 2008, and it was highly unlikely that the Debtors were going to have such funds to implement the re-branding strategy. In fact, the projected Debt Yield for the fourth quarter of 2007 and the first two quarters of 2008 was expected to fall below the loan agreement thresholds, so funding for such substantial re-branding was not likely to be available due to a likely Cash Trap Event. Further, financial projections at the time reflected negative cash flows for the fourth quarter of

2007 and the first quarter of 2008, which should have made it clear that Kim's projected growth was unrealistic and that cash would not be available for the re-branding.

132.    Indeed, at the same November 2007 board meeting, the existence of a Debt Yield Event and the pending Cash Trap Event finally were acknowledged as imminent issues. Attendees were advised that the anticipated Debt Yield would be below the required monthly Debt Yield from the fourth quarter of 2007 through the second quarter of 2008, triggering a Cash Flow Event on January 12, 2008.

133.    During this same time (November 2007), the proposed annual budget for 2008 was due.  HVM prepared annual and monthly financial budgets for the Debtors, which were required to be approved by certain of the Debtors' lenders.  If the proposed annual budget was not approved by the lenders, then the most recently approved annual budget governed the Debtors' operations.  Because the governing budget was insufficient to meet operating expenses and the Debtors' cash was subject to the flawed waterfall, the Debtors were on the verge of a Cash Trap Event.  Any cash remaining after the waterfall was funded would not be provided to the Debtors for crucial operating expenses and instead would be held by the lenders as additional collateral.  Moreover, the 2007 annual budget had major flaws: it (i) did not include occupancy taxes (which totaled approximately 9.2% of room revenues and were collected by the Debtors and held in trust for taxing authorities), and (ii) did not permit payment of necessary corporate overhead costs (*e.g.*, reservation services, travel agent commissions and certain management fees), which were critical to the Debtors' ongoing operations and which could not be paid during a Cash Trap Event period.  This corporate overhead accounted for 16% of the Debtors' total property and corporate expenses during late 2007.

134.    For example, the flawed budget put the Debtors at risk of having occupancy taxes that were collected put into the cash collateral account, but having no disbursements made to pay the taxing authorities, even though, as "trust fund" obligations, these were not the Debtors' property and instead belonged to the governments and were held by the Debtors in trust for the taxing authorities' benefit.  Thus, the government's funds were withheld, placing the Debtors in the position of wrongfully converting the government's funds to make other payments set forth in the cash management system.

135.    The Debtors attempted to redress these issues but met limited success.   In December 2007, they submitted a proposed budget to the lenders that reflected an increase in the overall property-level expenses, included significant increased capital expenditures for the re-branding strategy, and sought to ensure that all costs would be covered.   Defendants Lichtenstein, Kim, Teichman, DeLapp, and Rogers, among others, were directly involved in the negotiations with the lenders regarding the 2008 proposed annual budget.  But these issues were not resolved for several months, causing significant business disruption in the meantime.

**E.    DL-DW's Acquisition of the LIBOR Floor Certificates.**

136.    The lenders who financed the LBO had intended to sell their mortgage and mezzanine debt to third parties, but, shortly after the LBO closed, the market softened dramatically.  In addition to discounting the debt, the mezzanine lenders tried offering financing to help buyers purchase the debt.  The lenders also requested that Lichtenstein and Lightstone stop their efforts to sell equity, which the lenders perceived was interfering with their efforts to sell debt.

137.    Nevertheless, because the lenders were having so much difficulty selling their debt, the Debtor borrowers entered into a letter agreement amendment to the loan agreements

dated August 31, 2007, that adjusted terms regarding application of the proceeds from prepayments to make the debt more palatable to potential buyers. In exchange for the borrowers' consent to these accommodations, the lenders agreed to issue to the Debtor borrowers (or their designees) Class X-A and X-B certificates from the mortgage securitization (collectively, the "LIBOR Floor Certificates"). The LIBOR Floor Certificates were investment grade (AAA) and represented the right to receive a payment stream, derived from the mortgage loan payments, of the difference between the LIBOR "floor" amount and the actual LIBOR. Whenever LIBOR dropped below that floor, the difference would be paid over to the holder of the LIBOR Floor Certificates from the money paid by the Debtors on the mortgage debt.

138.    The Debtors never received the LIBOR Floor Certificates, even though they made the pertinent concessions and all payments under the loan agreements. Instead, on or around November 5, 2007, the LIBOR Floor Certificates were issued and transferred directly to DL-DW, an ultimate equity owner of the Debtors. Upon information and belief, DL-DW provided no value to the borrowers in exchange for these certificates. None of the pertinent accounting entries show that DL-DW provided consideration for its receipt of the certificates or otherwise account for the fact that property rightfully belonging to the Debtor borrowers was diverted to DL-DW.

139.    At the time of issuance, the LIBOR Floor Certificates were valued at approximately $25 million. As LIBOR began dropping throughout 2008 and 2009, the LIBOR Floor Certificates became increasingly valuable to DL-DW because the "floor" was higher than the actual LIBOR-based loan payments. This value, however, should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the mortgage and mezzanine agreements and were the parties who had contracted to receive the certificates. Delivery of the

LIBOR Floor Certificates to DL-DW was an improper distribution of the Debtors' property to the Debtors' equity owners. On December 31, 2007, their value was adjusted to fair value of $37,600,000 on the books of DL-DW, resulting in a gain of approximately $12,670,000. By December 31, 2007, less than two months after receiving the certificates, DL-DW had received at least $278,000 in income paid on the certificates. From November 2007 through April 2008, approximately $3,183,000 was paid out on account of the Certificates to DL-DW. Ultimately, by their final disposition, the LIBOR Floor Certificates had generated at least $74.3 million in value that belonged to the Debtors.

140.    The Defendants' distribution of the LIBOR Floor Certificates to DL-DW on or around November 5, 2007 instead of to the Debtors violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.

141.    For the same and similar reasons, the Defendants' diversion of the proceeds paid on the LIBOR Floor Certificates, without directing those proceeds to the Debtors, violated applicable law and provided Defendants with a windfall of at least $74.3 million at the expense of the Debtors.

**F.    The Company Makes Improper Distributions in 2007 to Equity Holders.**

142.    The loan agreements provided that, with the exception of distributions to Series A-1 preferred equity, equity distributions could not be made if the Debt Yield, measured on a quarterly basis, did not exceed 7.75%. Although the first Debt Yield calculation should have been reported to the lenders in July 2007, and monthly thereafter, no such calculation was submitted until January 21, 2008. Had management calculated the Debt Yield in July 2007, the

calculation would have indicated a Debt Yield of 7.09%. Indeed, the first calculation of the Debt Yield reported to the lenders in January 2008 indicated a Debt Yield of only 7.20%. Thus, the Debt Yield fell far short of the 7.75% required to make equity distributions other than to preferred equity.

143.    Despite the Debtors' non-compliance with the Debt Yield, lack of surplus, insolvency, and the future financial and operational declines that management foresaw or should have foreseen, the Debtors, directly or indirectly through other entities in the Debtors' corporate structure, made the following distributions to equity holders other than Series A-1 Unit Holders from June 11, 2007 through December 31, 2007, totaling approximately $8,835,000, in violation of the loan agreement and applicable law.

144.    First, the Debtors distributed a total of $6,166,666.66 to A-2 Series Unit Holders in BHAC Capital IV, an equity holder in ESI:

| Date | Recipient | Amount |
| --- | --- | --- |
| July 30, 2007 | PGRT | $1,066,666.67 |
| August 30, 2007 | PGRT | $1,033,333.33 |
| September 27, 2007 | PGRT | $1,000,000 |
| October 30, 2007 | PGRT | $1,033,333.33 |
| November 29, 2007 | PGRT | $1,000,000 |
| December 28, 2007 | PGRT | $1,033,333.33 |

These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.

145.    Second, on August 31, 2007, DL-DW distributed approximately $2,668,000 to Lightstone Holdings for its equity holding as an A-2 Series Unit Holder in DL-DW. On information and belief, this distribution to equity (DL-DW was an equity holder of Homestead)

was made from the Debtors' funds and therefore violated applicable law, as it was made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distribution, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.

146.    In addition, in 2007, the Debtors distributed approximately $7,656,666.63, on account of equity holdings in the Debtors, to various Series A-1 Unit Holders in BHAC Capital IV, an equity holder of ESI.  These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen:

| Date | Recipient | Amount |
|---|---|---|
| July 13, 2007 | Arbor Commercial | $1,661,111.11 |
| July 13, 2007 | Polar Extended Stay | $44,444.44 |
| July 13, 2007 | Princeton | $44,444.44 |
| July 26, 2007 | Arbor Commercial | $358,888.89 |
| July 26, 2007 | Polar Extended Stay | $18,888.89 |
| July 26, 2007 | Princeton | $18,888.89 |
| August 15, 2007 | Arbor Commercial | $20,000.00 |
| August 15, 2007 | Arbor Commercial | $713,333.33 |
| August 15, 2007 | Polar Extended Stay | $93,333.33 |
| August 15, 2007 | Princeton | $93,333.33 |
| September 17, 2007 | Arbor Commercial | $713,333.33 |
| September 17, 2007 | Polar Extended Stay | $103,333.33 |
| September 17, 2007 | Princeton | $103,333.33 |
| October 15, 2007 | Arbor Commercial | $450,000 |
| October 15, 2007 | Glida One | $550,000 |
| October 15, 2007 | Polar Extended Stay | $100,000 |
| October 15, 2007 | Princeton | $100,000 |

| November 13, 2007 | Polar Extended Stay | $103,333.33 |
| November 15, 2007 | Arbor Commercial | $495,000 |
| November 15, 2007 | Glida One | $568,333.33 |
| November 15, 2007 | Princeton | $103,333.33 |
| December 17, 2007 | Arbor Commercial | $450,000 |
| December 17, 2007 | Glida One | $550,000 |
| December 17, 2007 | Polar Extended Stay | $100,000 |
| December 17, 2007 | Princeton | $100,000 |

147.    Also in 2007, Debtor ESA P Portfolio Operating Lessee Inc. made equity distributions totaling $5.2 million, on account of equity holdings in the Debtors, to Arbor Commercial on account of its Series A-1 Units.  These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen:

| Date | Amount |
|---|---|
| August 15, 2007 | $1,250,000 |
| September 17, 2007 | $1,250,000 |
| October 15, 2007 | $900,000 |
| November 15, 2007 | $900,000 |
| December 17, 2007 | $900,000 |

**G.    The Debtors' Condition Further Deteriorates Throughout 2008, but the Improper Equity Distributions Continue.**

**1.    The 2008 Debt Yield Test and Formal Cash Trap Event.**

148.    On January 21, 2008, the Debtors reported to the Lenders their first Debt Yield calculation (covering the period ending December 31, 2007).  It did not meet the minimum required Debt Yield of 7.5% and thus the Debt Yield and Cash Trap Events were triggered. Starting in February 2008, the lenders "trapped" in a restricted cash collateral account any

unallocated cash available after the waterfall was satisfied, as determined on a monthly basis. Moreover, the Debt Yield was not projected to reach the cure amount of 7.6% for a period of six months, so the Cash Trap Event was not likely to end anytime soon. The fact that cash was now "trapped" put significant strain on the Debtors and required the use of over $27 million from a working capital reserve account to keep the Debtors temporarily afloat.

149.    The softening of room demand experienced by the Debtors in 2007 continued into early 2008. Occupancy rates decreased again. Moreover, overall supply in the industry increased at rates far exceeding only modest increases in demand.

### 2.    Deteriorating Performance but Continued Distributions in the First Quarter of 2008.

150.    In the first quarter of 2008, liquidity became constrained. In January, the Debtors were required to transfer $8.1 million from their main operating account to the cash management account to cover a shortfall in the waterfall to ensure that certain obligations were met, including interest payments on the mezzanine loan. Consequently, the general ledger balance of cash available to the Debtors to fund operating expenses decreased from $52.4 million as of December 31, 2007 to $42.0 million as of March 31, 2008.

151.    Nevertheless, during the first quarter of 2008, despite the Debtors' poor performance, strained liquidity, lack of surplus, and insolvency, the Debtors provided to BHAC Capital IV, an equity holder, cash distributions totaling $5,308,333.34 in violation of applicable law, which BHAC Capital IV then paid to Series A-1 Unit Holders, also in violation of applicable law:

| Date | Recipient | Amount |
|---|---|---|
| January 11, 2008 | Arbor Commercial | $900,000 |
| January 15, 2008 | Arbor Commercial & Ron Invest | $262,500 |
| January 15, 2008 | Glida One | $473,611.11 |

| January 15, 2008 | Polar Extended Stay | $86,111.11 |
| January 15, 2008 | Princeton | $86,111.11 |
| February 20, 2008 | Arbor Commercial | $1,808,333.33 |
| March 12, 2008 | Arbor Commercial | $684,523.81 |
| March 12, 2008 | Glida One | $327,380.95 |
| March 12, 2008 | Polar Extended Stay | $59,523.81 |
| March 12, 2008 | Princeton | $59,523.81 |
| March 12, 2008 | Ron Invest | $119,047.62 |
| March 17, 2008 | Arbor Commercial | $241,865.08 |
| March 17, 2008 | Glida One | $115,674.61 |
| March 17, 2008 | Polar Extended Stay | $21,031.75 |
| March 17, 2008 | Princeton | $21,031.75 |
| March 17, 2008 | Ron Invest | $42,063.49 |

These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.

> **3.  In the Second Quarter of 2008, Performance Continues to Deteriorate but Further Accommodations Are Made to Favor the Insiders and Distributions Continue to Be Made to Equity.**
>
> **a.  The Insiders Receive Proceeds from the LIBOR Floor Certificates.**

152.    Prior to the LBO, the Company had two sets of subordinated notes, with one set paying interest at 9.15% and totaling $31 million that was due on March 15, 2008 (the "9.15% Notes"), and another set, paying interest at 9.875% and totaling approximately $8.2 million that was due in June 2011 (the "9.875% Notes"). The initial acquisition agreement entered into by Lightstone required that this pre-LBO debt be satisfied by DL-DW at the LBO. But on the eve of the LBO's closing, the parties amended the agreement so that the notes did not need to be paid off at closing and instead were marked as assumed obligations of the "new" Debtors.

49

153.    On March 15, 2008, the 9.15% Notes matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due.  The Debtors failed to pay those amounts when due, and the trustee for the noteholders declared a default on March 24, 2008.

154.    On April 16, 2008, DL-DW secured a $22 million "loan" from affiliated investors who were insiders of the Debtors: (a) ABT-ESI, a member of the "Arbor Group" of Defendants, lent $5,225,000 and served as lead lender and servicer; (b) Park Avenue, a Lightstone Entity affiliated with Lichtenstein, contributed $11 million, half of the loan amount; (c) Princeton, another "Arbor Group" entity and a member of DL-DW, lent $550,000; and (d) Mericash, an affiliate of Joseph Chetrit, lent $5,225,000.

155.    This $22 million "loan", together with $10.6 million in additional funds from DL-DW, was used to pay off the outstanding principal balance and accrued interest on the 9.15% Notes plus $100,000 in professional fees.  It was guaranteed by BHAC Capital IV and, pursuant to a pledge agreement executed by Lichtenstein, secured by the valuable LIBOR Floor Certificates wrongfully held by DL-DW and not the Debtors, the rightful owners.  Though the loan was well collateralized, it accrued interest at an annual rate of 25% and thus is known as the "25% Note."  The note would mature on May 1, 2011.

156.    The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately, with a maximum monthly principal repayment of $416,666.  Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account (the "Floor Bonds Reserve Account") for the

benefit of BHAC Capital IV Series A-1 Unit Holders and was used to pay certain distributions to equity.  As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid through diversion of income from the LIBOR Floor Certificates that should have been paid to the Debtors.

157.    Lichtenstein, Owen, Teichman, and De Vinck signed a written consent authorizing the pertinent parties to execute the necessary agreements for these transactions.  On information and belief, the principals of Mericash, ABT-ESI, and Princeton, which included Chetrit and Joseph Tabak, participated in the decisions to use proceeds of the LIBOR Floor Certificates for payments on the 25% Note.

### b.    Resolution of the Proposed 2008 Annual Budget Comes Too Late to Avoid Additional Financial Duress.

158.    The Debtors' lenders had rejected the proposed 2008 annual budget submitted in early December 2007, objecting to (a) revenue projections in light of the poor economic climate at the time and the poor outlook for the industry; (b) the Debtors' proposed one-time capital expenditure expenses and corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that were not explained by the Debtors.  As discussions over the budget proceeded, the 2007 approved annual budget remained in place, causing additional financial strain, as funding for crucial operating costs was not available under the 2007 budget (*e.g.*, reservation system, occupancy taxes), and the amounts disbursed to the Debtors were lower than what was needed at the time to pay operating expenses.

159.    Finally, on April 15, 2008, the lenders agreed to make concessions to facilitate budgeting of operating expenses but required in exchange an amendment to the mortgage loan agreement (the "Mortgage Loan Second Amendment") that contained extensive restrictions on the mortgage borrowers' use of income, cash, fees, proceeds, property, and revenue from the

mortgaged hotels (including disbursements to the mortgage borrowers of excess cash flow under the Cash Management Agreement ("Restricted Excess Cash Flow") except in limited circumstances.  Under this budget agreement, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008.  No provision was made to repair the damage caused to the Debtors during the latter half of 2007, however, and the Debtors' cash problems were far from solved.  On May 1, 2008, after the 2008 annual budget was approved, Lichtenstein remarked that vendor payments were being delayed and that "it's demoralizing for the staff to have to be dodging vendors and local tax authorities who want their payments."

**c.    Debtors' Performance Drops, but the Distributions Continue.**

160.    On April 22, 2008, the Debtors retained Weil Gotshal & Manges ("Weil") as restructuring and insolvency professionals to assist with efforts to address the Debtors' financial distress and restructure the Debtors' suffocating LBO debt structure.  In June 2008, the Debtors consulted with and subsequently retained Lazard Freres ("Lazard") to assist with these efforts.

161.    In the second quarter of 2008, occupancy rates and revenues per room declined further.  An "Audit Update" included in the May 15, 2008 board of directors package noted that: (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance.  In addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly affect liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, at best, depending on the LIBOR rates.

162.    During the second quarter of 2008, despite the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, the Debtors paid, either by wire or by transfers from the cash management account the following cash

distributions to equity totaling $4,358,402.13 to Series A-1 Unit Holders in violation of

applicable law:

| Date | Recipient | Amount |
|------|-----------|--------|
| April 11, 2008 | Arbor Commercial | $684,523.81 |
| April 11, 2008 | Glida One | $327,380.95 |
| April 11, 2008 | Polar Extended Stay | $59,523.81 |
| April 11, 2008 | Princeton | $59,523.81 |
| April 11, 2008 | Ron Invest | $119,047.62 |
| April 15, 2008 | Arbor Commercial | $305,753.97 |
| April 15, 2008 | Glida One | $146,230.16 |
| April 15, 2008 | Polar Extended Stay | $26,587.30 |
| April 15, 2008 | Princeton | $26,587.30 |
| April 15, 2008 | Ron Invest | $53,174.60 |
| May 12, 2008 | Arbor Commercial | $684,523.81 |
| May 12, 2008 | Glida One | $327,380.95 |
| May 12, 2008 | Polar Extended Stay | $59,523.81 |
| May 12, 2008 | Princeton | $59,523.81 |
| May 12, 2008 | Ron Invest | $119,047.62 |
| June 12, 2008 | Arbor Commercial | $684,523.81 |
| June 12, 2008 | Glida One | $327,380.95 |
| June 12, 2008 | Polar Extended Stay | $59,523.81 |
| June 12, 2008 | Princeton | $59,523.81 |
| June 12, 2008 | Ron Invest | $119,047.62 |
| June 16, 2008 | Arbor Commercial | $27,418.63 |
| June 16, 2008 | Glida One | $13,113.26 |
| June 16, 2008 | Polar Extended Stay | $2,384.23 |
| June 16, 2008 | Princeton | $2,384.23 |
| June 16, 2008 | Ron Invest | $4,768.45 |

These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii)

when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite

the future financial and operational declines that management foresaw or should have foreseen.

163.   Similarly, despite the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, BHAC Capital IV also made the following distributions totaling $1,008,264.53 to Arbor Commercial, from the Floor Bonds Reserve Account, in violation of applicable law:

| Date | Amount |
|------|--------|
| May 15, 2008 | $500,000 |
| June 16, 2008 | $508,264.53 |

164.   The above payments were made with funds derived from the proceeds of the LIBOR Floor Certificates, which belonged to the Debtors but were wrongfully assigned to the benefit of equity interests in the Debtors, in violation of applicable law.

> **d.**    **The Recession Hits in the Third Quarter of 2008, but Distributions Continue to be Made to Equity.**

165.   By the third quarter of 2008, the Great Recession had hit in full, and conditions continued to worsen.   Revenue per room decreased again, falling below budget levels. Defendants knew or should have known that the Debtors could be completely out of cash as soon as January 2009.   The Debtors anticipated that they would not meet certain Debt Yield amortization avoidance thresholds by June 2009, which would trigger a requirement that they pay an estimated $51 million in amortization payments to the lenders for 2009.   This increase in anticipated cash needs when the Debtors' financial condition was rapidly declining caused the Debtors serious concern, as (i) all cash flows were subject to a Cash Trap and the Debtors were not projected to achieve a Debt Yield cure in 2008 or 2009, (ii) the Debtors would have difficulty obtaining an unqualified audit opinion at the end of 2008, which could result in a default under the pertinent LBO loan agreements, and (iii) approval of the 2009 proposed

annual budget posed critical challenges given the questions raised by certain of the lenders with respect to the annual budget in late-2007 and early-2008.

166.    Despite the foregoing, and despite the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, during the third quarter of 2008 the Debtors paid, either by wire or by transfers from the cash management account, the following cash distributions to equity totaling $3,750,000.00 to Series A-1 Unit Holders in violation of applicable law:

| Date | Recipient | Amount |
|---|---|---|
| July 11, 2008 | Arbor Commercial | $684,523.81 |
| July 11, 2008 | Glida One | $327,380.95 |
| July 11, 2008 | Polar Extended Stay | $59,523.81 |
| July 11, 2008 | Princeton | $59,523.81 |
| July 11, 2008 | Ron Invest | $119,047.62 |
| August 12, 2008 | Arbor Commercial | $684,523.81 |
| August 12, 2008 | Glida One | $327,380.95 |
| August 12, 2008 | Polar Extended Stay | $59,523.81 |
| August 12, 2008 | Princeton | $59,523.81 |
| August 12, 2008 | Ron Invest | $119,047.62 |
| September 12, 2008 | Arbor Commercial | $684,523.81 |
| September 12, 2008 | Glida One | $327,380.95 |
| September 12, 2008 | Polar Extended Stay | $59,523.81 |
| September 12, 2008 | Princeton | $59,523.81 |
| September 12, 2008 | Ron Invest | $119,047.62 |

These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.

167.   BHAC Capital IV also made the following distributions totaling $1,616,666.66 to Arbor Commercial during this period, from the Floor Bonds Reserve Account, in violation of applicable law:

| Date | Amount |
|---|---|
| July 15, 2008 | $500,000 |
| August 15, 2008 | $558,333.33 |
| September 15, 2008 | $558,333.33 |

168.   The above payments were made with funds derived from the proceeds of the LIBOR Floor Certificates, which belonged to the Debtors but were wrongfully assigned to the benefit of equity interests in the Debtors, in violation of applicable law.

169.   At the August 14, 2008 meeting of the board of directors of the "Extended Stay Hotels family of companies," Teichman made a motion, seconded by Owen, that "each of the Companies declare dividends for the next quarter in the amounts necessary or appropriate to pay the minimum mandatory amounts payable to the holders of A-1 securities" and to "ratify all dividends paid by any of the Companies to date." The motion passed unanimously.

170.   At this same meeting where the board authorized and approved, prospectively and retroactively, dividend payments and distributions to equity, it received detailed reports regarding the Debtors' poor financial performance in 2008 and anticipated continued decline in 2009. In contrast to its prospective and retroactive authorization of dividends and distributions to equity, the board tabled re-branding initiatives due to the companies' poor financial performance. Lichtenstein, Owen, Milone, Teichman, and de Vinck were present at this meeting as directors, while DeLapp, Kim, Rogers, and others were present as invited guests.

### G.   A Full Cash Crisis Hits in the Fourth Quarter of 2008 and Thereafter.

171.   During the fourth quarter of 2008, occupancy rate, average daily rate, and revenue per room performance continued to decline and were far off of budgeted projections. Revenue and property-level EBITDA performance had double-digit declines from the fourth quarter of 2007.   By the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined.

172.   Despite the foregoing and despite the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, during the fourth quarter of 2008 the Debtors paid, either by wire or by transfers from the cash management account, the following cash distributions to equity totaling $2,500,000 to Series A-1 Unit Holders in violation of applicable law:

| Date | Recipient | Amount |
|---|---|---|
| October 10, 2008 | Arbor Commercial | $684,523.81 |
| October 10, 2008 | Glida One | $327,380.95 |
| October 10, 2008 | Polar Extended Stay | $59,523.81 |
| October 10, 2008 | Princeton | $59,523.81 |
| October 10, 2008 | Ron Invest | $119,047.62 |
| November 12, 2008 | Arbor Commercial | $684,523.81 |
| November 12, 2008 | Glida One | $327,380.95 |
| November 12, 2008 | Polar Extended Stay | $59,523.81 |
| November 12, 2008 | Princeton | $59,523.81 |
| November 12, 2008 | Ron Invest | $119,047.62 |

These distributions violated applicable law, as they were made (i) despite a lack of surplus, (ii) when the Debtors were insolvent or were rendered insolvent by the distributions, and (iii) despite the future financial and operational declines that management foresaw or should have foreseen.

173.    In addition, BHAC Capital IV made the following distributions totaling $1,058,333.33 to Arbor Commercial, from the Floor Bonds Reserve Account, in violation of applicable law:

| Date | Amount |
|------|--------|
| October 15, 2008 | $500,000,00 |
| November 17, 2008 | $558,333.33 |

174.    The above payments were made with funds derived from the proceeds of the LIBOR Floor Certificates, which belonged to the Debtors but were wrongfully assigned to the benefit of equity interests in the Debtors, in violation of applicable law.

175.    At a November 13, 2008 meeting of the board of directors of the "Extended Stay Hotels family of companies," a Weil attorney conducted a presentation of the fiduciary duties for directors of Delaware corporations.  Representatives of Weil and Lazard advised the board that the company was in the "zone of insolvency."  The Weil attorney recommended that preferred shareholders forego the pending dividend and that the board resolve to cease all payments of dividends for the foreseeable future.  Thereafter, Teichman made a motion, seconded by Owen, to suspend the monthly preferred dividend payable to Series A-1 Unit Holders.  The motion passed unanimously, with the exception of Milone, who abstained. Lichtenstein, Owen, Milone, Teichman, and de Vinck were present as directors.  In addition, two attendees (Kaufman and Chetrit) affiliated with Arbor, and Richard Goldberg of Dechert LLP, counsel to the A-1 shareholders, were present as invited guests.  Aside from representatives from Lazard and Weil, the following insiders also were present as invited guests: DeLapp, Kim, Rogers, Kevin McDougall (ESH), Patrick Sullivan (Lightstone Group), and Joseph Tabak.  The November 17, 2008 distribution of $558,333.33 to Arbor Commercial

discussed in the preceding paragraphs was made *after* the board passed the above referenced resolution halting equity distributions.

176.    The Debtors' proposed 2009 annual budget submitted to the lenders in early December 2008 assumed a significant further decline in room revenues and property-level EBITDA.  At this point, the Debtors were simply trying to "stay[] alive for another few weeks," as Lichtenstein later stated.

177.    At the December 11, 2008 meeting of the board of directors of the "Extended Stay Hotels family of companies," Milone stated that they "presently [had] 3 goals: 1. Align interests of the Debtors, 2. Extend the life of the Company, [and] 3. Extend the existing debt." Milone also stressed the "importance of frequent data reviews and Board meetings during these difficult financial times."

178.    The following week, at the board meeting held on December 16, 2008, Chetrit suggested that "staff should be asked for a 20% salary reduction to make a significant impact upon cash flow."   Upon information and belief, this suggestion was made, *inter alia*, to increase cash available to continue improper distributions to equity holders, including entities owned or controlled by Chetrit, all to the detriment of the Debtors.

179.    By December 31, 2008, the general ledger balance of cash available to fund operations had slipped to $26.5 million.

180.    As a result of declining performance in December 2008 and January 2009, the receipts transferred to the waterfall were not sufficient to cover the interest due on the mezzanine debt in January 2009.  Consequently, the Debtors were forced to transfer $5.9 million from their main operating account to the cash management account to cover the shortfall.  Only $19 million was distributed from the cash management account to the Debtors

for budgeted operating expenses in January 2009, the lowest monthly amount distributed to the Debtors since the LBO's closing.  From mid-December 2008 to late March 2009, the Debtors were forced to fund occupancy taxes and other expenses totaling approximately $20 million out of a cash reserve account.  Due to steep declines in the average daily rate, occupancy rate, room revenue, and property-level EBITDA, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, compared to approximately $26.5 million as of December 31, 2008.

181.    On February 6, 2009, Weil issued a memorandum to the lower corporate level Debtors' "independent directors" (see ¶¶ 13, 18, 192) regarding the "liquidity crisis" and that the Company Board was exploring the possibility of petitioning for relief under chapter 11 of Bankruptcy Code.

182.    Although the board of the "Extended Stay Hotels family of companies" had passed a resolution stopping equity distributions in November 2008 in light of the financial and liquidity crises, the improper distributions to equity continued to be made *after* that resolution, using a "Preferred Equity Reserve Account" created at the LBO's closing as "security" for certain equity holders.  The Preferred Equity Reserve Account was funded with $20 million of the Debtors' funds at the LBO's closing, and certain equity holders could instruct that distributions be made from that reserve account to them.  If the account was used for such distributions, then BHAC Capital IV, using the Debtors' cash, was required to replenish the reserve back up to $20 million.  The following table represents the distributions from the Preferred Equity Reserve Account to Arbor Commercial *following* the November 13, 2008 board meeting at which the board resolved to halt equity distributions:

| Date | Amount |
|---|---|
| December 18, 2008 | $1,750,000 |
| January 20, 2009 | $1,808,333.33 |
| February 20, 2009 | $1,808,333.33 |
| March 11, 2009 | $15,178,970.53 |

In light of the Debtors' poor performance, strained liquidity, budget issues and concerns, lack of surplus, and insolvency, these payments were made in violation of applicable law.

183.    Eventually, on March 11, 2009, as the Debtors continued their downward spiral, the Preferred Equity Reserve Account was liquidated and the balance was wired to Arbor Commercial, as shown above in the preceding paragraph, again in violation of applicable law.

**H.    The Libor Floor Certificates Are Transferred to the Insider Lenders of the 25% Note.**

184.    At the March 11, 2009 board of directors meeting of the "Extended Stay family of companies," Teichman informed the board that the 25% Note owed by DL-DW needed to be refinanced, even though it was not scheduled to mature until May 1, 2011 and should not have been considered a pressing issue at the time.  The board then unanimously resolved to pay off the 25% Note by transferring the LIBOR Floor Certificates (which rightfully should have been held by the Debtors) to the holders of the 25% Note lenders, namely ABT-ESI, Lightstone Commercial (as assignee of Park Avenue's interest), Princeton, and Mericash.  The board also resolved to liquidate the Floor Bonds Reserve Account.

185.    These terms were put into a "Floor Bonds Agreement," executed the next day. Under this agreement, the LIBOR Floor Certificates were assigned to ABT-ESI, as lead lender under the 25% Note.  The other 25% Note lenders then contributed their interests to ABT-ESI. ABT-ESI was simultaneously restructured so that each of the other lenders became owners of ABT-ESI in proportion to their respective rights and interests in the 25% Note.  Also as part of

the deal, the Series A-1 Unit holders waived their rights to the $4,817,986 balance of the Floor Bonds Reserve Account, which was then wired to Lightstone Commercial.

186.    At the time the Floor Bonds Agreement was executed, the outstanding principal balance on the 25% Note was $17,416,674.    Even though the LIBOR Floor Certificates had brought in at least $13 million in less than one year, the Floor Bonds Agreement assigned the certificates an artificial value of $17,416,674, exactly equal to the balance of the 25% Note, in order to create the appearance of equivalent value for the agreement.    In the accounting records, the certificates were assigned a value of approximately $12.6 million (plus the cash payment of approximately $4.8 million that was paid to Lightstone Commercial).    In any event, the actual value of the LIBOR Floor Certificates was significantly greater than either of these figures.

187.    The net result of these moves was that the LIBOR Floor Certificates were transferred to pay the 25% Note, and the $4.8 million balance in the Floor Bonds Reserve Account was emptied to make a separate payment to Lightstone Commercial.    Prior to those transfers, the highly valuable LIBOR Floor Certificates that should have belonged to the Debtors had been transferred to DL-DW for no consideration and then were transferred to insiders to repay the $22 million "loan" to DL-DW.    As a result of the March 2009 transfers, the remaining accumulated proceeds of the LIBOR Floor Certificates as of March 2009 that had not been previously transferred to the insiders as payments on the $22 million loan were diverted to insider Lightstone Commercial.    The 25% Note lenders continued to receive payments on the LIBOR Floor Certificates until their cancellation in October 2010.    If the LIBOR Floor Certificates had been provided to the Debtors as required by the original transaction creating the certificates and the Debtors' insolvency, the Debtors would have

received at least $74.3 million in direct payments on the certificates and at least another $4.3 million in investment proceeds, a total of at least $78.6 million that was taken from the Debtors by equity holders without any consideration in return. In short, insider equity holders were paid richly with the Debtors' property as the Debtors moved inexorably toward bankruptcy.

### I.      Lichtenstein Further Profits from Insider Management Fees.

188.    Throughout the post-LBO period, Lichtenstein continued to profit personally from the Debtors, even as they were facing grave liquidity crises that had rendered them insolvent and had put them on the brink of bankruptcy. Either Lichtenstein or a Lichtenstein-affiliated entity reaped substantial "asset management" fees post-LBO totaling up to $1 million per year (the "Management Fee Transfers").

189.    Lichtenstein or a Lichtenstein-affiliated entity was paid these large sums for management services even though HVM and HVM Canada continued to manage all aspects of the Debtors' day-to-day business, including all operational, management, and administrative functions for Extended Stay hotels, and even though HVM already charged significantly higher management fees than those typically seen in the industry. On information and belief, neither Lichtenstein nor any Lichtenstein-affiliated entity performed any work that justified these fees. Also on information and belief, no detailed accounting of Lichtenstein's or any Lichtenstein-affiliated entity's services ever was provided to HVM or Debtors that justified these fees.

### J.      The Final Liquidity Crisis and the Debtors' Bankruptcy Petitions.

190.    During the first and second quarters of 2009, the Debtors experienced steep declines in average daily rate, occupancy rate, room revenue and property-level EBITDA. As a result, by March 31, 2009, the general ledger balance of cash available to fund operating expenses had decreased from approximately $26.5 million at the last quarter-end to only $16.2 million. During the second quarter of 2009, the Debtors continued capital expenditure freezes

and instituted hiring freezes related to all full-time and part-time personnel.  Vendor payments were delayed to conserve cash, and the board was advised no later than May 14, 2009 that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009.  As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million.

191.    The Debtors filed the first of their Chapter 11 petitions on June 15, 2009, two years and four days after the LBO closed, missing by a few days the 2-year period for bringing a fraudulent transfer claim regarding the LBO.

### THE CORPORATE STATUS
### OF THE DEBTORS AND THE INSIDER DEFENDANTS

192.    From the moment the LBO closed, the Debtors, under the control of the Defendants, disregarded all semblance of legal formality regarding the corporate status of the Debtors and affiliated entities.  The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements mandating their separateness.  They were treated internally at all relevant times as part of one company, sometimes described as "the Company" in the corporate minutes for the "Extended Stay Hotels family of companies."  They had common officers and directors and had no separate governance.  They conducted all material board of directors meetings on a consolidated basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners.  The Debtors thus were managed and operated on a completely centralized basis, even if their corporate structure was decentralized, at least nominally.

193.    A typical set of corporate minutes, from a May 15, 2008 "Meeting of the Board of Directors Extended Stay Hotels," illustrates the operative disregard of the specific corporate entities.  The minutes open, "A meeting of the Board of Directors Extended Stay Hotels (The

Company) was conducted at 100 Dunbar Street, Spartanburg, SC on Thursday, May 15th, 2008 commencing at 9:30 a.m." They add, "Present by invitation were the following officers of the Company: Gary DeLapp, President; David Kim, EVP & Chief Investment Officer" and "[o]n the management side, Mr. Delapp [sic] stated that the company is concentrating on job enhancement." Thus, even though DeLapp technically was an officer of HVM and three Debtor entities, he was treated as an executive officer of all of the Debtor affiliates. Kim was not an officer of any Debtor entity, yet he was treated as an officer of all of the Debtors.

194.    This operational and management integration of the Debtors was manifest in many other respects:

- The daily business of operating the hotels of the Extended Stay Hotels family of companies was managed by HVM, which in turn was managed by HVM Manager, of which Lichtenstein was the sole member;

- The Debtors' operations were integrated and interdependent and each of the Debtors was run in the interest of the Defendants and not in the interests of each individual Debtor;

- All of the Debtors were either wholly-owned or predominantly-owned by DL-DW and other Defendants;

- While many of the lower level Debtor entities had independent board members, none of the independent board member attended or participated at the key Company Board meetings, but rather key decisions were made by the single Company Board;

- The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity for the mezzanine borrowers;

- None of the mortgage borrower entities or mezzanine borrower entities kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained;

- Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated cash management account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans;

- The Debtors' expenses were generally funded from the consolidated cash management account and a single working capital reserve account;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded;

- The dividends and distributions made to equity on behalf of various Debtors were generally funded from the consolidated cash management account and other general accounts;

- The mortgage borrowers were jointly and severally liable on the mortgage debt, and yet paid the mezzanine debt for which the mortgage borrowers had no liability;

- Mezzanine borrower entities were prevented from enforcing contribution rights against other Debtors until after all of the mezzanine debt and mortgage debt had been paid in full;

- The Debtors made substantial payments for the benefit of insiders;

- The full board of the "Extended Stay Hotels family of companies" decided matters affecting a particular company, such as the resolution of the 25% Note, an obligation of DL-DW.

- The Debtors failed to pay debts as they came due in the ordinary course, with certain liabilities being greater than 60 days outstanding at all relevant times from and after the date the LBO closed; and

- The Debtors were insolvent and undercapitalized on the date the LBO closed and at all relevant times thereafter.

195.   The corporate books provide another good example of this integrated treatment of the Debtors and related entities.  For example, after the LBO's closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO.  The mortgage and mezzanine debt was recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each legal entity mortgage borrower or mezzanine borrower.  Similarly, the subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.  If the Debtors had established and maintained separate books for each of the individual mortgage borrowers and mezzanine borrowers as of the LBO, then the accounting by the mortgage borrowers and mezzanine borrowers should have reflected:

- The mortgage debt and the related proceeds – at each legal entity level for the individual mortgage borrowers – allocated based on the release amounts included in the mortgage loan agreement; and

- The mezzanine debt and the related proceeds – at the legal entity level for the individual mezzanine borrowers – allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant mezzanine borrower.

196.    This wholesale disregard of the Debtors' formally separate identities violated covenants of the applicable loan agreements.  These contained extensive "special purpose" entity and separateness representations and other covenants requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any person; (ii) pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records, financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or mezzanine loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and mezzanine loans, certain other specified liabilities not germane to this Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more than 60 days past the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.

197.   In short, the "Company," as it was described in the corporate minutes for the "Extended Stay Hotels family of companies," completely ignored the fiction of legal separateness of its entities.

198.   Based on the foregoing, those in control of the Debtors and their affiliates treated them as a single entity, did not follow the corporate formalities, exercised complete control or domination of the corporation, and operated as a single business enterprise where each entity was the mere instrumentality or alter ego of the others.  This domination was used to commit a fraud, wrong, or paramount inequity against the Debtors, resulting in their injuries alleged, herein, such that it would be fundamentally unfair to recognize the corporate forms.

## CLAIMS FOR RELIEF

### COUNT ONE

**Recovery of Illegal Dividends or Distributions
(11 U.S.C. §§ 541 and applicable state law)**

**(against Lichtenstein, DL-DW Holdings, L.L.C., ABT-ESI L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., Lightstone Commercial Management, Arbor ESH II L.L.C., Arbor Commercial Mortgage L.L.C., Polar Extended Stay (USA) L.P., Princeton ESH, L.L.C., PGRT ESH Inc., Lightstone Holdings, L.L.C., Glida One LLC, Ron Invest LLC, and BHAC Capital IV, L.L.C.)**

199.   Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-198 as if fully set forth herein.

200.   In November 2007, the LIBOR Floor Certificates were diverted from the Debtors and assigned to DL-DW without DL-DW providing any consideration in return, even though those instruments rightfully belonged to the Debtors who had made the requested accommodations to their mortgage loans in exchange for issuance of the LIBOR Floor Certificates.  As DL-DW was both a direct and an indirect equity owner of the Debtors, the assignment of the LIBOR Floor Certificates to DL-DW was a distribution of the Debtors'

property on account of equity.  This distribution was made at a time when the Debtors did not

have a surplus or were insolvent, or rendered the Debtors insolvent.  As previously stated, this

wrongful transfer deprived the Debtors of at least $74.3 million in income that would have been

earned by October 2010, when the certificates finally were extinguished.

201.    From November 2007 through February 2009, DL-DW received payments

totaling approximately $20 million as proceeds from the LIBOR Floor Certificates that should

have been paid to the Debtors.

202.    From on or around May 2008 through February 2009, DL-DW used

approximately $17.4 million of those proceeds to make the following payments:  (a) pay the

lenders of the 25% Note:  Mericash and ABT-ESI each received payments totaling $2,117,593,

Princeton received $222,905, and Park Avenue and its assignee, Lightstone Commercial,

received a total of $4,458,091; (b) pay approximately $3.7 million to the Series A-1 equity

holders as regular payments on equity; and (c) $4,817,986 was deposited into the Floor Bonds

Reserve Account.

203.    At the time it was assigned the LIBOR Floor Certificates and received the above

proceeds from the LIBOR Floor Certificates, DL-DW was aware that the Debtors did not have a

surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent.

At all pertinent times, DL-DW was aware of the distressed condition of the Debtors.

204.    Pursuant to the "Floor Bonds Agreement," on March 12, 2009, the LIBOR Floor

Certificates were assigned to ABT-ESI for the benefit of various equity-holder Defendants,

including DL-DW.  Additionally, the Floor Bonds Reserve Account was liquidated and the

balance in the amount of $4,817,896 was paid to Lightstone Commercial.  Subsequent to this

transfer, from March 2009 to October 2010, when the certificates were extinguished, an

estimated $55 million was paid on the LIBOR Floor Certificates to ABT-ESI and/or its assignees or subsequent transferees. On information and belief, Mericash and ABT-ESI each ultimately received approximately $13,066,792, Princeton ultimately received approximately $1,375,452, and Park Avenue/Lightstone Commercial ultimately received approximately $27,509,036.

205.    At the time it was assigned the LIBOR Floor Certificates and subsequently, when it received proceeds from the LIBOR Floor Certificates, ABT-ESI was aware that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent. At all pertinent times, ABT-ESI was aware of the distressed condition of the Debtors.

206.    When they received the proceeds from the LIBOR Floor Certificates, Mericash, Princeton, and Park Avenue/Lightstone Commercial were aware that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent. At all pertinent times, they were aware of the distressed condition of the Debtors.

207.    The distributions and payments referenced in paragraphs ¶¶ 200-206 shall be collectively referred to herein as the "LIBOR Floor Certificate Transfers," and together with the Management Fee Transfers and the Dividend Transfers (defined below), the "Improper and Fraudulent Transfers."

208.    In addition to the LIBOR Floor Certificate Transfers, the Debtors' funds were used to make various payments to Series A-1, A-2 and A-3 Unit Holders while the Debtors were insolvent. On the following dates, each of the following entities received a distribution in the following amount, which came from funds of the Debtors which were paid on account of equity interests in one or more affiliates in the "Extended Stay Hotels family of companies" (the "Dividend Transfers").

| Recipient | Date | Amount |
|---|---|---|
| Polar Extended Stay | 7/13/2007 | $44,444.44 |
| Princeton | 7/13/2007 | $44,444.44 |
| Arbor Commercial[1] | 7/13/2007 | $1,661,111.11 |
| Polar Extended Stay | 7/26/2007 | $18,888.89 |
| Princeton | 7/26/2007 | $18,888.89 |
| Arbor Commercial | 7/26/2007 | $358,888.89 |
| PGRT | 7/30/2007 | $1,066,666.66 |
| Arbor Commercial | 8/15/2007 | $713,333.33 |
| Arbor Commercial | 8/15/2007 | $20,000.00 |
| Polar Extended Stay | 8/15/2007 | $93,333.33 |
| Princeton | 8/15/2007 | $93,333.33 |
| Arbor Commercial | 8/15/2007 | $1,250,000.00 |
| PGRT | 8/30/2007 | $1,033,333.33 |
| Lightstone Holdings | 8/31/2007 | $2,668,000.00 |
| Arbor Commercial | 9/17/2007 | $713,333.33 |
| Polar Extended Stay | 9/17/2007 | $103,333.33 |
| Princeton | 9/17/2007 | $103,333.33 |
| Arbor Commercial | 9/17/2007 | $1,250,000.00 |
| PGRT | 9/27/2007 | $1,000,000.00 |
| Arbor Commercial | 10/15/2007 | $450,000.00 |
| Glida One | 10/15/2007 | $550,000.00 |
| Polar Extended Stay | 10/15/2007 | $100,000.00 |
| Princeton | 10/15/2007 | $100,000.00 |
| Arbor Commercial | 10/15/2007 | $900,000.00 |
| PGRT | 10/30/2007 | $1,033,333.33 |
| Polar Extended Stay | 11/13/2007 | $103,333.33 |
| Arbor Commercial | 11/15/2007 | $495,000.00 |
| Glida One | 11/15/2007 | $568,333.33 |
| Princeton | 11/15/2007 | $103,333.33 |
| Arbor Commercial | 11/15/2007 | $900,000.00 |
| PGRT | 11/29/2007 | $1,000,000.00 |
| Arbor Commercial | 12/17/2007 | $450,000.00 |
| Glida One | 12/17/2007 | $550,000.00 |
| Polar Extended Stay | 12/17/2007 | $100,000.00 |
| Princeton | 12/17/2007 | $100,000.00 |
| Arbor Commercial | 12/17/2007 | $900,000.00 |
| PGRT | 12/28/2007 | $1,033,333.33 |
| Arbor Commercial | 1/11/2008 | $900,000.00 |
| Arbor Commercial & Ron Invest | 1/15/2008 | $262,500.00 |
| Glida One | 1/15/2008 | $473,611.11 |
| Polar Extended Stay | 1/15/2008 | $86,111.11 |
| Princeton | 1/15/2008 | $86,111.11 |

---

[1] Upon information and belief, Arbor ESH II may have received amounts designated to Arbor Commercial and is liable to the extent it received such amounts.

| | | |
|---|---|---|
| Arbor Commercial | 2/20/2008 | $1,808,333.33 |
| Arbor Commercial | 3/12/2008 | $684,523.81 |
| Ron Invest | 3/12/2008 | $119,047.62 |
| Glida One | 3/12/2008 | $327,380.95 |
| Polar Extended Stay | 3/12/2008 | $59,523.81 |
| Princeton | 3/12/2008 | $59,523.81 |
| Arbor Commercial | 3/17/2008 | $241,865.08 |
| Ron Invest | 3/17/2008 | $42,063.49 |
| Glida One | 3/17/2008 | $115,674.61 |
| Polar Extended Stay | 3/17/2008 | $21,031.75 |
| Princeton | 3/17/2008 | $21,031.75 |
| Arbor Commercial | 4/11/2008 | $684,523.81 |
| Ron Invest | 4/11/2008 | $119,047.62 |
| Glida One | 4/11/2008 | $327,380.95 |
| Polar Extended Stay | 4/11/2008 | $59,523.81 |
| Princeton | 4/11/2008 | $59,523.81 |
| Arbor Commercial | 4/15/2008 | $305,753.97 |
| Ron Invest | 4/15/2008 | $53,174.60 |
| Glida One | 4/15/2008 | $146,230.16 |
| Polar Extended Stay | 4/15/2008 | $26,587.30 |
| Princeton | 4/15/2008 | $26,587.30 |
| Arbor Commercial | 5/12/2008 | $684,523.81 |
| Ron Invest | 5/12/2008 | $119,047.62 |
| Glida One | 5/12/2008 | $327,380.95 |
| Polar Extended Stay | 5/12/2008 | $59,523.81 |
| Princeton | 5/12/2008 | $59,523.81 |
| Arbor Commercial | 5/15/2008 | $500,000.00 |
| Arbor Commercial | 6/12/2008 | $684,523.81 |
| Ron Invest | 6/12/2008 | $119,047.62 |
| Glida One | 6/12/2008 | $327,380.95 |
| Polar Extended Stay | 6/12/2008 | $59,523.81 |
| Princeton | 6/12/2008 | $59,523.81 |
| Arbor Commercial | 6/16/2008 | $27,418.63 |
| Ron Invest | 6/16/2008 | $4,768.45 |
| Glida One | 6/16/2008 | $13,113.26 |
| Polar Extended Stay | 6/16/2008 | $2,384.23 |
| Princeton | 6/16/2008 | $2,384.23 |
| Arbor Commercial | 6/16/2008 | $508,264.53 |
| Arbor Commercial | 7/11/2008 | $684,523.81 |
| Ron Invest | 7/11/2008 | $119,047.62 |
| Glida One | 7/11/2008 | $327,380.95 |
| Polar Extended Stay | 7/11/2008 | $59,523.81 |
| Princeton | 7/11/2008 | $59,523.81 |
| Arbor Commercial | 7/15/2008 | $500,000.00 |
| Arbor Commercial | 8/12/2008 | $684,523.81 |
| Ron Invest | 8/12/2008 | $119,047.62 |

| | | |
|---|---|---|
| Glida One | 8/12/2008 | $327,380.95 |
| Polar Extended Stay | 8/12/2008 | $59,523.81 |
| Princeton | 8/12/2008 | $59,523.81 |
| Arbor Commercial | 8/15/2008 | $558,333.33 |
| Arbor Commercial | 9/12/2008 | $684,523.81 |
| Ron Invest | 9/12/2008 | $119,047.62 |
| Glida One | 9/12/2008 | $327,380.95 |
| Polar Extended | 9/12/2008 | $59,523.81 |
| Princeton | 9/12/2008 | $59,523.81 |
| Arbor Commercial | 9/15/2008 | $558,333.33 |
| Arbor Commercial | 10/10/2008 | $684,523.81 |
| Ron Invest | 10/10/2008 | $119,047.62 |
| Glida One | 10/10/2008 | $327,380.95 |
| Polar Extended Stay | 10/10/2008 | $59,523.81 |
| Princeton | 10/10/2008 | $59,523.81 |
| Arbor Commercial | 10/15/2008 | $500,000.00 |
| Arbor Commercial | 11/12/2008 | $684,523.81 |
| Ron Invest | 11/12/2008 | $119,047.62 |
| Glida One | 11/12/2008 | $327,380.95 |
| Polar Extended Stay | 11/12/2008 | $59,523.81 |
| Princeton | 11/12/2008 | $59,523.81 |
| Arbor Commercial | 11/17/2008 | $558,333.33 |
| Arbor Commercial | 12/18/2008 | $1,750,000.00 |
| Arbor Commercial | 1/20/2009 | $1,808,333.00 |
| Arbor Commercial | 2/20/2009 | $1,808,333.00 |
| Arbor Commercial | 3/11/2009 | $15,178,970.53 |

209.    Many of the above transfers were in fact made through BHAC Capital IV or HVM on behalf of BHAC Capital IV, using funds received from the Debtors.  In 2007, BHAC Capital IV received and paid out approximately $19,257,000.  In 2008, it received and paid out approximately $14,068,000.

210.    Some of the above transfers were made with proceeds of the LIBOR Floor Certificates.

211.    Each of these dividends or distributions was made at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent.  Each of the recipients of each of these dividend or distribution payments was an insider and therefore was aware at the time that the Debtors did not have a surplus or were insolvent, or that the payment rendered the

Debtors insolvent. At all pertinent times, each of the recipients was aware of the distressed condition of the Debtors.

212.   For those payments listed in the preceding paragraph that were made to Series A-2 and A-3 Unit Holders, the payments violated the terms of the pertinent loan agreements, which prohibited such dividends or distributions to equity when the Debt Yield fell beneath certain benchmarks as set forth in the loan covenants (as had been the case since the LBO closed).

213.   In addition, Lichtenstein or a Lichtenstein-affiliate received the Management Fee Transfers totaling up to $1 million per year on account of their equity interest in the Company and without providing management services or other consideration. The Management Fee Transfers were made at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent. Each of the recipients of each of these dividend or distribution payments was an insider and therefore was aware at the time that the Debtors did not have a surplus or were insolvent, or that the payment rendered the Debtors insolvent. At all pertinent times, each of the recipients was aware of the distressed condition of the Debtors.

214.   All of the Improper and Fraudulent Transfers were illegal payments to equity under applicable state law.

215.   Accordingly, pursuant to Bankruptcy Rule 7001, § 541 of the Bankruptcy Code, and applicable state law, including §§ 160, 173 and 174 of the DGCL and/or § 18-607 of the Delaware Limited Liability Company Act ("DLLCA"), Plaintiffs are entitled to entry of a judgment declaring that each of the transfers described above were illegal under applicable state law.

216.   For the same reasons, Plaintiffs are entitled to recover these transfers under § 541 of the Bankruptcy Code, and applicable state law, including §§ 160, 173 and 174 of the DGCL

and/or § 18-607 of the DLLCA, plus disgorgement of profits or reinvestment proceeds lost by

Debtors, prejudgment interest, costs and fees to the extent permitted by law.

## COUNT TWO

### Authorization of Illegal Dividends or Distributions
### (11 U.S.C. §§ 541 and applicable state law)

**(against Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, Milone, DL-DW Holdings, L.L.C., BHAC Capital IV, L.L.C., Lightstone Holdings, L.L.C., Lightstone Group, L.L.C., Lightstone Commercial Management, Park Avenue Funding L.L.C., Arbor ESH II L.L.C., Arbor Commercial Mortgage, L.L.C., Princeton ESH L.L.C., Atmar Associates, L.L.C., Glida One LLC, Ron Invest LLC, ABT-ESI L.L.C., Mericash Funding, LLC, Polar Extended Stay (USA) L.P., and PGRT ESH Inc.)**

217.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-216 as if fully set forth herein.

218.    Each of the illegal dividends or distributions alleged in Count One was authorized or allowed by one or more of the directors of the "Extended Stay Hotels family of companies" as follows:

a.    Lichtenstein, de Vinck, Owen, Teichman, Chetrit, and Martello authorized or allowed all of the unlawful distributions listed in Count One above made from June 11, 2007 through August 14, 2008.

b.    Lichtenstein, de Vinck, Owen, Teichman, Chetrit, and Milone authorized or allowed all of the unlawful distributions listed in Count One above made from August 15, 2008 through March 11, 2009.

c.    In authorizing or allowing these distributions, Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Milone, and Martello acted on behalf of and for the benefit of at least one of the following entities: DL-DW, BHAC Capital IV, Lightstone Holdings, Lightstone Group, Lightstone Commercial Management, Park Avenue, Arbor ESH, Arbor Commercial, Princeton, Atmar, Glida One, Ron Invest, ABT-ESI, Mericash, Polar Extended Stay, and PGRT.

75

219.    Each of the distributions was made from funds that, upon information and belief, came from the Debtors.

220.    Each of these dividends or distributions was made at a time when the Debtors did not have a surplus or were insolvent, or otherwise rendered the Debtors insolvent.

221.    Each of the Defendants knew of the distressed condition of the Debtors, including the facts that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent.

222.    Each of these payments was an illegal dividend or distribution to equity under applicable state law.

223.    Each of these illegal dividends or distributions was willfully authorized or allowed by Defendants despite the Debtors' insolvency or lack of a surplus.

224.    Under § 541 of the Bankruptcy Code and §§ 160 and 174 of the DGCL and/or § 18-607 of the DLLCA, or under comparable provisions of any other pertinent state law, Defendants are therefore each individually liable for repayment of the unlawful dividends or distributions set forth above that they authorized or allowed when they were directors, plus reinvestment proceeds lost by Debtors, prejudgment interest, costs and fees to the extent permitted by law.

## COUNT THREE

**Avoidance and Recovery of Illegal Dividends or Distributions
(11 U.S.C. §§ 544(b) and 550 and applicable state law)**

**(against Lichtenstein, DL-DW Holdings, L.L.C., ABT-ESI L.L.C., Mericash Funding LLC,
Park Avenue Funding L.L.C., Lightstone Commercial Management, Arbor ESH II
L.L.C., Arbor Commercial Mortgage L.L.C., Polar Extended Stay (USA) L.P., Princeton
ESH, L.L.C., PGRT ESH Inc., Lightstone Holdings, L.L.C., Glida One LLC, Ron Invest
LLC, and BHAC Capital IV, L.L.C.)**

225.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-224 as if fully set forth herein.

226.    Each of the transfers of property, funds, or obligations alleged in Count One, including the original assignment of the LBO Floor Certificates to DL-DW, was an illegal dividend or distribution to equity under applicable state law.

227.    Each of these illegal dividends or distributions was willfully made despite the Debtors' insolvency or lack of a surplus.

228.    Each of the Defendants was an insider and thus knew of the distressed condition of the Debtors, including the facts that that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent.

229.    To the extent that any Defendant received any of these transfers of property, funds, or obligations as an immediate or mediate transferee, each such Defendant (a) did not receive it in good faith, (b) was aware of the facts underlying these transfers and hence was aware of the avoidability of the transfer, and (c) did not receive it for value.

230.    Where a Defendant was not an initial, immediate, or mediate transferee of the transfer at issue, the Defendant was a party for whose benefit the transfer was made.  For instance, as a guarantor of the 25% Note, BHAC Capital IV was a party for whose benefit the

77

proceeds of the LIBOR Floor Certificates were used to pay principal and interest owed on the 25% Note.

231.    Pursuant to Bankruptcy Rule 7001 and § 544(b) of the Bankruptcy Code and applicable state law, including §§ 160, 173 and 174 of the DGCL and/or § 18-607 of the DLLCA, each of the above transfers is avoidable, and Plaintiffs are entitled to a declaration avoiding each of these transfers.

232.    Pursuant to § 550 of the Bankruptcy Code and applicable state law, including §§ 160, 173 and 174 of the DGCL and/or § 18-607 of the DLLCA, Plaintiffs are entitled to recover the amount of each of the above transfers from Defendants as initial transferees, parties for whose benefit the transfers were made, or immediate or mediate transferees, as well as disgorgement of profits or reinvestment proceeds lost by Debtors, prejudgment interest, costs and fees to the extent permitted by law.

## COUNT FOUR

### Unjust Enrichment
### (11 U.S.C. §§ 541 and applicable state law)

**(against DL-DW, L.L.C., ABT-ESI, L.L.C., BHAC Capital IV, L.L.C., Park Avenue Funding L.L.C., Princeton ESH, L.L.C., Mericash Funding, LLC, Lightstone Commercial Management, Arbor Commercial Mortgage L.L.C., Arbor ESH II L.L.C., Polar Extended Stay (USA) L.P., PGRT ESH Inc., Lightstone Holdings, L.L.C., Glida One LLC, and Ron Invest LLC)**

233.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-232 as if fully set forth herein.

234.    DL-DW, ABT-ESI, BHAC Capital IV, Park Avenue, Princeton, Mericash, Lightstone Commercial, Arbor Commercial, Arbor ESH, Polar Extended Stay, PGRT, Lightstone Holdings, Glida One, and Ron Invest have been unjustly enriched.  Each of these

Defendants wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

235.    From November 2007 through February 2009, DL-DW received payments totaling approximately $20 million as proceeds from the LIBOR Floor Certificates that should have been paid to the Debtors.  These funds unjustly enriched DL-DW, which wrongfully and unconscionably benefitted from the receipt of funds that belonged to the Debtors.

236.    Overall, the LIBOR Floor Certificates were worth at least $74.3 million before they finally were extinguished in October 2010.

237.    When it received the LIBOR Floor Certificates, and at all subsequent times when it received proceeds from the LIBOR Floor Certificates, DL-DW was aware that the Debtors did not have a surplus and/or were insolvent or that the assignment or payment rendered the Debtors insolvent.  At all pertinent times, DL-DW was aware of the distressed condition of the Debtors.

238.    From approximately May 2008 through approximately February 2009, DL-DW used approximately $8.9 million of its proceeds received from the LIBOR Floor Certificates to pay the lenders of the 25% Note:  Mericash and ABT-ESI each received payments totaling $2,117,593, Princeton received $222,905, and Park Avenue and its assignee, Lightstone Commercial, received a total of $4,458,091.  In addition, approximately $4,817,986, was subsequently paid to Lightstone Commercial when the Floor Bonds Reserve Account was liquidated.  These funds unjustly enriched Mericash, ABT-ESI, Park Avenue, and Lightstone Commercial, which wrongfully and unconscionably benefitted from the receipt of funds that belonged to the Debtors.  When they received these payments derived from the proceeds of the LIBOR Floor Certificates, Mericash, ABT-ESI, Park Avenue, and Lightstone Commercial were

aware that the Debtors did not have a surplus and/or were insolvent or that the payment rendered the Debtors insolvent.

239.    On information and belief, approximately $3.7 million of the proceeds from the LIBOR Floor Certificates during this period was paid by or on behalf of DL-DW to Arbor Commercial on behalf of itself and the other Series A-1 equity holders as regular payments on equity.

240.    On March 12, 2009, pursuant to the "Floor Bonds Agreement," the LIBOR Floor Certificates were assigned to ABT-ESI for the benefit of various equity-holder Defendants, including DL-DW.  Subsequent to this transfer, from March 2009 to October 2010, when the certificates were extinguished, an estimated $55 million was paid on the LIBOR Floor Certificates to ABT-ESI and/or its assignees or subsequent transferees.  On information and belief, Mericash and ABT-ESI each ultimately received approximately $13,066,792, Princeton ultimately received approximately $1,375,452, and Park Avenue/Lightstone Commercial ultimately received approximately $27,509,036.

241.    In addition to the unjust enrichment resulting from the wrongful diversion of the LIBOR Floor Certificates, Defendants were unjustly enriched by the wrongful payment of distributions and dividends to equity holders, depleting the Debtors' funds when the Defendants were insolvent and facing a grave liquidity crisis.

242.    Arbor Commercial depleted the assets of the Debtors by taking distributions totaling approximately $43,997,154[2] between 2007 and 2009.

243.    Arbor Commercial has been enriched at the expense of the Debtors and has retained the distributions totaling approximately $43,997,154.

_____
[2] This amount includes the single $262,500 distribution made to both Arbor Commercial and Ron Invest on January 15, 2008.

244.    Arbor ESH, as a member of BHAC Capital IV, was, upon information and belief, entitled to receive any distributions made to Arbor Commercial.  To the extent Arbor ESH received any distributions made to Arbor Commercial, Arbor ESH has been unjustly enriched as well and is liable for such distributions.

245.    Glida One depleted the assets of the Debtors by taking distributions totaling approximately $5,363,391 in 2007 and 2008.  Glida One was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions.

246.    Glida One has been enriched at the expense of the Debtors and has retained the distributions totaling approximately $5,363,391.

247.    In addition to receiving the above distributions from the LIBOR Floor Certificates, Princeton depleted the assets of the Debtors by taking distributions totaling approximately $1,235,162 in 2007 and 2008.  Princeton was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions.

248.    Princeton has been enriched at the expense of the Debtors and has retained the distributions totaling approximately $1,235,162.

249.    Ron Invest depleted the assets of the Debtors by taking distributions totaling approximately $1,433,935[3] in 2008.  Ron Invest was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions.

250.    Ron Invest has been enriched at the expense of the Debtors and has retained the distributions totaling approximately $1,433,935.

251.    Lightstone Holdings depleted the assets of the Debtors by taking distributions of approximately $2,668,000 on August 31, 2007, which was further improper in that it was made

---

[3] This amount includes the single $262,500 distribution made to both Arbor Commercial and Ron Invest on January 15, 2008.

in violation of the Loan Agreement. Lightstone Holdings was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions.

252. Lightstone Holdings has been enriched at the expense of the Debtors and has retained the distributions of approximately $2,668,000.

253. PGRT depleted the assets of the Debtors by taking distributions totaling approximately $6,167,000 in 2007. PGRT was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the Loan Agreement.

254. PGRT has been enriched at the expense of the Debtors and has retained the distributions totaling approximately $6,167,000.

255. Polar Extended Stay depleted the assets of the Debtors by taking distributions totaling approximately $1,235,162 in 2007 and 2008. Polar Extended Stay was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions.

256. Polar Extended Stay has been enriched at the expense of the Debtors and has retained the distributions totaling approximately $1,235,162.

257. Lichtenstein or a Lichtenstein-affiliated entity received management fees totaling up to $1 million per year paid with funds of the Debtors even though such fees were redundant, as management services for the hotel operations were provided by HVM and HVM Canada. These funds unjustly enriched Lichtenstein, who wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors. Lichtenstein was aware that the Debtors did not have a surplus and/or were insolvent at the time he or a Lichtenstein-affiliated entity received the management fees.

258.    Equity and good conscience require full restitution of all of the above monies and assets received by each of the above Defendants, directly and indirectly, from the Debtors.  This includes not only the money and assets that the Defendants received, but also the proceeds of that money.  Any interest earned with the money, or any payments made upon the assets that were received must be returned to the Trust.

259.    Accordingly, pursuant to § 541 of the Bankruptcy Code and applicable state law, Plaintiffs are entitled to restitution from each of the Defendants as set forth above, or the Defendants should be required to disgorge that amount, plus disgorgement of profits or reinvestment proceeds lost by Debtors, prejudgment interest, costs and fees to the extent permitted by law.

## <u>COUNT FIVE</u>

### Breach of Fiduciary and Contractual Duties of Care, Loyalty, and Good Faith
### (11 U.S.C. §§ 541 and applicable state law)

### (against all Defendants)

260.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-259 as if fully set forth herein.

261.    Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone, during their respective tenures as directors, officers, or persons that otherwise managed, owned, controlled, and dominated the Debtors, owed the Debtors and the Debtors' creditors the fiduciary and contractual duties of good faith, care and loyalty.

262.    Holders of the 9.875% Notes, mortgage debt, mezzanine debt, tax claims and certain other trade debt were creditors of the Company at, upon information and belief, all relevant times and were injured by the Defendants' improper actions or inactions as described herein.

263.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed.  Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone, during their respective tenures as directors, officers, or persons that otherwise managed, owned, controlled, and dominated the Debtors, therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners, at all times after the date the LBO closed.

264.    Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone, during their respective tenures as directors, officers, or persons that otherwise managed, owned, controlled, and dominated the Debtors, had the authority to control the management, affairs, and direction of the Debtors at all relevant times following the LBO's closing.  Each individual, during his tenure as a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors, by virtue of his position of control, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

265.    Each of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone, during their respective tenures as a director, officer or person that otherwise managed, owned, controlled, and dominated the Debtors, acting both individually and collectively, breached his fiduciary and contractual duties, as follows:

(a)    Causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable Defendants and, upon information and belief, in some cases, to himself, as described in this Amended Complaint, at times when the Debtors were insolvent, including, without limitation, the payment of the following value from the Debtors:

84

(i)     Distribution of the LIBOR Floor Certificates to DL-DW on or around
November 2, 2007, and subsequent payments received by (or for the
benefit of) DL-DW on account of those certificates, totaling no less than
approximately $20 million;

(ii)    Unlawful dividends or distributions to equity, made at a time when the
Debtors were insolvent or lacked a surplus, or otherwise rendered the
Debtors insolvent, totaling no less than $62.1 million;

(iii)   Securing the 25% Note with the LIBOR Floor Certificates that belonged
to the Debtors but had been wrongly assigned to DL-DW;

(iv)    Distribution of funds held in the Preferred Equity Reserve Account to
insiders on the eve of bankruptcy totaling no less than approximately
$20.5 million in early 2009;

(v)     Diverting proceeds from the LIBOR Floor Certificates that belonged to the
Debtors to pay off the insider 25% Note, thus providing ABT-ESI (and A-
1 equity holders) with at least $55 million in value that belonged to the
Debtors;

(vi)    Distribution of funds from the Floor Bonds Reserve Account on the eve of
the Debtors' eventual bankruptcy filing totaling approximately $4.8
million;

(vii)   Payment of substantial "asset management" fees totaling up to $1 million
annually to Lichtenstein or a Lichtenstein-affiliated entity, despite the fact
that HVM was managing the Debtors' daily business affairs and despite

the fact that neither Lichtenstein or any Lichtenstein-affiliated entity had performed work to justify these payments; and

(viii)  Delaying the commencement of bankruptcy proceedings, with self-dealing motives, until slightly more than two years after the LBO's closing, in an attempt to adversely impact the Debtors' ability to avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

(b)    To the extent that one or more Defendant claims that the dividends or distributions, or the other payments and transfers addressed in this Amended Complaint, were not unlawful or otherwise wrongful because they were made in connection with the terms of the LBO agreements, and to the extent that Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, or Milone may have caused or allowed the Debtors to enter into the LBO loan and other transaction documents that contained provisions that would cause or allow the Debtors to be forced to make improper dividends or distributions to one or more of the Defendants regardless of the Debtors' dire financial condition or poor performance, Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, or Milone would have breached their fiduciary duties that they owed to the Debtors.

266.    The acts or omissions of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone described herein were, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.

267.    Each of these acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

268.    In exercising their fiduciary duties as directors of the "Extended Stay Hotels family of companies," Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone acted under the domination or control of their employers or principals in connection with the acts and omissions alleged herein, or they acted on behalf of their employers or principals. Specifically, in authorizing or allowing these acts or omissions, Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Milone, and Martello acted on behalf of one or more of the following entities: DL-DW, ABT-ESI, BHAC Capital IV, Park Avenue, Princeton, Mericash, Lightstone Commercial, Arbor Commercial, Arbor ESH, Polar Extended Stay, PGRT, Lightstone Holdings, Glida One, and Ron Invest.  In exercising that domination or control, or in allowing Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Milone, and Martello to act on their behalf, each of those entities acted for its own benefit.

269.    Each of these acts and omissions of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust.

270.    By reason of each of the acts and omissions of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone described herein, Plaintiffs are entitled to recovery of actual, compensatory, and consequential damages from the Defendants, jointly and severally as to each injury to the Debtors, in amounts to be determined at trial, pursuant to § 541 of the Bankruptcy Code.

271.    Each of Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, and Milone are personally liable for the amount of the illegal dividends or other improper distributions alleged herein due to their willful and negligent approval of such illegal dividends or other

improper distributions at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent.

272.    In breaching his or its fiduciary duties to the Debtors, each of the above Defendants acted intentionally, outrageously and egregiously, demonstrating a high degree of moral culpability, and with wanton, willful, and reckless disregard for the Debtors' rights. Accordingly, Plaintiffs are entitled to punitive damages of at least three times the damages, or such other amount as the Court may determine after trial, awarded against each Defendant individually to punish and deter him and others from engaging in such conduct in the future, pursuant to § 541 of the Bankruptcy Code and applicable state law.

## COUNT SIX

### Aiding, Abetting, Inducing, or Participating in
### Breaches of Fiduciary and Contractual Duties and Other Misconduct
### (11 U.S.C. §§ 541 and applicable state law)

### (against All Defendants)

273.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-272 as if fully set forth herein.

274.    To the extent that any Defendant did not individually commit a particular act or omission at issue herein, that Defendant aided, abetted, induced, participated in, or conspired to, commit the breaches of fiduciary and contractual duties by one or more of the other Defendants, as described above.

275.    Each Defendant knew that the other Defendants' acts and omissions were wrongful and constituted breaches of fiduciary and contractual duties.  With that knowledge, each Defendant provided material and substantial assistance in connection with, and knowingly participated in, one or more breaches of fiduciary or contractual duties and misconduct identified above.

276.    In providing such assistance, each of the Defendants acted in bad faith and with the actual intent to assist the other Defendants in their respective breaches of fiduciary or contractual duties and misconduct identified above.

277.    Each Defendant's independent acts or omissions as an aider and abettor directly and proximately caused harm to the Debtors, the Debtors' creditors, and the Debtors' estates.

278.    Plaintiffs are entitled to recovery of actual, compensatory, and consequential damages from Defendants, jointly and severally, as a result of their acts or omissions that aided and abetted the above breaches of fiduciary or contractual duties in amounts to be determined at trial, pursuant to § 541 of the Bankruptcy Code and applicable state law.

279.    In aiding or abetting the above breaches of fiduciary duties to the Debtors, each of the above Defendants acted intentionally, outrageously and egregiously, demonstrating a high degree of moral culpability, and with wanton, willful, and reckless disregard for the Debtors' rights.   Accordingly, Plaintiffs are entitled to punitive damages of at least three times the damages, or such other amount as the Court may determine after trial, awarded against each Defendant individually to punish and deter him and others from engaging in such conduct in the future, pursuant to § 541 of the Bankruptcy Code and applicable state law.

## COUNT SEVEN

**Breaches of Fiduciary Duties Owed to Creditors**
**(11 U.S.C. §§ 541 and applicable state law)**

**(against All Defendants)**

280.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-279 as if fully set forth herein.

281.    Defendants breached the fiduciary duties identified herein owed to the Debtors' creditors by committing the acts or omissions described herein.

282.     Each of the Defendant's acts or omissions described herein was either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent, or negligent and in derogation of applicable law.

283.     Each of the Defendant's acts or omissions described herein directly and proximately caused generalized harm to all of the Debtors' creditors in the amounts described herein.

284.     By reason of the Defendants' acts or omissions described herein, Plaintiffs are entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in an amount to be determined at trial, on behalf of all of the Debtors' creditors and claimants, pursuant to § 541 of the Bankruptcy Code and applicable state law.

285.     In breaching their fiduciary duties to the Debtors' creditors, or in aiding and abetting such breaches, each of the above Defendants acted intentionally, outrageously and egregiously, demonstrating a high degree of moral culpability, and with wanton, willful, and reckless disregard for the Debtors' creditors' rights.     Accordingly, Plaintiffs are entitled to punitive damages of at least three times the damages, or such other amount as the Court may determine after trial, awarded against each Defendant individually to punish and deter him and others from engaging in such conduct in the future, pursuant to § 541 of the Bankruptcy Code and applicable state law.

## **COUNT EIGHT**

**Waste**
**(11 U.S.C. §§ 541 and applicable state law)**

**(against All Defendants)**

286.     Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-285 as if fully set forth herein.

287.    Each of the Defendants' acts or omissions described herein constituted a waste of assets of the Debtors.

288.    Each of the Defendants' acts or omissions described herein was either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent, or negligent and in derogation of applicable law.

289.    Each of the Defendants' acts or omissions identified herein constituted the irrational squandering of the Debtors' assets and the value thereof.  There was no good faith basis upon which any of the Defendants could have concluded that those acts or omissions were beneficial to the Debtors.

290.    Each of the Defendants' acts or omissions identified herein directly and proximately caused harm to the Debtors.

291.    By reason of the Defendants' acts or omissions described herein, Plaintiffs are entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in the amount to be determined at trial, pursuant to § 541 of the Bankruptcy Code and applicable state law.

<u>**COUNT NINE**</u>

**Conversion**
**(11 U.S.C. §§ 541 and applicable state law)**

**(against All Defendants)**

292.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-291 as if fully set forth herein.

293.    In November 2007, the LIBOR Floor Certificates were diverted from the Debtors and assigned to DL-DW without DL-DW providing any consideration in return, even though those instruments rightfully belonged to the Debtors who had made the requested

accommodations to their mortgage loans in exchange for issuance of the LIBOR Floor Certificates.

294.    From November 2007 through February 2009, DL-DW received payments totaling approximately $20 million as proceeds from the LIBOR Floor Certificates that should have been paid to the Debtors.

295.    Of that amount, from on or around May 2008 through February 2009, DL-DW used approximately $17.4 million of those proceeds to make the following payments: (a) pay the lenders of the 25% Note:  Mericash and ABT-ESI each received payments totaling $2,117,593, Princeton received $222,905, and Park Avenue and its assignee, Lightstone Commercial, received a total of $4,458,091; (b) pay approximately $3.7 million to the Series A-1 equity holders as regular payments on equity; and (c) $4,817,986 was deposited into the Floor Bonds Reserve Account.

296.    Lichtenstein, Owen, Teichman, de Vinck, Milone, ABT-ESI, Park Avenue Funding, Mericash, Princeton, DL-DW and BHAC Capital IV explicitly authorized or consented to the conversion of the proceeds of the LIBOR Floor Certificates referenced in the preceding paragraph.

297.    Pursuant to the "Floor Bonds Agreement," on March 12, 2009, the LIBOR Floor Certificates were assigned to ABT-ESI for the benefit of various equity-holder Defendants, including DL-DW.  Additionally, the Floor Bonds Reserve Account was liquidated and the balance in the amount of $4,817,896 was paid to Lightstone Commercial.  Subsequently, from March 2009 to October 2010, when the certificates were extinguished, an estimated $55 million was paid on the LIBOR Floor Certificates to ABT-ESI and/or its assignees or subsequent transferees.  On information and belief, Mericash and ABT-ESI each ultimately received

approximately $13,066,792, Princeton ultimately received approximately $1,375,452, and Park Avenue/Lightstone Commercial ultimately received approximately $27,509,036.

298.    Lichtenstein, Owen, Milone, Chetrit, Teichman, de Vinck, Lightstone Commercial, ABT-ESI, Mericash, Princeton, DL-DW, and BHAC Capital IV authorized the "Floor Bonds Agreement," thereby authorizing or allowing the further conversion of the LIBOR Floor Certificates and their proceeds as referenced in the preceding paragraph.

299.    All Defendants were each an officer, director, insider affiliate of, or otherwise controlled DL-DW and/or members of the board of the Company.

300.    In sum, the LIBOR Floor Certificate Transfers deprived the Debtors of at least $74.3 million in income that would have been earned by October 2010, when the certificates finally were extinguished.

301.    The LIBOR Floor Certificates were valuable personable property entitling their owners to receive substantial payments each month that the LIBOR rate fell below a designated level.

302.    The Debtors were the rightful owners of the LIBOR Floor Certificates and the proceeds on account thereof.

303.    Without legal justification or right, the Defendants intentionally interfered with the Debtors' right to dominion and control of the LIBOR Floor Certificates and to receipt of all proceeds paid on account of the LIBOR Floor Certificates.

304.    The Defendants' intentional interference with the Debtors' right to dominion and control of the LIBOR Floor Certificates and the proceeds on account thereof deprived Debtors of possession and use of the certificates and proceeds.

305.    Similarly, the Defendants converted, and intentionally interfered with the Debtors' right to possession, dominion, and control over the Debtors' property when they caused to be made or received each of the improper Management Fees Transfers and Dividend Transfers.

306.    The Defendants' interference caused substantial injury to the Debtors.

307.    Due to the Defendants' interference with the Debtors' property, Plaintiffs are entitled to recovery of actual, compensatory and consequential damages from Defendants in an amount to be determined at trial, on behalf of all of the Debtors' creditors and claimants, pursuant to § 541 of the Bankruptcy Code and applicable state law.

308.    In converting the Debtors' property, Defendants acted intentionally, outrageously and egregiously, demonstrating a high degree of moral culpability, and with wanton, willful, and reckless disregard for the Debtors' rights.   Accordingly, Plaintiffs are entitled to punitive damages of at least three times the damages, or such other amount as the Court may determine after trial, awarded against Defendants to punish and deter them and others from engaging in such conduct in the future, pursuant to § 541 of the Bankruptcy Code and applicable state law.

## COUNT TEN

### Aiding, Abetting, Inducing, or Participating in Conversion
### (11 U.S.C. §§ 541 and applicable state law)

### (against All Defendants)

309.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-308 as if fully set forth herein.

310.    To the extent that any Defendant did not individually convert the Debtors' right to own the LIBOR Floor Certificates, that Defendant aided, abetted, induced, or participated in, the conversion of the right of the Debtors to ownership of the LIBOR Floor Certificates.

311.   Similarly, to the extent that any Defendant did not individually convert the Debtors' right to own the funds subject to the improper Management Fees Transfers and Dividend Transfers, that Defendant aided, abetted, induced, or participated in, the conversion of the right of the Debtors to ownership of those funds.

312.   As an insider, each Defendant knew that the other Defendants' acts and omissions constituted conversion.  With that knowledge, each Defendant provided material and substantial assistance in connection with, and knowingly participated in, the conversion of the LIBOR Floor Certificates, and the funds subject to the improper Management Fee Transfers and Dividend Transfers.

313.   In providing such assistance, each of the Defendants acted in bad faith and with the actual intent to assist the other Defendants in the conversion of the LIBOR Floor Certificates and the funds subject to the improper Management Fee Transfers and Dividend Transfers.

314.   Each Defendant's independent acts or omissions as an aider and abettor directly and proximately caused harm to the Debtors, the Debtors' creditors, and the Debtors' estates.

315.   Plaintiffs are entitled to recovery of actual, compensatory, and consequential damages from Defendants, jointly and severally, as a result of their acts or omissions that aided and abetted the above conversion of property, in amounts to be determined at trial, pursuant to § 541 of the Bankruptcy Code and applicable state law.

316.   In aiding or abetting the conversion of the Debtors' property, each of the above Defendants acted intentionally, outrageously and egregiously, demonstrating a high degree of moral culpability, and with wanton, willful, and reckless disregard for the Debtors' rights. Accordingly, Plaintiffs are entitled to punitive damages of at least three times the damages, or such other amount as the Court may determine after trial, awarded against each Defendant

individually to punish and deter him and others from engaging in such conduct in the future, pursuant to § 541 of the Bankruptcy Code and applicable state law.

### COUNT ELEVEN

**Conspiracy**
**(11 U.S.C. §§ 541 and applicable state law)**

**(against All Defendants)**

317.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-316 as if fully set forth herein.

318.    The diversion of the Debtors' right to own, possess, and control the LIBOR Floor Certificates and the funds subject to the improper Management Fees Transfers and Dividend Transfers constitutes the tort of conversion.

319.    Each of the Defendants corruptly agreed with other Defendants to convert the Debtors' property from the Debtors to Defendants without legal cause or justification.

320.    Each of the Defendants intentionally and willingly agreed to further this plan and further agreed to the continued diversion of the proceeds from the LIBOR Floor Certificates to the benefit of the Defendants and not to the Debtors.

321.    The Defendants' agreement to convert the Debtors' property was facilitated by several overt acts, namely the assignment of the LIBOR Floor Certificates to DL-DW instead of to the Debtors, the diversion of the Management Fee Transfers from the Debtors to Lichtenstein or a Lichtenstein-affiliate, and the diversion of the Dividend Transfers to various Defendants as alleged in Count One.

322.    This agreement injured the Debtors by depriving them of valuable property and diverting tens of millions of dollars in revenue from this property to the benefit of Defendants.

323.    In providing such assistance, each of the Defendants acted in bad faith and with the actual intent to assist the other Defendants in their conversion of the Debtors' property.

324.    Plaintiffs are entitled to recovery of actual, compensatory, and consequential damages from Defendants, jointly and severally, as a result of their acts or omissions in support of this conspiracy, in amounts to be determined at trial, pursuant to § 541 of the Bankruptcy Code and applicable state law.

325.    In conspiring to convert the Debtors' property, each of the above Defendants acted intentionally, outrageously and egregiously, demonstrating a high degree of moral culpability, and with wanton, willful, and reckless disregard for the Debtors' rights. Accordingly, Plaintiffs are entitled to punitive damages of at least three times the damages, or such other amount as the Court may determine after trial, awarded against each Defendant individually to punish and deter him and others from engaging in such conduct in the future, pursuant to § 541 of the Bankruptcy Code and applicable state law.

## COUNT TWELVE

### Intentional Fraudulent Transfers
### (11 U.S.C. §§ 548(a)(1)(A) and 550)

**(against Lichtenstein, DL-DW Holdings, L.L.C., ABT-ESI L.L.C., Arbor Commercial Mortgage L.L.C., Arbor ESH II L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., Polar Extended Stay (USA) L.P., Princeton ESH, L.L.C., PGRT ESH Inc., Lightstone Holdings, L.L.C., Lightstone Commercial Management, Glida One LLC, Ron Invest LLC, and BHAC Capital IV, L.L.C.)**

326.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-325 as if fully set forth herein.

327.    Within two years before the Petition Date, the Debtors made all or nearly all of the wrongful dividends, distributions, and other transfers discussed herein.

328.    These transfers constitute transfers of interests of the Debtors in property.  The obligations constitute obligations incurred by the Debtors.

329.    These transfers were made and/or the obligations were incurred with actual intent to hinder, delay, or defraud one or more entities to which the Debtors were or became indebted. The Defendants, and the insiders who directed the Debtors to make these transfers and incur these obligations, had knowledge of the Debtors' insolvency when the transfers were made and the obligations incurred.   Accordingly, the Defendants and the insiders knew that they were hindering, delaying, or defrauding the Debtors' creditors when the Debtors paid equity owners on account of their equity ahead of paying off creditors.

330.    Among the many facts demonstrating that these payments and obligations were intended to hinder, delay, or defraud the Debtors' creditors are the following:

(i)     the transfers were made and the obligations were incurred when the Debtors were insolvent;

(ii)    the transfers were made and the obligations were incurred at a time when the Debtors were controlled by insiders who benefited directly and indirectly from the transfers and obligations;

(iii)   the transfers were made and the obligations incurred without any benefit or value received by the Debtors;

(iv)    when the transfers were made and the obligations incurred, the Debtors and the insiders had knowledge of the Debtors' insolvency;

(v)     the transfers were not made and the obligations were not incurred in the ordinary course of business;

(vi)    these distributions to equity were unlawful under applicable state law, as they were made while the Debtors were insolvent; and

(vii)   the transfers and obligations depleted much needed cash, adversely impacted and jeopardized the liquidity of the company, and hindered and delayed payments to creditors on obligations owed by the Debtors.

331.    To the extent that any Defendant received a transfer or obligation as an immediate or mediate transferee, such Defendant (a) did not receive it in good faith, (b) was aware of the facts underlying these transfers and hence was aware of the avoidability of the transfer, and (c) did not receive it for value.

332.    Where a Defendant was not an initial, immediate, or mediate transferee of the transfer at issue, the Defendant was a party for whose benefit the transfer was made.

333.    By reason of the foregoing, pursuant to § 548(a)(1)(A) of the Bankruptcy Code, the transfers and obligations described herein should be avoided as intentionally fraudulent transfers and/or obligations such that, pursuant to § 550 of the Bankruptcy Code, Plaintiffs may recover from DL-DW, ABT-ESI, Arbor Commercial, Arbor ESH, Mericash, Polar Extended Stay, Princeton, PGRT, Lightstone Holdings, Lightstone Commercial, Glida One, Ron Invest, and BHAC Capital IV the sums transferred, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Trust.

## COUNT THIRTEEN

### Intentional Fraudulent Transfer
### (11 U.S.C. §§ 544(b) and 550 and applicable state law)

**(against Lichtenstein, DL-DW Holdings, L.L.C., ABT-ESI L.L.C., Arbor Commercial Mortgage L.L.C., Arbor ESH II L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., Polar Extended Stay (USA) L.P., Princeton ESH, L.L.C., PGRT ESH Inc., Lightstone Holdings, L.L.C., Lightstone Commercial Management, Glida One LLC, Ron Invest LLC, and BHAC Capital IV, L.L.C.)**

334.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-333 as if fully set forth herein.

335.    Within two years before the Petition Date, the Debtors made all or nearly all of the wrongful dividends, distributions, and other transfers discussed herein.

336.     These transfers constitute transfers of interests of the Debtors in property.   The obligations constitute obligations incurred by the Debtors.

337.     These transfers were made and/or the obligations were incurred with actual intent to hinder, delay, or defraud one or more entities to which the Debtors were or became indebted. The Debtors, and the insiders who directed the Debtors to make these transfers and incur these obligations, had knowledge of the Debtors' insolvency when the transfers were made and the obligations incurred.   Accordingly, the Defendants and the insiders knew that they were hindering, delaying, or defrauding the Debtors' creditors when they required Debtors to pay equity owners on account of their equity ahead of paying off creditors.

338.     Among the many facts demonstrating that these payments and obligations were intended to hinder, delay, or defraud the Debtors' creditors are the following:

(i)      the transfers were made and the obligations were incurred when the Debtors were insolvent;

(ii)     the transfers were made and the obligations were incurred at a time when the Debtors were controlled by insiders who benefited directly and indirectly from the transfers and obligations;

(iii)    the transfers were made and the obligations incurred without any benefit or value received by the Debtors;

(iv)     when the transfers were made and the obligations incurred, the Debtors and the insiders had knowledge of the Debtors' insolvency;

(v)      the transfers were not made and the obligations were not incurred in the ordinary course of business;

(vi)     these distributions to equity were unlawful under applicable state law, as they were made while the Debtors were insolvent; and

(vii)    the transfers and obligations depleted much needed cash, adversely impacted and jeopardized the liquidity of the Debtors, and hindered and delayed payments to creditors on obligations owed by the Debtors.

339.     Pursuant to § 544(b) of the Bankruptcy Code, the Plaintiffs have the rights of an existing unsecured creditor of the Debtors.  Section 544(b) permits the Debtors to assert claims and causes of action that such a creditor could assert under applicable state law.  The transfers and obligations discussed herein are avoidable under applicable state fraudulent transfer or conveyance law by an unsecured creditor of the Debtors.

340.     To the extent that any Defendant received a transfer or obligation as an immediate or mediate transferee, such Defendant (a) did not receive it in good faith, (b) was aware of the facts underlying these transfers and hence was aware of the avoidability of the transfer, and (c) did not receive it for value.

341.     Where a Defendant was not an initial, immediate, or mediate transferee of the transfer at issue, the Defendant was a party for whose benefit the transfer was made.

342.     By reason of the foregoing, pursuant to § 544(b) of the Bankruptcy Code and applicable state fraudulent conveyance or fraudulent transfer law, the transfers and obligations discussed herein should be avoided as intentionally fraudulent transfers, conveyances and/or obligations such that, pursuant to § 550 of the Bankruptcy Code, Plaintiffs may recover from DL-DW, ABT-ESI, Arbor Commercial, Arbor ESH, Mericash, Polar Extended Stay, Princeton, PGRT, Lightstone Holdings, Lightstone Commercial, Glida One, Ron Invest, and BHAC Capital IV the sums transferred, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Trust.

## COUNT FOURTEEN

### Constructive Fraudulent Transfers
### (11 U.S.C. §§ 548(a)(1)(B) and 550)

**(against Lichtenstein, DL-DW Holdings, L.L.C., ABT-ESI L.L.C., Arbor Commercial Mortgage L.L.C., Arbor ESH II L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., Polar Extended Stay (USA) L.P., Princeton ESH, L.L.C., PGRT ESH Inc., Lightstone Holdings, L.L.C., Lightstone Commercial Management, Glida One LLC, Ron Invest LLC, and BHAC Capital IV, L.L.C.)**

343.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-342 as if fully set forth herein.

344.    Within two years before the Petition Date, the Debtors made all or nearly all of the wrongful dividends, distributions, and other transfers discussed herein.

345.    These transfers constitute transfers of interests of the Debtors in property.  The obligations constitute obligations incurred by the Debtors.

346.    The Debtors received no value, let alone reasonably equivalent value, in exchange for the transfers and obligations.

347.    To the extent that any Defendant received a transfer or obligation as an immediate or mediate transferee, such Defendant (a) did not receive it in good faith, (b) was aware of the facts underlying these transfers and hence was aware of the avoidability of the transfer, and (c) did not receive it for value.

348.    Where a Defendant was not an initial, immediate, or mediate transferee of the transfer at issue, the Defendant was a party for whose benefit the transfer was made.

349.    When the transfers were made and the obligations incurred, the Debtors were insolvent or became insolvent as a result thereof; (ii) were engaged in a business or transaction, or were about to engage in a business or transaction, for which their remaining property was an

unreasonably small capital; or (iii) intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as the debts matured.

350.    Accordingly, the transfers and obligations should be avoided pursuant to § 548(a)(1)(B) of the Bankruptcy Code, such that, pursuant to § 550 of the Bankruptcy Code, Plaintiffs may recover from DL-DW, ABT-ESI, Arbor Commercial, Arbor ESH, Mericash, Polar Extended Stay, Princeton, PGRT, Lightstone Holdings, Lightstone Commercial, Glida One, Ron Invest, and BHAC Capital IV the sums transferred, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Trust.

## COUNT FIFTEEN

### Constructive Fraudulent Transfers
### (11 U.S.C. §§ 544(b) and 550 and applicable state law)

**(against Lichtenstein, DL-DW Holdings, L.L.C., ABT-ESI L.L.C., Arbor Commercial Mortgage L.L.C., Arbor ESH II L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., Polar Extended Stay (USA) L.P., Princeton ESH, L.L.C., PGRT ESH Inc., Lightstone Holdings, L.L.C., Lightstone Commercial Management, Glida One LLC, Ron Invest LLC, and BHAC Capital IV, L.L.C.)**

351.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-350 as if fully set forth herein.

352.    Within two years before the Petition Date, the Debtors made all or nearly all of the wrongful dividends, distributions, and other transfers discussed herein.

353.    These transfers constitute transfers of interests of the Debtors in property.  The obligations constitute obligations incurred by the Debtors.

354.    The Debtors received no consideration or value, let alone fair consideration, or a fair equivalent, or reasonably equivalent value, in exchange for the transfers and obligations.

355.    One of the reasons why the Debtors did not receive fair consideration, or a fair equivalent, in exchange for the transfers and obligations discussed herein was that the insiders

who controlled the Debtors did not act in good faith with regard to the transfers and obligations and instead acted in their self-interest and the interest of the respective entities and individuals on whose behalf they acted.

356.    When the transfers were made and the obligations incurred, the Debtors were insolvent or became insolvent as a result thereof; (ii) were engaged in a business or transaction, or were about to engage in a business or transaction, for which their remaining property was an unreasonably small capital; or (iii) intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as the debts matured.

357.    Pursuant to § 544(b) of the Bankruptcy Code, Plaintiffs have the rights of an existing unsecured creditor of the Debtors.  Section 544(b) permits the Debtors to assert claims and causes of action that such a creditor could assert under applicable state law.  The transfers and obligations discussed herein are avoidable under applicable state fraudulent transfer or conveyance law by an unsecured creditor of the Debtors.

358.    To the extent that any Defendant received a transfer or obligation as an immediate or mediate transferee, such Defendant (a) did not receive it in good faith, (b) was aware of the facts underlying these transfers and hence was aware of the avoidability of the transfer, and (c) did not receive it for value.

359.    Where a Defendant was not an initial, immediate, or mediate transferee of the transfer at issue, the Defendant was a party for whose benefit the transfer was made.

360.    By reason of the foregoing, pursuant to § 544(b) of the Bankruptcy Code and applicable state fraudulent conveyance or fraudulent transfer law, the transfers and obligations discussed herein should be avoided as constructively fraudulent transfers, conveyances and/or obligations such that, pursuant to § 550 of the Bankruptcy Code,  may recover from DL-DW,

ABT-ESI, Arbor Commercial, Arbor ESH, Mericash, Polar Extended Stay, Princeton, PGRT, Lightstone Holdings, Lightstone Commercial, Glida One, Ron Invest, and BHAC Capital IV the sums transferred, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Trust.

### COUNT SIXTEEN

**Turnover of Property to the Estate**
**(11 U.S.C. § 542)**

**(against Lichtenstein, DL-DW Holdings, L.L.C., Lightstone Holdings L.L.C., The Lightstone Group, L.L.C., PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II, L.L.C., Arbor Commercial Mortgage, L.L.C., Princeton ESH, L.L.C., Atmar Associates, L.L.C., Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C., ABT-ESI L.L.C., Mericash Funding LLC, and Park Avenue Funding L.L.C.)**

361.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of paragraphs 1-360 as if fully set forth herein.

362.    Pursuant to 11 U.S.C. § 542(a), any entity which possesses property that the trustee may use, sell or lease under 11 U.S.C. § 363 is obligated to deliver the property to the trustee.

363.    The LIBOR Floor Certificates were valuable personal property that entitled their owners to receive substantial payments each month that the LIBOR rate fell below a designated level.

364.    The Debtors were the rightful owners of the LIBOR Floor Certificates.

365.    In November 2007, Defendants wrongfully converted the LIBOR Floor Certificates from the Debtors by assigning them to DL-DW without DL-DW providing any consideration in return.

366.    From November 2007 through February 2009, DL-DW received payments totaling approximately $20 million as proceeds from the LIBOR Floor Certificates that should have been paid to the Debtors.

367.    Of that amount, from on or around May 2008 through February 2009, DL-DW used approximately $17.4 million of those proceeds to make the following payments: (a) pay the lenders of the 25% Note: Mericash and ABT-ESI each received payments totaling $2,117,593, Princeton received $222,905, and Park Avenue and its assignee, Lightstone Commercial, received a total of $4,458,091; (b) pay approximately $3.7 million to the Series A-1 equity holders as regular payments on equity; and (c) $4,817,986 was deposited into the Floor Bonds Reserve Account.

368.    Pursuant to the "Floor Bonds Agreement," on March 12, 2009, the LIBOR Floor Certificates were assigned to ABT-ESI for the benefit of various equity-holder Defendants, including DL-DW.  Additionally, the Floor Bonds Reserve Account was liquidated and the balance in the amount of $4,817,896 was paid to Lightstone Commercial.  Subsequent to this transfer, from March 2009 to October 2010, when the certificates were extinguished, an estimated $55 million was paid on the LIBOR Floor Certificates to ABT-ESI and/or its assignees or subsequent transferees.  On information and belief, Mericash and ABT-ESI each ultimately received approximately $13,066,792, Princeton ultimately received approximately $1,375,452, and Park Avenue/Lightstone Commercial ultimately received approximately $27,509,036.

369.    Due to the wrongful transfer of the LIBOR Floor Certificates and their proceeds, the Debtors were deprived of at least $74.3 million in income that would have been earned on account of the LIBOR Floor Certificates.

370.   The LIBOR Floor Certificates and their proceeds were wrongfully converted from the Debtors, constitute property of the Debtors and thus Plaintiffs are entitled to turnover of the LIBOR Floor Certificates or their value along with all proceeds paid on account of the LIBOR Floor Certificates from Defendants pursuant to § 542 of the Bankruptcy Code.

371.   The Dividend Transfers were made using funds received by the Debtors or with proceeds of the LIBOR Floor Certificates that were stolen from the Debtors.

372.   The Dividend Transfers were made at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent.  Each of the recipients of each of these dividend or distribution payments was an insider and therefore was aware at the time that the Debtors did not have a surplus or were insolvent, or that the payment rendered the Debtors insolvent.  At all pertinent times, each of the recipients was aware of the distressed condition of the Debtors.

373.   The Dividend Transfers were illegal payments to equity under applicable state law, were unlawfully collected by Defendants, constitute property of the Debtors and should be delivered by Defendants to Plaintiffs pursuant to § 542 of the Bankruptcy Code.

374.   Lichtenstein or a Lichtenstein-affiliate received the Management Fee Transfers totaling up to $1 million per year.  The Management Fee Transfers were made at a time when the Debtors did not have a surplus or were insolvent, or rendered the Debtors insolvent.  Each of the recipients of each of these dividend or distribution payments was an insider and therefore was aware at the time that the Debtors did not have a surplus or were insolvent, or that the payment rendered the Debtors insolvent.  At all pertinent times, each of the recipients was aware of the distressed condition of the Debtors.

375.   The Management Fee Transfers were illegal payments to equity under applicable

state law, were unlawfully collected by Defendants, constitute property of the Debtors and

should be delivered by Defendants to Plaintiffs pursuant to § 542 of the Bankruptcy Code.

### COUNT SEVENTEEN

**Disallowance of Claims**
**(11 U.S.C. § 502(d))**

**(against All Defendants)**

376.    Plaintiffs repeat, reallege, and incorporate by reference each and every allegation

of paragraphs 1-375 as if fully set forth herein.

377.    The Defendants are transferees of one or more transfers avoidable under §§ 544

or 548 of the Bankruptcy Code, or are entities from which property is recoverable under §§ 542

or 550 of the Bankruptcy Code, and have not paid the amount or turned over the property for

which they are liable.

378.    As a result of the foregoing, pursuant to § 502(d) of the Bankruptcy Code,

Plaintiffs are entitled to disallow any filed or scheduled claims of the Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as to the claims set forth

above, as follows:

(i)    On Count One, declaring that defendants DL-DW Holdings, L.L.C., ABT-ESI

L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., Lightstone Commercial

Management, Arbor Commercial Mortgage L.L.C., Arbor ESH II L.L.C., Polar Extended Stay

(USA) L.P., Princeton ESH, L.L.C., PGRT ESH Inc., Lightstone Holdings, L.L.C., Glida One

LLC, Ron Invest LLC, and BHAC Capital IV, L.L.C. received illegal distributions and

awarding compensatory damages to Plaintiffs against:

a.  Lichtenstein or the Lichtenstein-affiliate that received the Management Fee Transfers, in an amount to be determined at trial, but not less than $3,000,000; and

b.  DL-DW Holdings, L.L.C. in an amount to be determined at trial but not less than $74,321,708; and

c.  ABT-ESI L.L.C. in an amount to be determined at trial but not less than $15,184,385; and

d.  Mericash Funding LLC in an amount to be determined at trial but not less than $15,184,385; and

e.  Park Avenue Funding L.L.C. in an amount to be determined at trial but not less than $31,967,127; and

f.  Lightstone Commercial Management in an amount to be determined at trial but not less than $36,785,113; and

g.  Arbor Commercial Mortgage L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

h.  Arbor ESH II L.L.C. in an amount to be determined at trial but not less than $43,997,154;[4] and

i.  Polar Extended Stay (USA) L.P. in an amount to be determined at trial but not less than $1,235,162; and

j.  Princeton ESH, L.L.C. in an amount to be determined at trial but not less than $2,833,518; and

---

[4]    As discussed above, to the extent Arbor ESH received any distributions made to Arbor Commercial, Arbor ESH has been unjustly enriched as well and is liable for such distributions.

      k.  PGRT ESH Inc. in an amount to be determined at trial but not less than $6,167,000; and

      l.  Lightstone Holdings, L.L.C. in an amount to be determined at trial but not less than $2,668,000; and

      m. Glida One LLC in an amount to be determined at trial but not less than $5,363,391; and

      n.  Ron Invest LLC in an amount to be determined at trial but not less than $1,433,935; and

      o.  BHAC Capital IV, L.L.C. in an amount to be determined at trial but not less than $40,607,000.

(ii)     On Count Two, declaring that Lichtenstein, de Vinck, Owen, Teichman, Chetrit, Martello, Milone, DL-DW Holdings, L.L.C., BHAC Capital IV, L.L.C., Lightstone Holdings, L.L.C., Lightstone Group, L.L.C., Lightstone Commercial Management, Park Avenue Funding L.L.C., Arbor ESH II L.L.C., Arbor Commercial Mortgage, L.L.C., Princeton ESH L.L.C., Atmar Associates, L.L.C., Glida One LLC, Ron Invest LLC, ABT-ESI L.L.C., Mericash Funding, LLC, Polar Extended Stay (USA) L.P., and PGRT ESH Inc. authorized illegal dividends and distributions and awarding compensatory damages to Plaintiffs in an amount to be determined at trial but not less than $139,159,012; and

(iii)    On Count Three, judgment against the following Defendants:

      a.  Lichtenstein or the Lichtenstein-affiliate that received the Management Fee Transfers, in an amount to be determined at trial, but not less than $3,000,000; and

b.   DL-DW Holdings, L.L.C. in an amount to be determined at trial but not less than $74,321,708; and

c.   ABT-ESI L.L.C. in an amount to be determined at trial but not less than $15,184,385; and

d.   Mericash Funding LLC in an amount to be determined at trial but not less than $15,184,385; and

e.   Park Avenue Funding L.L.C. in an amount to be determined at trial but not less than $31,967,127; and

f.   Lightstone Commercial Management in an amount to be determined at trial but not less than $36,785,113; and

g.   Arbor Commercial Mortgage L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

h.   Arbor ESH II L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

i.   Polar Extended Stay (USA) L.P. in an amount to be determined at trial but not less than $1,235,162; and

j.   Princeton ESH, L.L.C. in an amount to be determined at trial but not less than $2,833,518; and

k.   PGRT ESH Inc. in an amount to be determined at trial but not less than $6,167,000; and

l.   Lightstone Holdings, L.L.C. in an amount to be determined at trial but not less than $2,668,000; and

m. Glida One LLC in an amount to be determined at trial but not less than $5,363,391; and

n. Ron Invest LLC in an amount to be determined at trial but not less than $1,433,935; and

o. BHAC Capital IV, L.L.C. in an amount to be determined at trial but not less than $40,607,000.

(iv)    On Count Four, declaring that DL-DW, L.L.C., ABT-ESI, L.L.C., BHAC Capital IV, L.L.C., Park Avenue Funding L.L.C., Princeton ESH, L.L.C., Mericash Funding, LLC, Lightstone Commercial Management, Arbor Commercial Mortgage L.L.C., Arbor ESH II L.L.C., Polar Extended Stay (USA) L.P., PGRT ESH Inc., Lightstone Holdings, L.L.C., Glida One LLC, and Ron Invest LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to Plaintiffs against;

a. DL-DW Holdings, L.L.C. in an amount to be determined at trial but not less than $74,321,708; and

b. ABT-ESI L.L.C. in an amount to be determined at trial but not less than $15,184,385; and

c. BHAC Capital IV, L.L.C. in an amount to be determined at trial but not less than $40,607,000; and

d. Park Avenue Funding L.L.C. in an amount to be determined at trial but not less than $31,967,127; and

e. Princeton ESH, L.L.C. in an amount to be determined at trial but not less than $2,833,518; and

f.  Mericash Funding LLC in an amount to be determined at trial but not less than $15,184,385; and

g.  Lightstone Commercial Management in an amount to be determined at trial but not less than $36,785,113; and

h.  Arbor Commercial Mortgage L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

i.  Arbor ESH II L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

j.  Polar Extended Stay (USA) L.P. in an amount to be determined at trial but not less than $1,235,162; and

k.  PGRT ESH Inc. in an amount to be determined at trial but not less than $6,167,000; and

l.  Lightstone Holdings, L.L.C. in an amount to be determined at trial but not less than $2,668,000; and

m.  Glida One LLC in an amount to be determined at trial but not less than $5,363,391; and

n.  Ron Invest LLC in an amount to be determined at trial but not less than $1,433,935; and

o.  The Lichtenstein-affiliated entity or person that received the Management Fee Transfers, in an amount to be determined at trial, but not less than $3,000,000.

(v)  On Count Five, declaring that all Defendants breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors in light of the misconduct

identified above, and awarding, jointly and severally, both compensatory damages to Plaintiffs in an amount to be determined at trial but not less than $139,159,012 and punitive damages of at least three times the damage caused to the Debtors, or such other amount as the Court may determine after trial; and

(vi)    On Count Six, declaring that all Defendants aided, abetting, induced, participated in, or conspired to commit the breaches of fiduciary and contractual duties by one or more of the other Defendants and awarding actual, compensatory, and consequential damages jointly and severally to Plaintiffs in an amount to be determined at trial but not less than $139,159,012, and punitive damages of at least three times the damage caused to the Debtors, or such other amount as the Court may determine after trial; and

(vii)    On Count Seven, declaring that all Defendants breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors' creditors in light of the misconduct identified above and awarding actual, compensatory, and consequential damages jointly and severally to Plaintiffs in an amount to be determined at trial but not less than $139,159,012, and punitive damages of at least three times the damage caused to the Debtors, or such other amount as the Court may determine after trial; and

(viii)    On Count Eight declaring that each of the Defendants' acts or omissions constituted a waste of the assets of the Debtors and awarding actual, compensatory and consequential damages from Defendants, jointly and severally, in an amount to be determined at trial but not less than $139,159,012; and

(ix)    On Count Nine, declaring that all Defendants unlawfully converted the Debtors' property and awarding actual, compensatory and consequential damages from Defendants,

114

jointly and severally, in an amount to be determined at trial but not less than $139,159,012, and

punitive damages of at least three times the damage caused to the Debtors, or such other amount

as the Court may determine after trial; and

(x)    On Count Ten, declaring that all Defendants aided, abetted, induced, or

participated in the unlawful conversion of the Debtors' property by one of more of the other

Defendants and awarding actual, compensatory and consequential damages from Defendants,

jointly and severally, in an amount to be determined at trial but not less than $139,159,012, and

punitive damages of at least three times the damage caused to the Debtors, or such other amount

as the Court may determine after trial; and

(xi)    On Count Eleven, declaring all Defendants conspired with the other Defendants to

convert ownership of the LIBOR Floor Certificates from the Debtors to DL-DW without legal

cause or justification and awarding actual, compensatory and consequential damages from

Defendants, jointly and severally, in an amount to be determined at trial but not less than

$139,159,012, and punitive damages of at least three times the damage caused to the Debtors, or

such other amount as the Court may determine after trial; and

(xii)    On Count Twelve, pursuant to §§ 548(a)(1)(A) and 550 of the Bankruptcy Code,

judgment (a) avoiding the Improper and Fraudulent Transfers; (b) directing that the Improper

and Fraudulent Transfers be set aside; (c) recovering the Improper and Fraudulent Transfers, or

the value thereof, for the benefit of the Trust and its creditor beneficiaries against the following

Defendants in the following amounts:

a.   Lichtenstein or the Lichtenstein-affiliate that received the Management Fee Transfers, in an amount to be determined at trial, but not less than $3,000,000; and

b.   DL-DW Holdings, L.L.C. in an amount to be determined at trial but not less than $74,321,708; and

c.   ABT-ESI L.L.C. in an amount to be determined at trial but not less than $15,184,385; and

d.   BHAC Capital IV, L.L.C. in an amount to be determined at trial but not less than $40,607,000; and

e.   Park Avenue Funding L.L.C. in an amount to be determined at trial but not less than $31,967,127; and

f.   Princeton ESH, L.L.C. in an amount to be determined at trial but not less than $2,833,518; and

g.   Mericash Funding LLC in an amount to be determined at trial but not less than $15,184,385; and

h.   Lightstone Commercial Management in an amount to be determined at trial but not less than $36,785,113; and

i.   Arbor Commercial Mortgage L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

j.   Arbor ESH II L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

k.   Polar Extended Stay (USA) L.P. in an amount to be determined at trial but not less than $1,235,162; and

l.  PGRT ESH Inc. in an amount to be determined at trial but not less than $6,167,000; and

m.  Lightstone Holdings, L.L.C. in an amount to be determined at trial but not less than $2,668,000; and

n.  Glida One LLC in an amount to be determined at trial but not less than $5,363,391; and

o.  Ron Invest LLC in an amount to be determined at trial but not less than $1,433,935.

(xiii)   On Count Thirteen, pursuant to §§ 544(b) and 550 of the Bankruptcy Code, judgment (a) avoiding the Improper and Fraudulent Transfers; (b) directing that the Improper and Fraudulent Transfers be set aside; (c) recovering the Improper and Fraudulent Transfers, or the value thereof, for the benefit of the Trust and its creditor beneficiaries against the following Defendants in the following amounts:

a.  Lichtenstein or the Lichtenstein-affiliate that received the Management Fee Transfers, in an amount to be determined at trial, but not less than $3,000,000; and

b.  DL-DW Holdings, L.L.C. in an amount to be determined at trial but not less than $74,321,708; and

c.  ABT-ESI L.L.C. in an amount to be determined at trial but not less than $15,184,385; and

d.  BHAC Capital IV, L.L.C. in an amount to be determined at trial but not less than $40,607,000; and

117

e.  Park Avenue Funding L.L.C. in an amount to be determined at trial but not less than $31,967,127; and

f.  Princeton ESH, L.L.C. in an amount to be determined at trial but not less than $2,833,518; and

g.  Mericash Funding LLC in an amount to be determined at trial but not less than $15,184,385; and

h.  Lightstone Commercial Management in an amount to be determined at trial but not less than $36,785,113; and

i.  Arbor Commercial Mortgage L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

j.  Arbor ESH II L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

k.  Polar Extended Stay (USA) L.P. in an amount to be determined at trial but not less than $1,235,162; and

l.  PGRT ESH Inc. in an amount to be determined at trial but not less than $6,167,000; and

m.  Lightstone Holdings, L.L.C. in an amount to be determined at trial but not less than $2,668,000; and

n.  Glida One LLC in an amount to be determined at trial but not less than $5,363,391; and

o.  Ron Invest LLC in an amount to be determined at trial but not less than $1,433,935.

(xiv)    On Count Fourteen, pursuant to §§ 548(a)(1)(B) and 550 of the Bankruptcy Code, judgment (a) avoiding the Improper and Fraudulent Transfers; (b) directing that the Improper and Fraudulent Transfers be set aside; (c) recovering the Improper and Fraudulent Transfers, or the value thereof, for the benefit of the Trust and its creditor beneficiaries against the following Defendants in the following amounts:

a.    Lichtenstein or the Lichtenstein-affiliate that received the Management Fee Transfers, in an amount to be determined at trial, but not less than $3,000,000; and

b.    DL-DW Holdings, L.L.C. in an amount to be determined at trial but not less than $74,321,708; and

c.    ABT-ESI L.L.C. in an amount to be determined at trial but not less than $15,184,385; and

d.    BHAC Capital IV, L.L.C. in an amount to be determined at trial but not less than $40,607,000; and

e.    Park Avenue Funding L.L.C. in an amount to be determined at trial but not less than $31,967,127; and

f.    Princeton ESH, L.L.C. in an amount to be determined at trial but not less than $2,833,518; and

g.    Mericash Funding LLC in an amount to be determined at trial but not less than $15,184,385; and

h.    Lightstone Commercial Management in an amount to be determined at trial but not less than $36,785,113; and

119

     i.    Arbor Commercial Mortgage L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

     j.    Arbor ESH II L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

     k.    Polar Extended Stay (USA) L.P. in an amount to be determined at trial but not less than $1,235,162; and

     l.    PGRT ESH Inc. in an amount to be determined at trial but not less than $6,167,000; and

     m.    Lightstone Holdings, L.L.C. in an amount to be determined at trial but not less than $2,668,000; and

     n.    Glida One LLC in an amount to be determined at trial but not less than $5,363,391; and

     o.    Ron Invest LLC in an amount to be determined at trial but not less than $1,433,935.

(xv)    On Count Fifteen, pursuant to §§ 544(b) and 550 of the Bankruptcy Code, judgment (a) avoiding the Improper and Fraudulent Transfers; (b) directing that the Improper and Fraudulent Transfers be set aside; (c) recovering the Improper and Fraudulent Transfers, or the value thereof, for the benefit of the Trust and its creditor beneficiaries against the following Defendants in the following amounts:

     a.    Lichtenstein or the Lichtenstein-affiliate that received the Management Fee Transfers, in an amount to be determined at trial, but not less than $3,000,000; and

b.   DL-DW Holdings, L.L.C. in an amount to be determined at trial but not less than $74,321,708; and

c.   ABT-ESI L.L.C. in an amount to be determined at trial but not less than $15,184,385; and

d.   BHAC Capital IV, L.L.C. in an amount to be determined at trial but not less than $40,607,000; and

e.   Park Avenue Funding L.L.C. in an amount to be determined at trial but not less than $31,967,127; and

f.   Princeton ESH, L.L.C. in an amount to be determined at trial but not less than $2,833,518; and

g.   Mericash Funding LLC in an amount to be determined at trial but not less than $15,184,385; and

h.   Lightstone Commercial Management in an amount to be determined at trial but not less than $36,785,113; and

i.   Arbor Commercial Mortgage L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

j.   Arbor ESH II L.L.C. in an amount to be determined at trial but not less than $43,997,154; and

k.   Polar Extended Stay (USA) L.P. in an amount to be determined at trial but not less than $1,235,162; and

l.   PGRT ESH Inc. in an amount to be determined at trial but not less than $6,167,000; and

m.  Lightstone Holdings, L.L.C. in an amount to be determined at trial but not less than $2,668,000; and

n.  Glida One LLC in an amount to be determined at trial but not less than $5,363,391; and

o.  Ron Invest LLC in an amount to be determined at trial but not less than $1,433,935.

(xvi)   On Count Sixteen, entry of judgment against all Defendants, jointly and severally, for turnover of the value of the Debtors' property held by Defendants in an amount to be determined at trial but not less than $139,159,012; and

(xvii)   On Count Seventeen, pursuant to § 502(d) of the Bankruptcy Code, disallowance of the claims of all Defendants; and

(xviii)   On all Counts, pursuant to federal common law and New York Civil Practice Law and Rules §§ 5001 and 5004, awarding Plaintiffs prejudgment interest from the date on which the transfers were received; and

(xix)   Awarding Plaintiffs all applicable interest, costs, and fees to the extent permitted by law, including the disgorgement of profits or reinvestment proceeds lost by the Debtors; and

(xxi)    Granting Plaintiffs such other, further, and different relief as the Court deems just,

proper, and equitable.

Dated: New York, New York
      November 15, 2013

By: */s/ Michael Schatzow*

VENABLE LLP
Rockefeller Center, 24th Floor
1270 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 307-5500
Facsimile:    (212) 307-5598
Attn:  Michael Schatzow
      Carollynn H.G. Callari
      Mitchell Y. Mirviss (pro hac vice)
      Edmund M. O'Toole

    - and -

VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
Telephone:    (410) 244-7400
Facsimile:    (410) 244-7742
Attn:  Gregory A. Cross (pro hac vice)

*Counsel for Plaintiffs, the Extended Stay Litigation Trust and Finbarr O'Connor, as Successor Trustee of the Extended Stay Litigation Trust*