**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

| | |
|---|---|
| In re: | X   Case No. 09-13764 (JMP) |
| EXTENDED STAY, INC., *et al.* | :   (Jointly Administered) |
| Debtors. | : |
| | X |

------------------------------------------------------------

|  |  |
|---|---|
| FINBARR O'CONNOR, as Trustee for and on behalf of the EXTENDED STAY LITIGATION TRUST, and | : |
| THE EXTENDED STAY LITIGATION TRUST, | : |
| Plaintiffs, | : |
| -against- | : |
| DL-DW Holdings, L.L.C., Lightstone Holdings L.L.C., The Lightstone Group, L.L.C., PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II, L.L.C., Arbor Commercial Mortgage, L.L.C., Princeton ESH, L.L.C., Atmar Associates, L.L.C., Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C., ABT-ESI L.L.C., Mericash Funding LLC, Park Avenue Funding L.L.C., David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, Dae Hum Kim (a/k/a David Kim), and Gary De Lapp, | :   Adv. P. No. 11-2254 (JMP) <br> :   Adv. P. No. 11-2255 (JMP) <br> :   Adv. P. No. 11-2256 (JMP) <br> :   Adv. P. No. 11-2398 (JMP) |
| Defendants. | X |

------------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF MOVING
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3683
Fasimile: (212) 698-3599

*Attorneys for Moving Defendants Arbor ESH*
*II, LLC, Arbor Commercial Mortgage, LLC,*
*Atmar Associates, LLC, Glida One LLC,*
*Mericash Funding LLC, Ron Invest LLC,*
*ABT-ESI LLC, Princeton ESH LLC,*
*Guy R. Milone, Jr., Joseph Chetrit, and*
*Joseph Martello*

18399129

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ........................................................................... 4

ARGUMENT STANDARDS GOVERNING THIS MOTION TO DISMISS ................... 10

POINT I       THE AMENDED COMPLAINT FAILS TO MEET THE NOTICE PLEADING STANDARD OF FED. R. CIV. P. 8 ......................................... 12

POINT II      THE ACTUAL FRAUDULENT CONVEYANCE CLAIMS FAIL AS A MATTER OF LAW .................................................................. 16

     A.      The Trustee's Actual Fraudulent Conveyance Claims Are Facially Implausible ................................................................... 17

     B.      The Trustee Fails to Satisfy the Heightened Pleading Requirements of Rule 9(b) ................................................................ 22

     C.      The Trustee Does Not Sufficiently Allege The Existence of Badges of Fraud ............................................................................... 23

POINT III     THE TRUSTEE CANNOT AVOID TRANSFERS OF NONDEBTOR PROPERTY .................................................................... 26

POINT IV     THE BANKRUPTCY CODE'S SAFE HARBOR BARS THE TRUSTEE'S CLAIMS AGAINST THE MOVING DEFENDANTS .......... 29

     A.      The Preferred Dividends Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e) ............................. 31

           1.      The Second Circuit Interprets Section 546(e) Broadly ....................... 31

           2.      The Preferred Dividends Were "Transfers Made" ............................ 32

           3.      The Preferred Dividends Were Made "By" a "Financial Institution" ........................................................................ 32

           4.      The Preferred Dividends Were Made "In Connection With A Securities Contract" ................................................................ 33

     B.      The PERA Payments Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e) ........................... 36

           1.      The PERA Payments Were "Transfers Made" ................................. 36

           2.      The PERA Payments Were Made "By" a "Financial Institution" ........................................................................ 36

           3.      The PERA Payments Were Made "In Connection With A Securities Contract" ................................................................ 37

     C.      The LIBOR Certificate Transfers Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e) ............... 37

           1.      The LIBOR Certificate Transfers Were "Transfers Made" ............... 38

           2.      The Transfer of the LIBOR Floor Certificates Was Made "By" a "Financial Institution" ................................................. 38

3. The Transfer of the LIBOR Floor Certificates Was Made "In Connection With A Securities Contract" And Is A Settlement Payment ............................................................................................. 38

4. None Of The LIBOR Certificate Transfers Are Avoidable ................ 39

D. All State Law Claims are Preempted by Section 546(e) ................................. 40

POINT V     THE CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS FAIL AS A MATTER OF LAW ...................................................................... 46

POINT VI     THE TRUSTEE CANNOT RECOVER AMOUNTS GREATER THAN THAT OWED TO GENERAL UNSECURED CREDITORS AND THE INDENTURE TRUSTEE UNDER THE LITIGATION TRUST ................................................................................................................ 49

A. The Alleged Transfers Were Ratified by Those Holding Mortgage Facility Claims and Mezzanine Facility Claims .............................................. 51

B. The Bangor Punta Doctrine Bars the State Law Claims ................................. 53

C. The Trustee Should Only Recover to the Extent the Estate is Benefitted ...... 55

POINT VII     THE TRUSTEE LACKS STANDING AND IS EQUITABLY BARRED ....................................................................................................... 56

A. The Trustee Lacks Standing to Assert the State Law Claims Under the Wagoner Rule ................................................................................................... 57

B. The Trustee Lacks Standing to Assert Claims for (i) Waste; (ii) Conversion; (iii) Aiding, Abetting, Inducing, or Participating in Conversion; and (iv) Conspiracy ................................................................... 59

POINT VIII     THE COMMON LAW CLAIMS IN THE AMENDED COMPLAINT ARE ALL DEFECTIVE ............................................................................... 60

A. The Amended Complaint Fails to State a Claim for Breach of Fiduciary Duty or Breach of Contractual Duty Against The Moving Entities ............................................................................................................. 60

1. The Trustee's Claims Fail to Meet The Heightened Pleading Standard For Allegations Sounding in Fraud ...................................... 61

2. The Amended Complaint Does Not Allege A Breach of Any Contract Between The Moving Entities And the Debtors ................. 64

3. The Moving Entities, as Minority Stakeholders in BHAC Capital, Owed No Contractual or Fiduciary Duties to the Debtors or the Creditors Thereof ....................................................... 64

B. The Amended Complaint Fails to State a Claim for Breach of Fiduciary or Contractual Duty Against Milone, Chetrit, and Martello .......... 66

1. The Amended Complaint Does Not Allege a Contract Between Directors and Plaintiffs ....................................................................... 66

2. The Individuals Had No Fiduciary Duty When Not A Board Member ................................................................................................ 66

3.     ESI's Exculpatory Provisions Bar the Trustee's Breach of Fiduciary Duty Claim ..........................................................................66

4.     The Trustee Cannot Recover Punitive Damages for Fiduciary Duty Claims ..........................................................................................67

C.     The Amended Complaint Fails to State A Claim for Aiding, Abetting, Inducing or Participating in Breaches of Fiduciary Duties And Other Misconduct....................................................................................................67

1.     Aiding And Abetting Claim Must Be Dismissed as to Directors .......68

2.     The Amended Complaint Does Not Allege "Actual Knowledge" of the Moving Defendants ..............................................68

3.     The Amended Complaint Does Not Allege "Substantial Assistance" from Moving Entities ......................................................69

D.     The Amended Complaint Fails to State A Claim for Breach of Fiduciary Duties Owed to Creditors ............................................................70

1.     No Independent Cause of Action During "Zone of Insolvency"........70

2.     No Fiduciary Duties Are Owed to Creditors Under Delaware Law And in Any Event the Trustee Lacks Standing to Assert Creditor Claims ..................................................................................71

E.     The Amended Complaint Fails to State A Claim for Waste..........................71

F.     The Distribution Payments Are Governed by Contract and Cannot Be Subject to Unjust Enrichment Claims............................................................73

CONCLUSION.....................................................................................................................74

# TABLE OF AUTHORITIES

*@Wireless Enters. v. AI Consulting, LLC,*
    2006 WL 3370696 (W.D.N.Y. Oct. 30, 2006) .......................................................65

*A. Brod v. SK&I Co.,*
    998 F. Supp. 314 (S.D.N.Y. 1998) .......................................................................65

*A.W. Lawrence & Co. v. Burstein (In re A.W. Lawrence & Co.),*
    346 B.R. 51 (Bankr. N.D.N.Y. 2006) ..................................................................27

*Adams v. Calvaresee Farms Maint. Corp.,*
    2010 WL 3944961 (Del. Ch. Sept. 17, 2010) .....................................................68

*Adelphia Recovery Trust v. Bank of America,*
    390 B.R. 80 (S.D.N.Y. 2008), *aff'd*, 379 F. App'x 10 (2d Cir. 2010)...................51

*Airport Blvd. Apts., Ltd. v. NE 40 Partners, L.P. (In re NE 40 Partners, Ltd. P'ship),*
    440 B.R. 124 (Bankr. S.D. Tex. 2010) ................................................................23

*Allstate Fabricators Corp. v. Flagstaff Foodservice Corp. (In re Flagstaff
    Foodservice Corp.),*
    56 B.R. 899 (Bankr. S.D.N.Y. 1986) ..................................................................43

*American Fuel Corp. v. Utah Energy Dev. Co.,*
    122 F.3d 130 (2d Cir. 1997)................................................................................15

*Amfesco Indus., Inc. v. Greenblatt,*
    172 A.D.2d 261 (1st Dep't 1991) ........................................................................73

*Anadarko Petro. Corp. v. Panhandle E. Corp.,*
    545 A.2d 1171 (Del. 1988) .................................................................................48

*AP Servs., LLP v. Silva,*
    483 B.R. 63 (S.D.N.Y. 2012)....................................................................33, 43, 45

*Aronoff v. Albanese,*
    85 A.D.2d 3 (2d Dep't 1982) ..............................................................................72

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................... passim

*Astor Holdings v. Roski,*
    325 F. Supp. 2d 251 (S.D.N.Y. 2003)..................................................................44

*ATSI Commc'ns, Inc. v. Shaar,*
    493 F.3d 87 (2d Cir. 2007)..................................................................................23

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,*
    155 F.3d 59 (2d Cir. 1998)....................................................................................5

*Babin v. Caddo E. Estates I, Ltd.*,
   2013 WL 4048979 (E.D. La. Aug. 9, 2013) ...................................................23

*Baker v. Andover Assocs. Mgmt. Corp.*,
   924 N.Y.S.2d 307 (N.Y. Sup. Ct. Nov. 30, 2009) ...................................74

*Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
   256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd sub nom., Balabar-Strauss v.*
   *Lawrence*, 264 B.R. 664 (Bankr. S.D.N.Y. 2001) ...................................47

*Balaber-Strauss v. Lawrence*,
   264 B.R. 303 (Bankr. S.D.N.Y. 2001) ...................................................48

*Balaber-Strauss v. Murphy (In re Murphy)*,
   331 B.R. 107 (Bankr. S.D.N.Y. 2005) ...................................................57

*Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*,
   417 U.S. 703 (1974) ..................................................................54, 55

*Banque Arabe Et Int'l D'Investissement v. Maryland Nat'l Bank*,
   819 F. Supp. 1282 (S.D.N.Y. 1993), *aff'd*, 57 F.3d 146 (2d Cir. 1995) .................66

*Bautista v. Los Angeles Cnty.*,
   216 F.3d 837 (9th Cir. 2000) ...........................................................13

*Begier v. I.R.S.*,
   496 U.S. 53 (1990) ..................................................................27, 28

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007) ....................................................................10

*BHC Interim Funding, L.P. v. Finantra Capital, Inc.*,
   283 F. Supp. 2d 968 (S.D.N.Y. 2003) ...................................................61

*Bianco v. Erkins (In re Gaston & Snow)*,
   243 F.3d 599 (2d Cir 2001) ............................................................61

*Bond v. Nat'l Fin. Servs. (In re U.S. Mortgage Corp.)*,
   491 B.R. 642 (Bankr. D.N.J. 2013) ....................................................40

*Bond v. Sparks (In re U.S. Mortgage Corp.)*,
   492 B.R. 784 (Bankr. D.N.J. 2013) .................................................40, 45

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*,
   590 F.3d 252 (3d Cir. 2009) ...........................................................33

*Breeden v. Kirkpatrick & Lockhart, LLP*,
   268 B.R. 704 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003) .......................59

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ..............................................................72

*Cadlerock v. Morey (In re Morey)*,
2012 WL 369486 (S.D. Miss. Feb. 3, 2012) ........................................................23

*Caleb & Co. v. E.I. DuPont de Nemours & Co.*,
615 F. Supp. 96 (S.D.N.Y. 1985) .......................................................................48

*Calpine Corp. v. Rosetta Res., Inc. (In re Calpine Corp.)*,
377 B.R. 808 (Bankr. S.D.N.Y. 2007) ...............................................................55

*Cassirer v. Herskowitz (In re Schick)*,
234 B.R. 337 (Bankr. S.D.N.Y. 1999) ...............................................................27

*Cede & Co. v. Technicolor, Inc.*,
634 A.2d 345 (Del. 1993) ....................................................................................73

*Chiste v. Hotels.com L.P.*,
2011 WL 2150653 (S.D.N.Y. May 31, 2011) ....................................................74

*Christiana Town Ctr., LLC v. New Castle Ctr.*,
2003 WL 21314499 (Del. Ch. June 6, 2003), *aff'd*, 841 A.2d 307 (Del. 2004) ....................68

*Citicorp Acceptance Co. v. Robison (In re Sweetwater)*,
884 F.2d 1323 (10th Cir. 1989) .........................................................................56

*Commodity Futures Trading Comm'n v. Probber Int'l Equities Corp.*,
504 F. Supp. 1154 (S.D.N.Y. 1981) ...................................................................49

*Contemporary Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009) ...............................................................32, 37, 42

*Courtland Manor, Inc. v. Leeds*,
347 A.2d 144 (Del. Ch. 1975) .............................................................................55

*Crescent Res. Litig. Trust v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex 2013) ................................................................. passim

*Cruz v. TD Bank, N.A.*,
855 F. Supp. 2d 157 (S.D.N.Y. 2012) ................................................................12

*Daly v. Deptula (In re Carrozzella & Richardson)*,
286 B.R. 480 (D. Conn. 2002) ............................................................................18

*DeBlasio v. Merrill Lynch & Co.*,
2009 WL 2242605 (S.D.N.Y. July 27, 2009) ....................................................63

*DeJesus v. Sears, Roebuck Co.*,
87 F.3d 65 (2d Cir. 1996) ....................................................................................10

*Diamante v. Solomon & Solomon, P.C.*,
2001 WL 1217226 (N.D.N.Y. Sept. 18, 2001) ..................................................44

*DiVittori v. Equidyne Extractive Indus.,*
  822 F.2d 1242 (2d Cir. 1987)..........................................................................13, 64

*Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank,*
  236 F.3d 117 (2d Cir. 2001)............................................................................41, 43

*Eberhard v. Marcu,*
  530 F.3d. 122 (2d Cir. 2008)................................................................................52

*Enron Corp. v. Int'l Fin. Corp (In re Enron Corp.),*
  341 B.R. 451 (Bankr. S.D.N.Y. 2006)..................................................................32

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors
  Recovery Corp.),*
  651 F.3d 329 (2d Cir. 2011)........................................................................ passim

*Erone Corp. v. Skouras Theaters Corp.,*
  19 F.R.D. 299 (S.D.N.Y. 1956) ...........................................................................13

*FDIC v. Hirsch (In re Colonial Realty Co.),*
  980 F.2d 125 (2d Cir. 1992)..................................................................................27

*FDIC v. New York,*
  928 F.2d 56 (2d Cir. 1991)....................................................................................53

*Feitelberg v. Merrill Lynch & Co.,*
  234 F. Supp. 2d 1043 (N.D. Cal. 2002), *aff'd,* 353 F.3d 765 (9th Cir. 2003) .........................34

*Fletcher Int'l, Ltd. v. Ion Geophysical Corp.,*
  2011 WL 1167088 (Del. Ch. Mar. 29, 2011)........................................................35

*Fowler v. UPMC Shadyside,*
  578 F.3d 203 (3d Cir. 2009)..................................................................................10

*Galef v Alexander,*
  615 F.2d 51 (2d Cir. 1980)....................................................................................61

*Geron v. Appliedtheory Corp. (In re Applied Theory Corp.),*
  323 B.R. 838 (Bankr. S.D.N.Y.), *aff'd,* 330 B.R. 362 (S.D.N.Y. 2005) ................................48

*Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Grp., Inc.),*
  339 B.R. 570 (Bankr. D. Del. 2006) .....................................................................13

*Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global
  Crossing Ltd.),*
  385 B.R. 52 (Bankr. S.D.N.Y. 2008) ....................................................................36

*Granfinanciera, S.A. v. Nordberg,*
  492 U.S. 33 (1989)................................................................................................43

*Granite Partners, L.P. v. Bear, Stearns & Co.,*
  17 F. Supp. 2d 275 (S.D.N.Y. 1988)..............................................................13, 64

*Greenspun v Lindley*,
    44 A.D.2d 20 (1st Dep't 1974), *aff'd,* 36 N.Y.2d 473 (1975) ................................61

*Gurvey v. Cowan, Liebowitz & Latman, P.C.*,
    2013 WL 3718071 (S.D.N.Y. July 15, 2013) .........................................................12

*H-M Wexford LLC v. Encorp, Inc.*,
    832 A.2d 129 (Del. Ch. 2003)...............................................................................64

*Halvering v. McGlue's Estate*,
    119 F.2d 167 (4th Cir. 1941) ...............................................................................48

*Harstad v. First Am. Bank (In re Harstad)*,
    1994 WL 526013 (D. Minn. Jan. 20), *aff'd,* 39 F.3d 898 (8th Cir. 1994) ..............56

*Hart v General Motors Corp*,
    129 A.D.2d 179 (1st Dep't 1987) .........................................................................61

*Henneberry v. Sumitomo Corp.*,
    415 F. Supp. 2d 423 (S.D.N.Y. 2006)...................................................................66

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)............................................................................ 57, 58

*Hochman v. LaRea*,
    14 A.D.3d 653 (2d Dep't 2005) ...........................................................................74

*Holmes v. Air Line Pilots Ass'n, Int'l*,
    745 F. Supp. 2d 176 (E.D.N.Y. 2010) .................................................................18

*Hovis v. Ducate (In re Ducate)*,
    369 B.R. 251 (Bankr. S.D.N.Y. 2007)..................................................................25

*HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.*,
    2009 WL 385474 (W.D.N.Y. Feb. 12, 2009), *aff'd,* 634 F.3d 678 (2d Cir. 2011)................51

*Icebox-Scoops, Inc. v. Finanz St. Honore, B.V.*,
    676 F. Supp. 2d 100 (E.D.N.Y. 2009) .................................................................63

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd,* 68 F.3d 26 (2d Cir. 1995) ................51

*In re Citigroup Inc. S'holder Deriv. Litig.*,
    964 A.2d 106 (Del. Ch. 2009)...............................................................................73

*In re DJK Residential LLC*,
    416 B.R. 100 (Bankr. S.D.N.Y. 2009) ..................................................................11

*In re Enron Corp.*,
    2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006)..................................... passim

*In re Gaston & Snow*,
243 F.3d 599 (2d Cir. 2001).........................................................................17, 61

*In re Gen. Motors (Hughes) S'holder Litig.*,
2005 WL 1089021 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).......................69

*In re General Motors*,
407 B.R. 463 (Bankr. S.D.N.Y. 2009), *aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) ..........................43

*In re Hechinger Inv. Co.*,
274 B.R. 71 (D. Del. 2002) ...........................................................30, 41, 42, 43

*In re Hecht*,
41 B.R. 701 (Bankr. S.D.N.Y. 1984) ...........................................................................43

*In re Initial Public Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003) .........................................................................12

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011) .........................................................................21

*In re Musicland Holding Corp.*,
398 B.R. 761 (Bankr. S.D.N.Y. 2008) .........................................................................12

*In re Old Carco LLC*,
406 B.R. 180 (Bankr. S.D.N.Y. 2009), *aff'd sub nom., Mauro Motors Inc. v. Old
Cargo LLC,* 420 F. App'x 89 (2d Cir. 2011) .............................................................43

*In re REA Express, Inc.*,
412 F. Supp. 1239 (E.D. Pa. 1976) .............................................................................54

*In re Sagent Tech. Deriv. Litig.*,
278 F. Supp. 2d 1079 (N.D. Cal. 2003) .......................................................................63

*In re Trinsum Grp., Inc.*,
460 B.R. 379 (Bankr. S.D.N.Y. 2011).........................................................................12

*Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*,
240 B.R. 195 (Bankr. S.D.N.Y. 1999) .........................................................................33

*International Shoe Co. v. Pinkus*,
278 U.S. 261 (1929).....................................................................................................41

*Ironforge.com v. Paychex, Inc.*,
747 F. Supp. 2d 384 (W.D.N.Y. 2010) .......................................................................74

*Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*,
952 F.2d 1230 (10th Cir. 1991) ...................................................................................33

*Kaufman v. Cohen*,
307 A.D.2d 113 (1st Dep't 2003) ...............................................................................70

*Kipperman v. Onex Corp.*,
    411 B.R. 805 (N.D. Ga. 2009) ............................................................56

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ................................................................ 57, 58

*Kirschner v. KPMG LLP*,
    626 F.3d 673 (2d Cir. 2010).............................................................58

*Koch Indus., Inc. v. Aktiengesellschaft*,
    727 F. Supp. 2d 199 (S.D.N.Y. 2010).................................................74

*Kolbeck v. LIT Am., Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996), *aff'd,* 152 F.3d 918 (2d Cir. 1998) ............................63, 69

*Krock v. Lipsay*,
    97 F.3d 640 (2d Cir. 1996)................................................................17

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012) ....................................... passim

*Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*,
    435 B.R. 169 (Bankr. S.D.N.Y. 2010) ................................................18

*Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.)*,
    324 B.R. 575 (Bankr. W.D. Pa. 2005) ................................................33

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l)*,
    181 F.3d 505 (3d Cir. 1999)...............................................................33

*Lumpkin v. Envirodyne Indus., Inc.*,
    933 F.2d 449 (2d Cir. 1991)...............................................................16

*Lustig v. Weisz and Assocs., Inc. (In re Unified Comm. Capital, Inc.)*,
    260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd,* 2002 WL 32500567 (W.D.N.Y. 2002) ............................................................................................48

*MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*,
    157 F.3d 956 ....................................................................................74

*Madonna v. United States*,
    878 F.2d 62 (2d Cir. 1989)................................................................11

*Matulich v. Aegis Commc'ns Grp., Inc.*,
    942 A.2d 596 (Del. 2008) .................................................................35

*MC Asset Recovery, LLC v. Southern Co.*,
    2006 WL 5112612 (N.D. Ga. Dec. 11, 2006).....................................55

*Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp.,*
*Inc.)*,
276 F.3d 123 (2d Cir. 2002)....................................................................................74

*Midland Food Servs, LLC v. Castle Hill Holdings V, LLC*,
792 A.2d 920 (Del. Ch. 1999)................................................................................54

*Miller v. CSFB (In re Refco Inc. Sec. Litig.)*,
2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009)...............................................35, 52

*Miller v. Mitsubishi Digital Elecs. Am., Inc. (In re Tweeter Opco)*,
452 B.R. 150 (Bankr. D. Del. 2011) ......................................................................13

*Nathel v. Siegal*,
592 F. Supp. 2d 452 (S.D.N.Y. 2008)....................................................................34

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010).....................................................................................40

*Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*,
361 B.R. 369 (Bankr. S.D.N.Y. 2007) ................................................................. 26

*North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007) .........................................................................................71

*O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*,
383 B.R. 231 (Bankr. S.D.N.Y. 2008) .............................................................13, 64

*Official Comm. Of Unsecured Creditors of Maxwell Newspapers, Inc. v. MacMillan,*
*Inc. (In re Maxwell Newspapers, Inc.)*,
189 B.R. 282 (Bankr. S.D.N.Y. 1995) ...................................................................56

*Official Comm. Of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l*
*Forge Co.)*,
344 B.R. 340 (W.D. Pa. 2006) ...............................................................................30

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B*
*Holdings, LLC)*,
420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199
(S.D.N.Y. 2011) ................................................................................................62, 67

*Official Committee Of Unsecured Creditors v. American United Life Insurance*
*Company (In re Quebecor World (USA) Inc.)*,
719 F.3d 94 (2d Cir. 2013)...............................................................30, 31, 33, 35

*Pacific Elec. Wire & Cable Co. v. Set Top Int'l Inc.*,
2005 WL 578915 (S.D.N.Y. Mar. 11, 2005) .........................................................63

*Papasan v. Allain*,
478 U.S. 265 (1986)................................................................................................10

*Patrick v. Allen*,
    355 F. Supp. 2d 704 (S.D.N.Y. 2005)......................................................................11

*Pereira v. Dow Chem. Co.* (*In re Trace Int'l Holdings*),
    287 B.R. 98 (Bankr. S.D.N.Y. 2002)....................................................................49

*Pereira v. Dow Chem. Co.* (*In re Trace Int'l Holdings*),
    301 B.R. 801 (Bankr. S.D.N.Y. 2003)..................................................................48

*Pereira v. United Jersey Bank. N.A.*,
    201 B.R. 644 (S.D.N.Y. 1996)............................................................................43

*Pergament v. Precision Sounds DJ's, Inc. (In re Oko)*,
    395 B.R. 559 (Bankr. E.D.N.Y. 2008).................................................................15

*Picard v. HSBC Bank, PLC*,
    454 B.R. 25 (S.D.N.Y. 2011)..............................................................................59

*Picard v. JPMorgan Chase & Co.*,
    460 B.R. 84 (S.D.N.Y. 2011)..............................................................................57

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Sec. LLC)*,
    721 F.3d 54 (2d Cir. 2013).................................................................................58

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)..............................................................30, 31, 34

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
    458 B.R. 87 (Bankr. S.D.N.Y. 2011)...................................................................47

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010).................................................................47

*Rajala v. Gardner*,
    709 F.3d 1031 (10th Cir. 2013), *cert. denied sub nom., Rajala v. Lookout*
    *Windpower Holding,* _ U.S. _, 134 S. Ct. 164 (2013) ............................................27

*RCA Corp. v. Tucker*,
    696 F. Supp. 845 (E.D.N.Y. 1988) .....................................................................17

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...............................................................................63

*Rood v. Coggins & Herman, P.A. (In re Rood)*,
    2012 WL 648230 (D. Md. Feb. 28, 2012), *aff'd,* 2013 WL 55650 (D. Md. Jan. 2,
    2013) ..................................................................................................................16

*Roselink Investors, L.L.C. v. Shenkman*,
    386 F. Supp. 2d 209 (S.D.N.Y. 2004).................................................................17

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)...............................................................................11

*Royal Z Lanes, Inc. v. Collins Holding Corp.*,
 524 S.E.2d 621 (S.C. 1999) ...............................................................................47

*RSL Commc'ns PLC v. Bildirici*,
 649 F. Supp. 2d 184 (S.D.N.Y. 2009), *cert. denied*, _ U.S._, 132 S. Ct. 97 (2011) ...............71

*Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*,
 863 F. Supp. 2d 732 (N.D. Ill. 2012) .................................................................23

*S & K Sales Co. v. Nike, Inc.*,
 816 F.2d 843 (2d Cir. 1987).............................................................................68

*S.E.C. v. Zandford*,
 535 U.S. 813 (2002)........................................................................................33

*Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*,
 325 B.R. 81 (Bankr. S.D.N.Y. 2005)...................................................................29

*Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*,
 380 B.R. 324 (Bankr. S.D.N.Y. 2008) ................................................................17

*Schnall v. Marine Midland Bank*,
 225 F.3d 263 (2d Cir. 2000)...............................................................................5

*SeaQuest Diving LP v. S & J Diving Inc. (In re SeaQuest Diving L.P.)*,
 579 F.3d 411 (5th Cir. 2009) .......................................................................35, 39

*Securities Inv. Prot. Corp. v. Bernard L. Madoff Invs. Sec. LLC*,
 2013 WL 1609154 (S.D.N.Y. April 15, 2013) .......................................................36

*Serio v. Human Dynamics Corp.*,
 2008 WL 2600631 (S.D.N.Y. June 25, 2008) .......................................................74

*Seta Corp v. Atlantic Computer Sys. (In re Atlantic Computer Sys.)*,
 173 B.R. 858 (S.D.N.Y. 1994)...........................................................................30

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
 302 B.R. 760 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005)...................................18, 22

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
 403 F.3d 43 (2d Cir. 2005)........................................................................ passim

*Sharp Int'l Corp. v. States St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
 281 B.R. 506 (E.D.N.Y. 2002) ..........................................................................69

*Shearson Lehman Hutton, Inc. v. Wagoner*,
 944 F.2d 114 (2d Cir. 1991)........................................................................ passim

*Shields v. Citytrust Bancorp.*,
 25 F.3d 1124 (2d Cir. 1994)..........................................................................12, 24

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*,
337 B.R. 791 (Bankr. S.D.N.Y. 2005) .................................................................................24

*Simmons v. Roundup Funding, LLC*,
2009 WL 3049586 (S.D.N.Y. Sept. 23, 2009), *aff'd in part and vacated in part on other grounds*, 622 F.3d 93 (2d Cir. 2010) ...........................................................44

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*,
295 B.R. 593 (B.A.P. 8th Cir. 2003), *aff'd,* 376 F.3d 819 (8th Cir. 2004) ..............................55

*Statutory Comm. Of Unsecured Creditors on behalf Iridium Capital Corp. v. Motorola, Inc. (In re Iridium Operating LLC)*,
373 B.R. 283 (Bankr. S.D.N.Y. 2007) .................................................................................17

*Steiner v. Meyerson*,
1995 WL 441999 (Del. Ch. July 19, 1995) ..........................................................................72

*Stolz v. Brattleboro Hous. Auth. (In re Stolz)*,
315 F.3d 80 (2d Cir. 2002) ................................................................................................44

*Textile Deliveries, Inc. v Stagno*,
1992 WL 196783 (S.D.N.Y. Aug. 5, 1992) ..........................................................................24

*Thaler v. Adler (In re Adler)*,
372 B.R. 572 (Bankr. E.D.N.Y. 2007) .................................................................................24

*Trenwick Am. Litig. Trust v. Ernst & Young, LLP*,
906 A.2d 168 (Del. Ch. 2006), *aff'd,* 931 A.2d 438 (Del. 2007) ...........................................72

*UCAR Int'l, Inc. v. Union Carbide Corp.*,
2004 WL 137073 (S.D.N.Y. Jan. 26), *aff'd,* 119 F. App'x 300 (2d Cir. 2004).......................54

*Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
860 F.2d 515 (2d Cir. 1988) ...............................................................................................16

*United States ex rel. Barmak v. Sutter Corp.*,
2003 WL 21436213 (S.D.N.Y. June 20, 2003) .............................................................12, 22

*United States v. Cherry Street Partners, L.P. (In re Alliance Health of Fort Worth, Inc.)*,
240 B.R. 699 (N.D. Tex.), *aff'd,* 200 F.3d 816 (5th Cir. 1999)..............................................53

*United States v. Wolfson*,
642 F.3d 293 (2d Cir. 2011).................................................................................................65

*Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*,
735 F.2d 740 (2d Cir. 1984).................................................................................................57

*White v. Panic*,
783 A.2d 543 (Del. 2001) ...................................................................................................73

*Whitney v. Citibank, N.A.*,
    782 F.2d 1106 (2d Cir. 1986) ........................................................................68

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ...........................................................................58

*Wood ex rel. United States v. Applied Research Assocs., Inc.*,
    328 F. Appx. 744 (2d Cir. 2009) ..................................................................62

*World Capital Commc'ns Inc. v. Island Capital Mgmt., LLC (In re Skyway Commc'ns Holding Corp.)*,
    389 B.R. 801 (Bankr. M.D. Fla. 2008) .........................................................56

## CONSTITUTION

U.S. CONST. art. I, § 8, cl. 4 ................................................................................41

U.S. CONST. art. VI, cl. 2 ....................................................................................40

## STATUTES/CODES/RULES

11 U.S.C. § 101(22)(A) .......................................................................................37

11 U.S.C. § 101(49)(A)(ii) ...................................................................................34

11 U.S.C. § 101(54)((D) ......................................................................................32

11 U.S.C. § 525 ...................................................................................................44

11 U.S.C. § 544(a) ..............................................................................................27

11 U.S.C. § 544(b) ..............................................................................................42

11 U.S.C. § 546(e) ......................................................................................... passim

11 U.S.C. § 548(a)(1) ..........................................................................................27

11 U.S.C. § 548(a)(1)(A) .................................................................17, 30, 42, 61

11 U.S.C. § 548(a)(1)(B) ..............................................................................29, 46

11 U.S.C. § 548(a)(1)(B)(i) ................................................................................47

11 U.S.C. § 550 ............................................................................................29, 45

11 U.S.C. § 550(a) ...................................................................................45, 54, 55

11 U.S.C. § 741(7)(A)(i) ................................................................................ passim

Del. Code Ann. Title 10 § 341 (2011) ...............................................................67

Del. Code. Ann. Title § 102(b)(7) ................................................................66, 67

N.Y. Debtor and Creditor Law § 276 ............................................................17

S.C. Code Ann. § 27-23-10...........................................................................47

S.C. Code Ann. § 27-23-109.........................................................................17

Fed. R. Civ. P. 8(a)(2)..................................................................................10

Fed. R. Civ. P. 9(b) ...............................................................................22, 62

Fed. R. Civ. P. 12(b)(1)...............................................................................56

Fed. R. Civ. P. 12 (b)(6)..............................................................................56

Fed. R. Bankr. P. 7009.................................................................................11

Fed. R. Bankr. P. 7012(b) .......................................................................1, 10

## OTHER AUTHORITIES

John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2388 (2003) .....................46

Samir D. Parikh, *Saving Fraudulent Transfer Law*, 86 AM. BANKR. L. J. 305, 349-50 (2012) ............................................................................................46

Vines, C. Wesley and Vernon O. Teofan, "*The Preservation and Prosecution of Avoidance Actions Post-Confirmation\* \*Or how to save your avoidance action for a rainy day,*"12 BANKR. DEV. J. 735, 764 (1996) ...............................................56

Defendants Arbor ESH II, LLC ("**Arbor ESH**"), Arbor Commercial Mortgage, LLC ("**ACM**"), Atmar Associates, LLC ("**Atmar**"), ABT-ESI LLC ("**ABT-ESI**"), Glida One LLC ("**Glida**"), Mericash Funding LLC ("**Mericash**"), Princeton ESH LLC ("**Princeton**"), Ron Invest LLC ("**Ron Invest**" and, together with Arbor ESH, ACM, Atmar, ABT-ESI, Glida, Mericash, and Princeton the "**Moving Entities**"), Guy R. Milone, Jr. ("**Milone**"), Joseph Chetrit ("**Chetrit**"), and Joseph Martello ("**Martello**", and collectively, with Milone, Chetrit and the Moving Entities, the "**Moving Defendants**"),[1] by and through their undersigned attorneys, Dechert LLP, respectfully submit this memorandum of law in support of their motion to dismiss the amended complaint (the "**Amended Complaint**" or "**AC**")) of the Extended Stay Hotel Successor Trustee's (the "**Trustee**") in Adversary Proceeding Nos. 11-02254, 11-02256, and 11-02398 (collectively, the "**Consolidated Proceeding**") with prejudice for failure to state a claim on which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7012(b).

## PRELIMINARY STATEMENT[2]

The Amended Complaint suffers from obvious and fatal defects that require dismissal. To begin with, all claims based in actual fraud are not plead with particularity and are implausible on their face. The Trustee acknowledges that the transfers he seeks to recover were made pursuant to contractual arrangements put in place at the time of the LBO, or pursuant to a post-LBO loan designed to finance a pre-LBO debt. Nonetheless Trustee strains credulity to argue that the defendants invested $400 million ($200 million by the Moving Entities) of their own funds in the LBO with the intent, formed at the time of the

---

[1]    ACM, Glida, Ron Invest, and Princeton are also together referred to herein as the "**A-1 Series Unit Holders**."

[2]    Undefined capitalized terms used in the Preliminary Statement shall have the meanings ascribed to such terms *infra*.

investment, to put in place contractual arrangements to siphon off dividends and other payments to recoup their $400 million investment. This theory is not credible.

The transfers at issue were by definition for value because they were made in pursuant to pre-existing contractual arrangements. Thus, the constructive fraud claims are inadequately pled. Trying to cast all defendants in an unfavorable light, the Trustee simply groups them all as controlling persons, or insiders, or affiliates of insiders, or wrongdoers, or as aiders and abettors of wrongdoers, and so on. The Trustee, however, is wrong. None of the Moving Entities was ever in control of the Debtors or otherwise an insider. The individual directors served for limited periods of time, and were appointed as representatives of minority, non-controlling equity members, *i.e.,* the Moving Entities. But even were this not the case, all of the transfers that the Trustee seeks to recover are shielded from avoidance by section 546(e) of the Bankruptcy Code since they all qualify as transfers made in connection with a securities contract by or to a financial institution.

Adding insult to injury, any recovery by the Trustee in this suit would be overwhelmingly for the benefit of the lenders who financed the LBO. Just $4.2 million of the amount claimed would be due to any unsecured creditor in this case, *i.e.*, the Indenture Trustee on account of the Debtors' pre-petition unsecured debt. Thus, the sophisticated financial institutions who structured the loans that financed the LBO, sold them to unsuspecting investors, and led to the Moving Entities' loss of their investment in the Debtors, would be the real beneficiaries of a recovery here. The law does not allow for such an inequitable result.[3]

---

[3] The recent case of *Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464 (W.D. Tex 2013), shares many similarities with this action, and persuasively supports dismissal of the Amended Complaint. The *Crescent* court found that dividend distributions derived from term loan proceeds borrowed by the debtor and made pursuant to an agreement involving the contribution of real estate assets by Duke and the issuance of securities, were shielded from avoidance by section 546(e). *Id.* at 471-77. Further, the Court limited any recovery by the litigation trust to the amount of creditor claims asserted by those not involved in the term loan transaction. *Id.* at 483.

More particularly, the Trustee's claims against the Moving Defendants should be dismissed as a matter of law for the following reasons:

- The Amended Complaint utterly fails to satisfy the pleading standard of Rule 8(a) by grouping all defendants on one hand, and all Debtors on the other. The Amended Complaint, as pled, simply does not allow the defendants to properly defend themselves. *See* **Point I**.

- The claims based on actual fraud are implausible, fail to meet the heightened pleading standard of Rule 9(b) and do not sufficiently allege badges of fraud. *See* **Point II**.

- Most of the transfers the Trustee seeks to avoid and recover were made by third parties and never were property of the Debtors' estates. *See* **Point III**.

- Section 546(e) of the Bankruptcy Code, the safe-harbor provision, bars all of the Trustee's claims except the inadequately pled federal actual fraudulent conveyance claim. See **Point IV**.

- In addition to being inadequately pled, the constructive fraudulent transfer claims fail because they were for value – pursuant to contractual arrangements negotiated at the time of the LBO. *See* **Point V**.

- The Trustee's claims should be limited to, at most, the total amount due to creditors not involved in structuring the securities transactions that required the transfers to be made. The only such uninvolved creditor is the Indenture Trustee whose claim is at most $4.2 million; no other unsecured creditors can participate in any recovery to be obtained in this action. *See* **Point VI**.

- The Trustee lacks standing to assert a number of his overreaching claims. The Trustee is barred from asserting the common law claims by the *Wagoner* rule based on the *in pari delicto* doctrine. Further, many of the claims the Trustee asserts are not Litigation Trust Assets. *See* **Point VII**.

- The Trustee's threadbare and group pleading fails to make out the elements of a breach of fiduciary duty or breach of contract claim. The contract with the Moving Entities was the BHAC LLC Agreement and there is no allegation that it was breached. Finally, his remaining state law claims are defective for various reasons more fully described below. *See* **Point VIII**.

In sum, the Trustee's litigation is fundamentally flawed and the Amended Complaint should be dismissed with prejudice.

**STATEMENT OF FACTS**[4]

By this motion the Moving Defendants seek dismissal with prejudice of the Amended Complaint. The Trustee has now settled, for pennies on the dollar, the vast bulk of his claims related to the so-called leveraged buy-out (the "**LBO**") of the Extended Stay, Inc. family of companies ("**Extended Stay Hotels**" or "**ESI**") in 2007. While the $2 billion in transfers to the sellers in the LBO are indeed removed from the Amended Complaint, the alleged gravamen remains the LBO which allegedly left the hospitality company immediately insolvent, undercapitalized, and unable to pay debts as they became due, thereby ultimately causing the Debtors' bankruptcy over two years later, on June 15, 2009. (AC ¶¶ 2, 122-26, 191, 263).

This action stems from the sale process and sale of the Extended Stay Hotels, beginning in January 2007, when ESI's owners, the Blackstone Group L.P. ("**Blackstone**"), began exploring a possible sale. (AC ¶ 113). Blackstone-related entities had originally taken ESI private in 2004 and held ESI's private stock through two wholly-owned subsidiaries, BHAC IV, LLC ("**BHAC IV**") and BRE/HV Holdings LLC ("**BRE.HV**"). (AC ¶¶ 107-08).

Blackstone provided an offering memorandum and related materials concerning the proposed sale. (AC ¶ 114). On April 12, 2007, the Lightstone Group LLC ("**Lightstone**"), a company unaffiliated with the Moving Entities, offered to purchase 100% of the membership interest in ESI from Blackstone for approximately $8 billion, net of certain capital lease obligations, through the LBO. (AC ¶¶ 114-15). Lightstone financed the majority of the purchase with debt of $7.4 billion, cash of $400 million and $200 million of rollover equity. (AC ¶ 115). The loans came from among the largest and most sophisticated financial institutions in the world, and only following extensive due diligence. As the Trustee admits, the solicitation by Blackstone for the sale of the Debtors came with a pre-baked, *i.e.* stapled

---

[4]    This Statement of Facts is taken from the Amended Complaint and recitation herein is without any admission and solely for this motion to dismiss.

financing for up to $6.8 billion (AC ¶ 114), with the final amount being $7.4 billion. (AC ¶ 115).

The sale of ESI closed on June 11, 2007. (AC ¶ 115). The buyer of the ESI equity from BHAC IV and BRE.HV was DL-DW Holdings, Inc. ("**DL-DW**"), an entity established by Lightstone for the LBO transaction (AC ¶ 25). DL-DW indirectly owned ESI through BHAC Capital IV, LLC ("**BHAC Capital**"). DL-DW "owned and had control over [BHAC Capital], the majority shareholder of ESI[.]" (AC ¶ 25). At all pertinent times BHAC Capital held no less than approximately 99% of the equity in ESI. (AC ¶ 26).

In connection with the closing of the LBO some of the Moving Defendants gained an indirect ownership interest in ESI by purchasing preferred membership interests in BHAC Capital (the "**Series A-1 Units**"). (AC ¶ 116). The Moving Entities invested $200 million to purchase non-voting, minority interests in BHAC Capital. *See* Second Amended And Restated Limited Liability Company Agreement of BHAC Capital IV, L.L.C., dated June 29, 2007, Schedule A (as amended, the "**BHAC LLC Agreement**"), attached as Exhibits A and B to the Declaration of Richard A. Goldberg (hereinafter "**Goldberg Decl.**") filed simultaneously herewith.[5]

The Amended Complaint erroneously refers to the Moving Defendants as insiders. The Moving Entities <u>were not</u> insiders of the Debtors. The Moving Entities never owned any equity in the Debtors. The Trustee does not argue otherwise. Some of the Moving Entities, *i.e.,* Arbor ESH and Princeton owned Series A-1 Units and Common A-1 Unites in BHAC Capital. Arbor ESH also owned Common J Units. *See* BHAC LLC Agreement, Schedule A

---

[5]     The BHAC LLC Agreement is properly before the Court, as it is relied on in the Amended Complaint and is integral to the Trustee's claims. *See Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir. 1998) (court may consider documents incorporated by reference in the complaint in deciding a motion to dismiss); *Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir. 2000) (documents integral to claims asserted in a complaint may be considered in a motion to dismiss). Here, the BHAC LLC Agreement is both incorporated by reference and integral to the Trustee's claims.

The Trustee relies on the BHAC LLC Agreement in the Amended Complaint: "[S]everal of the Defendants invested in BHAC Capital IV and therefore received a percentage of BHAC Capital IV's membership interests . . ." AC ¶ 116. The same is true as to DL-DW. AC ¶ 25.

(Goldberg Decl., Exh. A). The Series A-1 Units, Common A-1 Unites and the Common J Units were non-voting except for extraordinary actions. *See* BHAC LLC Agreement, §§ 3.03(f)(i), (g); 3.11(c)(i), § 3.07(e). The Series A-1 Units included a right to appoint one member to BHAC Capital's board (*id.*) and ESI's board (*id.* § 4.01(g)) under certain circumstances. *Id.* The boards of BHAC Capital and ESI, however, were required to have a minimum of four or five members. *See id.*, § 4.01(c), 4.01(g). The Trustee is unable to plead that non-voting members are insiders based only on a right to appoint, at most, a board minority.

The Amended Complaint alleges that ACM, Arbor ESH and ABT are affiliated (AC ¶ 57, 68) and that Mericash is affiliated with "Arbor," which is not defined. (AC ¶ 70). The Amended Complaint alleges that Glida and Ron Invest were members of BHAC and exercised control over BHAC and ESI, but fails to acknowledge that Glida and Ron Invest only owned Series A-1 Units that did not grant any control rights over BHAC and thus ESI. *See* Waiver And Consent Agreement, attached as Exhibit C to the Goldberg Decl. (approving transfer from Arbor ESH Series A-1 Units and Common A-1 Units to Glida and Ron Invest).

As to Princeton and Atmar, the Trustee alleges that they were members of DL-DW and through that interest exercised control over BHAC and ESI. Once again, the Trustee ignores that Princeton and Atmar held minority, non-voting interests in DL-DW. Princeton and Atmar each owned 5 Common J units in DL-DW. *See* Second Amended And Restated Limited Liability Agreement of DL-DW Holdings LLC ("**DLDW LLC Agreement**"), attached to the Goldberg Decl. as Exhibit D. The Common J Units had no voting rights except for certain extraordinary actions, and no right to appoint directors. *See* DLDW LLC Agreement, § 3.11(e). Other than bare bones and unsubstantiated allegations of control, there is nothing pled to support the Trustee's assertion that the Moving Entities are insiders of the Debtors.

The individual Defendants, Milone, Chetrit and Martello, qualify as ESI insiders, but only for the period of time of their board service. The Trustee admits that Martello resigned on or about May 15, 2008, and Milone was appointed in his place. (AC ¶¶ 75, 79). The Trustee fails to allege the period in which Chetrit served on the board.

In connection with the issuance of the Series A-1 Units, a $20 million "**Preferred Equity Reserve Account**" was created at Wachovia Bank, N.A. ("**Wachovia**")[6] to serve as security assuring that required dividends would be paid to the preferred equity holders. (AC ¶ 182). *See also* BHAC LLC Agreement, § 5.11.

After the LBO closed, Wachovia as lender, and ESI as borrower, entered a letter agreement on August 31, 2007 to adjust certain provisions of the LBO's mortgage and mezzanine loans in exchange for the issuance of certificates to the borrowers or their designees (collectively, the "**LIBOR Floor Certificates**"). (AC ¶ 137; *See Walker, Truesdell, Roth & Assocs. v. Lightstone Holdings,* Complaint, ¶¶ 159-60, Adv. P. No. 11-2556 [Dkt. No. 1] (June 14, 2011) (the "**Original Complaint**")). These certificates were issued to DL-DW in November 2007 with a value of approximately $25 million. (AC ¶¶ 137-39).

On April 16, 2008, DL-DW obtained a $22 million dollar loan (evidenced by the "**25% Note**") from affiliated investors, $11 million of which was advanced by the Moving Entities, secured by the LIBOR Floor Certificates (AC ¶¶ 154, 155), and the $22 million was used to repay a defaulted loan that one of the debtors had failed to repay at maturity (AC ¶ 153, 155). Income from the LIBOR Floor Certificates was used to make payments on the 25% Note and the excess was placed in a reserve bank account for the benefit of A-1 Series Unit Holders (the "**Floor Bonds Reserve Account**"). (AC ¶ 156).

---

[6]     Although the agreement provided that the account be maintained at Citibank, in reality, the account was maintained at Wachovia. That difference is immaterial for this motion.

The Amended Complaint alleges that, after the LBO, the buyers, including the Moving Entities, received over $139 million as part of the improper payment of distributions to equity holders from the Debtors' remaining cash, (AC ¶ 1), including preferred equity distributions to the Series A-1 Unit Holders (the "**Preferred Dividends**"), distributions from the Preferred Equity Reserve Account (the "**PERA Payments**"), distributions out of the Floor Bonds Reserve Account (the "**Floor Bond Payments** "), payments to the lenders on the 25% Note (the "**25% Note Payments**"), and payments on account of the LIBOR Floor Certificates (the "**LIBOR Floor Certificate Payments**" and together with the Preferred Dividends, PERA Payments, Floor Bond Payments and 25% Note Payments, the "**Alleged Transfers**").

The Trustee continues to focus on the LBO as the immediate cause of the Debtors' alleged insolvency and the focal point of his alleged fraud (AC ¶ 2) and he alleges in conclusory fashion that "Defendants in this action, used that ownership, control, and management authority to improperly withdraw cash and assets from the financially distressed Debtors to benefit equity holders and their affiliates." (AC ¶ 3).

The Trustee concedes, however, that as early as April 22, 2008, the Debtors retained Weil Gotshal & Manges ("**Weil**") as their restructuring and insolvency counsel and that in June 2008, the Debtors retained Lazard Frères ("**Lazard**") to assist in addressing the Debtors' financial condition. (AC ¶ 160). The retention of Weil and Lazard did not immediately cause cessation of dividends. Rather, over six months later, on November 13, 2008, Weil recommended that the Debtors cease making preferred dividends, and a Board resolution adopting the recommendation was approved unanimously, with one abstention. (AC ¶ 175).

Absent from the Amended Complaint is any recognition that the investment by the Moving Entities of hundreds of millions of dollars reflected the expectation that the Debtors' business would be profitable. Also absent is any acknowledgment regarding the true scope of

the economic downturn in the third and fourth quarters of 2008, although the Amended Complaint concedes that the bankruptcy followed on the heels of the "Great Recession [which] had hit in full, and conditions continued to worsen." (AC ¶ 165). The Trustee would have the court believe that the U.S. Government merely passed the Toxic Asset Relief Program and injected billions into the nation's largest banks as part of "business-as-usual."

The Trustee's attempt to blame the investors in the ill-fated LBO and to downplay the impact of the Great Recession is not plausible. The recession was directly felt by the entire business travel industry, as travel and hotel expenditure by businesses significantly declined. The Debtors were far from the only hospitality provider that fell into bankruptcy following the 2008 financial crisis. On July 19, 2010, Innkeepers USA Trust and ninety-one of its subsidiaries, operating the Hilton, Hyatt and Marriott branded hotels, filed voluntary bankruptcy petitions in the Southern District of New York. (*In re Innkeepers USA Trust,* Case No. 10-13800 (SCC)). Similarly, on February 1, 2011, MSR Resort Golf Course LLC, operating another well-known hotel chain, filed voluntary petitions for relief under Chapter 11 in the Southern District of New York. (*In re MSR Resort Golf Course LLC,* Case No. 11-10372 (SHL)).

The same fate befell the Debtors and the LBO investors suffered severe losses along with the creditors. Approximately two years after the LBO, a devastating economic downturn overwhelmed Extended Stay Hotels and every other lodging company in the country. The economic crisis precipitated the longest and deepest drop in revenue per available room across the industry since the Great Depression. Unable to withstand this industry-crippling crisis, the Debtors declared bankruptcy in June 2009, two years after its sale and approximately 14 months after the Weil retention.

# ARGUMENT

## STANDARDS GOVERNING THIS MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6), made applicable by Federal Rule of Bankruptcy Procedure 7012(b), is "designed to test the legal sufficiency of the complaint, and thus does not require the court to examine the evidence at issue." *DeJesus v. Sears, Roebuck Co.*, 87 F.3d 65, 69 (2d Cir. 1996). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading must be sufficient to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citations omitted); *accord Twombly*, 550 U.S. at 570. *Iqbal* provided a two-step approach to evaluate motion to dismiss. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("*Iqbal* extends the reach of *Twombly* [to civil cases] . . . [and offers] a two-part analysis."). First, the court may begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Threadbare recitals of the elements of a cause of action supported by conclusory statements are not factual. *See id.* at 677-78. The court need not credit conclusory statements unsupported by factual allegations or legal conclusions and characterizations presented as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Second, the court may give "well-pleaded factual allegations" an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. The complaint must contain "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." *Id.* at 678. Plausibility requires more than the "sheer possibility" of wrongdoing—the plaintiff must plead sufficient factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

If the allegations of a complaint show that the complained-of conduct was "not only compatible with, but indeed was more likely explained by," lawful conduct, no claim for relief is stated. *Id.* at 680, 682 (allegations are rejected when there is an "obvious alternative explanation" for the conduct alleged that is more "likely" than the inference drawn in a complaint). Nor should a court accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly[7] before the court. *See Madonna v. United States*, 878 F.2d 62, 65-66 (2d Cir. 1989).

Where a complaint alleges fraud, Federal Rule of Civil Procedure 9(b), as incorporated in Federal Rule of Bankruptcy Procedure 7009, imposes "more stringent pleading requirements." *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009). A plaintiff must state "with particularity the circumstances constituting fraud," including the facts that give "rise to a strong inference of fraudulent intent." *Cruz v. TD*

---

[7]     While a court typically examines only the allegations of a pleading on a motion to dismiss, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citations omitted). A court may also consider "documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." *Patrick v. Allen*, 355 F. Supp. 2d 704, 709 (S.D.N.Y. 2005) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). All of the documents relied upon herein or attached to the Goldberg Decl. satisfy this standard, as they are either cited or referred to in the Amended Complaint, clearly reviewed by the Trustee in analyzing the LBO and in preparing the Amended Complaint, or the Court may take judicial notice of.

*Bank, N.A.*, 855 F. Supp. 2d 157, 176 (S.D.N.Y. 2012). In other words, the plaintiff must plead the "who, what, when, and where of his allegations." *United States ex rel. Barmak v. Sutter Corp.*, 2003 WL 21436213, at *4 (S.D.N.Y. June 20, 2003); *see In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (explaining that particularity means "the who, what, when, where, and how: the first paragraph of any newspaper story"). A plaintiff also must plead particularized facts in support of the "why," *i.e.* a strong inference of fraudulent intent. *See In re Musicland Holding Corp.*, 398 B.R. 761, 773 (Bankr. S.D.N.Y. 2008). A strong inference of fraudulent intent arises if a plaintiff plausibly alleges: (i) that the "defendants had both motive and opportunity to commit fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d Cir. 1994). "Without such basic information, plaintiff simply does not 'state with particularity the circumstances constituting fraud.'" *Gurvey v. Cowan, Liebowitz & Latman, P.C.*, 2013 WL 3718071, at *9 (S.D.N.Y. July 15, 2013) (*quoting* Fed. R. Civ. P. 9(b)).

## POINT I

## THE AMENDED COMPLAINT FAILS TO MEET
## THE NOTICE PLEADING STANDARD OF FED. R. CIV. P. 8

In an action to avoid and recover payments, Rule 8(a)(2) requires that the complaint, at a minimum, provide notice of who made the transfer, the date and amount of the transfer, and the other necessary elements of the cause of action. *See e.g.*, *In re Trinsum Grp., Inc.*, 460 B.R. 379, 388 (Bankr. S.D.N.Y. 2011) (holding that "adequate factual information" to survive a motion to dismiss includes "the transferor and the transferees as well as the amount of each transfer and the year in which each took place."); *In re Enron Corp.*, 2006 WL 2400369, at *6 (Bankr. S.D.N.Y. May 11, 2006) (to adequately plead a constructively fraudulent transfer, the plaintiff must allege that the transfer "actually involved property of

[the debtor] being transferred to the Defendant."); *Miller v. Mitsubishi Digital Elecs. Am., Inc. (In re Tweeter Opco)*, 452 B.R. 150, 154-55 (Bankr. D. Del. 2011) (granting motion to dismiss preferential transfer claim where debtor failed to identify which of its affiliates was the transferor); *Giuliano v. U.S. Nursing Corp.* (*In re Lexington Healthcare Grp., Inc.*), 339 B.R. 570, 575 (Bankr. D. Del. 2006) (same).

Group pleading is not allowed, *see Erone Corp. v. Skouras Theaters Corp.*, 19 F.R.D. 299, 300 (S.D.N.Y. 1956), and each claim must identify the plaintiff claiming damage and the allegedly offending conduct of each defendant. *See Bautista v. Los Angeles Cnty.*, 216 F.3d 837, 840 (9th Cir. 2000); *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*, 383 B.R. 231, 257 (Bankr. S.D.N.Y. 2008) ("[G]roup pleading is generally forbidden because each defendant is entitled to know what he is accused of doing." (citation omitted)); *DiVittori v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1988) ("The pleading must give notice to each opposing party of its alleged misconduct. Thus, a claim may not rely upon blanket references to acts or omissions by all the defendants, for each defendant named is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he is individually charged.").

The Amended Complaint follows an impermissible group pleading format. With one exception,[8] as to each of the Alleged Transfers, the Amended Complaint refers to the Debtors, collectively, as the party making the transfers. Thus, the Preferred Dividends are referred to as made by the Debtors, *see* AC ¶¶ 144, 146, 151, 162, 166, 172, and the defendants, including both LBO investors and their nominee directors, are referred to as a group as

---

[8]    The one exception is a $5.2 million distribution made by ESA P Portfolio Operating Lessee Inc.  AC ¶ 147.

"initial transferees, parties for whose benefit the transfers were made, or immediate or mediate transferees." *Id.* ¶ 232. Similarly, the Trustee fails to allege which Debtor entity was entitled to receive the LIBOR Floor Certificates, *id.* ¶¶ 138, 139, and as a result, it is unclear which Debtor allegedly was entitled to the income generated by the certificates, and whose supposedly diverted income was used to pay the 25% Note Payments and the Floor Bonds Payments.

Following the same pattern, the Trustee fails to allege that each Debtor-related transferor was insolvent or inadequately capitalized. Rather, the Amended Complaint alleges insolvency of the Debtors as a group. *See e.g.*, AC ¶¶ 211, 220, 228. As a result, the Amended Complaint fails to allege the most basic factual components of an avoidance action: who made the transfers sought to be avoided, who received them, and whether the transferor was insolvent or inadequately capitalized.

This pleading failure is fatal not only for the avoidance causes of action, but to all causes of actions. The remaining causes of action for illegal distributions, unjust enrichment, breach of fiduciary duties, waste, conversion, conspiracy, turn-over, and claim disallowance all fail as a matter of law for the Trustee's failure to allege the most basic elements of these claims-which entity's property was transferred causing a harm, which transferor entity was insolvent or lacked surplus, and which defendants owed fiduciary duties to which entity. The Amended Complaint utterly fails to provide the Defendants with the most basic facts necessary for them to mount a defense.

Presumably recognizing these fatal pleading defects, the Trustee attempts to circumvent Rule 8(a) requirements by alleging that the Debtors should be treated "as a single business enterprise where each entity was the mere instrumentality or alter ego of the others." (AC ¶ 198). This attempt fails for several reasons.

First, the Debtors were clearly able to prepare their bankruptcy schedules on a standalone basis, belying the conclusory allegation that "adequate records of complete accounting activity related to each entity were not maintained." (AC ¶194). The bankruptcy schedules filed by some of the Debtors shows that the Debtors were able to prepare schedules of assets, liabilities and payments made on a standalone basis.[9] Further, the Examiner's Report [Dkt. 913][10] explains that the lenders obtained non-consolidation opinions concerning certain of the debtor entities which were special purpose entities created to be borrowers for the mortgage and mezzanine loan facilities.

Second, the Trustee attempts to use alter ego and piercing the veil in an impermissible way. These doctrines are used to allow an injured party to disregard the corporate form of a wrongdoer to hold the wrongdoer liable for the debts of its alter ego or controlled entity. *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997); *Pergament v. Precision Sounds DJ's, Inc. (In re Oko)*, 395 B.R. 559, 563 (Bankr. E.D.N.Y. 2008). Thus, even applying alter ego and piercing principles in this case would not remedy the Amended Complaint's fatal pleading defects. Piercing the veil here would result in all of the Debtors being liable for the others' debts; but it would not allow any of the Debtors to assert claims held by another.

In any event, here, the Trustee is attempting to disregard the corporate form of Debtors-plaintiffs in order to circumvent the pleading requirements. Simply stated, the law does not allow a corporate entity to rely on the abuse of its own corporate form to its benefit. *See e.g.*, *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460 (2d Cir. 1991) ("The *alter ego* doctrine is a sword, not a shield, the basis for a cause of action, not a defense."); *Rood v.*

---

[9]   For example, the schedules for Homestead Village LLC, ESA P Portfolio MD Trust, ESH/Homestead Mezz 5 LLC and Extended Stay Hotels LLC show assets, liabilities and payments made in the 90 days prior to the filing, respectively as: *Assets*-$12,715,473.48, $108,404,527, $0, $0; *Liabilities*-$4,099,849,448, $4,099,849,448, $400,000,000, $0; *90 day payments*-$25,789,420, $0, $0, $0.

[10]   Unless specifically noted, all docket entries are to the docket of the lead case, Case No. 09-13764.

*Coggins & Herman, P.A. (In re Rood)*, 2012 WL 648230, at *4 (D. Md. Feb. 28, 2012) (same), *aff'd,* 2013 WL 55650 (D. Md. Jan. 2, 2013).

To the extent that the Trustee seeks to substantively consolidate the Debtors, that attempt fails. The confirmed chapter 11 plan in this case [Dkt No. 1157] (the "**Plan**") provides for "the substantive consolidation of the Debtors solely for purposes of voting, confirmation and distribution." *See* Plan § 6.1. The Plan further provides that subject to the restructuring transactions, "(a) all property of each Debtor shall vest in each respective Debtor … and (b) each Debtor shall continue to exist after the Effective Date as a separate corporate entity…." *Id.* The Debtors' ability to file separate schedules of assets and liabilities and to preserve their separate existence under the Plan, eliminates any basis for their substantive consolidation under *Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),* 860 F.2d 515, 518 (2d Cir. 1988).[11]

Based on all of the foregoing the Amended Complaint should be dismissed in its entirety for failure to properly plead any claim for relief.

**POINT II**

**THE ACTUAL FRAUDULENT CONVEYANCE
CLAIMS FAIL AS A MATTER OF LAW**

In Counts 12 and 13 of the Amended Complaint (the "**Actual Fraudulent Conveyance Claims**"), the Trustee attempts to plead actual fraudulent conveyance claims under state law and federal law.[12] To plead these claims, the Trustee must allege fraud with

---

[11]  In *Augie/Restivo*, the Second Circuit set forth a two part analysis for substantive consolidation. The first consideration is "whether creditors dealt with the entities as a single economic unit and did not rely on their separate credit in extending credit." 860 F.2d at 518 (internal quotation marks omitted). Here, to the contrary, the Examiner's Report [Dkt. 913] explains that the lenders obtained non-consolidation opinions concerning certain of the debtor entities which were special purpose entities created to be borrowers for the mortgage and mezzanine loan facilities. Second, the analysis concerns "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id.* As set forth above, the affairs of the debtors were not "so entangled" – as evidenced by the Debtors' separate schedules of assets and liabilities and the plan.

[12]  In deciding which state law applies to the Trustee's fraudulent conveyance claims, this Court should apply the choice-of-law rules of New York. *See In re Gaston & Snow*, 243 F.3d 599, 601-02 (2d Cir. 2001). For purposes of New York's choice-of-law analysis, fraudulent conveyance is considered to be a tort. *RCA*

specificity, *i.e.*, that the transferor acted with actual intent to hinder, delay or defraud its creditors. *See* 11 U.S.C. § 548(a)(1(A) ("The [T]rustee may avoid any transfer . . . if the debtor . . . made such transfer . . . with actual intent to hinder, delay, or defraud" creditors); S.C. Code Ann. § 27-23-109 ("Every . . . Transfer . . . which may be had or made to or for any intent  or purpose to delay, hinder, or defraud creditors . . . to be clearly and utterly void . . . ."); N.Y. Debtor and Creditor Law § 276 ("Every conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud …" creditors).  The Actual Fraudulent Conveyance Claims should be dismissed because they are entirely implausible and for the Trustee's failure to allege fraud with the requisite specificity.

## A.    The Trustee's Actual Fraudulent Conveyance Claims Are Facially Implausible

Under the *Twombly/Iqbal* pleading standard, all claims must be plausible to survive a motion to dismiss.  Here, the Actual Fraudulent Conveyance Claims require proof of actual fraudulent intent, "a creditor must show intent to defraud on the part of the transferor."  *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir.

---

*Corp. v. Tucker*, 696 F. Supp. 845, 854 (E.D.N.Y. 1988).  For tort claims, New York applies an "interest analysis" to determine choice-of-law, requiring "that the law of the jurisdiction having the greatest interest in the litigation be applied."  *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (internal quotation marks and citation omitted).

The Second Circuit has held that "two separate inquiries are required to determine [which state has] the greater interest: (1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss."  *Krock*, 97 F.3d at 645 (internal quotation marks omitted).  "In all interest analyses, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort."  *Id*. at 646 (internal quotation marks omitted).  Where the parties are domiciled in different states, the locus of the tort will be determinative in cases involving conduct regulating laws.  New York courts consider fraudulent conveyance laws to be conduct regulating laws.  *See Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004).  As a result, the locus of the alleged tort should govern the choice-of-law analysis here.

Bankruptcy courts, including this one, have consistently treated debtors as the injured parties in fraudulent conveyance actions brought by a bankruptcy estate, and therefore found that the locus of the injury was the state in which debtors are headquartered.  *See Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 380 B.R. 324, 332 n.6 (Bankr. S.D.N.Y. 2008) (applying Virginia law to fraudulent transfer claim brought by estate because debtor was headquartered in Virginia); *Statutory Comm. Of Unsecured Creditors on behalf Iridium Capital Corp. v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 342 n.49 (Bankr. S.D.N.Y. 2007) (Peck, J.) ("For the purposes of this litigation, the [District of Columbia's fraudulent conveyance statute] is applicable because the [debtor's] principal place of business was located in Washington, D.C.").

Extended Stay was headquartered in South Carolina.  (*See, e.g.*, Disclosure Statement at 25 ("Extended Stay maintains its corporate headquarters in Spartanburg, South Carolina.").)  The locus of the alleged tort here is therefore South Carolina, and thus South Carolina law governs the state law fraudulent conveyance claims.

2005) (citation omitted).  In other words, a claim for intentional fraudulent transfer lies only where the transferor made the transfer with the specific purpose of placing assets out of the reach of creditors.  *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 302 B.R. 760, 784 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005).  It is not enough that the transferor is engaged in a fraud, the debtor must have made specific transfers in connection with the fraudulent scheme.  *Sharp Int'l Corp.*, 403 F.3d at 56 (affirming dismissal of actual fraudulent conveyance claims where an existing lender was repaid with the proceeds of a loan fraudulently obtained for that purpose at the urging of the repaid lender); *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 490 (D. Conn. 2002) ("the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor").

The fact that the Debtors filed for bankruptcy protection does not raise an inference that the Alleged Transfers were a fraud on creditors.  Where, as here, the transfers are in satisfaction of contractual obligations, an allegation of fraudulent intent makes no sense.  *Sharp Int'l Corp.*, 403 F.3d at 56.  Here, "[t]he involvement of sophisticated and independent market participants shows the implausibility of the allegations of intentional fraud." *Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 193 (Bankr. S.D.N.Y. 2010).

*Twombly* and its progeny are clear: a claim's legal plausibility is predicated on its factual plausibility.  Where, as here, the factual allegations are "not only compatible with, but indeed . . . more likely explained by, lawful . . . behavior," the plausibility standard will not be met.  *Iqbal*, 556 U.S. at 680.  If there is an obvious alternative explanation that is more likely than that which is alleged, the plaintiff's claim must be dismissed as implausible.  *Id.*; *see also Holmes v. Air Line Pilots Ass'n, Int'l,*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) ("Allegations 'become implausible when the court's commonsense credits far more likely

inferences from the available fact[s].'") (quoting *Arar v. Ashcroft*, 585 F.3d 559, 617 (2d Cir. 2009) (*en banc*) (Parker, J., dissenting)).

Plausibility turns on a common sense evaluation of the entire factual landscape. *Iqbal*, 556 U.S. 679. The Trustee's allegations that the "transfers were made and/or the obligations were incurred with actual intent to hinder, delay, or defraud one or more entities to which the Debtors were or became indebted" (AC ¶ 329) is contradicted by an obvious, common sense explanation from the Trustee's own allegations -- the Alleged Transfers were made pursuant to contractual obligations.

The Trustee glosses over critical facts that make his claims entirely implausible. First, when the Debtors' retained professionals advised that the Preferred Dividends should be suspended, the Board, which included the individual defendants herein, voted unanimously (with one abstention) to suspend the dividends. (AC ¶ 175). If there was any intent to defraud, the directors could have easily debated the recommendation and reject it. But they did not. The Trustee does not even attempt to explain how this fact is consistent with actual intent to defraud.

Second, the recommendation to the Board to suspend dividends was made about seven months after Weil was retained and about five months after Lazard was retained. As evidenced by the Amended Complaint, millions of dollars in Preferred Dividends were paid during this period. One would expect that these sophisticated professionals would have recommended the suspension of dividends earlier had they considered such dividends inappropriate. But the Trustee does not allege (nor can he) any earlier recommendation to suspend dividends. These facts strongly suggest that there was in fact no intent to defraud. Rather, Preferred Dividends were contractually required and paid until professionals advised the Board to suspend them due to the Debtors' financial condition. The Amended Complaint's portrayal of the Debtors as "doomed" from the time of the LBO and conjecture

that the Preferred Dividends therefore must have been made with intent to defraud, is belied by the fact that Weil and Lazard did not suggest suspension of the dividends until November 2008.

Finally, the Trustee admits that the Preferred Dividends were made pursuant to agreements put in place at the time of the LBO. *See* AC ¶ 118 ("As part of the LBO, revenue and other cash received for the Debtors' operations were funneled into an integrated cash management account, pursuant to a Cash Management Agreement. The Cash Management Agreement sought to protect certain lenders and equity owners by imposing a set waterfall payout structure."). A copy of the Cash Management Agreement, dated as of June 11, 2007 (the "**Cash Management Agreement**"), is attached to the Goldberg Decl. as Exhibit E. As the Examiner Report notes, the Cash Management Agreement required all funds on deposit to be applied pursuant to a certain waterfall, which included "the lesser of $1.25 million or an amount that would yield 8% return to Preferred Equity Holders into the Preferred Equity Subaccount." *See* Examiner Report, at 91-92.

Since the Defendants invested about $400 million in the LBO, $200 million by the Moving Entities, (AC ¶ 115), the Trustee's argument essentially goes like this: The Defendants invested $400 million in an LBO transaction that was doomed from the start. Knowing that the Debtors were doomed, the Defendants set out in advance the Cash Management Agreement which was designed to defraud the Debtors' creditors by allowing the preferred equity holders to draw as much as possible out of the overleveraged Debtors. One of the obvious problems with this fantasy is that although, according the Trustee, the Defendants totally controlled the Debtors, they were able to draw, according to the Trustee, only $139 million rather than the $400 million invested and then some. This significant equity investment destroys any plausible argument that the LBO and its related agreements were entered into with intent to defraud. *See In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d

500, 516 (S.D.N.Y. 2011) (equity investment is "inconsistent with the allegation that [the investor] harbored information that the Company's financial health was in grave jeopardy," and quite to the contrary, it "signals only confidence in the future of the [] company.").

The Series A-1 Unit Holders invested $200 million in the Debtors in exchange for the right to receive the Preferred Dividends pursuant to the BHAC LLC Agreement. The Preferred Equity Reserve Account was created pursuant to the BHAC LLC Agreement to secure certain minimum dividends to the investors. *See* BHAC LLC Agreement, § 5.11 (mandating that BHAC Capital maintain a $20 million cash reserve for the purpose of funding unpaid cash distributions to the Series A-1 Unit Holders). The Trustee admits as such. (AC ¶ 182 (the "'Preferred Equity Reserve Account' was created at the LBO's closing as 'security' for certain equity holders.") The Trustee fails to explain how the provision of some manner of security to investors, at the time of the LBO, can plausibly be viewed as made with actual intent to defraud. After all, the Series A-1 Unit Holders invested $200 million but were "secured" with only 10% of their investment. The trustee's conclusory fraud allegations make no sense.

Finally, the 25% Note Payments and the LIBOR Floor Certificate Payments were made to the Moving Defendants on account of the 25% Note. (AC ¶ 184 ("The board then unanimously resolved to pay off the 25% Note by transferring the LIBOR Floor Certificates . . . to the holders of the 25% Note lenders.")). The proceeds of the $11 million loan the Moving Defendants made to DL-DW were used to satisfy a matured and defaulted obligation of the Debtors. DL-DW in turn pledged the LIBOR Floor Certificate to secure the 25% Note. (AC ¶ 155). As a result, there was no plausible fraudulent intent, but as the Trustee's own allegations evince and common sense dictates, the transfers were used to make payments that directly benefited the Debtors by reducing their outstanding debt. (*Id*. ¶ 232 ("the LIBOR Floor Certificates were used to pay principal and interest owed on the 25% Note")).

Accordingly, the Trustee's Actual Fraudulent Conveyance Claims are implausible on their face and inconsistent with the Trustee's factual allegations. The Trustee simply fails to plausibly allege actual fraudulent intent, and as such, the Actual Fraudulent Conveyance Claims must be dismissed.

**B.**     <u>The Trustee Fails to Satisfy the Heightened Pleading Requirements of Rule 9(b)</u>

An actual fraudulent transfer claim requires proof of actual fraud, and thus must be pled with specificity, as required by Fed. R. Civ. P. 9(b). *See Sharp Int'l Corp.,* 302 B.R. at 783. As discussed *supra*, Rule 9(b) of the Federal Rules of Civil Procedure establishes a heightened pleading standard for complaints alleging fraud or mistake; such pleadings must "state with particularity the circumstances constituting" the violation. Fed. R. Civ. P. 9(b).

The Actual Fraudulent Conveyance Claims, as against the Moving Defendants, are based upon the allegation that the Alleged Transfers were made with the Debtors' actual intent to hinder, delay or defraud some or all of its creditors. (AC ¶¶ 329, 337). Yet, the Amended Complaint sets forth no allegations, let alone specific and particular allegations, of fraudulent intent. Rather, the Trustee tracks the statutory language and then alleges that at the time the Alleged Transfers were made, the Debtors were insolvent. (*Id.* ¶¶ 330, 338). The Trustee fails to allege the required "who, what, when, and where of his allegations." *Barmak*, 2003 WL 21436213, at *4.

Despite the settled pleading requirements, conspicuously absent from the Amended Complaint is any allegation identifying anyone at the Debtors who acted with the requisite fraudulent intent. This fatal omission cannot be obscured by the Trustee's bare-bones conclusions that the Alleged Transfers "were incurred at a time when the Debtors were controlled by insiders who benefited directly and indirectly from the transfers and obligations," that when the Alleged Transfers were made "the Debtors and the insiders had knowledge of the Debtors' insolvency," and that the "Defendants and the insiders knew that

they were hindering, delaying, or defrauding the Debtors' creditors when the Debtors paid equity owners on account of their equity ahead of paying off creditors." (*Id.* ¶¶ 329-30, 337-38).

In fact, the Trustee ignores his own allegations that the transfers were made pursuant to contractual arrangements put in place at the time of the LBO, or to satisfy loan obligations and therefore, other than conclusory allegations, the Amended Complaint is silent as to who acted with intent to defraud and how creditors were defrauded. Instead, the Trustee lumps together all of the Alleged Transfers and asserts that they were made with actual intent to hinder, delay or defraud. (AC ¶¶ 329, 337). This type of conclusory group pleading is inadequate and legally deficient under Rule 9(b).

## C.    The Trustee Does Not Sufficiently Allege The Existence of Badges of Fraud

In the wake of the Supreme Court's decisions in *Twombly* and *Iqbal*, the Trustee should not be permitted to rely on the "badges of fraud" standard to avoid pleading a plausible and particularized actual fraud claim.[13]   Because the Trustee has "access to the details necessary to make these allegations, it must plead them and not just tell the defendants to go find them." *ATSI Commc'ns, Inc. v. Shaar*, 493 F.3d 87, 106 (2d Cir. 2007). The Trustee, armed with the Examiner's Report and unfettered access to records, is in the best position to plead facts concerning the Debtors' intent, and his failure to make particularized allegations requires that the Actual Fraudulent Conveyance Claims be dismissed.

Even if the Court were to permit the Trustee to plead fraud pursuant to the "badges of fraud" standard, the application of this standard "must not be mistaken for license to base claims of pleading fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). "[A] complaint must adduce specific facts

---

[13]    *See, e.g.*, *Babin v. Caddo E. Estates I, Ltd.*, 2013 WL 4048979, at *3 (E.D. La. Aug. 9, 2013) (decided post-*In re Lehman*); *Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 745-46 (N.D. Ill. 2012); *Cadlerock v. Morey (In re Morey)*, 2012 WL 369486, at *6 (S.D. Miss. Feb. 3, 2012); *Airport Blvd. Apts., Ltd. v. NE 40 Partners, L.P. (In re NE 40 Partners, Ltd. P'ship)*, 440 B.R. 124, 127-28 (Bankr. S.D. Tex. 2010).

supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard."

*Textile Deliveries, Inc. v Stagno*, 1992 WL 196783, at *1 (S.D.N.Y. Aug. 5, 1992). Even

under the badges of fraud standard, conclusory allegations are not entitled to any presumption

of truth. *See Thaler v. Adler (In re Adler)*, 372 B.R. 572, 581 (Bankr. E.D.N.Y. 2007); *see*

*also Iqbal*, 556 U.S. at 679 (pleadings which are "no more than conclusions" are not "entitled

to the assumption of truth").

The Trustee does not plausibly allege any of the recognized "badges of fraud" under

New York law:

> (1) the lack or inadequacy of consideration; (2) the family,
> friendship or close associate relationship between the parties;
> (3) the retention of possession, benefit or use of the property in
> question; (4) the financial condition of the party sought to be
> charged both before and after the transaction in question; (5)
> the existence or cumulative effect of a pattern or series of
> transactions or course of conduct after the incurring of debt,
> onset of financial difficulties, or pendency or threat of suits by
> creditors; (6) the general chronology of the event and
> transactions under inquiry; (7) a questionable transfer not in the
> usual course of business; and (8) the secrecy, haste, or
> unusualness of the transaction.

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809

(Bankr. S.D.N.Y. 2005). Courts have dismissed allegations of intentional fraudulent

conveyance on the pleadings when only some badges are present because "[t]he existence of

a badge of fraud is merely circumstantial evidence and does not constitute conclusive proof

of actual intent." *Id.* at 809-10 (dismissing intentional fraudulent transfer claim supported

only by the presence of questionable transactions without other badges of fraud); *Hovis v.*

*Ducate (In re Ducate)*, 369 B.R. 251, 261-62 (Bankr. S.D.N.Y. 2007) (holding that mere

"concurrence" of badges of fraud was inadequate to establish intentional fraudulent

conveyance). Absent from the Amended Complaint are any facts to support any inference of

actual fraudulent intent concerning the Alleged Transfers. Thus:

- 24 -

- The Trustee does not and cannot allege inadequate consideration for the rights granted to the Moving Defendants.

  - In reality, the Moving Defendants invested $200 million in order to receive the contractually mandated Preferred Dividends required under the BHAC LLC Agreement.

  - The BHAC LLC Agreement also entitled the Moving Defendants to payments under the Preferred Equity Reserve Account should they not receive payment of the required Preferred Dividends.

  - The Moving Defendants lent DL-DW over $11 million in order to pay off certain of the Debtors' matured and defaulted notes. This loan was memorialized by the 25% Note. The Moving Defendants were entitled to payment pursuant to the 25% Note, including the 25% Note Payments and the LIBOR Floor Certificate Payments.

- The Trustee does not and cannot allege that the general chronology of the transactions under inquiry give rise to suspicion. The Preferred Dividends and the Preferred Equity Reserve Account were put in place as part of the LBO, resulting in a $400 million investment by the Defendants in the Debtors. The payments on account of the 25% Note were payments for principal, interest, and payoff of a loan, reducing the Debtors' indebtedness. (AC ¶¶ 155, 184).

- The Trustee alleges, in conclusory fashion, that the Alleged Transfers were transfers made other than in the usual course of business (AC ¶¶ 330, 338), and to insiders, however, the Trustee ignores that the Debtors were contractually obligated to make such payments and that the Moving Entities are not insiders.

- The Trustee does not and cannot allege secrecy, haste, or unusualness regarding the payment of the Alleged Transfers, as the Debtors were contractually obligated to make such payments.

- Inadequate consideration and insolvency, even if adequately alleged, are inadequate by themselves to establish an intent to defraud. *See Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.),* 361 B.R. 369, 397 (Bankr. S.D.N.Y. 2007).

While the Trustee argues in a conclusory fashion that all defendants were "controlling person[s]," (AC ¶ 100), presumably as the predicate for treating all Defendants as insiders, the BHAC LLC Agreement belies this allegation as the Moving Entities had no general voting rights and had the right to appoint only a minority of BHAC Capital board and then only in certain circumstances. Since the Moving Entities do not qualify as insiders, *see*

*supra*, pp. 5-6, the main badge of fraud relied upon by the Trustee, *i.e.* transfers to insiders, falls.

The Amended Complaint fails to plead direct, circumstantial or other evidence remotely suggesting that the Alleged Transfers were made for the purpose of defrauding creditors. As such, the Actual Fraudulent Conveyance Claims should be dismissed.

## POINT III

## <u>THE TRUSTEE CANNOT AVOID TRANSFERS OF NONDEBTOR PROPERTY</u>

In Counts Three, Twelve, Thirteen, Fourteen, and Fifteen of the Amended Complaint (the "**Fraudulent Transfer Claims**"), the Trustee seeks to avoid the Alleged Transfers, including transfers made to the Moving Entities from the proceeds of the LIBOR Floor Certificates: the LIBOR Floor Certificate Payments, the 25% Note Payments, and the Floor Bond Payments (collectively the "**LIBOR Certificate Transfers**"). (*See, e.g.,* AC ¶¶ 202, 204, 226, 230). The Trustee also seeks to avoid transfers made from the Preferred Equity Reserve Account. (*See, e.g.,* AC. ¶ 182). The Amended Complaint concedes, however, that the LIBOR Floor Certificates, and any transfers derived therefrom, were not transfers of the Debtors' property (*see id.* ¶ 187), and neither were the funds in the Preferred Equity Reserve Account. Thus, these nondebtor transfers may not be avoided.

Section 548 of the Bankruptcy Code allows the Trustee to avoid a transfer "of an interest of the <u>debtor in property</u>, or any obligation . . . incurred by the debtor . . .." 11 U.S.C. § 548(a)(1) (emphasis added). Moreover, section 544 permits the trustee to "avoid any transfer of <u>property of the debtor</u> or any obligation incurred by the debtor. . .." 11 U.S.C. § 544(a) (emphasis added). Nowhere does the Bankruptcy Code, or any comparable state law, provide the Trustee with the power to avoid transfers of funds that *should have been* property of the Debtors. It is settled law in this Circuit that property fraudulently transferred is not considered property of the estate unless and until it is recovered. *See FDIC v. Hirsch (In re*

*Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *accord Rajala v. Gardner*, 709 F.3d

1031, 1038-39 (10th Cir. 2013), *cert. denied sub nom., Rajala v. Lookout Windpower*

*Holding*, _ U.S. _, 134 S. Ct. 164 (2013).

The Court must consider whether the property was sufficiently alleged to be property

of the Debtors' estates. *In re Enron Corp.*, 2006 WL 2400369, at *6. In determining whether

certain funds should be considered property of the estate for avoidance purposes "it is the

transferor's control of the funds . . . and not the actual ownership that is dispositive." *Id.*

Thus, funds transferred by a third party are generally not subject to avoidance. *See A.W.*

*Lawrence & Co. v. Burstein (In re A.W. Lawrence & Co.)*, 346 B.R. 51, 56 (Bankr. N.D.N.Y.

2006). A trustee must demonstrate that the debtor had legal title to the property and control

over its use. *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 343 (Bankr. S.D.N.Y.

1999); *See Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (holding that property, in that case trust

fund taxes, in which the debtor does not own an interest, is not property of the estate).

It is clear on the face of the Amended Complaint that the LIBOR Certificate Transfers

did not involve the Debtors' property:

- The LIBOR Floor Certificate Payments: "[T]he LIBOR Floor
Certificates were issued and transferred directly to DL-DW, an ultimate equity
owner of the Debtors." (AC ¶ 138). "[T]he highly valuable LIBOR Floor
Certificates that *should have belonged to the Debtors* had been transferred to
DL-DW . . ." (AC ¶ 187) (emphasis added).

- The 25% Note Payments: "The income generated from the
LIBOR Floor Certificates went directly to make all interest and principal
payments on the 25% Note . . .. As of December 31, 2009, $3.3 million of the
principal on the 25% Note had been repaid through diversion of income from
the LIBOR Floor Certificates that s*hould have been paid to the Debtors*." (AC
¶ 156) (emphasis added).

- The Floor Bonds Payments: "[T]he excess income from the
LIBOR Floor Certificates was deposited into [the Floor Bonds Reserve
Account] for the benefit of BHAC Capital IV Series A-1 Unit Holders." (AC
¶ 156). Payments from the Floor Bonds Reserve Account "were made with
funds derived from the proceeds of the LIBOR Floor Certificates, which
belonged to the Debtors but *were wrongfully assigned* to the benefit of equity
interests in the Debtors . . .." (AC ¶¶ 164, 168, 174) (emphasis added).

The Amended Complaint does not suggest that the Debtors ever controlled or possessed the LIBOR Floor Certificates. In fact, the Trustee states the opposite—the Debtors never controlled the LIBOR Floor Certificates. The LIBOR Floor Certificates were issued by the lenders and were never received by the Debtors. (AC ¶ 138). The Trustee acknowledges that the LIBOR Floor Certificates were "issued and transferred to DL-DW." (*Id.*). There is no allegation that these certificates passed through the Debtors' control. Even the Trustee's description of DL-DW's assignment of the certificates to ABT-ESI undermines the suggestion that the Debtors had control. (AC ¶¶ 184-87). The Trustee's allegations make clear that the Debtors continued to lack possession or control of the LIBOR Floor Certificates at the time of the transfer to ABT-ESI. (*Id.*).

Further, the placement of excess income from the LIBOR Floor Certificates into the Floor Bonds Reserve Account in no way supports any inference of the Debtors' ownership of the Floor Bond Reserve Account. (AC ¶ 156). DL-DW pledged the certificates to the lenders of the 25% Note, and any excess income from the certificates went directly into the reserve account, not through the Debtors. (*Id.*). "Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into" the Floor Bonds Reserve Account. (*Id.*). The Amended Complaint does not allege that the "excess" interest from the certificates placed into the Floor Bond Reserve Account was ever controlled by, or owned by, the Debtors.[14]

Similarly, the Preferred Equity Reserve Account is alleged to have been funded at the LBO's closing and was "'security' for certain equity holders . . . and certain equity holders could instruct that distributions be made from that reserve account to them." (AC ¶ 182).

_____

[14] The Trustee also alleges that certain of the Preferred Dividends "were made with proceeds of the LIBOR Floor Certificates." (AC ¶ 210). To the extent those Preferred Dividends were made with proceeds of the LIBOR Floor Certificates, they cannot be avoided as Preferred Dividends in question were not transfers of the Debtors' property.

Although not alleged, this account was the property of a non-debtor, BHAC Capital, *see* BHAC LLC Agreement, § 5.11 (establishing the Preferred Equity Reserve Account), and contrary to the Trustee's allegation that it was funded by Debtors' funds, it was funded by proceeds of the Series A-1 Unitholders' investment in BHAC Capital. *See* LBO Closing Funds Sources & Uses, attached to the Goldberg Decl. as Exhibit F (identifying $25.1 million as preferred equity reserve). The Debtors did not have control over the Preferred Equity Reserve Account, nor legal title to the funds therein. For these reasons, the PERA Payments were never property of the estate and cannot be avoided.

### POINT IV

### THE BANKRUPTCY CODE'S SAFE HARBOR BARS THE TRUSTEE'S CLAIMS AGAINST THE MOVING DEFENDANTS

Counts Three (state and federal law claims for avoidance and recovery of illegal dividends or distributions), Thirteen (state law actual fraudulent conveyance claims), Fourteen (federal law constructive fraudulent conveyance claim), and Fifteen (state law constructive fraudulent conveyance claims) of the Amended Complaint (collectively, the "**Safe Harbor Claims**") should be dismissed because of the safe harbor provisions of section 546(e) of the Bankruptcy Code.[15]

Section 546(e) of the Bankruptcy Code, entitled "Limitations on Avoiding Powers," provides a safe harbor that precludes the avoidance of most transfers made in connection with a securities contract, whether a trustee is attempting to avoid such transfer under the federal constructive fraud provision, section 548(a)(1)(B) of the Bankruptcy Code, or pursuant to

---

[15] Count Twelve for intentional fraudulent transfers should be dismissed because the supposed "fraudulent" intent is inadequately pled. *See* Point II, *supra*. Because the Fraudulent Transfer Claims fail as a matter of law, Counts Sixteen and Seventeen of the Amended Complaint for turnover of property pursuant to Section 542 and disallowance of claims under Section 502(d) should also be dismissed as well. *See Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 81, 135 (Bankr. S.D.N.Y. 2005) (property that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered pursuant to Section 550); *Seta Corp v. Atlantic Computer Sys. (In re Atlantic Computer Sys.)*, 173 B.R. 858, 862 (S.D.N.Y. 1994) (disallowance of claims under Section 502(d) is contingent on a determination of liability for underlying fraudulent conveyance claim).

state fraudulent conveyance provisions pursuant to section 544 of the Bankruptcy Code.[16]

Section 546(e) states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Under the plain wording of section 546(e), the Alleged Transfers are not avoidable because they are "transfers made" "by" a "financial institution" "in connection with a securities contract." *See Official Committee Of Unsecured Creditors v. American United Life Insurance Company (In re Quebecor World (USA) Inc.)*, 719 F.3d 94, 96 (2d Cir. 2013) (holding that payments were exempt from avoidance as they were transfers made by or to a financial institution in connection with a securities contract); *Picard v. Katz*, 462 B.R. 447, 451-52 (S.D.N.Y. 2011) (dismissing, among other claims, an actual fraudulent transfer claim under the New York State fraudulent conveyance statute as protected by section 546(e)'s safe harbor); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.),* 469 B.R. 415, 440 (Bankr. S.D.N.Y. 2012) (same).

---

[16] Section 546(e) preserves only actions for actual fraud brought under section 548(a)(1)(A); actual fraud claims borrowed from state law under section 544 are barred. *See Picard*, 462 B.R. at 453 (dismissing state actual fraudulent transfer law claim under New York law, as section 546(e) shields transfers that are otherwise avoidable under state law); *Official Comm. Of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 369-70 (W.D. Pa. 2006) (rejecting argument that section 546(e) does not shield transfers that are avoidable under applicable state law as actual fraudulent transfers); *In re Hechinger Inv. Co.*, 274 B.R. 71, 97-98 (D. Del. 2002) (same).

**A.** **The Preferred Dividends Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e)**

**1.** **The Second Circuit Interprets Section 546(e) Broadly**

In *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, 651 F.3d 329, 339 (2d Cir. 2011), the Second Circuit took an expansive view of the section 546(e) safe harbor. The Second Circuit focused on the importance of interpreting section 546(e) in accordance with its plain meaning, holding that section 546(e) shields from avoidance an issuer's redemption of its commercial paper prior to the maturity date. *Id.* at 330, 339. In *Enron*, the Second Circuit made clear that section 546(e) applies to private as well as public securities. *Id.* (noting the Second Circuit, as a result of the Enron decision, follows the Third, Sixth and Eighth Circuits).

In *Quebecor*, the Second Circuit affirmed the courts below and held that the payments by Quebecor were protected from avoidance under section 546(e) as "transfer[s] made by or to (or for the benefit of) a … financial institution … in connection with a securities contract" because (i) a trustee for the noteholders met the definition of a "financial institution," (ii) the note purchase agreements met the definition of a "securities contract" because they provided for both the original purchase and repurchase of the notes, and (iii) the payments were "in connection with" the note purchase agreements. 719 F.3d at 99-100.

The *Quebecor* decision highlights that the safe harbor of Section 546(e) does not require that the financial intermediary take title to the transferred funds. *Id.* at 99; *Enron*, 651 F.3d at 338. Thus, in the Second Circuit, section 546(e) is enforced in accordance with its plain terms. *Id.; Lehman*, 469 B.R. at 436 ("[T]he Court will strictly construe the plain meaning of section 546(e) in judging whether the claims set forth in the Amended Complaint are subject to the safe harbors of that Section of the Bankruptcy Code.").

## 2. The Preferred Dividends Were "Transfers Made"

Clearly the Preferred Dividends at issue qualify as "transfers made." The Trustee describes the Preferred Dividends as "transfer[s]." (*See, e.g.*, AC ¶ 172 (the Preferred Dividends were paid "either by wire or by transfers"), ¶ 208 (defining the distributions related to payments to Series A-1, A-2 and A-3 Unit Holders as the "Dividend Transfers")) and payment of dividends clearly satisfies the definition of the term transfer. *See* 11 U.S.C. § 101(54)((D). Thus, under the plain language of section 546(e), the "transfer made" requirement is met with respect to the Preferred Dividends.

## 3. The Preferred Dividends Were Made "By" a "Financial Institution"

The Preferred Dividends were made "by" a "financial institution." The Preferred Dividends were paid to the Moving Entities through the cash management system. (AC ¶¶ 5, 162, 166, 172). The Cash Management Account was located at Wachovia. (Examiner Report, p. 89 [Dkt. No. 913]; Cash Management Agreement, ¶ 2.1 (Goldberg Decl., Exh. E)). Wachovia, "a national banking association," *see* Cash Management Agreement, introductory paragraph, fits squarely within the Bankruptcy Code's definition of a "financial institution" as "a commercial or savings bank . . . ." 11 U.S.C. § 101(22)(A);[17] *see also Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 987 (8th Cir. 2009) (a bank qualifies as a financial institution); *Crescent*, 500 B.R. at 471-72 (parties did not dispute that Wachovia, Bank of America and JPMorgan Chase qualify).

The fact that Wachovia did not hold title to the funds is immaterial. *Quebecor* and *Enron* make clear that the absence of a financial intermediary that takes title to the securities during the course of the transaction is not a proper basis on which to deny section 546(e) protection. *Quebecor*, 719 F.3d at 100; *Enron*, 651 F.3d at 338.

---

[17] The Court can take judicial notice that Wachovia is a financial institution within the meaning of section 546(e). *See Enron Corp. v. Int'l Fin. Corp (In re Enron Corp.)*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006) (taking judicial notice that Chase Manhattan Bank was a financial institution for purposes of section 546(e)).

Regardless of whether the financial institution holds a beneficial interest in the property transferred, "transfers . . . made to each beneficial shareholder, either by the shareholder's stockbroker, a clearing agency, or a financial institution" satisfy the financial intermediary analysis. *AP Servs., LLP v. Silva*, 483 B.R. 63, 69 (S.D.N.Y. 2012) (finding that payments made directly to shareholders' bank accounts via wire transfer fell within section 546(e)); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1240 (10th Cir. 1991). Transfers made by a bank acting as an escrow agent (or "paying agent") in connection with payments to selling shareholders are made by a financial institution for purposes of section 546(e). *See Enron*, 651 F.3d at 338; *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l)*, 181 F.3d 505, 516 (3d Cir. 1999); *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 257-259 (3d Cir. 2009) (holding that a transfer in connection with a private leveraged buyout was protected by section 546(e), notwithstanding lack of a true "settlement process" involving a clearing house intermediary); *Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 585-86 (Bankr. W.D. Pa. 2005).

Applying the plain language of section 546(e), Wachovia qualifies under the Bankruptcy Code as a financial institution, thus the "by" a "financial institution" requirement is met.

### 4. The Preferred Dividends Were Made "In Connection With A Securities Contract"

In applying section 546(e), "the words 'in connection with' are to be interpreted liberally." *Lehman*, 469 B.R. at 442; *Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (interpreting section 546(g)'s "in connection with" requirement as suggesting "a broader meaning similar to 'related to'"); *see e.g., S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) ("[T]he SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'");

*Nathel v. Siegal*, 592 F. Supp. 2d 452, 463 (S.D.N.Y. 2008) (noting that in the securities context "[t]he Supreme Court has given the 'in connection with' phrase a 'broad interpretation' such that 'it is enough that the fraud alleged 'coincide[s]' with a securities transaction" (citation omitted) (second set of brackets in original)); *Feitelberg v. Merrill Lynch & Co.*, 234 F. Supp. 2d 1043, 1052 (N.D. Cal. 2002) ("The 'in connection with' element 'should be construed, not technically and restrictively, but flexibly' in order for section 10(b) to cover typical and novel forms of fraud." (citation omitted)), *aff'd*, 353 F.3d 765 (9th Cir. 2003). Significantly, "[t]he 'in connection with' requirement of Section 546(e) does not contain any temporal or existential requirement that a transfer must be 'in connection with' then-outstanding legal exposure. Indeed, Section 546(e) does not include any language that refers either to exposure or timing." *Lehman*, 469 B.R. at 442.

The Preferred Dividends at issue were made "in connection with a securities contract." A "securities contract" as defined in section 741(7) of the Bankruptcy Code includes, among other things, "a contract for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i). "Security" is defined in section 101(49) of the Bankruptcy Code to include stock. 11 U.S.C. § 101(49)(A)(ii). As this Court has recognized previously, "[t]he plain language of Section 741(7) is very broad in its application and encompasses virtually any contract for the purchase or sale of securities, any extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guarantee agreements." *Lehman*, 469 B.R. at 438; *Picard*, 462 B.R. 447, 451-52 ("Section 741(7) defines a 'securities contract' as a 'contract for the purchase, sale, or loan of a security,' which is the kind of contract Madoff Securities had with its customers."); *Miller v. CSFB (In re Refco Inc. Sec. Litig.)*, 2009 WL 7242548, at *3 n.4 (S.D.N.Y. Nov. 13, 2009) ("[t]he term 'securities contract' is broadly defined in Section 741(7) – a definition that clearly covers the purchase of [stock] shares.").

The A-1 Series Units are a security, as the units are preferred membership interests in an LLC.  *See SeaQuest Diving LP v. S & J Diving Inc. (In re SeaQuest Diving L.P.)*, 579 F.3d 411, 418 (5th Cir. 2009) ("LLC interest either qualifies as a 'transferable share' or falls within the broad residual category. *Id.* § 101(49)(A)(viii)").  Under Delaware law, "a preferred stockholder's rights 'are contractual in nature.'"  *Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, 2011 WL 1167088, at *4 (Del. Ch. Mar. 29, 2011) (quoting *In re Appraisal of Metromedia Int'l Group, Inc.,* 971 A.2d 893, 899 (Del. Ch. 2009)); *Matulich v. Aegis Commc'ns Grp., Inc.,* 942 A.2d 596, 600 (Del. 2008).  Similarly, an LLC membership interest is contractual.  Del. Code Ann. tit. 6, § 101(7) (2011) ("A member or manager of a limited liability company or an assignee of limited liability company interest is bound by the limited liability company agreement").  Since BHAC Capital is a Delaware limited liability corporation, *id.* ¶ 55, Delaware law applies with regard to the A-1 Series Units.

The Preferred Dividends were paid to the "A-1 Series Units Holders."  (AC ¶ 208).  The A-1 Series Units are securities and were issued pursuant to the BHAC LLC Agreement, a contract.  (*See* BHAC LLC Agreement, §§ 1.120 (defining "Series A-1 Minimum Cash Monthly Distribution"); 3.03(g) (specifying rights in the event Series A-1 Minimum Cash Monthly Distributions are not made)).  Since the A-1 Series Units constitute a security under the Bankruptcy Code and the Preferred Dividends were made pursuant to the contract to purchase the Series A-1 Units, the Preferred Dividends were made "in connection with a securities contract."[18] In fact, it is not even necessary that the debtor be a party to securities

---

[18]  The Preferred Dividends at issue are distinguishable from the claims made in *Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing Ltd.)*, 385 B.R. 52 (Bankr. S.D.N.Y. 2008).  Judge Gerber, prior to *Enron* and *Quebecor*, found that receipt of a dividend was not immune from avoidance under section 546(e) of the Bankruptcy Code.  *Id.* at 57 n.1.  There, the defendant agreed that the dividend was a "settlement payment" and not a "transfer…made" in connection with a securities contract.  *Id.*  In reaching his conclusion, Judge Gerber focused on the legislative purpose of section 546(e), *id.*, but as discussed *supra*, Second Circuit law now focuses on the plain language of the statute to determine whether the safe harbor applies and does not limit the definition.  *Enron*, 651 F.3d at 335.  The Moving Defendants believe that *Global Crossing* is no longer good law in light of *Enron*, and preserve the argument that the Preferred Dividends constitute "settlement payments" subject to the safe harbor provision of section 546(e).  In the unlikely event that the Court was to hold that the Preferred Dividends were not made "in connection

contract for section 546(e) to apply. *See Securities Inv. Prot. Corp. v. Bernard L. Madoff Invs. Sec. LLC*, 2013 WL 1609154, at **8-9 (S.D.N.Y. Apr. 15, 2013).

The same result was reached in the recent *Crescent* case, where the court found that distribution of a dividend to Duke Energy was both a settlement payment and a transfer in connection with a securities contract in a multifaceted "Project Galaxy" transaction involving Duke Energy's contribution of LLC membership interests, a $1.187 billion loan to a subsidiary, the aforementioned distribution of the loan proceeds to Duke Energy, and a related loan syndication. *Crescent*, 500 B.R. at 467-477.

Thus, the final necessary requirement is met for section 546(e)'s safe harbor barring the avoidance of the Preferred Dividends.

**B.** **The PERA Payments Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e)**

Even if the PERA Payments were made from property of the Debtors, and they were not, they are protected by section 546(e) of the Bankruptcy Code as well.

**1.** **The PERA Payments Were "Transfers Made"**

The PERA Payments were clearly "transfers made." The Trustee describes the Preferred Dividends as "transfer[s]." (*See, e.g.*, AC ¶ 208 (defining the PERA Payments, among other transfers, as the "Dividend Transfers")). Thus, under the plain language of section 546(e), the "transfer made" requirement is met with respect to the PERA Payments.

**2.** **The PERA Payments Were Made "By" a "Financial Institution"**

The PERA Payments were made "by" a "financial institution." The Preferred Equity Reserve Account was maintained at Wachovia.[19] *See* BHAC LLC Agreement, § 5.11. As alleged, the PERA Payments were made to ACM from the Preferred Equity Reserve

---

with a securities contract," the Moving Defendants submit that the Preferred Dividends were "settlement payments." *See Enron*, 651 F.3d at 336-37 (settlement payment does not require a purchase or sale of a security).

[19]    See n.6.

Account.  (AC ¶ 182).  Citibank fits squarely within the Bankruptcy Code's definition of a "financial institution" as "a commercial or savings bank . . . ."  11 U.S.C. § 101(22)(A),[20] *see also Contemporary Indus.*, 564 F.3d at 987 (a bank qualifies as a financial institution).  Applying the plain language of section 546(e), Citibank qualifies under the Bankruptcy Code as a financial institution.

### 3. The PERA Payments Were Made "In Connection With A Securities Contract"

The PERA Payments were made "in connection with a securities contract."  As discussed *supra*, the BHAC LLC Agreement is a securities contract.  Pursuant to that agreement, the Preferred Equity Reserve Account was created as security for the equity holders (AC ¶ 182).  Further, the Account qualifies in and of itself under section 741(A)(xi) as "any security agreement or arrangement or other credit enhancement."

The PERA Payments were paid to the "A-1 Series Units Holders" pursuant to the BHAC LLC Agreement.  (*See* BHAC LLC Agreement, § 5.11).  Since the PERA Payments were made pursuant to a securities contract, the PERA Payments were made "in connection with a securities contract."[21]  Thus, the final necessary requirement is met for section 546(e)'s safe harbor, and the PERA Payments are not subject to avoidance.

### C. The LIBOR Certificate Transfers Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e)

Even if the LIBOR Floor Certificates were property of the Debtors, and they never were, the LIBOR Certificate Transfers are protected by section 546(e) of the Bankruptcy Code.

---

[20]  The Court can take judicial notice that Citibank is a financial institution within the meaning of section 546(e).  *See also* n.17, *supra*.

[21]  In the unlikely event that the Court was to hold that the PERA Payments were not made "in connection with a securities contract," the Moving Defendants submit that the PERA Payments were "settlement payments" and "margin payments," subject to the safe harbor of section 546(e).

1. **The LIBOR Certificate Transfers Were "Transfers Made"**

The LIBOR Certificate Transfers qualify as "transfers made."  The Trustee describes them as "transfer[s]."[22]

2. **The Transfer of the LIBOR Floor Certificates Was Made "By" a "Financial Institution"**

The initial transfer of the LIBOR Floor Certificates was made "by" a "financial institution."  As discussed in the Original Complaint, the LIBOR Floor Certificates were issued by Wachovia directly to DL-DW.  (Original Complaint, ¶¶ 159-60).  As discussed *supra*, Wachovia fits squarely within the Bankruptcy Code's definition of a "financial institution."

3. **The Transfer of the LIBOR Floor Certificates Was Made "In Connection With A Securities Contract" And Is A Settlement Payment**

The transfer of the LIBOR Floor Certificates was made "in connection with a securities contract."  A "securities contract" as defined in section 741(7) of the Bankruptcy Code includes, among other things, "a contract for the purchase, sale, or loan of a security …a mortgage loan, any interest in a mortgage loan ... or mortgage loans or interests therein…."  11 U.S.C. § 741(7)(A)(i).

Here, the interests created in the mortgage and mezzanine loans were securities.  According to the Disclosure Statement for the Debtors' Fifth Am. Plan of Reorganization [Dkt. No. 1028] (the "**Disclosure Statement**"), "[s]ubsequent to the closing of the [LBO], the Mortgage Lenders sold their interests in the Mortgage Debt, and received in exchange therefore certificates representing ownership of the beneficial interests in a vehicle . . . holding the Mortgage Debt and the collateral therefore.  In turn, certain investors bought

---

[22]  *See e.g.*, AC ¶ 69 ("As Lead Lender/Servicer of the 25% Note, ABT-ESI received subsequent transfers . . ."), ¶ 71 ("Mericash was a lender on the 25% Note [and] received subsequent transfers . . . "), ¶ 138 ("the LIBOR Floor Certificates were issued and transferred directly to DL-DW . . ."), ¶ 207 (defining the payments made in connection with the LIBOR Floor Certificates, the Floor Bonds Reserve Account and the 25% Note as the "LIBOR Floor Certificate Transfers").

those interests . . . which represent beneficial interests in the Trust." (Disclosure Statement, pp. 27). Thus, the securitization of the mortgage debt resulted in the issuance of securities to investors. In addition, according to the Disclosure Statement, the Mezzanine Lenders held "100% of the issued and outstanding membership interests in certain of the Debtors . . . ." (*Id.* at 28). Those membership interests are securities. *See SeaQuest Diving L.P.*, 579 F.3d at 418.

As alleged in the Amended Complaint, the mortgage and mezzanine lenders who financed the LBO had difficulty selling their certificated mortgage and mezzanine debt. (AC ¶¶ 136-37). In connection with negotiated modifications to the mortgage and mezzanine interests (*i.e.* in connection with a "security contract"), the LIBOR Floor Certificates were issued by the lenders directly to DL-DW. (*Id.* ¶¶ 137-39). Thus, the LIBOR Floor Certificates were issued in connection with the syndication of the mortgage debt and were plainly issued in connection with a securities contract.

The transfer of the LIBOR Floor Certificates also qualifies as a settlement payment since it was made to complete a securities transaction-issuance by Wachovia to DL-DW. (Original Complaint, ¶¶ 159-60) *See Enron*, 651 F.3d at 334 (settlement payment should be interpreted as "the transfer of cash or securities made to complete a securities transaction." (citation omitted)).

### 4. None Of The LIBOR Certificate Transfers Are Avoidable

All of the LIBOR Certificate Transfers were made from the proceeds of the LIBOR Floor Certificates. The 25% Note Payments were all paid from the "income generated from the LIBOR Floor Certificates." (AC ¶ 156). The Floor Bond Reserve Account was funded by "income from the LIBOR Floor Certificates" (*id.*) and as a result, the Floor Bond Payments were made from such proceeds. Since the transfer of the Floor Bond Certificates is shielded from avoidance by section 564(e) as discussed above, it follows that the proceeds

are not subject to avoidance. There is no authority for the proposition that, although a transfer of property is not avoidable, the transfer of proceeds generated by the same underlying property is nonetheless avoidable.][23]

### D.    All State Law Claims are Preempted by Section 546(e)

Counts One through Eleven (the "**State Law Claims**") should also be dismissed, as section 546(e) explicitly and implicitly preempts them. The State Law Claims are based on the same facts and circumstances and seek in substance the same relief sought by the Safe Harbor Claims. As such, the State Law Claims must be dismissed. *See Bond v. Sparks (In re U.S. Mortgage Corp.)*, 492 B.R. 784, 816-17 (Bankr. D.N.J. 2013) (dismissing, as preempted by Section 546(e), claims for conspiracy, aiding and abetting civil conspiracy and fraud and conversion); *Bond v. Nat'l Fin. Servs. (In re U.S. Mortgage Corp.)*, 491 B.R. 642, 675 (Bankr. D.N.J. 2013) (same).

Under the doctrine of preemption, state laws that interfere with or are contrary to federal law are preempted and are without effect pursuant to the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2. Congress may preempt state law explicitly in a statute, or may do so implicitly under (i) "field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law," or (ii) "conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (internal quotation marks omitted).

The Constitution provides that Congress shall have the power "to establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art.

---

[23] In the unlikely event that the Court was to hold that the LIBOR Certificate Transfers were not made "in connection with a securities contract," the Moving Defendants submit that the LIBOR Certificate Transfers were "settlement payments." *See* n.18, *supra*.

I, § 8, cl. 4. In *International Shoe*, the Supreme Court explained preemption as it relates to federal bankruptcy law: "The national purpose to establish uniformity necessarily excludes state regulation. . . . States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations." *International Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929). Thus, the Bankruptcy Code precludes enforcement of state laws that regulate the same subject. *Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 120 (2d Cir. 2001).

As demonstrated below, the State Law Claims are barred by both field and conflict preemption, as the Bankruptcy Code completely occupies the "field of proceedings within bankruptcy" and the state law claims brought by the Trustee would circumvent Section 546(e). *See Hechinger Inv. Co.*, 274 B.R. at 97-98 (finding that both field preemption and conflict preemption applies where the trustee's state law claims would circumvent Section 546(e) of the Bankruptcy Code).

The Bankruptcy Code provides the *exclusive* framework for avoiding prepetition transfers of the Debtors' property, as evidenced by the comprehensive remedial scheme for avoidance and recovery of fraudulent transfers found throughout the Bankruptcy Code and in particular, Sections 544, 546, 548, 550-51, 555-56 and 559-61. *See Hechinger Inv. Co.*, 274 B.R. at 97. Congress provided that through sections 544(b), 548 and 550 of the Bankruptcy Code, the Trustee has the exclusive power to avoid fraudulent transfers of the Debtors' property and to pursue avoidance actions on behalf of the Debtors' estates. *Id.* Congress made clear the degree to which state fraudulent-transfer laws will be recognized in bankruptcy, authorizing the trustee to avoid prepetition transfers of the Debtors' property that are "voidable under applicable law by a creditor" of the debtor. *See* 11 U.S.C. § 544(b). However, Congress has placed clear limits on that authority, legislating that "[n]otwithstanding section []544" and its authorization to avoid transfers "voidable under

applicable law by a creditor," "transfer[s] made" "by or to" a "financial institution" "in connection with a securities contract" or as "settlement payments" cannot be avoided in bankruptcy except pursuant to Section 548(A)(1)(a). *Id.* §§ 544(b), 546(e). Therefore, Congress preempted any state law that would permit the avoidance of transfers protected by section 546(e).

Courts have rejected efforts to circumvent Section 546(e) though the use of state law claims. The court in *Contemporary Industries* found that claims for unjust enrichment and illegal shareholder distributions are preempted by section 546(e), as those claims seek to recover payments that are protected from avoidance as fraudulent transfers. 564 F.3d at 988. In terms equally applicable to the State Law Claims brought in the Amended Complaint, the Eighth Circuit recognized that:

> Through its state law claims, [the debtor] seeks to recover the same payments we have already held are unavoidable under § 546(e). Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section. Thus, [the debtor's] state law claims must fail.

*Id.*

Similarly, in *Hechinger*, 274 B.R. at 96-97, the Court found that section 546(e) of the Bankruptcy Code prohibited fraudulent transfer claims and preempted a parallel claim for unjust enrichment. *Accord AP Servs.*, 483 B.R. at 71. In reaching this conclusion, the court noted: "If the court were to entertain the Committee's unjust enrichment claim, a claim that effectively acts as an avoidance claim against shareholders in a transaction that the court has already found is an unavoidable settlement payment . . . the purpose of section 546(e) would be frustrated." 274 B.R. at 96. Furthermore, the court reasoned "[c]laims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code cannot be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless." *Id.*

The Second Circuit, and lower courts therein, have applied preemption principles in other bankruptcy contexts where parties have asserted state-law claims that would circumvent the Bankruptcy Code's provisions.[24]   Furthermore, the Second Circuit has held that state-law tort claims for violations of the automatic stay "are completely preempted by federal bankruptcy law," because Congress established a "comprehensive federal system" in a "lengthy, complex and detailed Bankruptcy Code," which sets forth the substantive standards "govern[ing] . . . debtors' affairs and creditors' rights" in bankruptcy cases and the corresponding "remedies" available to achieve those ends.  *Eastern Equip. & Servs. Corp.*, 236 F.3d at 120-21.[25]   The Supreme Court has recognized that, for fraudulent conveyance claims seeking monetary award, "any distinction that might exist between 'damages' and

---

[24]   The Southern District of New York has determined that creditor claims against a bank to recover prepetition transfers of the debtor's property under state-law theories of unjust enrichment, conversion and restitution are preempted to the extent of any conflict with the Bankruptcy Code because they "fall[] squarely within the ambit of section[] 547(b)" and "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress embodied by Section [] 547(b)."  *Pereira v. United Jersey Bank. N.A.*, 201 B.R. 644, 678-80 (S.D.N.Y. 1996); *see Allstate Fabricators Corp. v. Flagstaff Foodservice Corp. (In re Flagstaff Foodservice Corp.)*, 56 B.R. 899, 908-09 (Bankr. S.D.N.Y. 1986) (creditor fraud claim to recover goods from debtor preempted by "exclusive remedy for reclaiming creditors" under section 546(c) of the Bankruptcy Code); *In re Hecht*, 41 B.R. 701, 706 (Bankr. S.D.N.Y. 1984) (state law governing creditor setoff rights preempted by avoidance provisions of section 553(b) of the Bankruptcy Code to extent state law "would . . . frustrate[]" "Congress['s] inten[t] to limit the amount a creditor can offset").  Additionally, in *General Motors*, the court held that state-auto-dealer franchise laws "must be trumped by federal bankruptcy law" "[t]o the extent that [those] laws . . . impair the ability to reject, or to assume and assign [auto-dealer contracts]" under the Bankruptcy Code.  *In re General Motors*, 407 B.R. 463, 515 (Bankr. S.D.N.Y. 2009), *aff'd*, 428 B.R. 43 (S.D.N.Y. 2010); *see also In re Old Carco LLC*, 406 B.R. 180, 206 (Bankr. S.D.N.Y. 2009) (state franchise law protections cannot be used to negate the Debtors' rejection powers under section 365 of the Bankruptcy Code), *aff'd sub nom., Mauro Motors Inc. v. Old Cargo LLC*, 420 F. App'x 89 (2d Cir. 2011).

[25]   *See also Stolz v. Brattleboro Hous. Auth. (In re Stolz)*, 315 F.3d 80, 87, 92-94 (2d Cir. 2002) (Bankruptcy Code's bar against bankruptcy-discrimination under 11 U.S.C. § 525 prohibited enforcement of state-law eviction remedies for non-payment of discharged rent); *Astor Holdings v. Roski*, 325 F. Supp. 2d 251, 262-63 (S.D.N.Y. 2003) (holding that state-law tort claims for "bad faith" bankruptcy filings are preempted, since "remedies for 'the misuse of the . . . process' . . . [are] governed exclusively by th[e] Code"); *Simmons v. Roundup Funding, LLC*, 2009 WL 3049586, at *4 (S.D.N.Y. Sept. 23, 2009) (state law claims for filing fraudulent proof of claim preempted), *aff'd in part and vacated in part on other grounds*, 622 F.3d 93 (2d Cir. 2010); *Diamante v. Solomon & Solomon, P.C.*, 2001 WL 1217226, at *3 (N.D.N.Y. Sept. 18, 2001) (state law claims for violation of discharge injunction were preempted because "Plaintiff [wa]s, in effect, attempting to circumvent the enforcement and remedial scheme of the Bankruptcy Code, which provides a remedy for any violation of § 524 in the form of possible contempt sanctions," and "[t]o permit such claims would thwart Congress' intent in promulgating the Bankruptcy Code to create a singular federal system to adjust all of the rights and duties of both creditors and debtors").

monetary relief under a different label is purely semantic." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 49 & n.7 (1989).

Here, the Trustee is attempting to circumvent Section 546(e) through the State Law Claims. The Trustee simply re-labels the Safe Harbor Claims as State Law Claims in an attempt to circumvent sections 544(b) and 546(e) of the Bankruptcy Code. Indeed, the Trustee is bringing the very types of claims covered by section 544(b) and Congress' intent to preempt those claims under section 546(e) could not be more apparent. Avoidance and recovery of the Alleged Transfers is precisely what the Trustee seeks in all of his claims. *See e.g.,* AC ¶ 1 ("This is an action to recover . . . dividends and distributions . . . and other wrongful transfers").

Indeed, the Alleged Transfers sought to be avoided in the Safe Harbor Claims are the <u>exact same</u> dollar amounts sought to be avoided in Count One "Recovery of Illegal Dividends or Distributions." (AC pp. 108-110 ¶ (i)). The description in Count One – Recovery of Illegal Dividends or Distributions (AC ¶¶ 200-209), is used to form the basis for the Safe Harbor Claims, in addition to serving as the basis for all State Law Claims. Section 546(e) permits no such thing. The State Law Claims are preempted, regardless of whether the Trustee purports to bring those claims independently of section 544(b) under common law.

The fact that the Trustee simply relabels the avoidance claims as state law claims, distinguishes this case from this Court's decision in *Lehman*. In *Lehman*, 469 B.R. at 450, this Court held that state law claims were not preempted because they were unlike classic constructive fraud claims, and had more in common with actual fraud claims. Here, in contrast, the State Law Claims' allegations are very similar, if not identical, to the allegations underlying the constructive fraud claims, and the Amended Complaint's actual fraud claims are wholly insufficient and implausible. Where state law claims seek the same relief and rely on allegations that are similar to claims barred by section 546(e), courts hold that the state

law claims are preempted.  *See AP Servs.*, 483 B.R. at 71 n.65; *U.S. Mortgage*, 492 B.R. at 817.

In *AP Servs.*, though the court held the unjust enrichment claim preempted, it also held, with little analysis, that claims for breach of fiduciary duties were not preempted.  483 B.R. at 71-72.  The AP *Servs*. court based its ruling on an artificial distinction between the remedies available in respect of fraudulent transfers and those available on account of breach of fiduciary duties.  It reasoned that since claims for breach of fiduciary duties seek money damages, the award of money damages would not implicate the policy underlying section 546(e) to protect settled securities transactions. *Id.*

This reasoning is flawed because under section 550 of the Bankruptcy Code when a fraudulent transfer is avoided, the court may order the return of the property transferred or the value thereof.  11 U.S.C. § 550(a).  In fact, in essentially all attempts to avoid payments made to shareholders, the property sought to be recovered is the cash paid to the selling shareholders.  One need go no further than the Amended Complaint; regardless of the claim asserted, the Trustee seeks money damages. Furthermore, it is hard to see how requiring a selling shareholder to return a cash payment made to her in an LBO two years hence ever involves unsettling closed securities transactions; the sale is not implicated at all.  *See* Samir D. Parikh, *Saving Fraudulent Transfer Law*, 86 Am. Bankr. L. J. 305, 349-50 (2012).

The distinction made by the *AP Servs.* court is a distinction without a difference and is insufficient to overcome the weight of the preemption analysis.

Furthermore, the result reached in *AP Servs.* is so outrageously unjust and inequitable that it is inconceivable that Congress intended it.  According to *AP Servs.*, all parties to an LBO are protected by section 546(e) except the directors who approved it.  Thus, lenders, financiers, redeeming or selling shareholders- -all who benefited from the LBO are protected; the directors who have no personal stake in the transaction (and none is alleged here) are not.

Thus, the only parties who did not gain anything out of the transaction may be liable for the entire value of the transaction. We respectfully submit that this is an absurd result that Congress could not have intended. *See* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2388 (2003) ("[T]he Supreme Court has subscribed to the idea that judges may deviate from even the clearest statutory text when a given application would otherwise produce 'absurd' results.").

Accordingly, the Court should dismiss all of the State Law Claims as preempted by section 546(e) of the Bankruptcy Code.

**POINT V**

**THE CONSTRUCTIVE FRAUDULENT
CONVEYANCE CLAIMS FAIL AS A MATTER OF LAW**

Counts Fourteen and Fifteen (the "**Constructive Fraudulent Conveyance Claims**") are barred by section 546(e) as they are Safe Harbor Claims. *See supra* Point IV. In addition, as explained above, the state-law fraudulent conveyance claims are governed by South Carolina law, because ESI was headquartered there, and South Carolina law does not recognize the doctrine of constructive fraudulent conveyance. South Carolina law allows for avoidance only of transfers made with actual intent to defraud, or gratuitous transfers. *See* S.C. Code Ann. § 27-23-10; *Royal Z Lanes, Inc. v. Collins Holding Corp.*, 524 S.E.2d 621, 622 (S.C. 1999). The Trustee concedes that the Preferred Dividends and the PERA Payments were made pursuant to contractual arrangements put in place at the time of the LBO and thus are not gratuitous. (AC ¶¶ 5, 118, 155-56).

To state a constructive fraudulent transfer claim under section 548(a)(1)(b) of the Bankruptcy Code, the Trustee must allege that the debtor was insolvent and did not receive "reasonably equivalent value" for the transfer.[26] Here, the Trustee does not even allege on

---

[26] Although South Carolina law applies and does not recognize a claim for constructive fraudulent conveyance, the result would be the same under New York State law. "Although the terminology used by the [Debtor and Creditor Law] differs from that used in the Bankruptcy Code, both ultimately require a

whose behalf the Alleged Transfers were made or whether any individual transferor was insolvent, much less what value was given. (*See e.g.,* AC ¶¶ 166-67, 172-73, 186-87; *see also* 11 U.S.C. § 548(a)(1)(B)(i); *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*), 440 B.R. 243, 261 (Bankr. S.D.N.Y. 2010)). Due to this reason alone, the Constructive Fraudulent Conveyance Claims should be dismissed.

The Trustee fails to allege which Debtors, if any, allegedly paid the Preferred Dividends. (*See e.g.,* AC ¶¶ 166-67). Nor does the Trustee allege which Debtor funded the Preferred Equity Reserve Account. (AC ¶ 182). The Trustee concedes that no Debtor transferred, and does not identify who should have received, the LIBOR Floor Certificates or the proceeds thereof, including the 25% Note Payments and the Floor Bond Payments. (AC ¶¶ 139, 141).

Furthermore, portions of the Constructive Fraudulent Conveyance Claims are based upon the Preferred Dividends and the PERA Payments. As discussed in Point II.A., the Preferred Dividends and the PERA Payments were paid to the A-1 Series Units Holders pursuant to the BHAC LLC Agreement (AC ¶¶ 163, 208) and the Cash Management Agreement. To allege that Preferred Dividends and PERA Payments were made fraudulently and without reasonable equivalent value is just not plausible. (AC ¶ 330(iii)). A lawful declaration of dividend establishes a debt in favor of the equity holder, establishing a contractual right of the equity holder to be paid. *See Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 615 F. Supp. 96, 105 (S.D.N.Y. 1985); *Anadarko Petro. Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1175 (Del. 1988); *Halvering v. McGlue's Estate*, 119 F.2d 167, 171 (4th Cir. 1941) (applying N.Y. corporate law). Here, the dividends at issue were made pursuant to

---

trustee to establish that the debtor did not receive 'reasonably equivalent value' or 'fair consideration' in the transaction." *Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 667 (Bankr. S.D.N.Y. 2000), *aff'd sub nom., Balabar-Strauss v. Lawrence,* 264 B.R. 664 (Bankr. S.D.N.Y. 2001); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 111 (Bankr. S.D.N.Y. 2011).

contractual commitments negotiated at the time of the LBO. Satisfaction of present or antecedent debt is considered reasonably equivalent value. *See Pereira v. Dow Chem. Co.* (*In re Trace Int'l Holdings*), 301 B.R. 801, 805-06 (Bankr. S.D.N.Y. 2003); *Geron v. Appliedtheory Corp. (In re Applied Theory Corp.)*, 323 B.R. 838, 842 (Bankr. S.D.N.Y.), *aff'd,* 330 B.R. 362 (S.D.N.Y. 2005).

If that is not value enough, the Series A-1 Unit Holders invested $200 million in the Debtors based on contractual arrangements providing for the payment of the Preferred Dividends and PERA Payments pursuant to the BHAC LLC Agreement and the Cash Management Agreement. Contractually required transfers are not avoidable as constructively fraudulent. *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 308 (Bankr. S.D.N.Y. 2001) (payment of contractually provided services constitutes reasonably equivalent value, notwithstanding the assertion that the services contributed to the debtor's demise); *Lustig v. Weisz and Assocs., Inc. (In re Unified Comm. Capital, Inc.)*, 260 B.R. 343, 350-52 (Bankr. W.D.N.Y. 2001) (same), *aff'd,* 2002 WL 32500567 (W.D.N.Y. 2002).

Portions of the Constructive Fraudulent Conveyance Claims are based upon the 25% Note Payments and the LIBOR Floor Certificate Payments. As discussed in Point II.A., the 25% Note Payments and the LIBOR Floor Certificate Payments were made to the Moving Defendants on account of the 25% Note. (AC ¶ 184 ("The board then unanimously resolved to pay off the 25% Note by transferring the LIBOR Floor Certificates . . . [to the] 25% Note lenders.")). The Moving Defendants loaned the $11 million with the expectation to be repaid. Indeed, the Trustee acknowledges this transaction was a "loan" (AC ¶ 155). As the Trustee's own allegations evince, the transfers were made to pay principal and interest on the 25% Note. (AC ¶ 232 ("the LIBOR Floor Certificates were used to pay principal and interest owed on the 25% Note.")); *see also Commodity Futures Trading Comm'n v. Probber Int'l Equities Corp.*, 504 F. Supp. 1154, 1162 (S.D.N.Y. 1981) ("Since Shiffman's loan was to

PIE, PIE's repayment was in satisfaction of an antecedent debt and was therefore, assuming good faith, made for fair consideration …."); *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings)*, 287 B.R. 98, 108 (Bankr. S.D.N.Y. 2002) (if payments are considered made on account of a loan they are not avoidable).

Since the Trustee fails to specifically allege on whose behalf the payments were made and that the relevant transferor was insolvent, or was rendered insolvent as a result of these transfers, the Trustee fails to allege sufficient facts which, if proven, would establish that the Alleged Transfers were improper or unlawful when made. As a result, the Constructive Fraudulent Conveyance Claims must be dismissed.

## POINT VI

### THE TRUSTEE CANNOT RECOVER AMOUNTS GREATER THAN THAT OWED TO GENERAL UNSECURED CREDITORS AND THE INDENTURE TRUSTEE UNDER THE LITIGATION TRUST

The *Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, As Amended*, (the "**Plan**") vests in the Litigation Trust the "**Litigation Trust Assets**," which are defined as "(i) all claims and causes of action of the Debtors or the Debtors in Possession under sections 502(d), 542 through 551, and 553 of the Bankruptcy Code, and (ii) any other potential claims, causes of actions, charges, suits or rights of recover referenced in the Examiner's Report . . .". (Plan, § 1.89 [ Dkt. No. 1172]; *see also* AC ¶ 9).

The Litigation Trust Beneficiaries under the Litigation Trust are limited to the holders of Mortgage Facility Trust Claims, the Mezzanine Facility Claims, the Indenture Trustee and General Unsecured Claims. (*See* Plan, § 1.90). Should the Court decide that the Trustee is entitled to pursue any of the claims in the Amended Complaint, any recovery should be limited to, at most, the amounts that will be distributed by the Litigation Trust to the Indenture Trustee and General Unsecured Creditors, if any. The Indenture Trustee was owed (approximately $5.5 million (Dec. of Ari Lefkovits in Support of Settlement Agreement

Between ESI and Remaining Debtors, p. 13, § 5, [Dkt. No. 1160])) (the "**Lefkovits Decl.**"

and "**ESI Settlement Agreement**," respectively). Holders of General Unsecured Claims are

owed approximately $545,250 (Order Approving Disclosure Statement, Exhibit D [Dkt. No.

1098]) less the $450,000 "gift" paid to the holders of General Unsecured Claims under the

Plan (Plan, § 4.6(b)).   Pursuant to the Litigation Trust waterfall provisions, however, and

assuming the Trustee recovered the entire $139 million he seeks in the Amended Complaint,

the only payment that can be made to parties other than the lenders is $4.2 million to the

Indenture Trustee, which, in any event, should have been paid out of the $10.2 million

settlement with Blackstone and the mezzanine lenders.[27]  *Accord Crescent*, 500 B.R. at 483

(limiting the plaintiff litigation trust's potential recovery to amounts to be distributed to

creditors other then the lenders involved in the "tainted" transaction).   Under controlling

Second Circuit law, when the unsecured creditors are not set to benefit, claims for avoidance

of actual and constructive fraudulent transfers, preference and subordination, fail.   *See*

*Adelphia Recovery Trust v. Bank of America*, 390 B.R. 80, 95, 98, 99 (S.D.N.Y. 2008), *aff'd*,

379 F. App'x 10 (2d Cir. 2010).

---

[27]   Pursuant to the waterfall provisions of the litigation trust agreement, of the first $142.5 million to be collected, $10 million was paid in litigation trust funding (*see* motion for final decree [Dkt. No. 1679], ¶ 5(b)), $4 million is payable and was paid to the Indenture Trustee on the effective date of the ESI Settlement Agreement (which occurred when the Court approved the ESI Settlement Agreement and the Plan went effective, *see* ESI Settlement Agreement, § 7), $450,000 was payable and paid on the effective date of the Plan to unsecured creditors, $20 million was deposited in an indemnification trust, approximately $8 million would be paid on account of accrued tax liabilities resulting from the ESI Settlement Agreement (as to which the Moving Defendants have no information), and the remainder to the mortgage lenders on account of their deficiency claim, estimated at $120 million. *See* Lefkovits Decl., Ex. A to ESI Settlement Agreement (describing Tier I distributions).  Thus, should the Trustee recover $139 million, either $112.05 or $120.05 million will be paid to the mortgage lenders (depending on whether the tax liability was funded). The next $4.2 million is payable to the Indenture Trustee as Tier II distribution. General unsecured creditors are not entitled to participate in distributions until the Special Servicer and the holders of $3.3 billion in mezzanine loans received 90% of their claims. *See* Tier IV distributions. In sum, if the Trustee collects $139 million, $4.2 million will be distributed to the Indenture Trustee, $8 million potentially on account of tax liability, with the reminder distributed entirely to the mortgage and mezzanine lenders.  The Trustee's claims, therefore, are capped at either $12.2 million or $4.2 million. But, the Trustee has already recovered $10.2 million in settling the claims he brought against Blackstone and the lenders, leaving none or de-minimis non-lenders claims at best. *See* Motion to approve settlement agreement [Adv. P. No. 11-2254, Dkt. 180], ¶¶ 23-24 and Order approving the settlement agreement [Adv. P. No. 11-2254, Dkt. 193].

## A. The Alleged Transfers Were Ratified by Those Holding Mortgage Facility Claims and Mezzanine Facility Claims

A bankruptcy trustee lacks standing to bring avoidance actions under either section 544 or 548 of the Bankruptcy Code where no benefit will accrue to creditors other than those involved in the transactions underlying the avoidance actions. *See Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*, 735 F.2d 740, 742-43 (2d Cir. 1984) (holding that debtor had right to avoid unperfected security interest only to the extent that avoidance benefitted third party creditors); *Balaber-Strauss v. Murphy (In re Murphy)*, 331 B.R. 107, 126 (Bankr. S.D.N.Y. 2005) (holding that trustee has the right to avoid a fraudulent transfer only to the extent necessary to satisfy claims of those legally harmed by the transfer).

Where a creditor authorizes the debtor to transfer assets to third parties, the doctrine of ratification applies "to transactions sought to be avoided as fraudulent transfers." *HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.*, 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009), *aff'd*, 634 F.3d 678 (2d Cir. 2011). A fraudulent transfer is not void, but is voidable – "thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995). "Fraudulent conveyances are binding on all non-creditors, including the transferor himself." *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008). As the Second Circuit noted, "[t]he general rule, that courts will . . . extend no remedy to a grantor or vendor of property to recover back from the grantee or vendee the property thus transferred . . . is too well settled to be now called in question." *Id.* (citation omitted). Indeed, in *In re Refco Securities Litigation v. CSFB*, the court concluded that the trustee could not avoid and recover allegedly fraudulent transfers for the benefit of a lender, since the lender had authorized those very payments in connection with financing the transferor's tender offer. 2009 WL 7242548, at *11 (S.D.N.Y. Nov. 13, 2009).

As the *Crescent* court recently held: "To allow the Trust to step into the original lenders' shoes and set aside the billion dollar transfer as fraudulent would bail out the lenders who knew the terms of their own deal and have never asserted that they were defrauded in any way. Congress may be in the business of bailing out banks, but this Court is not." *Crescent*, 500 B.R. at 479-80.

The same analysis applies here. The Trustee is seeking to recover $139 million in transfers to various entities on behalf of the Litigation Trust Beneficiaries. (*See* AC ¶ 1). It is clear on the face of the Amended Complaint that the LIBOR Floor Certificates were issued by the lenders in exchange for an accommodation to adjust the terms of the debt. (AC ¶ 137 ("In exchange for the borrowers' consent to these accommodations, the lenders agreed to issue to the Debtor borrowers (or their designees) [the LIBOR Floor Certificates].")) Furthermore, it is clear that it was the lenders that "issued and transferred directly" to the defendants the LIBOR Floor Certificates. (*Id.* ¶ 138). The very lenders who issued and transferred the LIBOR Floor Certificates to the Moving Defendants cannot benefit from the Litigation Trust with respect to these avoidance claims.[28]

Moreover, both the Mortgage Facility Claims and the Mezzanine Facility Claims arise in connection with the LBO. (*See* Disclosure Statement, pp. 26-27 ("The [LBO] was financed through loans in an aggregate amount of $7.4 billion which consisted of (i) a mortgage loan in the principal amount of $4.1 billion . . . and (ii) an aggregate of $3.3 billion in 10 mezzanine loans . . ."); AC ¶ 115 (noting that the total purchase price for the LBO was $8 billion, the majority of which was $7.4 billion of debt.)). The Cash Management

---

[28] It is irrelevant that there may have been changes in ownership of the Mortgage Debt and the Mezzanine Debt., because the transferee of a claim takes only the rights that the transferor had. *FDIC v. New York*, 928 F.2d 56, 60 (2d Cir. 1991) ("[A]ssignee acquires from the assignor only those rights that the assignor enjoyed."); *see United States v. Cherry Street Partners, L.P. (In re Alliance Health of Fort Worth, Inc.)*, 240 B.R. 699, 704 (N.D. Tex.) (an assignee of a claim should never receive more on account of the claim than the assignor would have received had the claim not been assigned), *aff'd*, 200 F.3d 816 (5th Cir. 1999). Indeed, the Trustee himself originally sought the avoidance of the mezzanine debt in its entirety without regard to holder status.

Agreement, which mandated the payments of the Preferred Dividends, was created and required by these lenders in connection with the LBO. (*See* Original Complaint, ¶ 176 ("other agreements entered into in connection with the LBO provided that the holders of the Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law); *see also* Cash Management Agreement, § 3.4(g); AC ¶¶ 118-19). Indeed, the flow of funds of the Debtors was structured in accordance with the mortgage loan agreement. (AC, Ex. B). In other words, the prospective beneficiaries of the Trustee's claims against the Moving Defendants are the very lenders who imposed the Cash Management Agreement, which provided for the mechanism for payment of the Preferred Dividends.

Accordingly, the Trustee cannot sue on behalf of the lenders because the lenders ratified and/or made the very transfers that the Trustee now seeks to avoid for their benefit.

**B.     The *Bangor Punta* Doctrine Bars the State Law Claims**

The State Law Claims are barred by the Supreme Court's decision in *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703 (1974), which precludes a corporation from asserting a claim against its former shareholders for wrongdoing to the corporation, when the real beneficiaries of the suit could not bring the suit themselves. *Accord Midland Food Servs, LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 930 (Del. Ch. 1999) (dismissing claims for breach of fiduciary duty and fraudulent conveyance under the *Bangor Punta* doctrine). Where the prospective beneficiaries of a lawsuit have already "received all they had bargained for," a third party cannot bring suit on their behalf. *Bangor Punta*, 417 U.S. at 711.

Many courts have applied the reasoning of *Bangor Punta* to dismiss claims similar to the State Law Claims, including breach of fiduciary duty and unjust enrichment claims. *See*

*e.g.*, *UCAR Int'l, Inc. v. Union Carbide Corp.*, 2004 WL 137073, at *5 (S.D.N.Y. Jan. 26) (dismissing claim because "neither the shareholders, nor the corporation on their behalf, are entitled to recoup the amounts paid for the stock repurchase or dividend"), *aff'd,* 119 F. App'x 300 (2d Cir. 2004); *Midland Food*, 792 A.2d at 930 (finding that "the *Bangor Punta* Doctrine is not limited to barring claims for 'breach of fiduciary duty or corporate mismanagement'" and dismissing unjust enrichment and fraudulent conveyance claims).

 *Bangor Punta* applies even when there are also "innocent" third parties who could recover (*i.e.* the Indenture Trustee and the holders of General Unsecured Claims). 417 U.S. at 712 n.8. (explaining that the equitable principle underlying the decision "has long been applied to preclude full recovery by a corporation even where there are innocent minority shareholders who acquired their shares prior to the alleged wrongs."); *see also In re REA Express, Inc.*, 412 F. Supp. 1239, 1255 (E.D. Pa. 1976) (dismissing antitrust claim on *Bangor Punta* grounds despite presence of innocent, minority shareholders who held "approximately 20% ownership" of plaintiff).

 Here, the overwhelming beneficiaries of the State Law Claims would be the lenders, and any recovery would allow the lenders to benefit from challenging the very transactions they structured (*i.e.*, the Cash Management Agreement providing for the funding of the Preferred Dividends and the transfer of the LIBOR Floor Certificates). That the suit beneficiaries in *Bangor Punta* were shareholders not lenders is a distinction without a difference. If anything, the argument for applying the *Bangor Punta* doctrine is even stronger here. In *Bangor Punta*, the plaintiff was not itself involved in the alleged misconduct; it merely purchased its shares from wrongdoers at a price that took into consideration the alleged wrongdoing. By comparison, the lenders here structured, negotiated, and agreed to the structures put in place resulting in the Alleged Transfers that the Trustee now alleges

constituted wrongful conduct.[29]   In fact, the Moving Defendants' investment in the transaction arose only afterward while the lenders were present at the creation.

## C.   The Trustee Should Only Recover to the Extent the Estate is Benefitted

The extent of the Trustee's ability to exercise avoidance powers is governed by section 550(a) of the Bankruptcy Code.  *MC Asset Recovery, LLC v. Southern Co.*, 2006 WL 5112612, at *5 (N.D. Ga. Dec. 11, 2006).  Section 550(a) of the Bankruptcy Code allows recovery if such recovery will provide "benefit to the estate."  Whether the estate is benefitted depends on a case by case, fact specific analysis.  *Calpine Corp. v. Rosetta Res., Inc. (In re Calpine Corp.)*, 377 B.R. 808, 814 (Bankr. S.D.N.Y. 2007); *see also Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 607 (B.A.P. 8th Cir. 2003), *aff'd,* 376 F.3d 819 (8th Cir. 2004); *Kipperman v. Onex Corp.*, 411 B.R. 805, 876 (N.D. Ga. 2009); *World Capital Commc'ns Inc. v. Island Capital Mgmt., LLC (In re Skyway Commc'ns Holding Corp.)*, 389 B.R. 801, 808 (Bankr. M.D. Fla. 2008).  A post-confirmation recovery benefits the estate pursuant to section 550(a) of the Bankruptcy Code only if "creditors [are] meaningfully and measurably benefitted."  *Harstad v. First Am. Bank (In re Harstad)*, 1994 WL 526013, at *1 (D. Minn. Jan. 20), *aff'd,* 39 F.3d 898 (8th Cir. 1994).

"The primary concern is whether a successful recovery by the appointed representative would benefit the debtor's estate and particularly, *the debtor's unsecured creditors*."  *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1327 (10th Cir. 1989) (emphasis added); *see also Official Comm. Of Unsecured Creditors of Maxwell Newspapers, Inc. v. MacMillan, Inc. (In re Maxwell Newspapers, Inc.)*, 189 B.R.

---

[29]   *Bangor Punta* similarly bars recovery by any party that subsequently purchased the debt from the original lenders.  417 U.S. at 710 (dismissing all causes of action because of the settled principle "that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions"); *Courtland Manor, Inc. v. Leeds*, 347 A.2d 144, 148 (Del. Ch. 1975) (dismissing claim on *Bangor Punta* grounds because "acquiescence of the previous shareholder-directors in the acts complained of should preclude suit by the present shareholders now").  Since "equity would preclude" the original lenders "from maintaining an action in their own right," the subsequent holders of the debt are also be precluded from bringing state law claims on their behalf under *Bangor Punta*.  417 U.S. at 713.

282, 287 (Bankr. S.D.N.Y. 1995). "If the phrase 'for the benefit of the estate' is to be given meaning, then the outside limit on recovery should be the *lesser* [emphasis in original] *of* [emphasis added] the value of the property transferred *or the amount necessary to satisfy the creditors' claims* [emphasis added], with interest. Unless the recovery is capped at the aggregate amount of creditor claims, no policy behind the avoiding powers is served. This limitation is in addition to any requirement that the recovery in fact be directly received by the creditors." Vines, C. Wesley and Vernon O. Teofan, "*The Preservation and Prosecution of Avoidance Actions Post-Confirmation\* \*Or how to save your avoidance action for a rainy day,*" 12 Bankr. Dev. J. 735, 764 (1996) (emphasis added).

The Litigation Trust was established for the benefit of the Litigation Trust Beneficiaries. (Lefkovits Decl., at 56, § 1.1(a)). Although the Trustee is seeking recovery for approximately $139 million, as a result of the Litigation Trust Agreement waterfall provisions, unsecured creditors will recover nothing and the Indenture Trustee stands to recover at most $4.2 million.[30] That is the maximum amount that the Trustee has standing to pursue.

## POINT VII

## THE TRUSTEE LACKS STANDING AND IS EQUITABLY BARRED

The Trustee's State Law Claims, which are common law claims brought by him standing in the shoes of the Extended Stay Hotels estate against the Moving Defendants, are barred for lack of standing by the application of the *Wagoner* Rule to bankruptcy cases. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995); *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467-68 (2010). Further, certain of the Trustee's State Law Claims suffer from additional standing defects.

---

[30] See n.27, *supra.*

**A.      The Trustee Lacks Standing to Assert the State Law Claims Under the Wagoner Rule**

In *Wagoner* and *Hirsch*, the Second Circuit established that a trustee "has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."  *Wagoner*, 944 F.2d at 118 ("unless the party whose standing is at issue has a personal stake in the outcome of the controversy, the suit does not meet the case or controversy requirement of the Constitution.") (internal quotation marks and citations omitted).  Thus, "when creditors … have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Hirsch*, 72 F.3d at 1093.

Further, the court explained that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Wagoner*, 944 F.2d at 120.  "Thus, the Trustee cannot pursue them in his role as such." *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011).  This holding, referred to as the "*Wagoner* rule," "bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000).  This rule is based upon the *in pari delicto* doctrine, which "mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner*, 15 N.Y.3d at 464.  While *in pari delicto* is an affirmative defense, as discussed *infra*, *Wagoner* expressly framed its holding as a prudential limitation on standing under federal law, explaining that "if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation [on standing] that the legal rights asserted must be his own." *Wagoner*, 944 F.2d at 118.

The *Wagoner* rule has been applied numerous times to prevent bankruptcy trustees from bringing claims where the debtor's former management participated in fraud.  *See Kirschner v. KPMG LLP*, 626 F.3d 673, 677 (2d Cir. 2010) (acknowledging that district court

"considered the argument that [debtor entities] were injured by an 'imprudent' LBO and IPO" and concluded that "[it] is a basic principle of corporate finance that extending credit to a distressed entity in itself does the entity no harm."). As the New York Court of Appeals explained, on certification from the Second Circuit in *Kirschner*, "[s]o long as the corporate wrongdoer's fraudulent conduct enables the business to survive – to attract investors and customers and raise funds for corporate purposes," third-party claims are barred, "[e]ven where the insiders' fraud can be said to have caused the company's ultimate bankruptcy." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 468 (2010). The rule has also been applied to other allegations of fraud where the debtor's management participated in the wrongdoing. *See Hirsch*, 72 F.3d at 1093-94 (holding a trustee lacks standing to bring claims against third parties who allegedly assisted the debtor's former management in perpetrating a Ponzi scheme); *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Sec. LLC)*, 721 F.3d 54, 58 (2d Cir. 2013) (applying *Wagoner* to bar Madoff trustee from pursuing claims for unjust enrichment, breach of fiduciary duty, aiding and abetting fraud, and negligence, noting that the "holding relies on a rooted principle of standing . . ."); *Picard v. HSBC Bank, PLC*, 454 B.R. 25, 37 (S.D.N.Y. 2011) (applying *Wagoner* to bar Madoff trustee from pursuing unjust enrichment claim for payments authorized by debtors); *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709 (S.D.N.Y. 2001) (holding that a trustee lacks standing to bring claims against third parties who allegedly assisted the debtor's former management in perpetrating a Ponzi scheme), *aff'd*, 336 F.3d 94 (2d Cir. 2003).

The Trustee's Amended Complaint is replete with allegations of the Debtors *management's role* in the Alleged Transfers.[31] Given the Trustee's own allegations of the

---

[31] *See e.g.*, AC ¶ 119 ("The loan agreements entered into by the Debtors . . . provided for a 'Cash Trap Event'"); ¶ 124 ("The Debt Yield percentage . . . was required to be reported to the Debtors' lenders on a monthly basis . . . but the Debtors failed to do so. . . . this failure to report was intentional and allowed improper distributions to continue …. the Debtors immediately failed the Debt Yield test on the date the LBO closed, were unlikely to meet the test at the first trigger date in January 2008, and concealed this fact from the Lenders"); ¶ 125 ("Through the cash management system instituted after the [LBO], post-LBO

Debtors' senior management's central role in the allegedly improper transfers, the *Wagoner* rule clearly prohibits the Trustee, as "successor in interest" to management and the Extended Stay Hotels entities, from bringing claims against the Moving Defendants, as third parties, for alleged assistance in the Debtor's own alleged fraud.

For this reason, the Court should dismiss all of the State Law Claims with respect to the Moving Defendants.

## B. The Trustee Lacks Standing to Assert Claims for (i) Waste; (ii) Conversion; (iii) Aiding, Abetting, Inducing, or Participating in Conversion; and (iv) Conspiracy

Counts Eight through Eleven of the Amended Complaint should be dismissed because the Trustee lacks standing to assert claims for (i) waste; (ii) conversion; (iii) aiding, abetting, inducing, or participating in conversion; and (iv) conspiracy. In Count Eight, the Trustee alleges that all defendants, including the Moving Defendants, wasted corporate assets of the Debtors. (AC ¶¶ 286-91). In Count Nine, the Trustee alleges that all defendants, including the Moving Defendants, converted and intentionally interfered with the Debtors' right to possession, dominion, and control over the Debtors' property. (AC ¶¶ 292-308). In Count Ten, the Trustee alleges that all defendants, including the Moving Defendants, aided, abetted, inducted, or participated in, the conversion plead in Count Nine. (AC ¶¶ 309-316). In Count Eleven, the Trustee alleges that all defendants, including the Moving Defendants, conspired to convert the Debtors' property. (AC ¶¶ 317-325).

Section 1.7 of the Litigation Trust Agreement states that the Trustee is the "duly appointed representative of the Estates and ESI" and "succeeds to all of the rights and powers

---

equity holders could receive improper dividends or distributions from the Debtors"); ¶ 129 ("Senior management received frequent updates on [the Debtors] declining performance."); ¶ 143 ("Despite the Debtors' non-compliance with the Debt Yield, lack of surplus, insolvency, and the future financial and operational declines that management foresaw or should have foreseen, the Debtors . . . made [] distributions . . . in violation of the loan agreement and applicable law"); ("Lichtenstein, Owen, Teichman, and De Vinck signed a written consent authorizing the pertinent parties to execute the necessary agreements for [the 25% Note and the Floor Bonds Reserve Account]"); ¶ 192 ("The Debtors . . . disregarded all semblance of legal formality regarding the corporate status of the Debtors and affiliated entities. The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements").

of a trustee in bankruptcy with respect to prosecution of the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries." (*See* Lefkovits Decl., p. 59-60, § 1.7). "**Litigation Trust Assets**" is defined as "(i) all claims and causes of action of the Debtors or the Debtors in Possession under sections 502(d), 542 through 551, and 553 of the Bankruptcy Code, and (ii) any other potential claims, causes of actions, charges, suits or rights of recovery referenced in the Examiner's Report . . . ." (Plan, § 1.89).

As defined in the Plan and the other relevant documents related to the Litigation Trust, the Litigation Trust Assets do not include claims for corporate waste, conversion, aiding, abetting, inducing, or participating in conversion or conspiracy. These claims are not claims or causes of action under sections 502(d), 542 through 551, and 553 of the Bankruptcy Code nor are such claims referenced in the Examiner's Report.[32] The Trustee has no right or power to pursue claims other than Litigation Trust Assets, and thus, the Trustee does not have standing to bring Counts Eight, Nine, Ten and Eleven.

## POINT VIII

### THE COMMON LAW CLAIMS IN THE
### AMENDED COMPLAINT ARE ALL DEFECTIVE

#### A.     The Amended Complaint Fails to State a Claim for Breach of Fiduciary Duty or Breach of Contractual Duty Against The Moving Entities

In Counts Five and Seven of the Amended Complaint, the Trustee alleges that all of the defendants, breached both fiduciary and contractual duties of care, loyalty and good faith to both the Debtors and to the Debtors' creditors. (*See e.g.,* AC ¶¶ 263, 268, 281). The Trustee fails to state a claim for several reasons. First, the claims sound in fraud yet fail to meet the heightened pleading standard required under Rule 9(b) and fail to attribute actions to individual defendants with particularity; second, because even under a less demanding pleading standard, the allegations fail to identify a contract that was breached between the

---

[32]     Waste is only mentioned in n. 1502 to the Examiner Report in citing a case dealing with methods available to rebut the business judgment rule.

Debtors and the Moving Entities; and third, the Amended Complaint fails to establish how minority, non-voting stock ownership, standing alone, created a fiduciary relationship between the Moving Entities and the Debtors.

To state claims for breaches of fiduciary duties of care, loyalty and good faith under Delaware law,[33] plaintiffs must allege the existence of a fiduciary duty owed by each defendant and the breach of that duty. *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings, LLC)*, 420 B.R. 112, 143 (Bankr. S.D.N.Y. 2009) (applying Delaware law), *aff'd as modified,* 807 F. Supp. 2d 199 (S.D.N.Y. 2011). To state a claim breach of contract under Delaware law, plaintiff must allege: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damage to the plaintiff. *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003).

### 1. The Trustee's Claims Fail to Meet The Heightened Pleading Standard For Allegations Sounding in Fraud

As discussed above, Rule 9(b) of the Federal Rules of Civil Procedure establishes a heightened pleading standard for complaints alleging fraud or mistake; such pleadings must "state with particularity the circumstances constituting" the violation. Fed. R. Civ. P. 9(b). To meet the pleading standard, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) indentify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wood ex rel. United States*

---

[33] In the Second Circuit, the choice-of-law rules of the forum state apply to state law claims, unless state law conflicts with federal policy or interest. *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir 2001). Claims concerning breaches of fiduciary duty do not implicate federal policy concerns. *BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003). For that reason, New York choice-of-law rules apply to determine the law governing the various fiduciary claims. New York courts look to the law of the state of incorporation in adjudicating a corporation's internal affairs, including fiduciary duty claims. *Galef v Alexander*, 615 F.2d 51, 58 (2d Cir. 1980) (citing *Russian Reinsurance Co. v. Stoddard*, 240 N.Y. 149, 154 (1925)); *Hart v General Motors Corp*, 129 A.D.2d 179, 183 (1st Dep't 1987) (applying Delaware law); *see Greenspun v Lindley*, 44 A.D.2d 20, 21-22 (1st Dep't 1974), *aff'd,* 36 N.Y.2d 473 (1975) (dicta). ESI is a Delaware corporation, and all other of the other debtor corporations and limited liability companies, save one organized in Canada, are allegedly also organized in Delaware. (*See e.g.*, AC ¶¶ 16, 18). Here, Delaware law is thus applicable.

*v. Applied Research Assocs., Inc.*, 328 F. Appx. 744, 747 (2d Cir. 2009) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

The Trustee's allegations sound in fraud. The Trustee's section 548(a)(1)(A) claim specifically alleges actual fraudulent intent on the part of the Debtors, and all the Amended Complaint's claims are based upon the same underlying facts and allegations. Further, the very language used by the Trustee in the Amended Complaint, as discussed in the context of the *Wagoner* rule above, is filled with allegations of the Defendants' supposed fraudulent conspiracy – indeed Count Eleven in the Amended Complaint accuses all of the defendants of conspiracy. (*See e.g.,* AC ¶¶ 317-25). For that reason, all of the Trustee's allegations must be held to this heightened pleading standard, not simply the explicit fraud claims. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("Rule 9(b)… is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.").

All claims must be pled with particularity if based on the same set of facts as intentional fraud claims. *See Icebox-Scoops, Inc. v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 110 (E.D.N.Y. 2009) (discussing claims of negligent misrepresentation). When the factual allegations sound in fraud, the pleading requirements of Rule 9(b) are therefore applicable, for example, to claims of a breach of fiduciary duty. *See DeBlasio v. Merrill Lynch & Co.,* 2009 WL 2242605, at *10 (S.D.N.Y. July 27, 2009) (claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty that sound in fraud must meet Rule 9(b)); *Pacific Elec. Wire & Cable Co. v. Set Top Int'l Inc.*, 2005 WL 578915, at *15 (S.D.N.Y. Mar. 11, 2005) (finding "[b]oth counts [for breach of fiduciary duties and aiding and abetting breach of fiduciary duties] state that Defendants breached their fiduciary duties to Plaintiffs by making material misrepresentations to Plaintiffs. These claims sound in fraud and must meet the heightened pleading standard of Rule 9(b).") (internal quotation marks and

citation omitted).  Also, to the extent that the claims for breach of fiduciary duty are based on fraud, all allegations concerning the predicate acts of fraud must meet the particularity requirements of Rule 9(b).  *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996), *aff'd,* 152 F.3d 918 (2d Cir. 1998).

As there are no plausible, specific, allegations in the Amended Complaint describing how the Moving Entities exactly breached their alleged fiduciary duties, the Amended Complaint fails to meet this heightened pleading standard.  Without more, the complaint is too vague.  *See In re Sagent Tech. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1093 (N.D. Cal. 2003) ("the complaint cannot state a claim for breach of fiduciary duty in the absence of more specific allegations regarding which defendants are alleged to have performed which acts").

As explained in Point I *supra*, the Trustee cannot avoid the attribution requirement of the fraud with respect to distinct corporate entities.  *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. at 257-58 *DiVittori,* 822 F.2d at 1247; *Granite Partners,* 17 F. Supp. 2d at 286.  Violating this cardinal rule, the Amended Complaint  repeatedly lumps together a large group of entities concerning the Debtors' control.[34]

The Amended Complaint asserts only that each of "the Arbor Group Defendants[] owned and had control over [BHAC Capital], the majority shareholder of ESI, and thus controlled ESI through its indirect ownership interest."  (AC ¶ 26).  The facts actually alleged are to the contrary -- the Moving Entities' only connections to the Debtors were (i) as minority non-voting Series A-1 Unit Holders, having invested $200 million of their own capital as equity in the hotel chain, and (ii) by appointing directors, first Martello, then Milone, and subsequently Chetrit.

---

[34]   *E.g.*, "Despite their knowledge of ESI's financial difficulties, the entities and individuals that owned, controlled, dominated, or otherwise managed all aspects of the Debtors' post-LBO Businesses, all of whom are Defendants in this action, used that ownership, control, and management authority to improperly withdraw cash and assets from the financially distressed Debtors to benefit equity holders and their affiliates."  (AC ¶ 3).

Considering the Moving Entities' investment of hundreds of millions of dollars in the Debtors, the suggestion that the Moving Entities infused capital into a company they viewed as insolvent in order to defraud creditors out of a smaller sum fundamentally makes no sense. If, as the Amended Complaint alleges, all defendants, including the Moving Entities, understood that the "Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO," (AC ¶ 263) there is no plausible explanation for why the Moving Entities willingly invested in ESI in the first place.

### 2. The Amended Complaint Does Not Allege A Breach of Any Contract Between The Moving Entities And the Debtors

Generally, one who is not a party to a contract cannot be held liable for breach of that contract. *H-M Wexford LLC*, 832 A.2d at 144. Absent allegation of the existence of a contract supposedly breached by the Moving Entities, the Trustee fails to state a claim. The only contract between the Debtors and the Moving Entities referenced in the Amended Complaint is the BHAC LLC Agreement and there is no allegation of breach concerning that agreement. *See @Wireless Enters. v. AI Consulting, LLC*, 2006 WL 3370696, at **5-6 (W.D.N.Y. Oct. 30, 2006) ("AI is not a party to the contract between Verizon and @Wireless. Nor is AI a third-party beneficiary of that agreement .… [a]ccordingly, the contract claims against Verizon are dismissed.").

### 3. The Moving Entities, as Minority Stakeholders in BHAC Capital, Owed No Contractual or Fiduciary Duties to the Debtors or the Creditors Thereof

The Amended Complaint does not allege with particularity how, by virtue of a minority non-voting membership interest in BHAC Capital, with only one or two non-controlling board members, the Moving Entities directed the directors, who "acted under the domination or control of their employers or principals in connection with the acts and omissions alleged in [the Amended Complaint]" or how any of the Moving Entities "acted for its own benefit" "in exercising [] domination or control" over the Debtors. (AC ¶ 268). As

noted above, to the extent that a breach of fiduciary claim is based on fraud, the allegations surrounding the breach of fiduciary duty claim must be stated with particularity.

There are no particularized facts that explain how a fiduciary relationship supposedly developed between the Moving Entities and the Debtors upon the Moving Entities' purchase of their membership interests. Indeed, the Amended Complaint section on breach of fiduciary duties is silent on such relationship. A fiduciary relationship is characterized by the "reliance by one party on the integrity or discretion of another." *A. Brod v. SK&I Co.*, 998 F. Supp. 314, 327 (S.D.N.Y. 1998). A fiduciary relationship requires "great confidence and trust on the one part and a high degree of good faith on the other part." *United States v. Wolfson*, 642 F.3d 293 (2d Cir. 2011) (internal citation omitted).

An arms-length business transaction is insufficient to establish a special relationship. *Banque Arabe Et Int'l D'Investissement v. Maryland Nat'l Bank*, 819 F. Supp. 1282, 1292-93 (S.D.N.Y. 1993) (no special relationship found between sophisticated financial institutions which negotiated agreement in arms-length transaction), *aff'd,* 57 F.3d 146 (2d Cir. 1995). "Absent extraordinary circumstances, however, parties dealing at arm's length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation." *Henneberry v. Sumitomo Corp.*, 415 F. Supp. 2d 423, 460 (S.D.N.Y. 2006) (citation omitted).

The factual allegations in the Amended Complaint demonstrate nothing but the Moving Entities' arms-length purchase of non-controlling membership interests after the close of the LBO. The Trustee asserts that an Arbor principal attended certain board meetings and speculates that this was "to ensure that improper equity distributions would continue to be made ...." (AC ¶ 58). However, even were this true, the Amended Complaint fails to describe how such conduct created a confidential or special relationship between the Moving Entities and the Debtors. The Trustee does not allege that the Debtors relied "on the

integrity or discretion" of the Moving Entities at any time, nor would such an allegation be credible, given the sophisticated nature of the Debtors and their management.

## B. The Amended Complaint Fails to State a Claim for Breach of Fiduciary or Contractual Duty Against Milone, Chetrit, and Martello

In Counts Five and Seven of the Amended Complaint, the Trustee alleges that Martello, Chetrit, and Milone, as directors, breached both fiduciary and contractual duties of care, loyalty and good faith. As set forth above, the Trustee's Amended Complaint sounds in fraud and all of the claims against Martello, Chetrit, and Milone should be dismissed for failure to plead any duty, much less a breach. *See supra* at Point VIII.A.1.

### 1. The Amended Complaint Does Not Allege a Contract Between Directors and Plaintiffs

The Amended Complaint does not allege any contract between the Debtors and Milone, Chetrit, or Martello. Thus, the Trustee fails to state a claim for breach of contract.

### 2. The Individuals Had No Fiduciary Duty When Not A Board Member

As alleged, Martello served as director from June 11, 2007 until May 2008, Milone served as director "after May 15, 2008," and Chetrit "held interlocking director positions with numerous entities in the 'Extended Stay Hotels family of companies'" starting in late 2008. (AC ¶¶ 74, 79, 84). None of the directors can be liable for any of the actions taken prior to or after his period of board membership. Claims based upon board actions taken outside of their respective periods of membership should be dismissed.

### 3. ESI's Exculpatory Provisions Bar the Trustee's Breach of Fiduciary Duty Claim

Contrary to the Trustee's assertions in the Amended Complaint, (*id.* ¶ 21), the Trustees' breach of fiduciary duty claims should be denied because the exculpatory provision found in ESI's Certificate of Incorporation ("**Certificate**") provides a separate and independent basis to dismiss the Trustee's duty of care claim against the directors. ESI is a corporation governed by Delaware law. Section 102(b)(7) of the Delaware General

Corporation Law permits a corporation to "exculpate directors and officers for liability arising from a breach of fiduciary duty of care" in a company's certificate of incorporation. *BH S&B Holdings, LLC*, 420 B.R. at 145. ESI's Certificate provides that a "director of this Corporation shall not be liable to the Corporation or the Stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted . . .." (Certificate at Article 8).[35] The Trustee's claims against Martello, Chetrit, and Milone should therefore be dismissed.

### 4. The Trustee Cannot Recover Punitive Damages for Fiduciary Duty Claims

The Trustee is seeking punitive damages for the alleged breaches of fiduciary duty. (AC ¶ 272). Under Delaware law, claims for breach of fiduciary duty are within the jurisdiction of the Chancery Court. *See* Del. Code Ann. tit. 10 § 341 (2011); *Christiana Town Ctr., LLC v. New Castle Ctr.*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003), *aff'd*, 841 A.2d 307 (Del. 2004). Punitive damages are not available in the Chancery Court, and accordingly, are not available for breach of fiduciary duty claims under Delaware law. *See Adams v. Calvaresee Farms Maint. Corp.,* 2010 WL 3944961, at *21, n.204 (Del. Ch. Sept. 17, 2010). Because punitive damages are not available as a matter of law in Delaware, this court should dismiss the Trustee's request for such damages.

### C. The Amended Complaint Fails to State A Claim for Aiding, Abetting, Inducing or Participating in Breaches of Fiduciary Duties And Other Misconduct

In Count Six of the Amended Complaint, the Trustee alleges that all of the defendants aided, abetted, induced, participated in or conspired to commit the breaches of fiduciary and contractual duties by one or more of the other defendants. (AC ¶ 274). To state a claim for inducing or participating in a breach of fiduciary duty, the claim must allege "(1) a breach by

---

[35] This Court may "take judicial notice of an exculpatory provision at the motion to dismiss stage." *In re BH S&B Holdings, LLC*, 420 B.R. at 146. A copy of the Certificate is attached to the Goldberg Decl.. as Exhibit G. Claims based on bad faith and intentional misconduct are not subject to exculpation. Del. Code. Ann. Title § 102(b)(7). Such claims are barred here, however, because they are fraud-based and not pled with specificity as required by Rule 9(b).

a fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result." *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847-48, (2d Cir. 1987); *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986). In addition, to the extent that the underlying primary violation is based on fraud, the allegations of aiding and abetting liability must also meet the particularity requirements of Fed. R. Civ. P. 9(b). *Kolbeck*, 939 F. Supp. at 245. Even if the Trustee were not barred by the *Wagoner* rule, there are additional grounds for dismissing this count.

**1.     Aiding And Abetting Claim Must Be Dismissed as to Directors**

A claim for aiding and abetting a breach of fiduciary duty can only be sustained against a non-fiduciary, and thus the Trustee's claim for aiding and abetting breach of fiduciary duty must be dismissed as to Milone, Chetrit, and Martello as directors. *See In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

**2.     The Amended Complaint Does Not Allege "Actual Knowledge" of the Moving Defendants**

In the Second Circuit, while a plaintiff is not required to prove intent to harm, a plaintiff must prove that the alleged aider and abettor had actual knowledge of the breach of duty and induced or participated in it. *See S&K Sales*, 816 F.2d at 848. Constructive knowledge, as opposed to actual knowledge, is legally insufficient to impose aiding and abetting liability. *Kolbeck*, 939 F. Supp at 246. Allegations that a defendant "knew or recklessly disregarded" or "knew or should have known" of the primary wrongdoing is insufficient to plead actual knowledge. *Sharp Int'l Corp. v. States St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 281 B.R. 506, 514 (E.D.N.Y. 2002) (citing *Williams v. Bank Leumi Trust Co.*, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997)), *aff'd,* 403 F.3d 43 (2d Cir. 2005).

Here, the Amended Complaint does not sufficiently allege the knowledge of the Moving Defendants. (*See*, *e.g.*, AC ¶ 124 ("Defendants knew *or should have known*" that

"there was, in substance if not form, a continuous Cash Trap Event Period .... (emphasis added)"); ¶ 127 ("Defendants . . . knew *or should have known* of material events relating to the Debtors' performance and inevitable downward spiral." (emphasis added)); ¶ 165 ("Defendants knew *or should have known* that the Debtors could be completely out of cash as soon as January 2009." (emphasis added))). There are no specific allegations of what each of the Moving Defendants actually knew about the alleged fiduciary breaches, at the time they were allegedly aiding and abetting.

### 3. The Amended Complaint Does Not Allege "Substantial Assistance" from Moving Entities

In addition, the Amended Complaint is deficient in explaining how the Moving Entities provided "substantial assistance" in connection with any of the fraudulent activity.

"[T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dep't 2003). Here, no such fiduciary duty was owed by the Moving Entities to Plaintiffs, and none is alleged. "Under *Kaufman*, a company in a position to thwart or expose a breach of fiduciary duty may protect its interests by doing neither, sitting tight and being quiet." *Sharp Int'l Cor*p., 403 F.3d at 52. As was the case in *Sharp*, "[a]rtful pleading aside, all of these allegations come down to omissions or failures to act . . . As such, they are not 'substantial assistance,' as that term is elucidated in *Kaufman* . . . ." *Id.* at 51-52; *see e.g.*, AC ¶ 262 ("the Defendants improper . . . inactions").

Thus, neither actual knowledge nor substantial assistance is alleged and the aiding and abetting claim should be dismissed.

**D.** **The Amended Complaint Fails to State A Claim for Breach of Fiduciary Duties Owed to Creditors**

**1.** **No Independent Cause of Action During "Zone of Insolvency"**

In Count Five of the Amended Complaint, the Trustee alleges that "The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed." (*Id.* ¶ 263). As a result, the directors "owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners, at all times after the date the LBO closed." (*Id.*) However, there is no claim for a breach of fiduciary duty owed to a creditor while a company is in the "zone of insolvency."

Delaware courts have expressly stated that the "need for providing directors with definitive guidance compels us to hold that no direct claim for breach of fiduciary duties may be asserted by the creditors of a solvent corporation that is operating in the zone of insolvency." *North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). "When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners." *Id.* As the Third Circuit held, "[h]aving closely examined these authorities, the Court concludes that adopting Plaintiff's "zone of insolvency" theory would provide redundant legal protections to creditors, while impeding corporations' ability to recruit qualified directors, generate capital, and serve their general wealth-maximizing function." *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 206-07 (S.D.N.Y. 2009) ("Accordingly, to the extent that either of Plaintiff's claims is based on the existence of such a duty, Defendants' motion for summary judgment is granted and those components of Plaintiff's claims are dismissed."), *cert. denied,* _ U.S._, 132 S. Ct. 97 (2011). To the extent that this claim asserts that the Moving

Defendants owed a duty to creditors while the Debtors were in a "zone of insolvency," the claim should be dismissed.

### 2. No Fiduciary Duties Are Owed to Creditors Under Delaware Law And in Any Event the Trustee Lacks Standing to Assert Creditor Claims

The Delaware Supreme Court has held that "creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors." *N. Am. Catholic Educ.,* 930 A.2d at 103. None of the Moving Defendants owed any fiduciary duties to any creditors.

Even if creditors of the Debtors had standing to assert fiduciary duty claims, and they do not, the Trustee does not have standing to bring suit on behalf of the Debtors' creditors. "[F]ederal bankruptcy law is clear that litigation trusts do not have standing to pursue the direct claims of creditors." *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 191 (Del. Ch. 2006), *aff'd,* 931 A.2d 438 (Del. 2007). Further, the Plan limits the Trust's assets to claims of the "Debtors or the Debtors in Possession …." (Plan § 1.89), which does not include the rights of creditors. *See Trenwick*, 906 A.2d at 191. For these reasons, the Court should dismiss Count Seven against the Moving Defendants.

### E. The Amended Complaint Fails to State A Claim for Waste

As discussed above, *supra* at Point VII.C, the Trustee lacks standing to assert his waste claim. Further, he does not allege the elements of such a claim. "[T]he essence of waste is the diversion of corporate assets for improper or unnecessary purposes." *Aronoff v. Albanese*, 85 A.D.2d 3, 5 (2d Dep't 1982) (citing *Michelson v Duncan*, 407 A.2d 211, 217 (Del. 1979)). To maintain a claim of waste, plaintiff's allegations must support a reasonable inference that the directors authorized "an exchange that [was] so one sided that no business person of ordinary, sound judgment could conclude that the corporation [had] received adequate consideration." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (quoting *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998)). Waste is "very rarely

encountered in the world of real transactions" to the point that the cause of action is "possibly non-existent." *Steiner v. Meyerson*, 1995 WL 441999, at *5 (Del. Ch. July 19, 1995).

At the threshold, the Moving Entities are not fiduciaries of the Debtors; therefore they are not liable for any alleged corporate waste of the Debtors' assets. The directors served for limited periods and thus cannot be liable for any alleged waste that occurred while not in office. The corporate waste claim suffers from the same group-pleading defect as the fiduciary duty claims described above: although it names multiple entities and individuals as defendants, it is entirely unclear from the Amended Complaint who allegedly did what, if anything, in connection with this claim.[36]

It is true that Milone, Chetrit, and Martello were directors at certain distinct time periods, and that directors owe a fiduciary duty to manage the property of the corporation "in good faith, according to their best judgment and skill, and in the interest of the stockholders." *Amfesco Indus., Inc. v. Greenblatt*, 172 A.D.2d 261, 263 (1st Dep't 1991). However, "[t]o prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001). The test to show corporate waste is thus "difficult for any plaintiff to meet." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 136 (Del. Ch. 2009).

The business judgment rule "creates a presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

---

[36] For example, the Trustee is suing Atmar for corporate waste, yet the Amended Complaint fails to allege any action or inaction on Atmar's part.

**F.    The Distribution Payments Are Governed by Contract and Cannot Be Subject to Unjust Enrichment Claims**

The unjust enrichment quasi-contractual claims in Count Four of the Amended Complaint must be dismissed because the payments at issue are governed by express contracts. For example, the Trustee alleges that the Moving Entities Arbor ESH and ACM wrongfully benefited by taking millions of dollars in corporate distributions between 2007 and 2009. (AC ¶ 242).[37] However, all of these payments were contractual and thus are not subject to an equitable claim. A claimant seeking relief under a theory of unjust enrichment must demonstrate "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc).*, 276 F.3d 123, 129 (2d Cir. 2002) (internal quotations omitted). "The existence of a contract between parties to a dispute ordinarily precludes recovery for unjust enrichment for events arising out of the same subject matter as the contract." *Chiste v. Hotels.com L.P.*, 2011 WL 2150653, at *2 (S.D.N.Y. May 31, 2011); *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998 (same).

This also applies when the plaintiff is not a party to the contract. *See Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 216 (S.D.N.Y. 2010) (dismissing unjust enrichment claim of plaintiffs who were not party to the relevant contract); *Serio v. Human Dynamics Corp.*, 2008 WL 2600631, at *3 (S.D.N.Y. June 25, 2008) (holding unjust enrichment claim failed as a matter of law where contracts existed governing the subject matter even though plaintiff was not a party to those agreements); *Baker v. Andover Assocs. Mgmt. Corp.*, 924 N.Y.S.2d 307, at *21 (N.Y. Sup. Ct. Nov. 30, 2009) (granting motion to

---

[37]    The Trustee alleges that Arbor ESH and ACM wrongfully benefited in the amount of $44 million (AC ¶ 242), that Glida wrongfully benefited in the amount of $5,363,000 (AC ¶ 245), that Princeton wrongfully benefited in the amount of $1,235,162 (AC ¶ 247), that Ron Invest wrongfully benefited in the amount of $1,433,935 (AC ¶ 249), that ABT-ESI and Mericash were unjustly enriched by each receiving approximately $13 million from the LIBOR Floor Certificates, and that Princeton was unjustly enriched by receiving approximately $1,375,452 from the LIBOR Floor Certificates. (AC ¶ 240).

dismiss an unjust enrichment claim on the basis of contracts to which plaintiff was not a party).[38]

The Trustee's own allegations make clear that the Alleged Transfers at issue were paid and received pursuant to valid and enforceable contracts. (*See e.g.,* AC ¶¶ 5, 118, 155-56). Thus, the unjust enrichment claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants Arbor ESH II, LLC, Arbor Commercial Mortgage, LLC, Atmar Associates, LLC, Glida One LLC, Mericash Funding LLC, Ron Invest LLC, ABT-ESI LLC, Princeton ESH LLC, Guy R. Milone, Jr., Joseph Chetrit, and Joseph Martello respectfully request that the Court dismiss the Amended Complaint in its entirety, with prejudice.

Dated: New York, New York.
December 20, 2013

DECHERT LLP

By: */s/ Shmuel Vasser*
Gary J. Mennitt
Shmuel Vasser

1095 Avenue of the Americas
New York, NY  10036
(212) 698-3500
(212) 698-3599 (fax)
gary.mennitt@dechert.com
shmuel.vasser@dechert.com

*Attorneys for Defendants Arbor ESH II, LLC, Arbor Commercial Mortgage, LLC, Atmar Associates, LLC, Glida One LLC, Mericash Funding LLC, Ron Invest LLC, ABT-ESI LLC, Princeton ESH LLC, Guy R. Milone, Jr., Joseph Chetrit, and Joseph Martello*

---

[38] Here, there is no dispute as to the existence of a contract. "Although plaintiffs argue that they may plead contract and quasi-contract claims in the alternative, that is true only when there is a bona fide dispute as to the existence of a valid contract." *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 397-98 (W.D.N.Y. 2010) (*citing JTH Tax, Inc. v. Gouneh*, 721 F. Supp. 2d 132, 139 (N.D.N.Y. 2010); *Hochman v. LaRea*, 14 A.D.3d 653 (2d Dep't 2005)).