UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| EXTENDED STAY, INC. *et al.*, | Case No. 09-13764 (JMP) |
| Reorganized Debtors. | |
| FINBARR O'CONNOR, as Trustee for and on behalf of the EXTENDED STAY LITIGATION TRUST, and | Adv. Proc 11-2254, 11-2255, 11-2256, 11-2398 (JMP) |
| THE EXTENDED STAY LITIGATION TRUST, | |
| Plaintiffs, | |
| v. | |
| DL-DW Holdings, L.L.C., *et. al.*, | |
| Defendants. | |

**LIGHTSTONE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. BANKR. P. 7012(b) AND FED. R. CIV. P. 12(b)(1) AND (b)(6), AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
David M. Friedman
Robert M. Novick
Daniel N. Zinman
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for the Lightstone Defendants*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................... v

PRELIMINARY STATEMENT ................................................................................ 1

PERTINENT BACKGROUND AND PROCEDURAL HISTORY .............................. 9

I.     THE 2007 TRANSACTION ............................................................................ 9

II.    THE CHAPTER 11 CASES ........................................................................... 13

III.   POST-EFFECTIVE DATE EVENTS AND PROCEDURAL HISTORY ...................... 14

       A.     The Trust Harasses the Defendants With Five Complaints in Three Courts. ........ 14

       B.     The Mezzanine Lenders Dismiss Themselves and Turn Over Control of the Trust to the Mortgage Lenders. ............................................................... 15

       C.     Blackstone, Citibank and Bank of America Settle. ................................. 17

ARGUMENT ....................................................................................................... 17

I.     LEGAL STANDARDS AND MATERIALS THAT MAY BE CONSIDERED IN ADJUDICATING THIS MOTION .................................................................. 17

       A.     Only Well-Pleaded Factual Allegations. .............................................. 17

       B.     Claims Must be Plausible on Their Face. ............................................. 18

       C.     Documents and Information That May Be Considered in Adjudicating this Motion. ...................................................................................... 18

       D.     Consideration of the Prior Complaints is Permitted – And in This Case Essential. ...................................................................................... 20

II.    THE CLAIMS RELATING TO THE COUPON PAYMENTS AND THE FLOOR CERTIFICATES ARE BARRED BY SECTION 546(E) OF THE BANKRUPTCY CODE. ................................................................................................... 23

       A.     Section 546(e) Requires the Dismissal of Counts 3, 13, 14 and 15 as to the Floor Certificate Transfers and the Series A Unit Payments. .............................. 23

            1.     The Securities Contract Transfers Were Made by or to or for the Benefit of a Financial Institution. ............................................. 24

        2.      The Floor Certificate Transfers and the Series A Unit Payments Were Made in Connection With a Securities Contract. ............................ 26

   B.     Section 546(e) Requires Dismissal of Counts 1, 2 and 4 as to the Securities Contract Transfers ........................................................................................ 29

III.   THE TRUST DID NOT, AND CANNOT, ALLEGE STANDING TO ASSERT THE CLAIMS AGAINST THE LIGHTSTONE DEFENDANTS ................................ 32

   A.     The Prerequisites to Standing. ............................................................................ 32

   B.     The Complaints Fail to Allege Facts Establishing That any Debtor Was Injured and That Recovery Would Benefit Creditors of That Debtor. ................. 34

   C.     The Trust Cannot Cure the Inadequacy of Its Complaint By Disregarding the Separate Existence of the Debtor Entities. ....................................................... 39

        1.      The Debtors' Clearly Delineated Organizational Structure. ..................... 40

        2.      Delaware Law Does Not Permit Reverse Veil Piercing. .......................... 42

        3.      The Amended Complaint Does Not Allege Facts that, if Proven, Would Satisfy the Legal Standards for Veil Piercing. ............................. 44

        4.      Substantive Consolidation is Precluded by the Plan, the Confirmation Order, Multiple Other Rulings of the Court, and the Trust's Own Admissions ........................................................................ 46

IV.   THE ADVERSARY PROCEEDING MUST BE DISMISSED BECAUSE IT IS BROUGHT UNDER THE DIRECTION, AND SOLELY FOR THE BENEFIT, OF THE MORTGAGE LENDER WHICH WAS THE CHIEF ACTOR IN THE CHALLENGED TRANSFERS ...................................................................................... 50

   A.     This Action is Being Prosecuted By and For the Mortgage Lender. .................... 51

        1.      The Unpaid Debt as of Plan Confirmation. ............................................. 51

        2.      The Mortgage Lender Obtains Control of the Trust as a *Quid Pro Quo* for Dismissing All Claims Against the Mezzanine Lenders. ........... 52

        3.      Blackstone, Citibank and Bank of America Settle. ................................... 54

        4.      The Trust Waterfall. ................................................................................ 54

        5.      The Mortgage Lender Admitted the Claims Benefit Only the Mortgage Lender and not the Estate. ....................................................... 56

B.     THE CLAIMS ARE FUTILE BECAUSE THE ONLY PARTY THAT
       STANDS TO RECOVER PROCEEDS FROM THIS LITIGATION IS
       NOT PERMITTED TO DO SO.............................................................................58

       1.     The Trust Cannot Exercise Avoidance Powers for the Benefit of
              the Mortgage Lender..............................................................................58

V.     COUNT SEVEN FOR BREACH OF SUPPOSED FIDUCIARY DUTIES TO
       CREDITORS MUST BE DISMISSED AS A MATTER OF LAW ...............................63

VI.    THE FLOOR CERTIFICATE TRANSFER ALLEGATIONS DO NOT SATISFY
       *IQBAL* BECAUSE BANKS DO NOT GIVE AWAY 74 OR EVEN 25 MILLION
       DOLLARS OF ASSETS....................................................................................66

VII.   THE COMPLAINT DOES NOT ALLEGE A CLAIM FOR BREACH OF
       FIDUCIARY DUTIES BY ANY OF THE LIGHTSTONE ENTITY DEFENDANTS..68

VIII.  THE BREACH OF FIDUCIARY DUTY CLAIMS AGAINST THE LIGHTSTONE
       INDIVIDUAL DEFENDANTS MUST BE DISMISSED BECAUSE THE TRUST'S
       ALLEGATIONS ARE INSUFFICIENT TO OVERCOME THE BUSINESS
       JUDGMENT RULE.........................................................................................70

IX.    THE TRUST CANNOT ESTABLISH A BREACH OF THE DUTY OF CARE...........73

X.     THE TRUST'S DUTY OF CARE CLAIM IS BARRED BY EXCULPATORY
       PROVISIONS IN ESI'S CERTIFICATE OF INCORPORATION..............................76

XI.    THE TRUST HAS NOT PLAUSIBLY ALLEGED BAD FAITH .................................77

XII.   THE TRUST CANNOT RECOVER PUNITIVE DAMAGES.......................................77

XIII.  THE TRUST'S AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
       CLAIM FAILS AS A MATTER OF LAW .......................................................78

       A.     The *Wagoner* Rule Bars the Trust's Claim...........................................78

       B.     The Trust Fails to Plead Any Predicate Breach of Fiduciary Duty. .....................79

       C.     As Alleged Corporate Insiders, the Lightstone Defendants Cannot Be Liable
              For Purportedly Aiding and Abetting Each Other in Breaches of Fiduciary
              Duty.......................................................................................................80

       D.     The Trust's Allegations Are Conclusory. ...........................................80

XIV.   COUNTS 1 AND 2 MUST BE DISMISSED AGAINST ALL PARTIES THAT
       ARE NOT ALLEGED TO HAVE BEEN DIRECTORS OF CORPORATE
       TRANSFERORS AT THE TIME ALLEGED ILLEGAL DIVIDENDS WERE
       PAID .........................................................................................................82

XV.  THE TRUST DOES NOT PLEAD A VALID CLAIM FOR WASTE............................ 84

XVI.  ADDITIONAL REASONS THE TRUST'S CLAIMS FOR ACTUAL FRAUD
      (COUNTS 12 AND 13) MUST BE DISMISSED............................................................ 86

CONCLUSION.............................................................................................................................. 87

**Page(s)**

**Cases**

*In re 18th Ave. Realty*,
No. 03-14480, 2010 Bankr. LEXIS 1553 (Bankr. S.D.N.Y. May 7, 2010)............................47

*In re 3COM Corp. Shareholders Litig.*,
No. 16721, 1999 Del. Ch. LEXIS 215 (Del. Ch. Oct. 25, 1999) ...........................................85

*In re Access Cardiosystems, Inc.*,
404 B.R. 593 (Bankr. D. Mass. 2009) *aff'd*, 488 B.R. 1 (D. Mass. 2012)...........................72

*Adams v. Calvarese Farms Maint. Corp.*,
No. 4262, 2010 Del. Ch. LEXIS 199 (Del. Ch. Sept. 17, 2010)............................................78

*In re Adelphia Comm. Corp. Sec. Litig.*,
2011 U.S. Dist. LEXIS 69169 (S.D.N.Y. June 24, 2011) ......................................................38

*Adelphia Recovery Trust v. Bank of America*,
05 Civ. 9050, 2011 U.S. Dist. LEXIS 39139 (Apr. 7, 2011) at *24.......................................49

*Adelphia Recovery Trust v. Bank of America*,
379 Fed. App'x 10 (2d Cir. 2010)..........................................................................................60

*Adelphia Recovery Trust v. Bank of America, N.A.*,
390 B.R. 80 (S.D.N.Y. 2008)......................................................................................... *passim*

*Adelphia Recovery Trust v. HSBC Bank USA*,
634 F.3d 678 (2d Cir. 2011)...................................................................................................61

*Albert v. Alex. Brown Mgmt. Servs.*,
No. 04C-05-250, 2004 Del. Super. LEXIS 303 (Del. Super. Ct. Sept. 15, 2004) .................78

*In re ALT Hotel, LLC*,
479 B.R. 781 (Bankr. N.D. Ill. 2012) .....................................................................................43

*In re Am. Way Serv. Corp.*,
229 B.R. 496 (Bankr. S.D. Fla. 1999) ...................................................................................55

*Andrews v. Metro N. Commuter R.R.*,
882 F.2d 705 (2d Cir. 1989)............................................................................................20, 40

*In re Appalachian Fuels, LLC*,
493 B.R. 1 (B.A.P. 6th Cir. 2013)..........................................................................................49

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) .......................................................................71, 73

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................ *passim*

*Atuahene v. City of Hartford*,
   10 Fed. App'x 33 (2d Cir. 2001).......................................................................38

*In re Augie/Restivo Baking Co., Ltd.*,
   860 F.2d 515 (2d Cir. 1988).......................................................................7, 47

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*,
   155 F.3d 59 (2d Cir. 1998)................................................................................20

*Balaber-Strauss v. Town of Harrison (In re Murphy)*,
   331 B.R. 107 (Bankr. S.D.N.Y. 2005) ..............................................................59

*Bangor Punta Operations v. Bangor Aroostock Railroad Co.*,
   417 U.S. 703 (1974)............................................................................ *passim*

*Bautista v. Los Angeles County*,
   216 F.3d 837 (9th Cir. 2000) ...........................................................................35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................ *passim*

*In re Best Prods. Co.*,
   168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................................61

*In re BH S&B Holdings LLC*,
   420 B.R. 112 (Bankr. S.D.N.Y. 2009) *aff'd as modified*, 807 F. Supp. 2d 199
   (S.D.N.Y. 2011) ............................................................................44, 45, 76

*Big Apple Consulting USA, Inc. v. Belmont Partners, LLC*,
   873 N.Y.S.2d 232 (N.Y. Sup. Ct. 2008) ...........................................................80

*Bogart v. Isr. Aero. Indus. Ltd.*,
   No. 09-Civ-4783, 2010 U.S. Dist. LEXIS 12263 (S.D.N.Y. Feb. 5, 2010)............................33

*Breeden v. Kirkpatrick & Lockhart, LLP*,
   268 B.R. 704 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003) ...................................62, 79

*Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.), ("Walt Disney III")*,
   906 A.2d 27 (Del. 2006) ................................................................77, 84

*In re Brun*,
   360 B.R. 669 (Bankr. C.D. Cal. 2007)...............................................................55

vi

*Buckley v. O'Hanlon*,
   No. 04-955, 2007 U.S. Dist. LEXIS 22211 (D. Del. Mar. 28, 2007) ....................................65

*Bullmore v. Ernst & Young Cayman Is.*,
   45 A.D.3d 461 (1st Dep't 2007) ........................................................................................81

*Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*,
   491 B.R. 335 (S.D.N.Y. 2013)........................................................................................43, 44

*In re Caremark Int'l*,
   698 A.2d 959 (Del. Ch. 1996)................................................................................................74

*Case Fin. Inc. v. Alden*,
   No. 1184-VCP, 2009 Del. Ch. LEXIS 153 (Del. Ch. Aug. 21, 2009)...................................44

*Center for Reprod. Law v. Bush*,
   304 F.3d 183 (2d Cir. 2002)....................................................................................................36

*Charter Servs. Inc. v. DL Air, LLC*,
   711 F. Supp. 2d 1298 (S.D. Ala. 2010)...................................................................................45

*In re Citigroup Inc. S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009).................................................................................................74

*Citron v. Fairchild Camera & Instrument Corp.*,
   569 A.2d 53 (Del. 1989) ..........................................................................................................71

*Citron v. Steego Corp.*,
   No. 10171, 1988 Del. Ch. LEXIS 119 (Del. Ch. Sept. 9, 1988)............................................70

*Coach, Inc. v. Kmart Corporations*,
   756 F. Supp. 2d 421 (S.D.N.Y. 2010).....................................................................................62

*Coal Operators and Associates, Inc. v. Babbitt*,
   291 F.3d 912 (6th Cir. 2002) ..................................................................................................36

*In re Colonial Realty Co.*,
   226 B.R. 513 (Bankr. D. Conn. 1998) ....................................................................................55

*Contemporary Indus. Corp. v. Frost (in re Contemporary Indus. Corp.)*,
   564 F.3d 981 (8th Cir. 2009) .............................................................................................30, 32

*Cooper Development Co. v. Friedman*,
   92 Civ. 7572, 1994 U.S. Dist. LEXIS 1814 (S.D.N.Y. Feb. 22, 1994) .................................71

*Cooper v. Parsky*,
   140 F.3d 433 (2d Cir. 1998).....................................................................................................18

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)................................................................................19

*Criden v. Steinberg*,
    No. 17082, 2000 Del. Ch. LEXIS 50 (Del. Ch. Mar. 23, 2000) .............................84

*CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*,
    No. 03-Civ-7936, 2007 U.S. Dist. LEXIS 74723 (S.D.N.Y. Oct. 3, 2007)............71

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).................................................................................33, 34

*Dubai Islamic Bank v. Citibank, N.A.*,
    256 F. Supp. 2d 158 (S.D.N.Y. 2003)...............................................................18

*Dubroff v. Wren Holdings, LLC*,
    No. 3940, 2009 Del. Ch. LEXIS 89 (Del. Ch. May 22, 2009) .............................69

*E.E.O.C. v. Staten Island Sav. Bank*,
    207 F.3d 144 (2d Cir. 2000)...........................................................................20

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008).............................................................................61

*In re Enron Corp.*,
    370 B.R. 583 (Bankr. S.D.N.Y. 2007)...........................................................4, 22

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011).............................................................................24

*Enron v. Int'l Fin. Corp. (In re Enron Corp.)*,
    341 B.R. 451 (Bankr. S.D.N.Y. 2006)...............................................................26

*Erone Corp. v. Skouras Theatres Corp.*,
    19 F.R.D. 299 (S.D.N.Y. 1956) .......................................................................35

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (D. Del. 2009).............................................................................84

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994).................................................................................4

*FW/PBS, Inc. v. Dallas*,
    493 U.S. 215 (U.S. 1990), *overruled on other grounds by City of Littleton*
    *v. Z. J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004)..............................................34, 36

*Gagliardi v. Trifoods Int'l*,
    683 A.2d 1049 (Del. Ch. 1996).....................................................................74, 75

*Gesoff v. IIC Indus., Inc.*,
    902 A.2d 1130 (Del. Ch. 2006).................................................................78

*Grumman Olson Indus. v. McConnell (In re Grumman Olson Indus.)*,
    329 B.R. 411 (Bankr. S.D.N.Y. 2005)...............................................79, 80

*Harbor Fin. Partners v. Huizenga*,
    751 A.2d 879 (Del. Ch. 1999)..............................................................84

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)................................................................80

*Holmes v. Air Line Pilots Ass'n*,
    745 F. Supp. 2d 176 (E.D.N.Y. 2010) ...................................................66

*Jones v. Rath Packing Co.*,
    430 U.S. 519 (1977)..........................................................................30

*Katzenstein v. VIII SV5556 Lender, LLC (In re St. Vincent's Catholic Med. Cntrs. of N.Y.)*,
    440 B.R. 587 (Bankr. S.D.N.Y. 2010)...................................................19

*Kirschner v. Bennett*,
    648 F. Supp. 2d 525 (S.D.N.Y. 2009)...................................................81

*Kiryas Joel Alliance v. Village of Kiryas Joel*,
    495 Fed. App'x 183 (2d Cir. 2012) ......................................................34

*Krys v. Sugrue (In re Refco Sec. Litig.)*,
    No. 07-md-1902, 2010 U.S. Dist. LEXIS 33642 (S.D.N.Y. Mar. 1, 2010)............64

*Krys v. Sugrue* (*In re Refco Sec. Litig.*),
    No. 09-md-1902, 2010 U.S. Dist. LEXIS 41386 (S.D.N.Y. Feb. 3, 2010) ............33

*In re Lear Corp. S'holder Litig.*,
    967 A.2d 640 (Del. Ch. 2008)..........................................................73, 75

*Lefkowitz v. Bank of N.Y.*,
    676 F. Supp. 2d 229 (S.D.N.Y. 2009)...................................................80

*In re Lehman Bros. Holdings Inc.*,
    416 B.R. 392 (Bankr. S.D.N.Y. 2009) ..................................................19

*Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings)*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012)...............................................27, 29

*Lemond v. Manzulli*,
    No. 05-Civ-2222, 2009 U.S. Dist. LEXIS 50135 (E.D.N.Y. Feb. 9, 2009) ............84

*LH 1440 LLC v. Lehman Commercial Paper, Inc. (In re Lehman Bros. Holdings Inc.)*,
No. 09-1138, 2010 Bankr. LEXIS 2373 (Bankr. S.D.N.Y. July 21, 2010) ............................18

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).................................................................................................32, 33

*Lyondell Chem. Co. v. Ryan*,
970 A.2d 235 (Del. 2009) ........................................................................................77

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000)......................................................................................35

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001) .......................................................................................76

*Marino v. Grupo Mundial Tenedora, S.A.*,
810 F. Supp. 2d 601 (S.D.N.Y. 2011)........................................................................80

*McMillan v. Intercargo Corp.*,
768 A.2d 492 (Del. Ch. 2000)...................................................................................76

*Mediators, Inc. v. Manney (In re Mediators, Inc.)*,
105 F.3d 822 (2d Cir. 1997)......................................................................................80

*Midland Food Servs. LLC v. Castle Hill Holdings V, LLC*,
792 A.2d 920 (Del. Ch. 1999)...................................................................................63

*Morrison v. Nat'l Austl. Bank Ltd.*,
547 F.3d 167 (2d Cir. 2008).....................................................................................34

*Munno v. Town of Orangetown*,
391 F. Supp. 2d 263 (S.D.N.Y. 2005)........................................................................19

*In re Musicland Holding Corp.*,
424 B.R. 95 (Bankr. S.D.N.Y. 2010).........................................................................64

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007) ....................................................................................64, 65

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
386 F.3d 107 (2d Cir. 2004)......................................................................................34

*Nymex S'holder Litig. v. New York Mercantile Exch., Inc.*,
No. 3621, 2009 Del. Ch. LEXIS 176 (Del. Ch. Sept. 30, 2009)............................77

*O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*,
383 B.R. 231 (Bankr. S.D.N.Y. 2008)........................................................................80

*O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*,
    488 B.R. 394 (B.A.P. 9th Cir. 2013)..................................................................28

*Ochre LLC v. Rockwell Architecture Planning & Design*,
    12 CIV. 2837, 2012 U.S. Dist. LEXIS 172208 (S.D.N.Y. Nov. 28, 2012) ..........................70

*Ochre LLC v. Rockwell Architecture Planning & Design*,
    12 CIV. 2837, 2012 U.S. Dist. LEXIS 172208 (S.D.N.Y. Nov. 28, 2012) ..........................38

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
    322 F.3d 147 (2d Cir. 2003)..................................................................18

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group*
    *(In re Hechinger Inv. Co.)*,
    274 B.R. 71 (D. Del. 2002)..............................................30, 31, 32, 69

*Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing*
    *Corp. (In re Lois/USA, Inc.)*,
    264 B.R. 69 (Bankr. S.D.N.Y. 2001) ..................................................................20

*Official Comm. of Unsecured Creditors of Quebecor World (U.S.A.) Inc.*
    *v. Am. Life Ins. Co. (In re Quebecor World (U.S.A.) Inc.)*,
    719 F.3d 94 (2d Cir. 2013)..................................................................4, 26

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.*
    *(In re Verestar, Inc.)*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ..............................................76, 77

*Parrott v. Coopers & Lybrand, L.L.P.*,
    263 A.D.2d 316 (1st Dep't 2000) ..................................................................82

*Peterson v. Somers Dublin Ltd.*,
    729 F.3d 741 (7th Cir. 2013) ..................................................................24

*Phillips v. Reed Group, Ltd.*,
    07 Civ. 3417, 2011 U.S. Dist. LEXIS 157522 (S.D.N.Y. Jan. 24, 2011)..............................43

*Picard v. HSBC Bank PLC*,
    454 B.R. 25 (S.D.N.Y. 2011)..............................................62, 65, 79

*In re PNB Holding Co. S'holders Litig.*,
    No. 28-N, 2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006)..............................69

*Poindexter v. EMI Record Group, Inc.*,
    No. 11 Civ. 559, 2012 U.S. Dist. LEXIS 42174 (S.D.N.Y. Mar. 27, 2012)..........................20

*Purvi Enters., LLC v. City of N.Y.*,
    62 A.D.3d 508 (1st Dep't 2009) ..................................................................81

*Raines v. Byrd*,
    521 U.S. 811 (1997)..................................................................................................33

*Richardson v. Goord*,
    347 F.3d 431 (2d Cir. 2003)....................................................................................21

*Roni LLC v. Arfa*,
    15 N.Y.3d 826 (2010) .............................................................................................82

*RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.)*,
    No. 03-ap-2176, 2003 Bankr. LEXIS 1635 (Bankr. S.D.N.Y. Dec. 11, 2003) .....................71

*In re Saba Enterprises, Inc.*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009) ....................................................................43

*Schnall v. Marine Midland Bank*,
    225 F.3d 263 (2d Cir. 2000).....................................................................................20

*Securities Investor Protection. Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ....................................................................44

*In re Seitz*,
    400 B.R. 707 (Bankr. E.D. Mo. 2008) .....................................................................55

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991)...............................................................................78, 79

*Solomon v. Armstrong*,
    747 A.2d 1098 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000)........................70

*Solow v. Stone*,
    994 F. Supp. 173 (S.D.N.Y. 1998)................................................................77, 78, 80

*Soroof Trading Dev. Co. v. GE Fuel Cell Systems, LLC*,
    283 F.R.D. 142 (S.D.N.Y. 2012) ............................................................................45

*SPGGC, LLC v. Blumenthal*,
    505 F.3d 183 (2d Cir. 2007).....................................................................................29

*Springle v. United States*,
    11 Civ. 8827 (NRB), 2013 U.S. Dist. LEXIS 20365 (S.D.N.Y. Feb. 14, 2013) ...................21

*Sprint Commc'n Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008)..................................................................................................33

*Stanziale v. Nachtomi*,
    330 B.R. 56 (D. Del. 2004).......................................................................................77

*Steinberg v. Sherman*,
   No. 07-Civ-1001, 2008 U.S. Dist. LEXIS 37367 (S.D.N.Y. May 8, 2008) ..........................82

*Steiner v. Meyerson*,
   No. 13139, 1995 Del. Ch. LEXIS 95 (Del. Ch. July 19, 1995) ..............................................85

*Sulton v. Wright*,
   265 F. Supp. 2d 292 (S.D.N.Y. 2003)....................................................................................21

*In re Sunstates Corp. S'holder Litig.*,
   788 A.2d 530 (Del. Ch. 2001).................................................................................................45

*Talkin, Muccigrosso & Roberts v. Florio, Perrucci, Steinhardt & Fader, LLC*,
   No. 107605/07, 2009 N.Y. Misc. LEXIS 5302 (Sup. Ct. Sept. 11, 2009).............................81

*Tasini v. New York Times Co.*,
   184 F. Supp. 2d 350 (S.D.N.Y. 2002)....................................................................................34

*Tellabs, Inc. v. Makor Issues & Rights*,
   551 U.S. 308 (2007)................................................................................................................19

*Terr. of the U.S. V.I. v. Goldman, Sachs & Co.*,
   937 A.2d 760 (Del. Ch. 2007).................................................................................................84

*Torch Liquidating Trust v. Stockstill*,
   561 F.3d 377 (5th Cir. 2009) ..................................................................................................64

*In re Trados Inc. S'holder Litig.*,
   73 A.3d 17 (Del. Ch. 2013)......................................................................................................64

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
   906 A.2d 168 (Del. Ch. 2006)..................................................................................................65

*TufAmerica, Inc. v. Diamond*,
   12 Civ. 3529, 2013 U.S. Dist. LEXIS 129128 (S.D.N.Y. Sept. 10, 2013) .............................21

*UCAR Int'l, Inc. v. Union Carbide Corp.*,
   00 CV 1338, U.S. Dist. LEXIS 914 (S.D.N.Y. Jan.26, 2004),
   *aff'd* 119 F. App'x 300 (2d Cir. 2004)...................................................................................63

*In re USDigital, Inc.*,
   443 B.R. 22 (Bankr. D. Del. 2011) .........................................................................................64

*In re Victory Markets, Inc.*,
   221 B.R. 298 (B.A.P. 2d Cir. 1998).........................................................................................47

*In re Vintero Corp.*,
   735 F.2d 740 (2d Cir. 1984)....................................................................................................59

In re *Walt Disney Co. Derivative Litig.,*
    907 A.2d 693 (Del. Ch. 2005).............................................................73, 75

*In re Walt Disney Co. Derivative Litig,*
    No. 15452, 2004 Del. Ch. LEXIS 132 (Del Ch. Sept. 10, 2004).....................72, 73

*Warth v. Seldin,*
    422 U.S. 490 (1975)................................................................................36

*White v. Panic,*
    783 A.2d 543 (Del. 2001) ........................................................................86

*Whiteford Plastics Co. v. Chase Nat'l Bank of New York City,*
    179 F.2d 582 (2d Cir. 1950).....................................................................59

*Wight v. BankAmerica Corp.,*
    219 F.3d 79 (2d Cir. N.Y. 2000) ...............................................................79

*In re WorldCom, Inc.,*
    No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) .........47

**Statutes**

6 Del. C. § 18-607.......................................................................................83

8 Del. C. § 102(b)(7) ...........................................................................76-77

8 Del. C. § 141..........................................................................................69

8 Del. C. § 160.....................................................................................8, 83

8 Del. C. § 173..........................................................................................83

8 Del. C. § 174.................................................................................8, 83, 84

11 U.S.C. § 101(22)...................................................................................25

11 U.S.C. § 101(49)(A)..........................................................................27, 28

11 U.S.C. § 541..........................................................................................29

11 U.S.C. § 544(b).................................................................................23, 31

11 U.S.C. § 546(e) ............................................................................. *passim*

11 U.S.C. § 548(a)(1)(B) ........................................................................23, 32

11 U.S.C. § 550....................................................................................32, 55

11 U.S.C. § 741(7) ..................................................................................................27

**Other Authorities**

Fed. R. Bankr. P. 9019 .......................................................................................17, 54

Fed. R. Civ. P. 12 ...........................................................................................1, 4, 22, 35

Fed. R. Civ. P. 9(b) .........................................................................................19, 86

Fed. R. Civ. P. 7012(b) ..............................................................................................1

James Wm. Moore, et al., *Moore's Federal Practice*, § 10.03[2][a] (3d ed. 1997) .....................36

U.S. Const., art. III, § 2, cl. 1 ...................................................................................33

The Lightstone Defendants[1] as and for their motion pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(1) and (b)(6) to dismiss the Amended Complaint[2] filed in each of the above-captioned Adversary Proceedings on November 15, 2013 (the "Amended Complaint," cited herein as "AC"), respectfully submit this memorandum of law in support thereof.

## PRELIMINARY STATEMENT

When the Debtors confirmed their Plan[3] in July 2010, there appeared to be legitimate purposes for creating and empowering the "Extended Stay Litigation Trust" (the "Trust"). That changed dramatically with the subsequent settlement or dismissal of many of the litigation claims and targeted defendants, coupled with a hand-off of control of the Trust to the prepetition Mortgage Lender (defined below). As things stand today, the Trust has devolved into a scrim for the Mortgage Lender, and only the Mortgage Lender, to attack transactions that the Mortgage Lender itself performed, in hopes of obtaining damages *for its own conduct*. This is nothing short of an abuse of the judicial system. Indeed, when the Creditors Committee had sought standing to assert the claims alleged in this action, the Mortgage Lender – speaking through the Trust's present litigation counsel, which they share – expressly represented that these claims will "not provide any apparent benefit to these estates or their creditors" because all proceeds go to

---

[1] The "Lightstone Defendants" consist of DL-DW Holdings, LLC ("DL-DW"), Lightstone Holdings, LLC, The Lightstone Group, LLC, Lightstone Commercial Management, BHAC Capital IV, LLC ("BHAC"), Park Avenue Funding, LLC, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, and Joseph Teichman.

[2] The "Amended Complaint" is actually the Trust's second amended complaint and the sixth complaint it has filed against the Lightstone Defendants in these jointly administered proceedings. A First Amended Complaint was filed on August 12, 2011 in Adv. Pro. 11-02256, and is submitted herewith as **Exhibit A** (the "Prior Amended Complaint"). The complaint that commenced Adversary Proceeding No. 11-2255 (the "Fraudulent Transfer Complaint") is submitted herewith as **Exhibit B**. The complaint that commenced Adversary Proceeding No. 11-2254 (the "Fiduciary Duty Complaint") is submitted herewith as **Exhibit C**. The Complaint filed in Adversary Proceeding 11-2398 is virtually identical to the Fiduciary Duty Complaint. The Trust's counsel, control persons and beneficiaries have filed additional complaints against certain of the Lightstone Defendants in other courts as well.

[3] "Debtors' Fifth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as Amended" (the "Plan"). The Court's order confirming the Plan entered July 20, 2010 [Ch. 11 Docket No. 1172] (the "Confirmation Order"), to which the Plan is an exhibit, is submitted as **Exhibit D** hereto.

the Mortgage Lender.[4]

      The Amended Complaint attacks three categories of transactions. The first is that "funds of the Debtors"[5] were used to pay an annual management fee (the "Management Fees") of "up to" $1 million to "Lichtenstein or a Lichtenstein affiliate."[6] The Management Fee funded an array of board-level management services furnished to the Debtors, including the General Counsel[7] for this multi-billion dollar enterprise having over 666 commercial properties in 44 different states.[8] In a seeming lapse of professionalism, the Trust alleges that no services or consideration was provided for the Management Fees[9] and receipt of the payment was an act of conversion! Were there not multiple bases for immediate dismissal of the Amended Complaint, the Lightstone Defendants would relish the opportunity to demonstrate that they provided much more than reasonably equivalent value in exchange for the Management Fees.

      The second category of transactions attacked by the Amended Complaint is the payment of mandatory periodic coupon payments in respect of certain hybrid securities ("Series A Units"). The payments were disbursed by the Mortgage Lender, from a bank account titled "for the benefit of [Mortgage Lender] Wachovia," over which the Mortgage Lender exercised exclusive control. A Cash Management Agreement (**Exhibit F** hereto), agreed to by 99.95 percent of the Debtors' creditors, required that all of the Debtors' receipts be swept into the Wachovia account and granted Wachovia and its affiliated successors exclusive control over the

---

[4] *See* "Objection of Special Servicer to the Motion of the Official Committee of Unsecured Creditors for an Order Appointing the Creditors' Committee as Estate Representative with Respect to the Prosecution of Certain Causes of Action" dated June 15, 2010 [Ch. 11 Docket No. 1065] at pp. 14-15, submitted herewith as **Exhibit E**.

[5] AC ¶¶ 188, 257, 265(vii), 374.

[6] *Id*. ¶ 188.

[7] *Id*. ¶ 48.

[8] *Id*. ¶ 106.

[9] *Id*. ¶ 213.

account and a lien in the funds.  The Mortgage Lender's attempt to recoup fixed payments

agreed to by all creditors, which the Mortgage Lender itself disbursed, is obviously riddled with

fatal flaws.

The third transaction was a transfer (the "<u>Floor Certificate Transfer</u>") of a speculative

security (the "<u>Floor Certificates</u>") issued by the Wachovia securitized trust that held the

Mortgage Note.  It was not a security issued by the Debtors.  The Floor Certificates were

property of the Mortgage Lender, and the Mortgage Lender transferred them directly to

defendant DL-DW.[10]  On November 5, 2007, Wells Fargo, as Trustee for the Mortgage Lender

(the Wachovia Trust holding the Mortgage Note), certified that DL-DW was the beneficial

owner of the Floor Certificates and entitled to all distributions therefrom.[11]  The Trust alleges

that the Floor Certificates were valued at $25 million at the time of the transfer.[12]  As damages

for this alleged $25 million transfer, the Trust seeks to recover the inexplicable sum of $74

million – money that it would roundtrip back to the Mortgage Lender that freely and voluntarily

made the transfer and certified DL-DW as beneficial owner of the Floor Certificates in the first

place.  The Trust seeks to hold *all* of the defendants jointly and severally liable for its irrational

damage demand.

Equally disturbing, is the plain fact, self-evident from the documentation referenced in

the Amended Complaint, that the Debtors did not give up anything of value that plausibly could

support a claim that they were entitled to the Floor Certificates.  All the Debtors did was

acknowledge an inter-lender agreement as to how certain debt prepayments would be allocated

among the lender group.  In contrast, it is clear from the face of the Amended Complaint that

---

[10] *Id.* ¶ 137.

[11] (*See* Series 2007-ESH, Class X-A and X-B Certificates, attached as **Exhibit G** hereto.)

[12] *Id.* ¶ 139.

defendants provided the Debtors with $22 million of cash as consideration for the (alleged $25 million value) Floor Certificates.[13]  The Trust's entire theory regarding the Floor Certificate Transfer is plainly baseless.

In addition to these fundamental deficiencies, all of the claims in the Amended Complaint must be dismissed for multiple other reasons.  <u>First</u>, the transfers of the Floor Certificates and the Series A Unit Payments are not actionable by reason of the safe harbor provisions of 11 U.S.C. § 546(e), for the reasons explained by the Second Circuit Court of Appeals, and this Court in *Quebecor*, *Lehmann* and *Enron*.

<u>Second</u>, the Adversary Proceeding must be dismissed because it is brought solely for the benefit of, and as a practical matter by, the Mortgage Lender.  As documented below, the Mortgage Lender controls the Trust's actions in this litigation, shares counsel with the Trust, and will be the only beneficiary of any hypothetical litigation recoveries.  Yet, it was the Mortgage Lender that transferred the Floor Certificates  (which, as an interest in Wachovia securitized trust, was the Mortgage Lender's property, never the Debtors'); it was the Mortgage Lender that disbursed all of the Series A Unit Payments from an account it controlled, in accordance with a Cash Management Agreement to which it and all the other lenders agreed; and the Series A Units themselves were issued as an integrated component of the 2007 sale and financing transaction (the "<u>2007 Transaction</u>") in which the Mortgage Lender played a lead role.  Under the Supreme Court's *Bangor Punta* doctrine, principles of *in pari delicto* and unclean hands, and case law interpreting chapter 5 of the Bankruptcy Code, the Mortgage Lender may not profit by using the Trust as an artifice to attack its own business dealings.

<u>Third</u>, the Amended Complaint must be dismissed because the Trust still has failed to

---

[13] The $25 million value is taken to be true since this is a Rule 12 motion.  The Lightstone Defendants believe, and would intend to demonstrate, that the Floor Certificates had little or no value at the time of the transfer.

plead which Debtors allegedly made any of the challenged transfers. As a result, the Amended

Complaint fails to satisfy constitutional standing requirements that are prerequisites to subject

matter jurisdiction, and also fails to adequately state any claims.[14] One may not allege that

"some entity" was injured and on that basis allow another entity that was not injured sue for

damages.

The Trust's failure to allege an injury to any particular Debtor is not inadvertent. Long

before the defendants' involvement with Extended Stay, the Debtors were structured, for the

benefit of their lenders, as a standard mezzanine/REIT structure that divides property ownership

from mezzanine indebtedness obligations, and operations from holding companies.[15] The asset-

less and structurally junior special purpose Debtors that were Mezzanine Debt obligors could not

possibly have made or funded any of the transfers alleged in the Amended Complaint. The only

entities whose assets conceivably could have been transferred, the Property Owners (as identified

below), were solvent at all relevant times and have no unpaid creditors,[16] let alone innocent or

"triggering" creditors that were injured or could serve to confer standing for avoidance purposes.

In fact, the only "eligible" creditors to be found anywhere in the Debtors' enterprise were

noteholders of the parent Debtor, Extended Stay, Inc. ("ESI"), positioned at least twelve entity

levels away from Property Owners.[17] There were only $4 million of outstanding ESI notes after

the effective date of the Debtors' Plan. The Trust's recent $10 million settlement with former

defendant Blackstone has now brought in more than enough funds to repay the noteholders in

full, thus removing any pretext of damages to unpaid creditors. In any event, as explained

---

[14] Although plaintiffs' obligation to establish standing is jurisdictional and therefore a prerequisite to any further relief or analysis of the claims, we address 11 U.S.C. § 546(e) defenses first below because they are a straightforward basis for dismissing most of this action under Second Circuit authority.

[15] *See* Ex. A and discussion of structure at section II. C. 1., below.

[16] The Mortgage Loan claims were non-recourse. *See* Disclosure Statement (**Exhibit H** hereto) at p. 27.

[17] *See* AC at Ex. A; Ex. H at 23-24 and Ex. E.

below, those creditors do not stand to receive any theoretical recoveries from this litigation, all of which will go to the Mortgage Lender.[18]

Two-and-a-half years after the defendants began raising these arguments, the Trust's only response has been to add a few additional paragraphs to the Amended Complaint alleging that the Debtors' separateness should be disregarded. That is, three years after Plan confirmation, the Trust seeks to make the solvent transferor Debtors insolvent by making them liable for their shareholders' debts, and to retroactively create creditors and duties at those entities that did not exist at the time the transactions occurred, solely for the purpose of manufacturing litigation claims where none exist. That is like giving a driver a back-dated parking ticket because a no-parking sign was posted years after he had already driven away.

The Trust's attempt to manufacture unpaid creditors in order to create constitutional standing fails for multiple reasons. To begin with, what the Trust seeks is to reverse-pierce its own predecessors' veils – *i.e.*, to make the Property Owners liable for (distant) shareholders' debts in order to create triggering creditors for purposes of asserting claims. However, Delaware law, which applies here, does not recognize reverse veil piercing.

Furthermore, to state a basis for disregarding entity separateness, a complaint must allege that *the corporate form itself* was fraudulent or the instrumentality of fraud. The Amended Complaint does not allege that the Debtors' mezzanine structure was fraudulent. Nor could it, for the Debtors' structure was established for ordinary and legitimate financing purposes, existed prior to the 2007 Transaction, existed prior to the defendants' involvement with Extended Stay, and was required by documents executed by the lenders (who are the Trust's beneficiaries). It is terrifying to contemplate the turmoil that would be brought down upon the financial markets if a

---

[18] *See* Section IV. A., below.

standard commercial mezzanine financing structure were to be adjudicated in and of itself fraudulent and collapsed – especially on the basis of nothing more than the Trust's rather silly allegations, such as the enterprise was sometimes referred to as "a family of companies"[19] and as a branded hotel chain it operated with a unified business purpose.

Although not explicitly requested by the Amended Complaint, substantive consolidation under bankruptcy law also is impossible. The Court's Confirmation Order expressly provided for the continuing entity separateness of each Debtor and its respective properties. A request for substantive consolidation would be a collateral attack on the Plan and Confirmation Order, as well as other orders entered in the chapter 11 cases; it is impossible for entities to, on one hand, meet the standard of being "hopelessly entangled" and, on the other hand, be completely separate entities not long thereafter. Substantive consolidation years after the confirmation of the Plan and liquidation of the Debtors also is untimely. In any event, there are no allegations in the Amended Complaint that, if provable, would satisfy the Second Circuit's *Augie/Restivo* standard. To the contrary, the Trust *judicially admitted* the separateness of the Debtors in its earlier complaints and now is bound by those admissions.

Fourth, the Amended Complaint also suffers from a converse problem: it lumps all of the defendants together without regard to which ones may or may not have played what roles in any of the alleged actionable conduct, or who received or benefited from the transfers. The Amended Complaint makes only non-factual, conclusory allegations, such as that all of the defendants (various individuals with no relationship to one another, Arbor entities, Lightstone entities) are alter-egos of each other, which is plainly ridiculous. This, too, requires dismissal of many of the counts of the Amended Complaint for failure to state a claim.

---

[19] We note that "companies" is plural.

And there are many more defects. The Amended Complaint frivolously asserts claims against entity defendants under Del. Corp. L. § 174 which imposes liability only upon a corporation's directors. The Amended Complaint asserts claims against the defendants under Del. Corp. L. § 160, which prohibits certain share redemptions, although this statute has no connection whatsoever to any allegation in the Amended Complaint. The Amended Complaint also seeks to hold the defendants liable for breaches of fiduciary duties to creditors when the claim does not exist under applicable law, and even if it did, the Trust would lack standing to assert it.

The Lightstone Defendants, as well as other defendants, include among them working individuals of ordinary means who did not personally invest in Extended Stay and who did not receive or benefit from any alleged transfers. They also include entities that are only sued because they were (alleged) subsequent transferees of relatively modest sums, not because of any direct conduct on their parts. And Mr. Lichtenstein lost hundreds of millions of dollars of his own money as a result of his investment in Extended Stay. Yet, for four years they all have been accused publicly of "looting" what was originally alleged to be billions of dollars and now is "only" $139 million. That is not something easily explained on an application to refinance one's home mortgage or lease a car. After an examiner's report, access to the examiner's work papers, review of the Debtors' documents, four initial complaints, a first amended complaint, fully briefed prior motions to dismiss, and now the latest Amended Complaint, it is legally and morally wrong for these defendants to continue to be defamed and dogged by far-fetched claims, which now are brought by a shill for the very entity that proximately caused all of the challenged transfers and has already received a 98-cent recovery on its claims (while defendants' investments were wiped out). It is more than time to put these claims and allegations

permanently to rest.

## PERTINENT BACKGROUND AND PROCEDURAL HISTORY[20]

### I.  THE 2007 TRANSACTION

Prior to the 2007 Transaction, Blackstone and Citigroup were seeking to "unload" the Extended Stay enterprise (the "Company") from Blackstone's portfolio (Prior Amended Complaint ¶¶ 72-73, 87; Fraudulent Transfer Complaint ¶¶ 66-67, 81; Fiduciary Duty Complaint ¶¶ 152-53, 166).  They identified Mr. Lichtenstein as their "mark" (Prior Amended Complaint ¶ 88; Fraudulent Transfer Complaint ¶ 82; Fiduciary Duty Complaint ¶ 167).  The company was offered for sale with nearly $7 billion dollars of "stapled financing" (pre-packaged loans arranged by the sellers) to finance over 90% of the purchase price, thereby providing prospective purchasers with hard market proof that the deal and the Company were sound.  (AC ¶ 114.)  The financing was arranged by the Mortgage Lender, Wachovia Bank, along with Bank of America and Bear Stearns.  (*See* Intercreditor Agreement (**Exhibit I** hereto) at 1.)

Following a broad-based marketing process (Prior Amended Complaint ¶ 85; Fraudulent Transfer Complaint ¶ 79; Fiduciary Duty Complaint ¶ 164), Mr. Lichtenstein and "Lightstone" submitted what turned out to be the winning bid to purchase the Business.  (AC ¶ 114.)  Their bid included more than $400 million of buyer cash.  (*Id.* ¶ 115.)  In addition to this huge equity investment, Mr. Lichtenstein incurred $100 million of contingent personal liability for the debt by executing 11 conditional guaranties.  (Prior Amended Complaint ¶ 120; Fraudulent Transfer Complaint ¶ 117; Fiduciary Duty Complaint, ¶ 198.)  Following the Debtors' bankruptcy, he paid the guaranties.

---

[20] In accordance with the Rule 12(b)(6) standards, allegations in the Amended Complaint are to be true at this stage of the case unless contradicted by other materials that the Court is permitted to consider in the context of this motion.  The Lightstone Defendants of course reserve their rights to contest any such allegations when and if procedurally appropriate.  The recitation of the Trust's allegations is not an admission or endorsement of any of them.

With a great deal of Mr. Lichtenstein's own skin in the game, and with the $7 billion endorsement of some of the world's most sophisticated financial institutions including the Mortgage Lender, DL-DW acquired the Company on June 12, 2007 for a nominal purchase price of $8 billion, structured as follows.

$4.1 billion: Senior Mortgage Debt. The initial mortgage lenders were Wachovia, Bear Stearns and Bank of America.[21] They sold the mortgage note – there was but a single mortgage note – to Wachovia Large Loan, Inc. Thereafter, Wachovia Large Loan, Inc. deposited the mortgage note into Wachovia Bank Commercial Mortgage Trust. Wachovia Bank, N.A. became the initial Servicer and Special Servicer for the Mortgage Loan, and Wells Fargo Bank, N.A. the initial trustee for the commercial trust.[22]

$3.3 billion: Mezzanine Debt incurred by the Mezzanine Borrowers (identified below), which held asset-remote indirect equity interests in the entities that owned the assets of the Business. The initial Mezzanine Lenders *also* were Wachovia, Bear Stearns and Bank of America. Mezzanine Lenders had no recourse to the business assets. In fact, the Mortgage Lender (and Wachovia in its various capacities) included numerous covenants in their loan documents to maintain the separation between Mezzanine Borrowers and Mezzanine Lenders, and Extended Stay's operating and business assets, including by prohibiting the parties from seeking to substantively consolidate the Mezzanine Borrowers with the operating and property-owning entities.[23]

The Mezzanine Lenders also were benefitted by the contingent $100 million personal guaranty given by Mr. Lichtenstein – which he has now paid out of his own assets.

$420 million: Cash received in exchange for a combination of Series A Units and common equity. Approximately $220 million of the cash was put up by Mr. Lichtenstein and his affiliates, and $200 million funded by other defendants (primarily the "Arbor Parties"). The Series A Units entitled their holders to receive periodic payments at a fixed rate pursuant to a

---

[21] *See* Intercreditor Agreement (Ex. I ) at 1-2.

[22] *See* Disclosure Statement (Ex. H) at 27-28. To avoid confusion, the term "Mortgage Lender" is used throughout to refer successively to Wachovia and its initial co-lenders, Wachovia Large Loan, Inc., and the Wachovia Bank Commercial Mortgage Trust as they are related-party successors in interest, as well as the special servicer (also initially a Wachovia entity) where it speaks or acts in such capacity as the agent for the Mortgage Lender.

[23] *See* Ex. I.

mandatory cash waterfall agreed upon by all the Lenders.[24]  A portion of the coupon payments were prefunded in a segregated account established for such purpose at the closing.  The remainder were made out of the lockboxed cash management account that was held at and controlled by the Mortgage Lender.[25]

$200 million:  Equity of the post-sale company retained by Blackstone.[26]

Of the sale proceeds, $1.8 billion in cash went to Blackstone and the remainder was used to retire existing debt, provide working capital for the business, and pay the bankers' fees.  (Prior Amended Complaint ¶ 123; Fraudulent Transfer Complaint ¶ 120; Fiduciary Duty Complaint ¶ 201.)  None of the financing debt is alleged to have been cashed out to the defendants.

Shortly after closing, lenders came to Mr. Lichtenstein with demands.  They insisted that Mr. Lichtenstein cease attempts to sell equity in the Company because it was competing with their efforts to sell off interests in the loans.  (AC ¶ 136.)  They also forced Mr. Lichtenstein to purchase certain of the hotel properties that were leased to Extended Stay for approximately an additional $200 million, despite the fact that this was not part of "the deal" he had agreed to.  (Prior Amended Complaint ¶¶ 161-62; Fraudulent Transfer Complaint ¶¶ 158-59; Fiduciary Duty Complaint ¶¶ 238-39.)  Or, as the Complaints bluntly put it, the lenders demanded that Mr. Lichtenstein "resolve the defaults or else."  (Prior Amended Complaint at 56; Fraudulent Transfer Complaint at 53; Fiduciary Duty Complaint at 84.)  Finally, the lenders demanded modifications to the Loans "because the lenders were having so much difficulty selling their debt."  (AC ¶ 137.)  The Amended Complaint alleges that "[i]n exchange for the borrowers' consent to these accommodations, the lenders agreed to issue to the Debtor borrowers (or their

---

[24] *See* BHAC Limited Liability Company Agreement (**Exhibit J** hereto) (making quarterly coupon payments mandatory, not discretionary; Cash Management Agreement (Ex. F) (requiring disbursement of payments from account); *see also* AC at Ex. B.

[25] Prior Amended Complaint ¶¶ 116-19; Fraudulent Transfer Complaint ¶¶ 113-16; Fiduciary Duty Complaint ¶¶ 194-97; *see also* Ex. F.

[26] Conceptually, one could view this as Blackstone having sold the majority of the company for $7.8 billion while retaining a minority interest.

designees) [the Floor Certificates.]" (*Id.*) We respectfully urge the Court to review the page-long agreement cited in the Complaint: it exclusively addressed a loan amendment regarding the allocation of a very limited portion of loan repayment proceeds among lenders. The Debtors gave up <u>nothing</u> in this transaction.

The Cash Management Agreement was put into place by the lenders as a condition of the 2007 Transaction. The Cash Management Agreement required cash generated by the hotel properties to be swept automatically into an account at Wachovia and then disbursed in accordance with the agreement's "waterfall" provisions. (Ex. F at 17-19; AC ¶ 126 and Ex. B.) The Cash Management Agreement shows that this mandatory payment structure, which was pre-negotiated with all of the Debtors' outstanding creditors (except possibly the $4 million of M&T notes at ESI), accounted for various items including debt service payments on the mortgage and mezzanine loans and ordinary course fixed payments to holders of the Debtors' hybrid preferred securities. *See id.*

The cash management account itself, the Trust has admitted, was created and specifically titled "for the Benefit of Wachovia Bank" and "was located at Wachovia at all times relevant to [the] Complaint." (Prior Amended Complaint ¶ 116; Fraudulent Transfer Complaint ¶ 113; Fiduciary Duty Complaint ¶ 194.) The distributions made from this account, including the coupon payments, were mandated by agreements entered into or ratified by the lenders as part of the 2007 Transaction. (Prior Amended Complaint ¶ 181; Fraudulent Transfer Complaint ¶ 178; Fiduciary Duty Complaint ¶ 258) ("[O]ther agreements entered into in connection with the LBO provided that [equity holders] would receive their equity distributions [from Wachovia] regardless of the Debtors' financial condition ....").

The timing of the 2007 Transaction was terrible for Mr. Lichtenstein. Not long

afterwards, the world economy went into an historic tailspin, with both U.S. real estate markets and the hospitality industry being particularly hard hit. Facing an ever-deteriorating economic climate, Mr. Lichtenstein and other directors retained qualified outside professionals to assist in restructuring the Company and avoiding bankruptcy. (*See* Prior Amended Complaint ¶ 198; Fraudulent Transfer Complaint ¶ 195; Fiduciary Duty Complaint ¶ 275.)

Although the Debtors ultimately became unable to service their debts to the institutions that financed the 2007 Transaction, they did an outstanding job of satisfying all of their operating obligations. Nearly two years after the $8 billion transaction closed, the Company's *record high* 60-day outstanding payable balance was <u>merely $1.3 million</u>, (Prior Amended Complaint ¶ 217; Fraudulent Transfer Complaint ¶ 214; Fiduciary Duty Complaint ¶ 296), an amount that is a rounding error for a $4 billion to $8 billion enterprise. By the time the Debtors obtained approval of their Disclosure Statement, and despite the additional financial tolls of operating in chapter 11, total general unsecured debt was only approximately $550,000 (*see* Disclosure Statement (Ex. H) at 26-27, and nearly all of that debt was repaid pursuant to the Plan. (*See* Plan (Ex. D) at p. 93 of 141.) Thus, together with $4 million of remaining M&T Notes, the Debtors in the aggregate came out of bankruptcy with no other unpaid claims except for financing debt that was created by the lenders' participation in the 2007 Transaction.

## II.   THE CHAPTER 11 CASES

In April 2008, the Debtors' boards retained Weil Gotshal & Manges, and soon thereafter Lazard Frères & Co., to provide advice and analysis and to dialogue with the lenders. On June 15, 2009, most of the Debtors filed voluntary petitions for relief under chapter 11. Following the Petition Date, Weil and Lazard became Extended Stay's primary chapter 11 professionals. The individual Lightstone Defendants continued to manage the Debtors and their affairs throughout the chapter 11 cases. Defendant Teichman still does so to this day. No party sought to replace

13

or dispossess management before, during or after the chapter 11 cases.

For their size, the chapter 11 cases were relatively placid. At the request of the United States Trustee, Ralph R. Mabey was appointed as examiner on September 28, 2009. On April 8, 2010 he filed a report that outlined his understanding of the events that led to the chapter 11 cases and potential claims.

The Debtors marketed their business for sale and conducted an auction on May 27, 2010. The successful bidder was Blackstone and some co-investors, who bid $3.93 billion. On June 8, 2010, less than a year after seeking chapter 11 protection, the court confirmed the Plan, which provided for Blackstone to reacquire the business that it had sold to Mr. Lichtenstein for $8 billion three years earlier.

The Plan also created the Trust. Many, but not all, of the Debtors' rights to assert claims relating to the 2007 Transaction and the payments made in respect of the securities issued in connection with the 2007 Transaction were transferred to the Litigation Trust. As explained below, upon the Plan's effective date, the Trust's beneficiaries came to consist of at least $140 million of unpaid Mortgage debt which has first rights to any recoveries, $3.2 billion of unpaid Mezzanine debt held by successors to the Mortgage Lender, and only $4.2 million of claims of creditors who did not participate in the 2007 Transaction and agree to the Cash Management Agreement.

## III.    POST-EFFECTIVE DATE EVENTS AND PROCEDURAL HISTORY

### A.    The Trust Harasses the Defendants With Five Complaints in Three Courts.

The procedural history leading up to the current Amended Complaint is one of the Trust making every conceivable effort to make this litigation as expensive, burdensome, procedurally complicated and slow as possible. On or about June 14, 2011, the Trust filed five complaints in two different courts that were all based on a virtually identical set of factual allegations about the

14

2007 Transaction and the subsequent transfers that are the subject of the Amended Complaint. Lightstone Defendants were named as defendants in four of those actions.

Former co-defendant Blackstone removed an action that the Trust filed in New York State court to federal court. On July 29, 2011, the Trust filed a motion to remand the action back to state court so as to keep the litigation pending in multiple courts. Also on or about that date, the Trust filed a motion to withdraw the reference from the Bankruptcy Court – where it chose to file – to the District Court, in order to pursue some of its claims in yet a third court. Both motions were denied.

On August 12, 2011, the Trust filed its "First Amended Complaint" against certain Lightstone Defendants and others in Adversary Proceeding 11-02256. On August 18, 2011, the Trust objected (unsuccessfully) to the defendants' request for administrative consolidation of the five substantially similar actions. On September 28, 2011, the Trust appealed (unsuccessfully) from the earlier denial of its motion to remand one of its actions back to state court.

On November 11, 2011, the various current and former defendants filed motions to dismiss. Briefing of the motions was completed February 3, 2012. The Lightstone Defendants asserted substantially all of the grounds for dismissal that they must now present again in the within Motion. The 2011 motions were not argued or adjudicated.

**B.    The Mezzanine Lenders Dismiss Themselves and Turn Over Control of the Trust to the Mortgage Lenders.**

At the same time the Trust sued the Lightstone Parties, it also sued the Mezzanine Lenders to avoid their claims and recover fraudulent conveyances and preferences under many of the same theories asserted against the Lightstone Parties. The Trust alleged that the Mezzanine Lenders received approximately $300 million of interest payments prior to the Petition Date, some within 90 days. The Trust alleged that those payments were fraudulent transfers and illegal

dividends because the Mezzanine Lenders only held claims against the Mezzanine Borrowers whereas the funds of the Property Owners and Operating Lessees were used to make the payments. In other words, the Trust brought a $300 million complaint, and prosecuted it for over a year through multiple motions, that asserted claims founded upon the premise that there was entity separateness between Debtors and in turn their respective creditor groups. The Lightstone Parties were parties to those actions, as the Trust also sued the Lightstone Parties for their alleged roles in permitting or causing the allegedly improper use of the Property Owners' assets to pay Mezzanine Debtors' creditors.

The Mezzanine Lenders, with the cooperation of the Mortgage Lender, fashioned a non-litigation and no-cost solution to the claims asserted against them. Using their status as the overwhelming majority of Litigation Trust beneficiaries, they removed the initial Trustee who had sued them. They also amended the Trust Agreement to provide that claims against them shall not constitute assets of the Trust, thereby ensuring that no successor Trustee could ever sue the Mezzanine Lenders.

The *quid pro quo* for this arrangement was that the Mezzanine Lenders granted control of the Trust's litigation decisions to the Mortgage Lender. They jointly amended the Trust Agreement to provide:

> Until the Special Servicer on behalf of the Mortgage Facility Trust has received distributions of Litigation Trust Proceeds satisfying its Tier 1 claim in full, plus reimbursement of any funding of the Litigation Trust provided by the Mortgage Facility Trust, the Special Servicer, and solely the Special Servicer, shall serve as an advisor to the Litigation Trustee with respect to all matters concerning the Litigation Trust. The Litigation Trustee shall consult with and obtain in advance the consent of the Special Servicer with respect to any material decisions made with respect to the Litigations, including without limitation the Litigation Trustee's decisions to retain professionals and any proposed settlements related thereto.

(**Exhibit K** hereto, at 3.) Thereafter, the Mortgage Lender caused the Trust to retain the

Mortgage Lender's own counsel. Venable LLP continues to represent the Mortgage Lender in the Reorganized Debtors' cases and in continuing litigation over the proceeds of Mr. Lichtenstein's guaranty as well as the Trust.

### C. Blackstone, Citibank and Bank of America Settle.

On June 20, 2013, the Trust (by now under the control of the Mortgage Lender) filed a Rule 9019 Motion seeking approval of settlements with Blackstone, Citibank and Bank of America. Under the terms of the settlements, Blackstone, which received almost $2 billion from the 2007 Transaction, and the investment banks that received tens of millions of dollars for packaging, promoting and financing the 2007 Transaction, received broad releases. In exchange, Blackstone settled the $2 billion of claims against it for $10 million, while Citibank paid $200,000 and Bank of America paid nothing. These recoveries significantly exceeded the amount of outstanding claims of creditors who did not participate in the 2007 Transaction and Financing, leaving no party able to confer standing on the Trust to attack the transfers that are the subject of the Amended Complaint.

## ARGUMENT

### I. LEGAL STANDARDS AND MATERIALS THAT MAY BE CONSIDERED IN ADJUDICATING THIS MOTION

#### A. Only Well-Pleaded Factual Allegations.

In deciding a motion to dismiss, courts will accept as true only well-pleaded factual allegations. *See Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003); *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998). A complaint that "consists of conclusory allegations unsupported by factual assertions" does not provide defendants with proper notice of the claims against them. *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 162 (S.D.N.Y. 2003). Consequently, courts will not

accept "conclusions of law or unwarranted deductions of fact" as true. *Dubai*, 256 F. Supp. 2d at 163 (*quoting First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)). If an affirmative defense negating a plaintiff's claims appears on the face of the complaint, the claims should be dismissed under Rule 12(b)(6). *See Color Tile*, 322 F.3d at 158 (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

### B. Claims Must be Plausible on Their Face.

In addition, on a Rule 12(b)(6) motion, a claim will be dismissed if it is not plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *LH 1440 LLC v. Lehman Commercial Paper, Inc., (In re Lehman Bros. Holdings Inc.)*, No. 09-1138, 2010 Bankr. LEXIS 2373, at *1-2 (Bankr. S.D.N.Y. July 21, 2010) (Peck, J.) (applying *Iqbal*; granting motion to dismiss). When determining plausibility, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.; *Twombly*, 550 U.S. at 555. Moreover, a reviewing court must "draw on its judicial experience and common sense" to determine whether the alleged facts state a plausible claim. *Iqbal*, 556 U.S. at 679; *see also In re Lehman Bros. Holdings Inc.*, 416 B.R. 392, 396 (Bankr. S.D.N.Y. 2009) ("[C]onsideration of the Motion [to Dismiss] necessarily leads to a review of the complaint within the commercial context" of the transaction in question). For claims alleging actual fraud (Counts 12 and 13), a heightened pleading standard applies. Fed. R. Civ. P. 9(b) (party alleging fraud must state with particularity the circumstances constituting the fraud).

### C. Documents and Information That May Be Considered in Adjudicating this Motion.

Courts must consider a complaint in its entirety as well as other sources courts ordinarily

examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007). The Court is empowered to take judicial notice of public filings, which, in an adversary proceeding, include those filed on its own docket in the underlying bankruptcy case. *Katzenstein v. VIII SV5556 Lender, LLC (In re St. Vincent's Catholic Med. Cntrs. of N.Y.)*, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 267-68 (S.D.N.Y. 2005) (a court may consider documents of which the plaintiff has actual notice and relied upon in drafting the complaint, and "may take judicial notice of public records and of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action.") (internal quotation marks and citation omitted); *Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 89-90 (Bankr. S.D.N.Y. 2001) (court may consider exhibits incorporated into complaint by reference, matters of which judicial notice may be taken, and items on which the plaintiff relied in drafting the complaint or that are an integral part of a claim).

In the context of bankruptcy litigation, a debtor's confirmed plan and related disclosure statement are included among such documents. *See Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 88 (S.D.N.Y. 2008) ("In a bankruptcy-related proceeding, the terms of a confirmed plan of reorganization are binding on parties to the plan and should be considered

by a court when deciding a motion to dismiss.").

Where the claims are based on a written instrument, a court may also consider the instrument even if it is not attached. *Id*. *See also E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000) (court may consider documents attached to the complaint in deciding a motion to dismiss); *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir. 1998) (court may consider documents incorporated by reference in the complaint when deciding a motion to dismiss); *Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir. 2000) (contracts integral to the claims were properly considered on motion to dismiss).

### D. Consideration of the Prior Complaints is Permitted – And in This Case Essential.

"The amendment of a pleading does not make it any less an admission of the party." *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 707 (2d Cir. 1989). Hence, courts in this district regularly consider allegations in a non-operative complaint as admissions even at the motion to dismiss stage. *See Poindexter v. EMI Record Group, Inc.*, No. 11 Civ. 559, 2012 U.S. Dist. LEXIS 42174, at *7 (S.D.N.Y. Mar. 27, 2012) ("In determining a Rule 12(b)(6) motion to dismiss ... even though the [a]mended [c]omplaint is the operative pleading, the [c]ourt may still credit admissions in the original complaint" ); *Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003), *abrogated on other grounds by Richardson v. Goord*, 347 F.3d 431, 433 (2d Cir. 2003) ("Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings. As such, the Court may consider them on a motion to dismiss under Rule 12(b)(6).") (citations omitted); *Springle v. United States*, 11 Civ. 8827 (NRB), 2013 U.S. Dist. LEXIS 20365, at *17 (S.D.N.Y. Feb. 14, 2013) (considering allegations in a withdrawn complaint as admissions on a motion to dismiss); *but see TufAmerica, Inc. v. Diamond*, 12 Civ. 3529, 2013 U.S. Dist. LEXIS 129128, at *25 (S.D.N.Y. Sept. 10, 2013).

In amending its complaints, the Trust engaged in some inventive drafting to try to obscure the integral and undisputed role of the Mortgage Lender in the challenged transactions. For example, the prior complaints alleged that "[o]n or about November 27, 2007, DL-DW took possession of the Floor Certificates, **which were transferred by Wachovia** in exchange for the agreement by the mortgage borrowers and the Mezzanine Borrower to an amendment of the mortgage debt and the Mezzanine Debt." (Prior Amended Complaint ¶ 262, emphasis added). The Amended Complaint has been rewritten in the passive voice: "[O]n or around November 5, 2007, the LIBOR Floor Certificates were issued and transferred directly to DL-DW, an ultimate equity owner of the Debtors." (AC ¶ 138.) The Trust proceeded to argue in support of its motion to amend that, contrary to the Lightstone Defendant's argument that the claims are futile because the Mortgage Lender was the transferor of the Floor Certificates: "The proposed amended complaint says no such thing: it asserts that the certificates were transferred to DL-DW in November 2007 but does not specify by whom[.]"[27] This is unseemly.

As another example, the prior complaints alleged that the cash management account from which the management fees and coupon payments were made "was in the name of 'ESP P Portfolio LLC [a debtor] for the Benefit of Wachovia Bank.' The Cash Management Account was located at Wachovia at all times relevant to this Complaint" and "[t]he Mezzanine Loan agreements acknowledged that the Cash Management Account was controlled by the mortgage lenders." (Prior Amended Complaint ¶¶ 116, 118). These allegations, too, were simply erased, not because they were mistaken, but because they help defeat the Trust's claims. (*See* AC ¶ 118) (alleging merely that "revenue and other cash received for the Debtors' operations were funneled into an integrated cash management account" with no mention of the Mortgage Lender and its

---

[27] Reply in Support of Motion for Leave to Amend, 11-ap-02398 Dkt. No. 205, at 12.

control over the account.)  In fact, the Prior Amended Complaint contained eighteen (18)

allegations about Wachovia as Mortgage Lender; the Amended Complaint contains <u>zero</u>.

Although the Trust already has been granted leave to amend (and we are not rearguing

that decision here), a decision respecting a motion to amend in *Enron* is instructive for purposes

of this Rule 12 motion.  In *Enron*, like here, a plaintiff sought to amend a complaint to omit

certain allegations that would defeat the plaintiff's claims.  *In re Enron Corp.*, 370 B.R. 583,

597-98 (Bankr. S.D.N.Y. 2007).  Judge Gonzalez observed that "a court may refuse to allow an

amendment where, by omitting allegations from the previously filed complaint, the plaintiff

seeks to 'erase' admissions that are contained in it."  *Id.* at 597 (quoting *Austin v. Ford Motors

Inc.*, 149 F.3d 148, 155 (2d Cir. 1998)).  This, he explained, is because a plaintiff may not

"manipulate the pleadings by omitting the allegations that defeat its claim."  *Id.*  Rather, a party

that wants to erase its previous allegations that defeat its claim for relief "must present a

legitimate explanation for its previous inclusion, such as it having been the result of mistake or

inadvertence."  *Id.* at 597-98.

There were no mistakes respecting the Mortgage Lender's role in the 2007 Transaction,

the existence and terms of the Cash Management Agreement, the Mortgage Lender's control

over the cash management account, and the Mortgage Lender's direct and proximate

participation in the challenged transfers.  Thus, it is completely appropriate, and indeed required

by the interests of justice, for the Court to treat the erased allegations of the prior complaints as

judicial admissions as permitted by the authorities cited above.

## II. THE CLAIMS RELATING TO THE COUPON PAYMENTS AND THE FLOOR CERTIFICATES ARE BARRED BY SECTION 546(E) OF THE BANKRUPTCY CODE

### A. Section 546(e) Requires the Dismissal of Counts 3, 13, 14 and 15 as to the Floor Certificate Transfers and the Series A Unit Payments.

Counts 3 and 15 of the Amended Complaint seek to avoid as constructive fraudulent transfers under section 544(b) of the Bankruptcy Code (i) the Floor Certificate Transfer, and (ii) a series of payments the Debtors made to the holders of "Series A" hybrid securities (the "Series A Unit Payments" and, together with the Floor Certificate Transfer, the "Securities Contract Transfers").  Count 14 of the Amended Complaint seeks to avoid the Securities Contract Transfers as constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.  Count 13 of the Amended Complaint seeks to avoid the Securities Contract Transfers as intentional fraudulent transfers under section 544(b) of the Bankruptcy Code.  All of these counts must be dismissed as to the Securities Contract Transfers because, to the extent they hypothetically might otherwise be avoidable, the Securities Contract Transfers fall within the safe harbor provision of Bankruptcy Code section 546(e).

Section 546(e) prohibits the avoidance of margin and settlement payments and transfers in connection with a securities, commodity or forward contract (other than as intentional fraudulent transfers under section 548(a)(1)(A)), if made by, to or for the benefit of a host of market institutions, including financial institutions and financial participants.  11 U.S.C. § 546(e).  "Congress enacted § 546(e)'s safe harbor in 1982 as a means of 'minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.'"  *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) (*quoting Kaiser Steel Crop. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir. 1990).  Congress intended that section 546(e) "ensure that honest

investors will not be liable if it turns out that a leverage buyout (LBO) or other standard business transaction technically rendered a firm insolvent." *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 748 (7th Cir. 2013) (Easterbrook, J.).

Section 546(e) provides that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). Thus, for the Securities Contract Transfers to fall within the safe harbor of section 546(e), they must have been made: (1) by, or to, or for benefit of, a financial institution; and (2) in connection with a securities contract. Both elements are satisfied.

### 1. The Securities Contract Transfers Were Made by or to or for the Benefit of a Financial Institution.

The Bankruptcy Code defines a Financial Institution as:

> (A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or

> (B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940.

11 U.S.C. § 101(22).

Each of the Floor Certificate Transfer and the Series A Unit Payments were made by, to

or for the benefit of a Financial Institution. The Floor Certificates were, per the Amended Complaint, the "Class X-A and X-B certificates from the mortgage securitization[.]" (AC ¶ 137). The certificates themselves are titled, respectively:

> WACHOVIA BANK COMMERCIAL MORTGAGE TRUST
> COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES
> SERIES 2007-ESH, CLASS X-A CERTIFICATE

and:

> WACHOVIA BANK COMMERCIAL MORTGAGE TRUST
> COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES
> SERIES 2007-ESH, CLASS X-B CERTIFICATE

(*See* Ex. G.) The certificates further state that "The Trust Fund was created, and the Trust Asset is to be serviced, pursuant to the Trust and Servicing Agreement ... by and among Wachovia Large Loan, Inc., as Depositor, Wachovia Bank, National Association, as Servicer and Special Servicer and Wells Fargo Bank, N.A. as Trustee." (*Id.*)

The Trust judicially admitted that the Floor Certificates were transferred to DL-DW by Wachovia:

> On or about November 27, 2007, DL-DW took possession of the LIBOR Floor Certificates, which were transferred by Wachovia in exchange for the agreement by the mortgage borrowers and the Mezzanine Borrower to an amendment of the mortgage debt and the Mezzanine Debt.

(*See* Prior Amended Complaint (Ex. A) ¶ 262.) The Amended Complaint also alleges that the August 31, 2007 Letter Agreement provided that "the lenders agreed to issue to the Debtor borrowers (or their designees) Class X-A and X-B certificates from the mortgage securitization[.]" AC ¶ 116. The Letter Agreement (**Exhibit L** hereto) is addressed to financial institutions, including Wachovia.

The Trust admitted that the Series A Unit Payments were made from a cash management account created and titled "for the Benefit of Wachovia Bank" and which "was located at

Wachovia at all times relevant to [the] Complaint." (Prior Amended Complaint ¶ 116; Fraudulent Transfer Complaint ¶ 113; Fiduciary Duty Complaint ¶ 194.) Wachovia obviously is a Financial Institution.[28] Accordingly, because Wachovia issued and transferred the Floor Certificates, and because the Series A Unit Payments were made by Wachovia from an account "for the benefit of Wachovia" at Wachovia Bank, the requirement that the Securities Contract Transfers were made by a Financial Institution is satisfied.[29]

### 2. The Floor Certificate Transfers and the Series A Unit Payments Were Made in Connection With a Securities Contract.

The Bankruptcy Code defines "Securities Contract" as, among other things,

(i) a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101);

\* \* \*

(vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

(viii) any combination of the agreements or transactions referred to in this subparagraph;

(ix) any option to enter into any agreement or transaction referred to in this subparagraph.

11 U.S.C. § 741(7). As this Court has held, "[t]he plain language of section 741(7) is very broad

---

[28] An entity's status as a financial institution is a matter that is appropriate for judicial notice. *Enron v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006).

[29] It is irrelevant whether the transferred securities or cash was beneficially owned by the Financial Institution. Case law is clear that "a transfer may qualify for the section 546(e) safe harbor even if the financial intermediary is merely a conduit." *Official Comm. of Unsecured Creditors of Quebecor World (U.S.A.) Inc. v. Am. Life Ins. Co. (In re Quebecor World (U.S.A.) Inc.)*, 719 F.3d 94, 99 (2d Cir. 2013).

in its application, and encompasses virtually any contract for the purchase or sale of securities

....” *Lehman Bros. Holdings v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings)*, 469

B.R. 415, 438 (Bankr. S.D.N.Y. 2012).

Here, the Floor Certificate Transfer was made in connection with “a contract for the

purchase, sale or loan of a security.” Clearly, the Floor Certificates were securities. The

Bankruptcy Code defines “Security” as “includ[ing]” a “(i) note; (ii) stock; (iii) treasury stock;

(iv) bond; (v) debenture; (vi) <u>collateral trust certificate</u>; [and] ... (xiii) interest of a limited partner

in a limited partnership ....” 11 U.S.C. § 101(49)(A) (emphasis added). As a collateral trust

certificate issued by the Mortgage Trust, the Floor Certificate is a security under the Bankruptcy

Code. This fact appears on the face of the Floor Certificates themselves. (*See* Ex. G.)

Furthermore, the Trust alleged that “The LIBOR Floor Certificates were investment grade

(AAA) ...” (AC ¶ 137), an allegation that can only apply to a security.[30]

Furthermore, the Amended Complaint alleges that the Floor Certificates were transferred

in exchange for adjusting terms in the Debtors’ loan agreement for the purpose of making the

certificated interests in the debt more attractive to potential buyers. (*Id.*) Accordingly, the Floor

Certificate Transfer also was a transfer (of a security) in connection with a securities contract.

The Series A Unit Payments also were transfers in connection with a securities contract.

Each of the recipients of the Series A Unit Payments purchased their respective Series A Units in

connection with the 2007 Transaction. (*Id.* ¶¶ 115-17.) The Series A Units were hybrid

securities that had features of a debt security (mandatory periodic payments at a fixed annual rate

with priority of payment above certain other debt obligations pursuant to the Cash Management

Agreement) and equity rights in BHAC. (*Id.* ¶ 146; *see also* Second Amended and Restated

---

[30] It is also an allegation that refutes the Trust’s allegations of the borrowers’ insolvency at the time of the transfer.

Limited Liability Company Agreement of BHAC Capital IV, L.L.C. (Ex. J) (establishing rights and properties of the Series A Securities.)  Notes and membership units in an LLC are both "securities" under the Bankruptcy Code.  *See* 11 U.S.C. § 101(49)(A)(i); *O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013) ("[A]n interest of a member in an LLC is a 'security'" under section 101(49)(A), analogous to a interest of a limited partner in a limited partnership under 101(49)(A)(xiii)).

The Series A-1 Units required certain mandatory periodic payments.  (*See* Ex. G at 3-4.)  When the Series A Units were authorized by the Mortgage Lender and other lenders in connection with the 2007 Transaction, the payment rights were made an integral part of the Cash Management Agreement, such that when the securities were acquired by the applicable Defendants, the mandatory payment requirements were known, understood and constituted an expected and valuable part of the consideration for the purchase of the securities.  Indeed, significant funds for payment of the coupons were prefunded in a special "Preferred Equity Reserve Account" as an integrated element of the 2007 Transaction, and equity holders were granted the right "to instruct that distributions be made from that reserve account to them" was one of the rights carried by the securities.  (AC ¶ 182.)  Thus, Series A Unit Payments were made "in connection with" the securities contract – *i.e.*, the purchase of the Series A Units by the applicable Defendants.

Importantly, "the words 'in connection with' are to be interpreted liberally" and construed "broadly to mean 'related to.'"  *Lehman*, 469 B.R. at 442.  Also, the fact that the Series A Unit Payments were made after the applicable Defendants acquired their Series A Units is of no matter.  As this Court has held, "[t]he 'in connection with' requirement of section 546(e) does not contain any temporal or existential requirement that a transfer must be 'in connection with'

then-outstanding legal exposure.  Indeed, section 546(e) does not include any language that refers either to exposure or timing."  *Id.*  Further, "any payments and any lien that the [bank] received in connection with the securities contract would not be avoidable, because they were transfers."  *Id.* at 446 (*quoting Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414, 430 (Bankr. S.D.N.Y. 2011)).  Thus, the Unit A Series Payments were made in connection with a securities contract.  Accordingly, section 546(e) bars Counts 3, 13, 14 and 15 as to the Securities Contract Transactions.

### B.    Section 546(e) Requires Dismissal of Counts 1, 2 and 4 as to the Securities Contract Transfers.

Counts 1 and 2 of the Amended Complaint seek to recover alleged illegal dividends or distributions pursuant to section 541 of the Bankruptcy Code and applicable state law.  Count 4 of the Amended Complaint is a claim for unjust enrichment.  All of these claims are based on exactly the same facts and seek exactly the same relief as the fraudulent transfer claims.  Accordingly, to the extent Counts 1, 2 and 4 relate to the Securities Contract Transfers, they too must be dismissed because these state law claims are preempted by section 546(e).

"Federal preemption of a state statute can be express or implied, and generally occurs: where Congress has expressly preempted state law ... or where federal law conflicts with state law."  *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007) (citations omitted).  Federal law expressly preempts a state law where "Congress' command is explicitly stated in the statute's language."  *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977).  When a statute does not have explicit language preempting state law, there are two circumstances where courts will find preemption:

> (i) conflict preemption, where the state law and federal law directly conflict such that the two together cannot coexist either because "compliance with both federal and state regulations is a physical impossibility" or there is "an inevitable collision between the two schemes of regulation."; and, (ii) field preemption,

where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co.)*, 274 B.R. 71, 96 (D. Del. 2002) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963); *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381-82 (3d Cir. 1999)).

In *Contemporary Indus. Corp. v. Frost (in re Contemporary Indus. Corp.)*, 564 F.3d 981 (8th Cir. 2009), the Eighth Circuit held that state law claims for unjust enrichment and illegal and/or excessive shareholder distributions were barred by section 546(e), as they involved essentially the same facts and sought the same remedy as fraudulent transfer claims subject to section 546(e), ruling that "allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section." *Id.* at 988.

Similarly, in *In re Hechinger*, the Delaware District Court ruled that an unjust enrichment claim was barred by section 546(e), based on the fact that the unjust enrichment claim sought "the same remedy ... as that sought under its fraudulent transfer claim[.]" The Court ruled:

> If the court were to entertain the Committee's unjust enrichment claim, a claim that effectively acts as an avoidance claim against the shareholders in a transaction that the court has already found is an unavoidable settlement payment, and allowed the Committee to circumvent section 546(e) by asserting a state law claim for unjust enrichment based on the same facts and seeking essentially the same relief, the purpose of section 546(e) would be frustrated. Claims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless. Because the Committee's unjust enrichment claim effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts with the remedial exemption set forth in Code section 546(e). Allowing recovery for unjust enrichment here would implicate the same concerns regarding the unraveling of settled securities transactions more than one year after settlement, which is precisely the result that section 546(e) precludes.

274 B.R. at 96. These rulings apply with equal force to Counts 1 and 2 (which are illegal

30

dividend claims) and Count 4 (which is an unjust enrichment claim), as they arise under the same

facts and seek the same remedy as the fraudulent transfer Counts in the Amended Complaint.

With respect to the Security Contract Transfers, Counts 1, 2 and 4 arise from the same

facts as the fraudulent transfer Counts. For example, Count 3, the first of the fraudulent transfer

counts, after repeating and realleging the prior paragraphs, describes the transfers that are the

subject of Count 3: "Each of the transfers of property, funds, or obligations alleged in Count

One." (AC ¶ 226). Each of Counts 2 and 4, along with the other fraudulent transfer counts (*i.e.*,

Counts 12-15), have the same or similar language and specify the same transfers: Count 2, ¶ 218

("Each of the illegal dividends or distributions alleged in Count One ...."); Count 4, ¶¶ 235-56

(specifying the amounts transferred in connection with the Floor Certificate Transfer and the

Series A Unit Payments by defendant); Count 9, ¶¶ 293-97 (specifying the amounts transferred

in connection with the Floor Certificate Transfer); Count 12, ¶ 327 ("Within two years before the

Petition Date, the Debtors made all or nearly all of the wrongful dividends, distributions and

other transfer discussed herein."); Count 13, ¶ 335 (same); Count 14, ¶ 344 (same); Count 15,

¶ 352 (same).

Similarly, Counts 1, 2 and 4 seek the same relief as the fraudulent transfer Counts,

recovery of the transfers: Count 1, ¶ 216 ("Plaintiffs are entitled to recover these transfers ....");

Count 2, ¶ 224 ("Defendants are each individually liable for repayment of the unlawful dividends

or distributions set forth above ...."); Count 3, ¶ 232 ("Plaintiffs are entitled to recover the

amount of each of the above transfers ...."); Count 4, ¶ 258 (Seeking "restitution of all of the

above monies and assets received by each of the above Defendants, directly and indirectly, from

the Debtors"); Count 12, ¶ 333 ("[T]he transfers and obligations described herein should be

avoided as intentionally fraudulent transfer and/or obligations such that, pursuant to § 550 of the

Bankruptcy Code, Plaintiffs may recover from [various Defendants] the sums transferred ....");

Count 13, ¶ 342 (same); Count 14, ¶ 350 ("[T]he transfers and obligations should be avoided

pursuant to § 548(a)(1)(B) of the Bankruptcy Code, such that, pursuant to § 550 of the

Bankruptcy Code, Plaintiffs may recover from [various Defendants] the sums transferred ....");

Count 15, ¶ 360 ("[T]he transfers and obligations discussed herein should be avoided as

constructively fraudulent transfers, conveyances and/or obligations such that, pursuant to § 550

of the Bankruptcy Code, [SIC] may recover from [various Defendants] the sums transferred

...."). Accordingly, Counts 1, 2 and 4 are barred and preempted by section 546(e). Like the

plaintiffs in *Contemporary Indus. Corp.* and *In re Hechinger*, the Plaintiffs here cannot bring the

claims that Congress forbid under section 546(e) by calling them unjust enrichment and illegal

dividend claims.

In sum, section 546(e) directly bars Counts 1, 2, 3, 4, 13, 14 and 15 with respect to the

transfers of the Floor Certificates and the Series A Unit Payments. (Those Counts must also be

dismissed as to the Management Fee transfers for other reasons stated below.)

## III.     THE TRUST DID NOT, AND CANNOT, ALLEGE STANDING TO ASSERT THE CLAIMS AGAINST THE LIGHTSTONE DEFENDANTS

### A.     The Prerequisites to Standing.

Article III standing is a threshold requirement for federal court jurisdiction. *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). Under Article III of the Constitution,

federal judicial power extends only to "Cases" and "Controversies." U.S. Const., art. III, § 2,

cl. 1. "'No principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal-court jurisdiction to actual cases or

controversies.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare*

*Rights Org.*, 426 U.S. 26, 37 (1976)). "As the Supreme Court has noted, the standing inquiry is

essentially 'a jurisdictional prerequisite to a federal court's deliberations.'" *Krys v. Sugrue* (*In re Refco Sec. Litig.*), No. 09-md-1902, 2010 U.S. Dist. LEXIS 41386, at *41 (S.D.N.Y. Feb. 3, 2010) (quoting *Hodel v. Irving*, 481 U.S. 704, 711 (1987)).

"[I]n order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Commc'n Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (*citing Lujan*, 504 U.S. at 560-61) (internal quotations and alterations omitted); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

The party invoking jurisdiction bears the burden of establishing these elements, which are the "irreducible constitutional minimum" requirements of standing. *Lujan*, 504 U.S. at 560-61. Accordingly, "on a motion to dismiss, it is the burden of the party who seeks standing to sue clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Bogart v. Isr. Aero. Indus. Ltd.*, No. 09-Civ-4783, 2010 U.S. Dist. LEXIS 12263, at *8-9 (S.D.N.Y. Feb. 5, 2010) (citations omitted) (quoting *Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994)). "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (U.S. 1990) (citations omitted), *overruled on other grounds by City of Littleton v. Z. J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004).

Plaintiffs cannot rely on conclusory allegations of injury to establish standing to sue. *Id.* Instead, plaintiffs must "allege facts essential to show jurisdiction. If they fail to make the

necessary allegations, they have no standing." *Id.* (internal quotation marks omitted).  Where, as

here, a defendant moves to dismiss with a factual challenge because no facts (alleged or not)

exist that could ever support standing, "no presumptive truthfulness attaches to the complaint's

jurisdictional allegations; rather, the burden is on the plaintiff to satisfy the Court, as fact-finder,

of the jurisdictional facts." *Tasini v. New York Times Co.*, 184 F. Supp. 2d 350, 353 (S.D.N.Y.

2002) (citations omitted); s*ee also Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.

2008) ("jurisdiction must be shown affirmatively, and that showing is not made by drawing from

the pleadings inferences favorable to the party asserting it") (internal quotations and citations

omitted).

A plaintiff "must demonstrate standing for each claim he seeks to press."  *Daimler-*

*Chrysler Corp.*, 547 U.S. at 352; *see also Kiryas Joel Alliance v. Village of Kiryas Joel*, 495 Fed.

App'x 183, 189 (2d Cir. 2012) (standing must be demonstrated for each claim and each form of

relief sought).  Thus, should the Court find that the Trust has standing to assert certain of its

claims, it does not follow that the Trust can assert all of the claims in the Amended Complaint,

*i.e.*, claims that require the existence of an unpaid innocent creditor of a transferor.

In deciding the motion, the court "may consider affidavits and other materials beyond the

pleadings to resolve the jurisdictional issue."  *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107,

110 (2d Cir. 2004); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In

resolving a motion ... under Rule 12(b)(1), a district court ... may refer to evidence outside the

pleadings.").

**B.      The Complaints Fail to Allege Facts Establishing That any Debtor Was
Injured and That Recovery Would Benefit Creditors of That Debtor.**

The Complaint is deficient because it lumps all of the Debtors together without alleging

which one made the challenged transfers, whether that Debtor was insolvent (for claims

requiring insolvency or lack of surplus), and whether that Debtor had any creditors who were injured by the transfer and did not (like the Mortgage Lender) consent to or actually participate in the alleged conduct.  It is a fatal deficiency because the Trust and the Mortgage Lender, like every other party involved with the Debtors, knows that those Debtors which plausibly could be alleged to have made transfers were solvent at the time of the transfers and/or never had any creditors except the Mortgage Lender.  (Below, we also address below the Trust's new theory that this deficiency can be overcome by ignoring the separateness of the Debtor entities.)

Complaints brought on behalf of many plaintiffs that fail to identify which plaintiff was harmed are deficient.  *See Bautista v. Los Angeles County*, 216 F.3d 837, 840 (9th Cir. 2000) (finding a complaint on behalf of fifty-one plaintiffs that alleged three claims for relief based on three types of discrimination to be deficient, explaining that a plaintiff's individual right to relief "depends upon proof of the operative facts giving rise to an enforceable right in favor of that plaintiff" and that "each plaintiff's claim being founded upon a separate transaction or occurrence, it is properly 'stated in a separate count ... [because] a separation facilitates the clear presentation of the matters set forth.'") (*quoting* Fed. R. Civ. P. 10(b)); *Erone Corp. v. Skouras Theatres Corp.*, 19 F.R.D. 299, 300 (S.D.N.Y. 1956) (requiring plaintiffs to amend the complaint because "[n]ot only have the plaintiffs been grouped together in a single count although their claims are admittedly individual and separate but their business activities have likewise been lumped together in a catch-all allegation that they are and have been 'engaged in the business of managing, operating, leasing, owning and building motion picture theaters and exhibiting motion picture films'" and finding that "[i]t is apparent that there may be defenses available to the defendants which are applicable to one or more plaintiffs but not to the others…"); *see also* James Wm. Moore, et al., Moore's Federal Practice, § 10.03[2][a] (3d ed. 1997) ("Separate

counts will be required if necessary to enable the defendant to frame a responsive pleading or to enable the court and the other parties to understand the claims.").

In addition to the constitutional requirements, the Trust also must satisfy "prudential standing" restrictions. This requires that a plaintiff must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This is necessary to enforce the principle that "as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted." *Coal Operators and Associates, Inc. v. Babbitt*, 291 F.3d 912, 916 (6th Cir. 2002) (internal quotation marks omitted); *see also Center for Reprod. Law v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002) ("Pursuant to the doctrine of prudential standing, a court must ask whether a plaintiff's claim rests on the legal rights of a third party, asserts only a generalized grievance, or asserts a claim that falls outside the zone of interests protected by the legal provision invoked.").

The Trust has failed to allege "facts essential to show jurisdiction." *FW/PBS, Inc.*, 493 U.S. at 231 (internal quotation omitted). The most blatant defect is the failure to allege an "injury in fact" to any particular Debtor. The Trust does not even attempt to satisfy this burden. Rather, the Trust lumps all 75 Debtors together and, in many cases, lumps all of the defendants together, without putting the defendants (or the Court) on notice of the bases, if any, for the Trust's standing to challenge any given act or omission targeted in the Complaints. The Trust also fails to allege a "fairly traceable" connection between an alleged injury in fact and the alleged conduct of any given defendant, and fails to allege that it is likely that any injury will be remedied by the relief the Trust seeks in bringing suit.

The distinctions among Debtors – which ones made transfers and which ones did not –

are not merely technical but are meaningful and outcome-determinative, because the Trust's

claims evaporate if the Debtors whose assets were used to fund the challenged transfers were not

Debtors that became insolvent or were Debtors whose creditors consented to or participated in

the transfers.

Second Circuit law is especially clear that avoidance claims may only be brought for the

benefit of unpaid creditors of the actual transferor, not for unpaid creditor of its affiliates.

District Judge McKenna in the *Adelphia* cases dismissed a litigation trust's bankruptcy claims

for lack of standing where there were unpaid creditors within the debtors' corporate structure but

no unpaid claims against the particular debtors that made the challenged transfers. *Adelphia*

*Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. June 18, 2008), *aff'd*, 379 Fed.

App'x 10 (2d Cir. 2010) (adopting reasoning of District Court). In that case, as here, a litigation

trust had succeeded to various avoidance claims to recover transfers made by certain debtors.

The transferor debtors had significant debt on the petition date, but the confirmed plan paid the

transferor debtors' creditors in full out of proceeds from asset sales. The court found that

"[g]iven that the creditors of the [transferor] Debtors have received full payment with interest

under the Plans, it follows that these creditors do not stand to benefit from recovery on the

Bankruptcy Claims at issue here, and the [litigation trust] does not have standing to bring these

claims on their behalf." *Id*. at 95. Adelphia's litigation trust argued that there were still existing

claims at non-transferor debtor entities within the enterprise that would have benefitted from the

avoidance action, but Judge McKenna rejected the argument, observing that "[b]ankruptcy courts

in this circuit have repeatedly interpreted §§ 544 and 548 [to hold] that the Bankruptcy Code's

avoidance provisions can only be asserted to benefit a creditor of the debtor in question." *Id*. at

94. *See also In re Adelphia Comm. Corp. Sec. Litig.*, 2011 U.S. Dist. LEXIS 69169 (S.D.N.Y.

June 24, 2011) (reaching same conclusion).

The Amended Complaint continues to fail to allege an "injury in fact" to any particular Debtor. The Trust makes impossible allegations that all of the Debtors did or suffered the acts in the Amended Complaint. (*See, e.g.*, AC ¶ 138 ("The Debtors never received the LIBOR Floor Certificates, even though they made the pertinent concession and all payments under the loan agreements."); *id.* ¶ 143 ("The Debtors, directly or indirectly through other entities in the Debtors' corporate structure, made the following distributions to equity holders ...."); *id.* ¶ 144 ("[t]he Debtors distributed a total of $6,166,666.666 to Series A-2 Unit Holders); *id.* ¶ 145 ("On information and belief, [a certain distribution] was made from the Debtors' funds ...."); *id.* ¶ 146 ("[t]he Debtors distributed approximately $7,656,666,63 on account of equity holdings in the Debtors ..."); *id.* ¶ 205 ("the Debtors did not have a surplus and/or were insolvent."). (*See further*, without limitation, AC at ¶¶ 162, 166, 168, 172, 200, 208, 219, 252-56.) *See also Ochre LLC v. Rockwell Architecture Planning & Design*, 12 CIV. 2837, 2012 U.S. Dist. LEXIS 172208, at *16-17 (S.D.N.Y. Nov. 28, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants. . . . A plaintiff cannot merely 'lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" (quoting *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001))).

As a result, the Trust has failed to adequately plead any of its claims. There is no way to tell what Debtor was (allegedly) harmed by what transfer or breach of duty. The 75 Debtors include an array of types of entities, including holding companies, bankruptcy remote special purpose mezzanine borrowers, property owners, and operating lessees.[31] Given the divergent

---

[31] *See* Amended Complaint Ex. A; *see also*, *e.g.*, Prior Amended Complaint ¶ 110 ("The mortgage loan agreement was between the mortgage lenders and twenty-one mortgage borrowers .... All but three of the mortgage borrowers

types of assets and liabilities of each Debtor – some of which have never had any debt, some of which never had any assets, some of which have no unpaid creditors, and some of which never could have funded any of the alleged transfers – it is inconceivable that any act or omission alleged in the Complaints could have been a breach of a duty to or inflicted harm upon all 75 Debtors.

But even more fatal, the actual claims for relief, which begin at page 68 of the Amended Complaint, for the most part do not even plead (however inadequately) that "the Debtors" made transfers. Rather, the Trust makes its allegations in the passive voice: "Floor Certificates were diverted from the Debtors and assigned to DL-DW" (AC ¶ 200); "the Debtors funds were used" (*id*. ¶ 208) that "Lichtenstein or a Lichtenstein affiliate received the Management Fee Transfers" (*id.* ¶ 213); *see also* AC ¶¶ 204, 211, 240, 257.

The Trust did not even plead on behalf of lumped Debtors here because it could not. The undisputed and admitted facts are that the Mortgage Lender made the transfers from the Cash Management Account it controlled as to the Series A Unit Payments and Management Fees, and from its own assets as to the Floor Certificates.

### C. The Trust Cannot Cure the Inadequacy of Its Complaint By Disregarding the Separate Existence of the Debtor Entities.

The Debtors have been administered in this Court for years as separate entities and always treated as such by all of their stakeholders. Yet, apparently conceding that it cannot plead valid claims if it alleges which of the Debtors made transfers, were insolvent, or otherwise were injured, the Trust has instead dotted the Amended Complaint with generic allegations[32] that

---

owned properties. The parent entities of the three non property-owning mortgage borrowers were also parties to, but not borrowers under, the mortgage loan agreement. In addition, four Debtor operating lessee entities were parties to, but not borrowers under, the mortgage loan agreement."), and ¶ 112 (describing mezzanine borrower entities).

[32] *See, e.g.*, AC ¶ 14 ("the insiders who owned and managed the Debtor companies consistently and regularly disregarded their corporate forms, such that the Debtors may and should be treated as a single corporate entity.").

apparently are intended to support a new theory that the Debtors' corporate separateness can be disregarded under state veil piercing theories or, perhaps, substantive consolidation. This ploy cannot succeed for multiple reasons: (1) Delaware law, which applies here, does not permit reverse veil piercing which is what the Trust seeks, (2) the Trust has not, and cannot, satisfy the legal requirement of alleging that the Debtors' REIT and/or mezzanine structure was in and of itself a fraud, (3) consolidation or veil piercing is untimely and a collateral attack on the Plan and multiple orders entered by this Court, (4) consolidation or veil-piercing is contrary to the Trust's prior judicial admissions, and (5) the theory is facially implausible given the easily distinguishable role, functions and creditor constituencies of the Debtors.

### 1.    The Debtors' Clearly Delineated Organizational Structure.

The entire chapter 11 case was administered on the basis that the Extended Stay business was organized as a REIT and a mezzanine finance structure. While numerous examples of this exist, the following description of the capital structure is taken from the Disclosure Statement, of which the Court can take judicial notice,[33] and judicial admissions found in the Trust's complaints.[34]

The organizational chart that is Exhibit A to the Amended Complaint depicts Extended Stay as a model mezzanine-financed REIT, as is customarily required by lenders (and in fact was required by the lenders here) to enable them to securitize senior debt, isolate the mezzanine debt from operating assets to preserve its junior priority, and have the enterprise qualify for the tax benefits of a REIT by separating real property ownership from operations. As such, the Debtors are readily separable into standard categories in accordance with their distinct roles, separate assets and separate creditors, as has been acknowledged throughout their chapter 11 cases, as

---

[33] *See Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 84 (S.D.N.Y. 2008).

[34] *See Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 707 (2d Cir. 1989).

follows:

       i.     <u>Property Owners</u>.  There were 18 entities that owned the hotel properties.[35]  Each was a borrower under the Mortgage Loan Agreement, and their respective properties secured the Mortgage Loan.  (*See* Ex. H at 27, AC Ex. A.)  Since they own real properties with recorded titles, there is no room for confusions as to which Property Owners owned which hotels.

       ii.     <u>Non Property Owner Borrowers</u>.  Three additional entities – ESA Canada Properties Borrower L.L.C., ESA MD Borrower L.L.C., and ESA P Portfolio MD Borrower L.L.C. – did not own property but were borrowers under the Mortgage Loan documents.  (*See* AC Ex. A.)

       iii.     <u>Operating Lessees</u>.  Four Debtors – ESA Canada Operating Lessee Inc., ESA 2005 Operating Lessee Inc., ESA Operating Lessee Inc., and ESA P Portfolio Operating Lessee Inc. – were the operating lessees.  (*See id.*)  These entities were not borrowers under the Mortgage Loan and they did not own the properties.  (*Id.*)  However, these were the entities through which the properties were operated, and hence operating revenues were received by these entities, and most non-financing debt was incurred – and subsequently repaid – at these entities.  (Ownership and operation of property is separated in a REIT.)

       iv.     <u>Mezzanine Borrowers</u>.  There were thirty Mezzanine Borrowers, divided into ten tiers of structural priorities, as shown on Exhibit A to the Amended Complaint.  (*See* AC Ex. A).  Each such entity has the word "Mezz" in its name, along with a numeral establishing its respective place in the finance hierarchy (e.g., Mezz 2, Mezz 3, etc.).  *See id.*  Each set of three structurally parallel Mezzanine Borrowers issued its own tier of Mezzanine Debt.  (Prior Amended Complaint ¶ 112; Fraudulent Transfer Complaint ¶ 109; Fiduciary Duty Complaint ¶ 191).  The Mezzanine Debtors did not own properties and did not have any business or operations.  (Prior Amended Complaint ¶ 112; Fraudulent Transfer Complaint ¶ 110.)  Their only function was to facilitate the Mezzanine Debt by separating the Mezzanine Debt from the operating and property-owning entities, and separating each of the ten tiers of Mezzanine Debt from each other in order to maintain the strict priorities of the debt structure.  (Prior Amended Complaint ¶ 112; Fraudulent Transfer Complaint ¶ 110.)

       v.     <u>BHAC and Homestead</u>.  Entities referred to as BHAC and Homestead held the silos of Mezzanine Borrowers.  BHAC and Homestead owned trademarks and licenses used in the operation of Extended Stay's business.  The trademarks and licenses were pledged as collateral for the Mortgage Loan.  BHAC was not a Debtor.  In prior complaints, the Trust alleged that following the 2007 Transaction

---

[35] These are the Debtors: ESA 2005 Portfolio L.L.C., ESA 2005- San Jose L.L.C., ESA 2005- Waltham L.L.C., ESA Acquisition Properties L.L.C., ESA Alaska L.L.C., ESA FL Properties L.L.C., ESA MN Properties L.L.C., ESA P Portfolio L.L.C., ESA P Portfolio PA Properties L.L.C., ESA P Portfolio TXNC Properties L.P., ESA PA Properties L.L.C., ESA Properties L.L.C., ESA TX Properties L.P., ESH/Homestead Portfolio L.L.C., ESH/HV Properties L.L.C., ESH/MSTX Property L.P., ESH/TN Properties L.L.C. and ESH/TX Properties L.P.  (*See* AC Ex. A.)

BHAC still remained an affiliate and/or wholly owned subsidiary of Blackstone. (Prior Amended Complaint ¶ 65; Fraudulent Transfer Complaint ¶ 55; Fiduciary Duty Complaint ¶ 47).

vi.    Extended Stay, Inc. ("ESI"). ESI issued the M&T Bonds in 2001, of which about $4 million remains unpaid. ESI was excluded from the Plan. The M&T bondholders were not creditors of any other Debtors. ESI sits structurally junior to the entire mezzanine structure and thus this Debtor and its estate certainly had no connection to assets of the transferors. Thirteen levels of entities, including the entire mezzanine structure, intervene between ESI and the Property Owners.

The Trust has not alleged that there was ever any confusion among creditors, or anyone else, as to which Debtors served which functions in the capital structure, or which Debtors they held claims against. Nor could it make such an allegation. Nearly 100% of Extended Stay's outstanding debt is finance debt created by loan documents that expressly acknowledges and agree to preserve the Debtors' structure, whereas the balance, the $4 million of M&T Notes, were securities issued solely by the parent corporation, Extended Stay, Inc.

## 2.    Delaware Law Does Not Permit Reverse Veil Piercing.

The Trust cannot save its claims by seeking to pierce the Debtors' veils because the applicable state law, that of Delaware, does not permit "reverse veil piercing" (that is, making subsidiaries liable for their shareholders/parents' debts).

The choice of law rules of the forum state, New York in this case, determine which state's law governs a veil piercing claim. *In re Saba Enterprises, Inc.*, 421 B.R. 626, 648 (Bankr. S.D.N.Y. 2009) (*citing Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). In particular, the Second Circuit specifically held that bankruptcy courts adjudicating corporate veil piercing claims should apply the choice of law rules of the forum state. *Id*.

Under New York choice of law rules, the law of the state of incorporation of the entity subject to potential veil piercing governs the claim. *Id*. *See also Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335, 346 (S.D.N.Y. 2013) (applying Delaware law to a

veil piercing claim against a Delaware LLC, because "[u]nder New York's choice of law rules, the law of the state of incorporation determines when the corporate form will be disregarded.") (citations omitted); *Phillips v. Reed Group, Ltd.*, 07 Civ. 3417, 2011 U.S. Dist. LEXIS 157522, at *30 (S.D.N.Y. Jan. 24, 2011) ("Under New York choice-of-law rules, the law of the state of incorporation is used to determine whether the corporate veil should be pierced.").

As a consequence, the Trust's efforts to reverse pierce the Debtors' veils are doomed because Delaware "has never recognized any form of reverse piercing." *In re ALT Hotel, LLC*, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012).

The *ALT Hotel* court conducted what is by far the most thorough and scholarly, as well as the most recent, analysis of whether a Delaware court might permit reverse veil piercing – as none ever has. It concluded that "not only has Delaware never accepted reverse piercing, but the general tenor of Delaware corporate law suggests its acceptance would be doubtful. Delaware has an exceptionally strong policy of respecting the corporate form." *In re ALT Hotel*, 479 B.R. at 802 (citations omitted). Furthermore, the Lightstone Defendants have not found any ruling by a court sitting in New York that permitted a party to reverse pierce a Delaware entity's veil.

In opposing the 2011 motions to dismiss, where this issue also was raised, the Trust relied upon the wrong law. It cited to *Securities Investor Protection. Corp. v. Stratton Oakmont, Inc.* to support the proposition that a court may treat a parent and a subsidiary as a single entity. 234 B.R. 293 (Bankr. S.D.N.Y. 1999). That court was applying New York law, which unlike Delaware, has recognized reverse veil piercing. *Id*. at 321.

As if that were not enough, the Trust's legal theory is made even more hopeless by the fact that Trust, as the successor to the Debtors, is in effect trying to pierce *its own* veil to enable it to sue third parties that it otherwise has no claims against, as opposed to the conventional

situation where a third party claims a corporate veil has been abused to shield shareholders from

liability to that third party. It also appears that the Delaware courts also have not spoken directly

to the issue of whether a shareholder or corporation may pierce its own corporate veil even in a

forward direction, although the Delaware Chancery court recently observed that allowing a

plaintiff to pierce its own corporate veil to establish standing to bring an action for a wrong to a

subsidiary "would be unusual to say the least." *Case Fin. Inc. v. Alden*, No. 1184-VCP, 2009

Del. Ch. LEXIS 153, at *12 (Del. Ch. Aug. 21, 2009). As Delaware has never permitted reverse

veil piercing by third party plaintiffs, then certainly there is no legal basis to entertain the Trust's

quest to reverse pierce its own veils – dozens of them – to move an unsecured creditor's claim to

a subsidiary entity against which the creditor itself is not asserting claims.

### 3. The Amended Complaint Does Not Allege Facts that, if Proven, Would Satisfy the Legal Standards for Veil Piercing.

A claim for veil piercing requires a showing "that the corporate form was used to

perpetrate some form of injustice or fraud." *Capmark Fin. Group Inc. v. Goldman Sachs Credit

L.P.*, 491 B.R. 335, 347 (S.D.N.Y. 2013) (quoting *Wallace v. Wood*, 752 A.2d 1175, 1183 (Del.

Ch. 1999)). "The fraud or similar injustice ... must, in particular, be found in the defendant's use

of the corporate form." *In re BH S&B Holdings LLC*, 420 B.R. 112, 134 (Bankr. S.D.N.Y. 2009)

*aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (internal citations and quotations

omitted). "In other words, the plaintiff must plead facts showing that <u>the corporation is a sham

and exists for no other purpose than as a vehicle for fraud</u>." *Id.* at 140. (internal citations and

quotations omitted, emphasis added). "There must be an abuse of the corporate form to effect a

fraud or an injustice - some sort of elaborate shell game." *Id.* at 141. The Delaware Chancery

Court explained:

> For the purposes of the corporation law, the act of one corporation is not regarded
> as the act of another merely because the first corporation is a subsidiary of the

other, or because the two may be treated as part of a single economic enterprise for some other purpose. Rather, to pierce the corporate veil based on an agency or 'alter ego' theory, '**the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.**'

*In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) (quoting *Wallace*, 752 A.2d at 1184) (emphasis added). *See also Soroof Trading Dev. Co. v. GE Fuel Cell Systems, LLC*, 283 F.R.D. 142, 152 (S.D.N.Y. 2012) (allegations must indicate "not only that [the two entities] operating as a unified economic entity, but also that the corporate form ha[d] been erected for a fraudulent purpose.") (emphasis added).

The Amended Complaint makes no allegations whatsoever to support a conclusion that the Debtors' mezzanine and REIT structure existed for no purpose other that to serve as a vehicle for fraud or was erected for a fraudulent purpose. Any such allegation would be implausible, if not outright foolish, because it is abundantly clear from the record in these cases, the loan documents, and the complaints themselves that the Debtors were structured as they are for purposes of the mezzanine financing and to qualify as a REIT. Indeed, the lenders *required* the Debtors to maintain their corporate structure. *See* AC ¶ 196. Furthermore, the Debtors were formed and organized into a mezzanine structure long before the 2007 Transaction (AC ¶¶ 106, 108, 116) by persons other than the defendants. *See Charter Servs. Inc. v. DL Air, LLC*, 711 F. Supp. 2d 1298, 1309 (S.D. Ala. 2010) (plaintiffs failed to demonstrate how corporation was a façade or sham entity where the entity was created by someone other than the shareholder and was purchased by the shareholder prior to the occurrence of the alleged misconduct) (applying Delaware law). Although obvious, it still bears mention that the lenders choose to refinance the Debtors in 2007 with full knowledge of the Debtors' corporate structure.

Accordingly, the Amended Complaint does not contain allegations that would permit veil piercing even if Delaware recognized reverse veil piercing.

**4.    Substantive Consolidation is Precluded by the Plan,
the Confirmation Order, Multiple Other Rulings
of the Court, and the Trust's Own Admissions.**

Although the Amended Complaint does not refer explicitly to substantive consolidation under bankruptcy common law, some allegations in the Amended Complaint suggest that the Trust may aspire to substantively consolidating the Debtors to avoid dismissal of its claims.

First, and we think dispositively, the Plan and Confirmation Order decreed that there would be limited (a/k/a "convenience") consolidation "for Plan Purposes Only."  Except for purposes of confirmation and convenience of making distributions (*e.g.*, avoidance of duplicative distributions for creditors asserting the same claim against multiple Debtors), the Plan and Confirmation order each provide:

> (a) all property of each Debtor shall vest in each respective Reorganized Debtor, free and clear of all Claims, Liens, Liabilities, encumbrances, charges and other interests and (b) each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporate and bylaws (or other formation documents) in effect before the Effective Date.

(*See* Ex. D at pp. 34-35 of 141, ¶ 14, and pp. 97-98 of 141, § 6.1.)

Substantive Consolidation requires, among other things, a showing that untangling entities is either impossible or so costly as to consume the entangled assets.  *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988).  "Commingling ... can justify substantive consolidation only where the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors ... or where no accurate identification and allocation of assets is possible."  *Id.* at 519 (internal citations and quotations omitted).  *See also In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, at *108-09 (Bankr. S.D.N.Y. Oct. 31, 2003) (substantive consolidation is appropriate "when it

would be so costly and difficult to untangle the [d]ebtors' financial affairs, such that doing so is a 'practical impossibility" or "that it is not possible to create accurate financial data for each legal entity.").

It is impossible for the Debtors to be separate entities in July 2010 and through 2013 and beyond, by express order of this Court, if they also were hopelessly entangled to the point where one could not even attempt to unscramble them and identifying their assets is impossible. Thus, a claim that the Debtors are subject to substantive consolidation is nothing less than a collateral attack on the Plan and Confirmation Order. *See In re Victory Markets, Inc.*, 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998) ("a confirmed plan holds the status of a binding contract as between the debtor and its creditors"); *In re 18th Ave. Realty*, No. 03-14480, 2010 Bankr. LEXIS 1553, at *14 (Bankr. S.D.N.Y. May 7, 2010) ("it is commonly recognized that a confirmed plan is, in essence, a legally binding agreement"); *Adelphia*, 390 B.R. at 88 ("Under the Bankruptcy Code, a confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike.").

Second, the Court may also take judicial notice of other proceedings that have been before it that preclude substantive consolidation. *See* Section I. C., above. One is the "ESI Settlement" approved by the Court. As discussed above, the only Debtor liable for the M&T Bonds – the only outstanding non-financing debt owed by any Debtors – was ESI. ESI was excluded from the Plan. Instead, ESI negotiated the ESI Settlement with the Plan Debtors. In approving the ESI Settlement, the Court "ORDERED that the ESI Settlement represents a fair, prudent and reasonable compromise of the controversies resolved therein and is in the best interests of the Debtors' estates and ESI's estate, and their respective creditors". (Order Pursuant to Bankruptcy Rule 9019 Approving a Settlement Agreement Between Extended Stay Inc. and

47

Remaining Debtors, Ch. 11 Docket No. 1170 at 3 (**Exhibit M** hereto).)  Thus, separateness of ESI, its estate, and its "respective creditors" from those of the other Debtors was recognized in a prior finding by the Court.

Third, on January 3, 2013, the Court so-ordered a stipulation that had the primary purpose and effect of giving continuing effect to the separateness of, and structural priorities created by, the 30 tiers of separate Mezzanine Debtors.  (*See* Docket No. 1709, **Exhibit N** hereto.)

Fourth, cash receipts and disbursements have continued to be accounted for separately at each of the 75 Debtors.  (*See*, *e.g.*, Debtors' Fourth Post-Confirmation Status Report, filed on July 15, 2011 [Ch. 11 Docket No. 1459]; Debtors' Post-Confirmation Quarterly Operating Report for the Period From 7/1/2011 to 9/30/2011, filed on October 17, 2011 [Ch. 11 Docket No. 1516] (together, **Exhibit O** hereto).)

Fifth, the Trust judicially admitted the critical separateness between Property Owners and the Mezzanine Debtors.  The Trust never sought substantive consolidation or veil piercing until it filed its Amended Complaint because it had been alleging another claim that was premised upon the separateness of the Debtors:  that $300 million of mezzanine interest payments could be avoided as constructive and intentional fraudulent conveyances because the payments were made from the assets of Debtors that were not obligors on the Mezzanine Debt.  The Trust alleged:

> As a result of the Cash Management Agreement requirements, the payments to the Mezzanine Lenders were made from cash contributed by entities who were not obligors under the Mezzanine Loans but who were nonetheless compelled by the effect of the collective transaction documents to actually pay those loans.  ...  The payments are fraudulent transfers ... because the entities that actually paid the money did not even owe the obligation.

*See* Prior Amended Complaint ¶ 257.  This is an express admission by the Trust that – as the Lightstone Defendants have said from the outset – the Debtors that conceivably could be alleged

to have funded transfers are not the entities that have unpaid creditors.  The Trust's judicial

admissions defeat any claim for substantive consolidation or veil piercing.  The totality of all of

the above orders and events also render assertions that the Debtors could meet the requirements

for consolidation implausible under the *Iqbal* standard.

> Finally, we note District Judge McKenna's decision on this subject in *Adelphia*:

> At the heart of the ART response to the Goldman motion is the proposition that ACC "exercised complete control over the [Adelphia Cash Management System ("CMS")] ... and the Concentration Account ..., managing the collective cash of ACC, its subsidiaries and the RFEs."  ...  This may no doubt be the way the Rigas family managed things, but the easy attribution of money to whatever entity may at the moment be convenient stopped with the bankruptcies and are, in the Court's view, no longer appropriate.

*See Adelphia Recovery Trust v. Bank of America*, 05 Civ. 9050, 2011 U.S. Dist. LEXIS 39139

(Apr. 7, 2011) at *24 (internal citations omitted).  The Trust here seeks to disregard corporate

separateness for the sole purpose of salvaging its litigation claims more than four years after the

Petition Date and more than three years after confirmation of the liquidating Plan.  Even if facts

to support consolidation existed, that door was locked a long time ago.  *See In re Appalachian*

*Fuels, LLC*, 493 B.R. 1, 21-22 (B.A.P. 6th Cir. 2013) (substantive consolidation denied because

the Debtors' joint plan and confirmation order maintained the separateness of the assets of each

debtor).

*        *        *

The Trust has been using obfuscatory language to "keep balls in the air" for years.  Now

on its sixth complaint, there is no room to excuse the Trust's failure to own up to the facts that

the transfers could not have been made from the assets of insolvent Debtors; that the Property

Owners were not insolvent at the time of any transfers because they were not liable for the $3.3

billion of Mezzanine Debt; that the sole possible creditor of any of the (conceivable) transferor

Debtors, the Mortgage Lender, had consented to and actually performed the challenged transfers;

49

that the (conceivable) transferor Debtors do not have any triggering unsecured creditors for avoidance purposes or that could have been injured by the conduct alleged in the Amended Complaint; and that the Amended Complaint manifestly fails to meet basic federal pleading requirements. Accordingly, the Amended Complaint should be dismissed in its entirety.

## IV. THE ADVERSARY PROCEEDING MUST BE DISMISSED BECAUSE IT IS BROUGHT UNDER THE DIRECTION, AND SOLELY FOR THE BENEFIT, OF THE MORTGAGE LENDER WHICH WAS THE CHIEF ACTOR IN THE CHALLENGED TRANSFERS

In 2011, the Lightstone Defendants and others argued that Trust cannot recover more than $5.6 million because that was the universe of unpaid claims that were not created directly by the 2007 Transactions. Subsequent record research indicates that the amount of non-lender debt in fact is only about $4 million.[36] The Lightstone Defendants argued that all other unpaid claims are claims of lenders who participated in the 2007 Transaction and ratified or proximately caused the transactions challenged by the Trust. Under equitable grounds and under judicial interpretation of chapter 5 of the Bankruptcy Code, parties that participated in or consented to transactions may not challenge them or benefit from their avoidance.

Since the prior Motions to Dismiss were filed, there have been three significant developments that now require dismissal of the action in its entirety on these grounds. One, as a result of the settlement or other dismissal of the Trust's claims against Blackstone and all lender defendants, the Trust's remaining claims are not large enough to provide a recovery for any party other than the Mortgage Lender which had its own hands in every alleged bad act. Conversely, the supposed existence of unpaid unsecured creditors that can confer standing for the Trust to

---

[36] This is the amount of non-lender debt that can be found *anywhere* among all the Debtors, and thus is the maximum recovery *if arguendo* the debt existed at a Debtor that was harmed by any of the challenged transfers and *if* the claims were being brought for the benefit of such creditors. The Trust has been misconstruing the Lightstone Parties' argument to be an admission that there exist triggering unsecured creditors for purposes of conferring standing. That is incorrect.

bring avoidance actions has become a ruse, because those creditors are not going to receive or benefit from any recoveries.  As shown below, the Mortgage Lender admitted this in a prior pleading.  Two, the Trust itself has been transformed into a double for the Mortgage Lender.  Not only do the recoveries go to the Mortgage Lender, the Trust Agreement was amended to provide the Mortgage Lender with control over the Trust's litigation decisions.  The Mortgage Lender also caused the Trust to retain the Mortgage Lender's own counsel so that the Trust and Mortgage Lender now both speak and act through a single mouthpiece.  Three, the Trust has recovered $10 million from Blackstone, more than enough to pay all of the alleged innocent creditors in full.  We do not see how the Bankruptcy Court could countenance allowing the Trust to exploit the existence of this very small pool of permanently out-of-the-money unsecured creditors as grounds for recovering one transfer after another while not repaying them with the recoveries.

### A.    This Action is Being Prosecuted By and For the Mortgage Lender.

#### 1.    The Unpaid Debt as of Plan Confirmation.

Aside from the Mortgage Loans and Mezzanine Loans, the only other Trust beneficiaries are truly *de minimis* and deeply subordinated general unsecured creditors and the holders of the M&T Notes.  In their Disclosure Statement, the Debtors included the following estimate of general unsecured claims:  "as of April 30, 2010, other than amounts owed to HVM [which were paid], the Chapter 11 Debtors had unsecured prepetition debt of approximately $545,250 (on a consolidated basis, exclusive of any amounts owing in respect of any tax liabilities)."  (*See* Ex. H at 26-27.)  Under the Confirmed Plan, general unsecured creditors received a payment equal to the lesser of 80% of their claims and $455,000.  (*See* Ex. D at p. 93 of 141.)  Accordingly, the total amount of unpaid general unsecured claims throughout the Debtors' entire enterprise is roughly $100,000.

The only other non-lender debt is the M&T Notes. The M&T Notes were claims against the holding company, ESI, and structurally junior to all of the mezzanine debt. Ex. H at 29. Of an initial issuance of $300 million, only $8 million remained outstanding as of the Petition Date. *Id.* As stated above, ESI did not confirm a plan. However, pursuant to the "ESI Settlement" which the Court approved as an arm's length settlement between the different estates and their distinct creditor bodies, the holders of M&T Notes received a distribution of $4 million, leaving a balance of $4 million. *See* Ex. M. Thus, according to the Plan and Disclosure Statement, of which the Court properly can take judicial notice, there is only $4.1 million of unpaid creditors throughout the entire enterprise who had not participated in the 2007 Transaction and bound themselves to the Cash Management Agreement. Thus, the Lightstone Parties argued in 2011 that the maximum conceivable recovery against them should be capped at $4.1 million (previously calculated at $5.6 million) <u>IF</u> the Trust's claims are otherwise valid, provable, and not subject to defenses. However, for the reasons set forth below, it is now clear that unsecured creditors do not stand to receive any of the theoretical proceeds of this litigation.

2. **The Mortgage Lender Obtains Control of the Trust as a *Quid Pro Quo* for Dismissing All Claims Against the Mezzanine Lenders.**

At the same time that the Trust sued the Lightstone Defendants, it also sued the Mezzanine Lenders to avoid their claims and recover fraudulent conveyances and preferences under many of the same theories asserted against the Lightstone Defendants. In addition to their role in the 2007 Transaction, the Mezzanine Lenders received approximately $300 million of interest payments prior to the Petition Date, some within 90 days. The Trust alleged that those payments were illegal dividends and fraudulent transfers.

The Mezzanine Lenders found their way out of the litigation by amending the Trust Agreement to provide that claims against them shall not constitute assets of the Trust. The quid

pro quo for this amendment was that the Mezzanine Lenders agreed that control of the Trust's litigation decisions would be provided to the Mortgage Lenders. They jointly amended the Trust Agreement to provide:

> Until the Special Servicer on behalf of the Mortgage Facility Trust has received distributions of Litigation Trust Proceeds satisfying its Tier 1 claim in full, plus reimbursement of any funding of the Litigation Trust provided by the Mortgage Facility Trust, **the Special Servicer, and solely the Special Servicer, shall serve as an advisor to the Litigation Trustee with respect to all matters concerning the Litigation Trust. The Litigation Trustee shall consult with and obtain in advance the consent of the Special Servicer with respect to any material decisions made with respect to the Litigations, including without limitation the Litigation Trustee's decisions to retain professionals and any proposed settlements related thereto.**

(Ex. K at 3, § 3(c) (emphasis added).)

At the July 24, 2012 hearing on the subject, a Venable attorney – at that time still acting only as counsel for the Mortgage Lender – left no room for doubt as to the import and intent behind this change to the Trust governance, stating:

> "[W]e are the first and primary beneficiaries of this Trust";

> "[The Trustee is] supposed to be representing me, and trying to get – do what's in my best interests";

> "Well, we will replace the litigation trustee, and we will say, this is what we want you to focus on, and this is why, and this is how we're going to focus it"; and

> "The special servicer wants to take control of these litigations, so that we get some recoveries here, and sooner than later, Your Honor."

(July 24, 2012 Hrg. Tr. at 33-36 (**Exhibit P** hereto.)

Thereafter, the Trust began sharing counsel with the Mortgage Lenders. In addition to representing the Trust in this action, Venable LLP represents the Mortgage Lender in the Reorganized Debtors' chapter 11 cases and in continuing state court litigation over the proceeds of Mr. Lichtenstein's personal guaranty.

53

### 3. Blackstone, Citibank and Bank of America Settle.

As discussed above, on June 20, 2013, the Trust filed a Rule 9019 Motion seeking approval of settlements with Blackstone, Citibank and Bank of America, pursuant to which Blackstone settled the $2 billion of avoidance claims against it for $10 million, Citibank paid $200,000, and Bank of America paid nothing. Those recoveries are sufficient to pay in full all creditors that did not participate in the 2007 Transaction and Financing, leaving no party with standing to attack the transfers that are the subject of the Trust's complaints.

### 4. The Trust Waterfall.

As a result of the dismissal of Blackstone and all of the lenders, the Mortgage Lender is no longer just the "first and primary" beneficiary, but the only beneficiary, because the Trust's remaining claims cannot recover sufficient funds to pay anyone else.

The Litigation Trust Agreement (**Exhibit Q** hereto) provides for "Tiers of Proceeds." (*See* Ex. Q at 36.) Tier 1 is: "First $142.5 million (minus the amount of any funds released from the Mortgage Parties Indemnification Fund)[] payable 100% to the Special Servicer." (*Id.*)

The Amended Complaint filed by the Mortgage Lender's counsel, conveniently enough, seeks $139 million of damages. While the Trust may respond that a "home run" result, padded with interest or punitive damages, could yield an incremental recovery beyond the amount needed to pay the Mortgage Lender's Tier 1 distribution, that would be incorrect. Aside from the utter improbability of such as result, as this Motion should make clear, the Trust's *ad damnum* has been frivolously inflated.

Of the $139 million of damages sought, $74 million is damages attributed to the Floor Certificate Transfer. This sum is arbitrary and contrary to law. There are two possible dates for valuing the Floor Certificates, the date of transfer and the date of judgment. Usually, the value of fraudulently transferred property is determined as of the date of the transfer. *In re Seitz*, 400

B.R. 707, 722 (Bankr. E.D. Mo. 2008); *In re Brun*, 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007)

("courts equate 'value' with the fair market value of the subject property at the time of the

transfer"); *In re Colonial Realty Co.*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998) ("Courts

generally agree that the market value of the property at the time of transfer ... is the proper

measure of recovery under § 550."). "This is especially true where the property depreciated in

value after the transfer." *Brun*, 360 B.R. at 674. When fraudulently transferred property

appreciates in value after the transfer, some courts have held that the judgment date is the

appropriate valuation date. *See Seitz*, 400 B.R. at 722-23 (when property appreciates after the

transfer, "[t]he plain language of § 550(a)(1), Congressional intent, and concerns of equity

persuade the Court that ... [the] value of the transferred property is most properly determined

from the date of the judgment for recovery, not from the date of the transfer"); *see also In re Am.

Way Serv. Corp.*, 229 B.R. 496, 531 (Bankr. S.D. Fla. 1999) ("when the property has

appreciated, the trustee is entitled to recover the property itself, or the value of the property at the

time of judgment").

The Amended Complaint pleads that the Floor Certificates were valued at $25 million at

or about the time they were transferred to DL-DW. (AC ¶ 139.) (Should the issue ever be tried,

the Lightstone Defendants intend to demonstrate they were worth far less than that.) The

Amended Complaint also pleads that the Floor Certificates were cancelled in October 10, 2010

upon the repayment of the Mortgage Loan (*id.* ¶ 187), and hence have been worthless from that

date forward, including through the date of any aspirational judgment. Thus, there are two

possible damage amounts: $25 million and $0, not $74 million. When the maximum damages

for the Floor Certificate Transfer is reduced from $74 million to $25 million, the maximum

principal amount of damages sought by the Trust adds up to only $90 million.

That amount, however, still must be further reduced by the $22 million cash consideration Debtors received from certain defendants in exchange for the Floor Certificates. Although the Trust has tried to obscure the consideration that went back to the Debtors by burying it in a different section of the Amended Complaint, the Amended Complaint does contain the judicial admission of the undisputable fact that the Floor Certificates were utilized to provide $22 million cash to the Debtors. (*See id.* ¶ 154 (Debtors received $22 million loan plus $10.6 million additional funds from DL-DW); *id.* ¶ 155 (the loan was secured by DL-DW's pledge of the Floor Certificates; distributions on Floor Certificates rather than Debtors' own funds were used to pay interest on the loan); *id.* ¶ 184 (Floor Certificates, rather than assets of the Debtors, were used to repay the loan while the Debtors retained the loan proceeds).) When one deducts the additional $22 million from the claim, the maximum amount of damages available to the Trust, even if it hits a "home run," adds up to only <u>$68 million</u> less costs of prosecution. That is less than half of the amount of the Mortgage Lender's first claim upon Trust recoveries. It is thus clear why the Mezzanine Lenders were willing to turn over control of this litigation to the Mortgage Lender: the Mortgage Lender is the only party with an interest in the outcome.

5.    **The Mortgage Lender Admitted the Claims Benefit**
       <u>**Only the Mortgage Lender and not the Estate.**</u>

The foregoing is not merely the Lightstone Defendants' view, but also that of the Mortgage Lender itself, which expressly admitted in a prior pleading that the claims will not benefit the estate but only the Mortgage Lenders. On April 23, 2010, prior to confirmation of the Plan, the Official Committee of Unsecured Creditors appointed in the chapter 11 cases had sought *STN/Housecraft* authority to assert the claims that are the subject of the pending litigations brought by the Trust. (*See* Ch. 11 Dkt. No. 976 (**Exhibit R** hereto).) The Mortgage Lender, through Venable, stated as follows in its June 15, 2010 opposition to the Committee's

motion (emphases added and emphases in original removed; references to the "Trust" here refer to the Mortgage Lender, not the as yet unformed Litigation Trust):

> 20. There are only three groups of unsecured creditors that are represented by the Creditors' Committee: (a) trade claims aggregating approximately $500,000 ("De Minimis Trade Claims"); (b) a claim in the approximate amount of $8 million held by M&T as Indenture Trustee for the ESI Notes ("M&T Claim"); and (c) the Mezzanine Debt in the approximate amount of $3.3 billion **(which is deeply subordinated to the Mortgage Debt)**.

> 21. **The De Minimis Trade Claims are of inconsequential value** in these cases and the Trust is agreeable to have such claims paid in full pursuant to the Plan. No one holding a De Minimis Trade Claim is a member of the Creditors' Committee. These creditors clearly are not driving the actions of the Creditors' Committee and would not benefit from the Creditors' Committee's pursuit of the Proposed Litigations. **Also, the M&T Claim is solely against assets of the ESI estate, including its equity interest in other Debtors. The M&T claim is so structurally subordinated (including structural subordination to the $3.3 billion of Mezzanine Debt) that there is no hope for any recovery on the M&T Claim from the estates, other than the ESI estate.** In addition, the Plan is conditioned on a settlement being agreed to with ESI that will in all likelihood resolve the M&T Claim before confirmation.

> 22. As a consequence, the Creditors' Committee's request is solely on behalf of the holders of the Mezzanine Debt. Indeed, holders of the Mezzanine Debt comprise 4 of the 5 members of the Creditors' Committee. Yet, any recovery the Mezzanine Lenders receive from the Proposed Litigations must be paid to the Trust until all obligations under the Mortgage Loan Agreements are paid in full. "All payments or distributions upon or with respect to a [Mezzanine Loan] which are received by a [Mezzanine Lender] contrary to the provisions of [the Inter-Creditor] Agreement shall be received by such [Mezzanine Lender] in trust for the benefit of [Trust] … and shall be paid within two (2) Business Days of receipt thereof over first to [the Trust] to the extent then payable to [the Trust]." See Inter-Creditor Agreement, §§ 9-11. Absent a "home run", there would be little, if any, actual recoveries for the Mezzanine Lenders and certainly no recovery before the Litigation Trust is formed. It is important to reemphasis that the Trust has an estimated $83 million deficiency claim against the estates and has a contractual deficiency claim in excess of the $83 million [37] against any recoveries paid to the Mortgage Lenders.

> 23. The Trust, whose collateral is the likely source for funding the Creditors' Committee's pursuit of the Proposed Litigations and who is the most likely

---

[37] As documented by the Trust waterfall, the Mortgage Lender subsequently increased its claim to over $140 million.

recipient of any recoveries therefrom, objects to the Motion. Accordingly, **the relief requested in the Motion would not provide any apparent benefit to these estates or their creditors.**

*See Objection of Special Servicer to the Motion of the Official Committee of Unsecured Creditors for an Order Appointing the Creditors' Committee as Estate Representative with Respect to the Prosecution of Certain Causes of Action*, dated June 15, 2010 [Ch. 11 Docket No. 1065] at pp. 14-15 (**Exhibit E** hereto.).  Thus, the record is irrefutable that this litigation is being pursued for the sole benefit of the Mortgage Lender.

## B.   THE CLAIMS ARE FUTILE BECAUSE THE ONLY PARTY THAT STANDS TO RECOVER PROCEEDS FROM THIS LITIGATION IS NOT PERMITTED TO DO SO

Having established that, despite good intentions that existed when the Plan was confirmed, the Trust and this litigation now exist only for the Mortgage Lender, we now turn to the consequences:  all of the claims must be dismissed under multiple legal principles, including consent, ratification, in pari delicto, unclean hands, the provisions of chapter 5 of the Bankruptcy Code, and the *Bangor Punta* doctrine.

### 1.   The Trust Cannot Exercise Avoidance Powers for the Benefit of the Mortgage Lender.

The Trust only has standing to recover purportedly fraudulent conveyances to the extent doing so will benefit creditors of the transferor Debtor.  The Second Circuit Court of Appeals has long held that a trustee's "strong-arm powers" are limited to actions that benefit creditors.  In *Whiteford Plastics Co. v. Chase Nat'l Bank of New York City*, 179 F.2d 582 (2d Cir. 1950), the debtor sought to avoid an unperfected security interest that secured its obligation to a lender.  *Id.* at 583-85.  The debtor brought the avoidance action after it had emerged from bankruptcy under an approved plan of arrangement that provided creditors a fixed recovery such that, if the debtor succeeded in the avoidance action, only the debtor would benefit.  The court held that the debtor

could not pursue its action against the lender. *Id.* at 584 ("The debtor never contributed or offered to contribute this value to the plan and [now] seeks to obtain it purely for its own benefit. This we think it cannot do. In our opinion the bank, which had a good secured claim as against the debtor, can still hold it where the petition to avoid the sale is not in the interest of the general creditors."). *See also Balaber-Strauss v. Town of Harrison (In re Murphy)*, 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005) ("Courts have consistently held that an avoidance action can only be pursued if there is some benefit to creditors and may not be pursued if it would only benefit the debtor.") (citations omitted).

Similarly, in *In re Vintero Corp.*, the debtor owned a ship that was subject to a lien that had lapsed. 735 F.2d 740 (2d Cir. 1984). The debtor brought an action to avoid the lien. The court explained that the debtor "was given the right to avoid [the lender's] security interest in order to protect such third parties, not to create a windfall for [the debtor] itself." *Id.* at 742. The court held that "[t]o the extent that other creditors of [the debtor] are not affected adversely by enforcement of [the lender's] security interest, there is no reason why such interest should not be enforced," *id.*, and ordered that the lien would not be avoided, "but that such security interest shall not entitle [the lender] to a priority of payment as against [the debtor's] general unsecured creditors." *Id.* at 743.

As discussed above in the context of standing, District Judge McKenna in the *Adelphia* cases dismissed a litigation trust's avoidance claims where there were unpaid creditors within the debtors' corporate structure, but no claims against the particular debtors that made the challenged transfers. *Adelphia Recovery Trust*, 390 B.R. at 80. In that case, a litigation trust succeeded to various avoidance claims to recover transfers made by certain debtors. The transferor debtors had significant debt on the petition date, but under the confirmed plans, the transferor debtors'

creditors had been paid in full out of proceeds from asset sales. The court found that "[g]iven that the creditors of the [transferor] Debtors have received full payment with interest under the Plans, it follows that these creditors do not stand to benefit from recovery on the Bankruptcy Claims at issue here, and the [litigation trust] does not have standing to bring these claims on their behalf." *Id*. at 95. The litigation trust argued that existing claims at non-transferor debtor entities within the enterprise structure would have benefitted from avoidance action, but the court rejected that argument. Judge McKenna was affirmed by the Second Circuit. *See Adelphia Recovery Trust v. Bank of America*, 379 Fed. App'x 10 (2d Cir. 2010) (adopting reasoning of District Court).

We acknowledge that authorities have held that a *if* a debtor has triggering creditors, it can under some circumstances recover a transfer that is larger than the amount needed to repay the triggering creditors. But that does not save the Trust's claims for $139 (really $68) million, because the recoveries here are not benefitting a triggering creditor or "the estate" at all but only the Mortgage Lender. The Mortgage Lender may not benefit from the avoidance of transfers it agreed to. "A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance." *Adelphia Recovery Trust v. HSBC Bank USA*, 634 F.3d 678, 691 (2d Cir. 2011) (citations omitted). "Were transferors allowed to assert fraudulent conveyance claims against those to whom they transfer property, transferors would be empowered to rescind transactions by virtue of their own fraudulent or deceptive designs. Such empowerment would be perverse." *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008). *See also In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("Because the fraudulent transfer is voidable by creditors only, it is not remarkable that, as between the parties to the transfer, the law regards the transfer as real and binding.").

It is clear from the Amended Complaint, the documents referenced therein, and the Trust's judicial admissions that all three sets of transfers were performed not only with the Mortgage Lender's consent, but with its active participation as the primary actor. The Series A Unit Payments were made pursuant to securities issued as an integral part of the 2007 Transaction that the Mortgage Lender (and also the Mezzanine Lenders) negotiated, financed and directly participated in. The Series A Unit Payments were made pursuant to the Cash Management Agreement to which all of the lenders agreed to be bound. The Series A Unit Payments and Management Fee payments were made from an account titled "for the benefit of Wachovia," which was under Wachovia's exclusive control, which was held at Wachovia, and which was part of Wachovia's cash collateral as Mortgage Lender. The Management Fees were paid periodically for two years during which they were disclosed to the Mortgage Lender, included in negotiated budgets, and reflected on the Debtors' books and records, with no protest from the Mortgage Lender. Indeed, the Amended Complaint alleges that the payment of management fees is essential to preserving the value of the collateral. (*See* AC ¶ 126) ("management fees are not discretionary expenses for a hotel chain"). The Mortgage Lender directly transferred the Floor Certificates – which were never property of the Debtors – from itself to DL-DW, and thereafter certified that DL-DW is the "beneficial owner" of the Floor Certificates and entitled to all distributions therefrom. (*See* Ex. G.) The Mortgage Lender also made all of those distributions.

In sum, documents that are properly considered on this motion to dismiss leave no room for any doubt or ambiguity that the Mortgage Lender (and in most cases the Mezzanine Lenders too, who in any event are successors in interest to Wachovia) fully and knowingly endorsed and caused all of the transfers challenged by the Complaint. It is not entitled to any recoveries. *See*

*supra.*  Because the Mortgage Lender (a) was the only (arguable) creditor of an (arguable) transferor Debtor, and (b) is the only party that would receive the recoveries if the transactions were avoided, the transactions are not avoidable.

This holds equally true for the claims to recover these transfers that are asserted under tort theories.  Based upon the above facts, the Mortgage Lender may not recover tort proceeds on the grounds of *in pari delicto* and unclean hands.  *See Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011) (in pari delicto precludes a wrongdoer from recovering from another wrongdoer, and "prudential considerations deprive a bankruptcy trustee of standing to even bring a claim that would be barred by *in pari delicto*; *see also Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 708-13 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003); *Coach, Inc. v. Kmart Corporations*, 756 F. Supp. 2d 421, 429 (S.D.N.Y. 2010) ("The doctrine of unclean hands 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.'" (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945))).

Finally, this result cannot be avoided by allowing the Mortgage Lender, or any party that bought debt from the Mortgage Lender, to hide behind the Trust (which is essentially its alter-ego).  Such a result is barred by the Supreme Court's decision in *Bangor Punta Operations v. Bangor Aroostock Railroad Co.*, 417 U.S. 703 (1974).  *Bangor Punta* held that courts should look through the entity nominally asserting a claim to the real beneficiaries of the litigation, and prohibit the action if the beneficiaries could not bring the suit on their own behalf.  *Id.* at 713.  In *Bangor Punta*, a corporation alleged that its former owners had improperly caused the corporation to declare special dividends to its stockholders and exploited the corporation for their own benefit in violation of law.  *Id.* at 707.  The actual beneficiaries of the action would have

been the corporation's new shareholders. However, they could not recover on such claims because they had "received all they had bargained for" when they purchased the corporation after the distributions. *Id*. at 711.

In reversing the Court of Appeals, the Supreme Court rejected the argument that the action could be maintained because it was brought in the name of the corporation. *Id*. at 707, 713. Instead, it held that "where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded[,]" otherwise, any recovery "would constitute a windfall, for it would enable them to obtain funds to which they had no just title or claim." *Id*. at 713. *See also UCAR Int'l, Inc. v. Union Carbide Corp.*, 00 CV 1338, 2004 U.S. Dist. LEXIS 914 (S.D.N.Y. Jan.26, 2004), *aff'd* 119 F. App'x 300 (2d Cir. 2004) (dismissing claims or corporation to recoup dividends where the recoveries would benefit shareholders who had full disclosure of the terms of the allegedly wrongful leverage recapitalization); *Midland Food Servs. LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 930 (Del. Ch. 1999) (holding that the *Bangor Punta* doctrine is not limited to barring claims for breach of fiduciary duty or corporate mismanagement but also extends to claims for fraudulent conveyance and unjust enrichment). This doctrine strongly applies here, where the Trust is acting for, and controlled by, a beneficiary that has no right to benefit from the Trust's claims under the facts of this case Accordingly, the Amended Complaint should be dismissed in its entirety for this additional reason.

## V.     COUNT SEVEN FOR BREACH OF SUPPOSED FIDUCIARY DUTIES TO CREDITORS MUST BE DISMISSED AS A MATTER OF LAW

Count 7 of the Amended Complaint attempts to allege a separate claim against "All Defendants" for "Breaches of Fiduciary Duties Owed to Creditors." (AC pp. 89-90). The Trust claims that it is asserting the claim "on behalf of all of the Debtors' creditors and claimants[.]"

(*Id*. ¶ 284.)  It is doubtful such a cause of action exists even in theory, and in any event both Delaware law[38] and the Plan preclude the Trust from asserting it.

Under Delaware law, "*[c]reditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (emphasis in original); *accord In re Musicland Holding Corp.*, 424 B.R. 95, 101 (Bankr. S.D.N.Y. 2010) ("[i]ndividual creditors ... have *no right to assert direct* claims for breach of fiduciary duty against corporate directors") (internal citations and quotations omitted) (emphasis in original); *In re Refco*, 2010 U.S. Dist. LEXIS 33642, at *112 (same); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 42 n.15 (Del. Ch. 2013) (same); *In re USDigital, Inc.*, 443 B.R. 22, 42 (Bankr. D. Del. 2011) (same); *see also Torch Liquidating Trust v. Stockstill*, 561 F.3d 377, 386 n.8 (5th Cir. 2009) (officers and directors "never owe duties to the creditors") (applying Delaware law).

Several years ago, the Delaware Supreme Court put an end to any speculation among lower courts as to the existence of such a cause of action.  The Court in *Gheewalla* explained:

> To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors. Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation.

*Gheewalla*, 930 A.2d at 103.

Even if such a cause of action did exist, the Trust would lack standing to assert it.

[T]he U.S. Supreme Court established that bankruptcy trustees and litigation

---

[38] The state of incorporation controls whether a corporation and its directors and officers have a fiduciary duty to creditors during insolvency.  *Krys v. Sugrue (In re Refco Sec. Litig.)*, No. 07-md-1902, 2010 U.S. Dist. LEXIS 33642, at *113 (S.D.N.Y. Mar. 1, 2010) (citing *Solow v. Stone ("Solow")*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (internal affairs doctrine applies to the determination of whether a fiduciary duty exists, in an insolvency claim brought by individual creditors).  All of the Debtors except ESA Canada Operating Lessee Inc., a Canadian entity, are Delaware business entities.

> trusts formed as part of reorganization plans do not have standing to bring direct claims belonging to creditors under the federal bankruptcy statute.

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006) (citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 434 (1972)); *accord Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011).

The Plan vested the Trust with title to the "Litigation Trust Assets." (Ex. D at p. 103 of 141, Art. 6.17(a).) "Litigation Trust Assets" are limited to "claims and causes of action of the *Debtors or the Debtors in Possession*." (*Id*. at p. 83 of 141, Art. 1.89 (emphasis added).) The Trust was never conferred rights to bring claims that belong to creditors (and in this case the creditors do not even have such claims under Delaware law.). Thus, both bankruptcy jurisprudence and the Plan bar the Trust from asserting breach of fiduciary duty claims *See Buckley v. O'Hanlon*, No. 04-955, 2007 U.S. Dist. LEXIS 22211, at *7-9 (D. Del. Mar. 28, 2007) (the "trustee did not obtain an assignment of rights from a subset of creditors" and therefore "[t]he court will dismiss…claims [trustee] asserts on behalf of the debtors' creditors").

Although it is a moot issue because Count 7 is frivolous as a matter of law, it still bears note that the claims would also be appropriately dismissed because the Trust has not, and cannot, allege that the property transferred belonged to Debtors that had creditors, or creditors that had not consented to the transfer and therefore no duty would have been breached. Furthermore, the claims would have to be dismissed against all parties who were not officers or directors, that is, all of Lightstone and non-Lightstone entity defendants.

Relatedly, Counts 6, 10 and 11, which are claims for aiding and abetting and conspiracy, must be dismissed to the extent they seek relief for aiding and abetting or conspiring to breach fiduciary duties to creditors since there is no underlying claim.

## VI. THE FLOOR CERTIFICATE TRANSFER ALLEGATIONS DO NOT SATISFY *IQBAL* BECAUSE BANKS DO NOT GIVE AWAY 74 OR EVEN 25 MILLION DOLLARS OF ASSETS

*Twombly* and its progeny are clear: a claim's legal plausibility is predicated on its factual plausibility. Plausibility is a relative measure. Thus, where the factual allegations are "not only compatible with, but indeed ... more likely explained by, lawful ... behavior," the plausibility standard will not be met. *Iqbal*, 556 U.S. at 680. Correspondingly, if there is an "'obvious alternative explanation'" that is more likely than that which is alleged, the plaintiff's claim must be dismissed as implausible. *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567); *see also Holmes v. Air Line Pilots Ass'n*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) ("Allegations 'become implausible when the court's commonsense credits far more likely inferences from the available fact.'") (quoting *Arar v. Ashcroft*, 585 F.3d 559, 617 (2d Cir. 2009) (*en banc*) (Parker, J., dissenting)).

In essence, plausibility turns on a "common sense" evaluation of the entire factual landscape. *Iqbal*, 556 U.S. at 679. In *Iqbal*, the plaintiff alleged that the FBI's detainment of thousands of Arab Muslim men in the wake of the September 11 attacks indicated invidious discrimination. The U.S. Supreme Court upheld dismissal, reasoning:

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers ... in ... an Islamic fundamentalist group. […] It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims.

*Id.* at 681. The Court thus concurred with the defendant's argument that the arrests more likely were lawful attempts to detain illegal aliens with potential connections to the terrorist hijackers. *See id.* Accordingly, because of that "'obvious alternative explanation' for the arrests," the Court held that "discrimination is not a plausible conclusion." *Id.* at 682 (quoting *Twombly*, 550

U.S. at 567).

The holding in *Twombly* is similar. There, the Court held that the plaintiff's allegations of parallel conduct, without more, did not sufficiently allege a conspiracy under the Sherman Act. *See* 550 U.S. at 567-69. Although it acknowledged that parallel conduct was consistent with an unlawful agreement, the Court concluded that such conduct "was not suggestive of conspiracy" because "history" and "the complaint itself" demonstrated an "obvious alternative explanation" – that the alleged conduct exemplified typical free-market behavior. *Id.* at 567-68.

The Trust has alleged that "the Debtors" were entitled to received $25 million worth of Floor Certificates in exchange for agreeing to "pertinent concessions" to the lenders set forth in an alleged August 31, 2007 letter agreement referenced in the Amended Complaint. (AC ¶¶ 137-39.) We respectfully invite the Court to review that alleged agreement, submitted as Exhibit L hereto. It is a one-and-a-quarter page letter – that so far as we know at this time was not countersigned by the lenders – in which various of the Extended Stay entities agreed that if there should at some point in the future ever be a prepayments of the loan made from the sale of a "Hotel License" then the funds would be applied ratably among all the Mezzanine Lenders. (*See id.*) In other words, it was merely an acknowledgment of an inter-lender agreement. *The Debtors gave up no consideration or value.* We submit that it is utterly implausible, to put it mildly, that Wachovia ever would have agreed to give the Debtors $25 million of securities in exchange for nothing.

The most plausible alternative explanation – and the one the Lightstone Defendants intend to demonstrate if the claims survive motions to dismiss – is that the Floor Certificates in fact had zero or *de minimis* value at the time of the transfer, and for a considerable period of time thereafter. But for purposes of this motion, the Amended Complaint pleads another more

plausible explanation: that DL-DW used the Floor Certificates to provide $22 million cash to the Debtors. (*See* AC ¶ 154 (Debtors received $22 million loan plus $10.6 million additional funds from DL-DW); *id.* ¶ 155 (the $22 million came in the form of a loan secured by DL-DW's pledge of the Floor Certificates, and distribution from the Floor Certificates, rather than Debtors' own funds, were used to pay interest on the loan); *id.* ¶ 184 (Floor Certificates, rather than assets of the Debtors, were used to repay the loan while the Debtors retained the loan proceeds).)

The Trust has attempted to plead only half of the transaction to manufacture a claim. If one pleads only that an insolvent debtor transferred a million dollars to a third party, it sounds like that debtor may have acted tortiously. If the debtor got back a large house worth roughly a million dollars, then there is no claim at all. And if the debtor were to bring an action to recover the million dollars as having been "looted" by the third party or taken in exchange for nothing, when it is clear from documents that equivalent value went back to the debtor, the claim is neither plausible nor asserted in good faith.

For this additional reason, the claims challenging the Floor Certificate Transfers should be dismissed under *Iqbal* and *Twombly*.

## VII. THE COMPLAINT DOES NOT ALLEGE A CLAIM FOR BREACH OF FIDUCIARY DUTIES BY ANY OF THE LIGHTSTONE ENTITY DEFENDANTS

Count 5 of the Amended Complaint alleges breach of fiduciary and contractual duties of care, loyalty, and good faith" against "all Defendants." (AC pp. 83-88.) No contract or contractual duties are identified, so there is no claim stated for breach of contractual duties. The fiduciary duty claims must be dismissed against all of the entity defendants, including DL-DW, Lightstone Holdings, Lightstone Group, or Lightstone Commercial (the "Lightstone Entity Defendants"), because they owed no fiduciary duties to the Debtors.

Under Delaware law, "fiduciary duties are owed only by directors, officers, or controlling

shareholders." *In re Hechinger*, 274 B.R. at 93. The Lightstone Entity Defendants could not have been directors or officers of any of the Debtors as they are not natural persons.[39] Therefore, it was up to the Trust to allege facts that if proven could support a conclusion that the Lightstone Entity Defendants were controlling shareholders of "the Debtors." For such purposes, a "controlling shareholder" either "1) owns more than 50% of the voting power of a corporation; or 2) exercises control over the business and affairs of the corporation.'" *Dubroff v. Wren Holdings, LLC*, No. 3940, 2009 Del. Ch. LEXIS 89, at *11, n.22 (Del. Ch. May 22, 2009) (quoting *In re PNB Holding Co. S'holders Litig.*, No. 28-N, 2006 Del. Ch. LEXIS 158, at *31 (Del. Ch. Aug. 18, 2006). The Complaint does not allege that any of the Lightstone Entity Defendants had voting rights, let alone voting control, with regard to any or all of the Debtors.

Second, the Trust fails to allege specific facts that show each of the named entity defendants actually exerted control over any of the Debtors. To have control, shareholders must "have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control." *In re PNB Holding*, 2006 Del. Ch. LEXIS 158, at *31; *see also Solomon v. Armstrong*, 747 A.2d 1098, 1117 n.61 (Del. Ch. 1999) (domination requires "literal control of corporate conduct"), *aff'd*, 746 A.2d 277 (Del. 2000). Moreover, "it is the *actual exercise* of such control, not the simple potential for control, that creates the special duty. *Citron v. Steego Corp.*, No. 10171, 1988 Del. Ch. LEXIS 119, at *16 (Del. Ch. Sept. 9, 1988) (emphasis added).

To the contrary, this is another logically implausible claim. By pleading that twenty-seven defendants had the authority to control the management, affairs and direction of the Debtors and actually did so, the Trust has really pled that *none* of them had such authority. The

---

[39] *See* 8 Del. C. §§ 141(b) and 142(a).

captain of a ship controls where the ship goes. If you create a ship with 27 cockpits and staff each with its own captain, then none of them has the ability to control where the ship goes. The Trust's lumping together of all of the defendants defeats the claims by making them absurd. *See Ochre LLC v. Rockwell Architecture Planning & Design*, 12 CIV. 2837, 2012 U.S. Dist. LEXIS 172208, at *16-17 (S.D.N.Y. Nov. 28, 2012) ("Where a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants. . . . A plaintiff cannot merely 'lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" (quoting *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001))).

And here, too, the Trust's admissions, and other documents which are appropriate by subject to judicial notice reflect that *with respect to the actual transfers challenged by the Amended Complaint*, the Mortgage Lender had significant, if not complete control, as set forth above. Neither the individuals nor the entities could have breached any fiduciary duties by reason of the Mortgage Lender exercising rights, especially rights that were conferred on it by virtually 100 percent of the Debtors' creditors through the Cash Management Agreement and other 2007 Transaction documents. Finally, the Disclosure Statement contradicts the Trust's boilerplate allegations. It said that "ESI currently has approximately 90 preferred stock investors." Ex. H at p. 23, § III.B. These claims should be dismissed for these additional reasons.

## VIII. THE BREACH OF FIDUCIARY DUTY CLAIMS AGAINST THE LIGHTSTONE INDIVIDUAL DEFENDANTS MUST BE DISMISSED BECAUSE THE TRUST'S ALLEGATIONS ARE INSUFFICIENT TO OVERCOME THE BUSINESS JUDGMENT RULE

If, *arguendo*, the Amended Complaint adequately pled the existence of fiduciary duties owed by "all Defendants," the Trust's allegations that they were breached are not sufficient to

overcome the business judgment rule.  Under Delaware law, the business judgment rule is "'a presumption that in making a business decision, the directors of a corporation acted on an informed basis [*i.e.,* with due care], in good faith and in the honest belief that the action taken was in the best interest of the company.'"  *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  To overcome this presumption at the pleading stage, a plaintiff bears the burden of demonstrating that defendants either:  (i) were grossly negligent; or (ii) engaged in self-dealing.  *See Aronson*, 473 A.2d at 812.[40]  The Complaints do not contain factual allegations of gross negligence or self-dealing by the Lightstone Defendants.  Rather, the transactions, in particular the Series A Unit Distributions, occurred in accordance with contractual obligations incurred by Debtors and ratified by their creditors.  Observing duties or exercising rights permitted – and here required – by contract does not constitute gross negligence, self-dealing or bad faith.  *See Cooper Development Co. v. Friedman*, 92 Civ. 7572, 1994 U.S. Dist. LEXIS 1814, at *13 (S.D.N.Y. Feb. 22, 1994) (granting defendant's motion for summary judgment on a breach of fiduciary duty claim because "where the partnership agreement expressly authorized defendant to enter into a competing venture, it cannot be a breach of [defendant's] duties under that agreement to do exactly what he was authorized to do"); *see also In re Access Cardiosystems, Inc.*, 404 B.R. 593, 697 (Bankr. D. Mass. 2009) *aff'd*, 488 B.R. 1 (D. Mass. 2012) (under Massachusetts law, "[plaintiff] cannot argue that the [defendants] were constrained by fiduciary obligations to refrain from exercising their rights pursuant to the Stockholders Agreement ... [t]hey exercised their rights in good faith") (*citing In re Wet-Jet International, Inc.*, 235 B.R. 142, 149-50 (Bankr. D. Mass. 1999) ("Where there is no indication of any failure in the duty of good faith and fair

---

[40] *See also CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, No. 03-Civ-7936, 2007 U.S. Dist. LEXIS 74723, at *7-9 (S.D.N.Y. Oct. 3, 2007) (applying Delaware law); *RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.)*, No. 03-ap-2176, 2003 Bankr. LEXIS 1635, at *31 (Bankr. S.D.N.Y. Dec. 11, 2003) (same).

dealing at the time that stockholder agreements are executed, issues of the breach of fiduciary duty do not arise when one party simply seeks to exercise its rights under those agreements")).

The purported acts upon which the Trust's breach of fiduciary duty claims rest were done pursuant to, and in conformance with, transactional documents that were in place before the alleged acts occurred, generally at the impetus of the lenders who comprise nearly all of "the Debtors'" creditors. Accordingly, the Trust's allegation that the Lightstone Defendants are liable for "causing or allowing the Debtors to improperly pay ... illegal dividends or other improper distributions" (AC ¶ 265) is wrong as a matter of law. The equity distributions were part of the 2007 Transaction's contractual framework. Thus, it is untenable to argue that authorization of the distributions was improper, for the mechanism through which those distributions was triggered was negotiated by the contracting parties – including the Debtors and the lenders – before any Lightstone Defendants had fiduciary duties to the Debtors.

*In re Walt Disney Co. Derivative Litig*, No. 15452, 2004 Del. Ch. LEXIS 132 (Del Ch. Sept. 10, 2004) is closely on point. There, after having found that it was proper for the defendant to negotiate the terms of his compensation "to his greatest advantage" before becoming a fiduciary, *id.* at *17, the court found that it was proper for him to authorize and accept the benefits of that bargain *after* he became a fiduciary, *id.* at *25-28. Even though that defendant's stock options were potentially onerous to the company, there was no "self-dealing" because the options were granted "according to the previously agreed-upon terms" of the employment contract that was negotiated before the defendant had fiduciary duties. *Id.* at *22-23. Likewise, the terms of the Series A Units were negotiated in connection with the 2007 Transaction, before any of the Lightstone Defendants could have assumed any (putative) fiduciary duties to any of the Debtors and before any of the defendants had purchased the securities. Therefore, as a matter

of law, the so-called "improper distributions" cannot be deemed a breach of fiduciary duty. *See id.* at *28. Furthermore, there cannot be any claim of self-dealing against any of the defendants who did not receive the distributions.

## IX. THE TRUST CANNOT ESTABLISH A BREACH OF THE DUTY OF CARE

The Trust fails to plead facts to support a conclusion that the Lightstone Defendants were grossly negligent, and thus cannot state a claim for a breach of the duty of care. *See In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 651 (Del. Ch. 2008) ("Even where it is possible to hold directors responsible for a breach of the duty of care, Delaware law requires that directors have acted with gross negligence."); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("[U]nder the business judgment rule director liability is predicated upon concepts of gross negligence.").

The standard for gross negligence in this context is "extremely stringent." *In re Lear*, 967 A.2d at 652. In fact, "the definition is so strict that it imports the concept of recklessness into the gross negligence standard[.]" *Id.* at 652 n. 45. Thus, in order to adequately plead "gross negligence," a plaintiff must allege plausible facts to support the conclusion that a fiduciary director or officer showed "reckless indifference" or "deliberate disregard" or acted "without the bounds of reason." In re *Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 750 (Del. Ch. 2005).

The Trust's allegations fall far short of pleading a breach of the duty of care. The Trust alleges that the Lightstone Defendants breached an alleged duty of care by "causing or allowing" the "distribution of the LIBOR Floor Certificates," "substantial equity distributions" and "improper distributions, " *etc*. (AC ¶ 265.) However, all these allegations focus entirely on the ultimate business *result* instead of the *decision process* that led to those results. It is the process that determines whether or not due care and loyalty were exercised. *See In re Caremark Int'l*, 698 A.2d 959, 967 (Del. Ch. 1996) ("[C]ompliance with a director's duty of care can never appropriately be judicially determined by reference to the content of the *board decision* that

73

leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed.").

Retrospectively declaring that each business decision allegedly made by the Lightstone Defendants (not all of whom are not even alleged to have had anything to do with the decision) somehow was the catalyst for the Debtors' eventual aggregate insolvency does not plead that there was gross negligence or a lack of good faith in making those decisions. "[T]he business judgment rule is process oriented[.]" *Id.* at 967-68. That is, whether "after the fact," a decision is found "substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', *provides no ground for director liability*, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests." *Id.* at 967 (emphasis added); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 130 (Del. Ch. 2009) ("[T]he mere fact that a company takes on business risk and suffers losses – even catastrophic losses – does not evidence misconduct, and without more, is not a basis for personal director liability.")[41]; *accord Gagliardi v. Trifoods Int'l*, 683 A.2d 1049, 1053 (Del. Ch. 1996).

Nowhere in the Amended Complaint is it even suggested that the actual decision process underlying the challenged distributions was "without the bounds of reason." *See Walt Disney*, 907 A.2d at 750. In fact, the Complaints allege just the opposite: that ESI's board "met regularly to discuss material developments and how to proceed in light of them," *In re Lear*, 967 A.2d 640 at 649 (*see also*, *e.g.*, AC ¶¶ 131-32, 158, 160, 169-70), and that the board solicited and acted upon "the advice of professional advisors," *In re Lear*, 967 A.2d at 649, that included Lazard

---

[41] Moreover, "[t]hat there were signs in the market that reflected worsening conditions and suggested that conditions may deteriorate even further is not an invitation for this Court to disregard the presumptions of the business judgment rule and conclude that the directors are liable because they did not properly evaluate business risk." *In re Citigroup*, 964 A.2d at 130.

Freres & Co. and Weil, Gotshal & Manges LLP.  (AC ¶ 160.)  The Complaint is long on adverbs but devoid of specific facts that, if proven, might demonstrate a breach of due care or loyalty.

*Gagliardi* is on point.  There, the court addressed, and rejected, the same type of conclusory allegations that permeate the Trust's allegations here.  *See* 683 A.2d at 1051-53.  For example, an allegation that the defendants "entered into a transaction ... to acquire 'Lloyd's Ribs' at a grossly excessive price, knowing (or recklessly not knowing) that the Company could not afford the transaction," among others, was characterized by the Court as using hindsight to "allege[] only ... ordinary business decision[s] with a pejorative characterization." *Id.*  The Trust's use of terms like "wanton," "willful," "reckless," "outrageously," and "egregiously" to characterize the Lightstone Defendants' supposed acts in allowing the challenged transfers  are exactly the type of allegations rejected as inadequate by *Gagliardi*.  Indeed, it is because so many plaintiffs attempt to abuse these types of conclusory allegations that "duty of care violations are rarely found" under Delaware law.  *Walt Disney*, 907 A.2d at 750.

Accordingly, because the Complaint provides no actual factual allegations to support a gross negligence theory, it does not state a claim for breach of the duty of care.  *See*, *e.g.*, *In re Lear*, 967 A.2d at 649 (duty of care claim dismissed because "cursory allegations that the board did not have a basis for concluding that the [transaction agreement] was financially advantageous" and "that the board knew that the $37.25 per share deal was 'unfair,'" were "allegations []unsupported by the pled facts"); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000) (granting motion dismissing claims for breach of fiduciary duties, because on a " Rule 12(b)(6) motion…a court… will not rely upon conclusory allegations of wrongdoing or bad motive unsupported by pled facts.").

## X. THE TRUST'S DUTY OF CARE CLAIM IS BARRED BY EXCULPATORY PROVISIONS IN ESI'S CERTIFICATE OF INCORPORATION

Even if the Trust could allege a claim for breach duty of care against the Lightstone Defendants, any defendant that was an ESI director or officer (the only defendants who would have such duties) would be shielded from such claims by an exculpatory clause in ESI's certificate of incorporation. Pursuant to the certificate: "A director of this Corporation shall not be liable to the Corporation or the Stockholders for monetary damages for breach of fiduciary duty as a director ...." (Certificate Art. VIII.)[42]

The Delaware Chancery Court and the Second Circuit each have held that exculpatory clauses of this type are defenses against a bankruptcy trustee asserting a debtor's claims. *See Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 472-73 (Bankr. S.D.N.Y. 2006). In addition, Delaware law specifically permits such protection for directors in a corporation's certificate. *See* Del. Code Ann. tit. 8, § 102(b)(7). This protection also extends to corporate officers.[43]

Accordingly, Counts 5, 6, and 7 must be dismissed to the extent they allege a breach of the duty of care against defendants who were directors or officers of ESI (the only entity with non-financing creditors), including the individual Lightstone Defendants. *See, e.g.*, *In re Verestar*, 343 B.R. at 473 (dismissing "allegations of the [c]omplaint that charge the directors with breach of the duty of care" based on exculpatory provision in the charter of the corporation authorized by 8 Del. C. § 102(b)(7)); *Nymex S'holder Litig. v. New York Mercantile Exch., Inc.*,

---

[42] A copy of the Certificate is submitted as **Exhibit S** hereto. The Court "may take judicial notice of an exculpatory provision at the motion to dismiss stage." *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 145 (Bankr. S.D.N.Y. 2009); *see also Malpiede v. Townson*, 780 A.2d 1075, 1092-93 (Del. 2001).

[43] "[T]he decisions that impose a fiduciary duty on officers of a Delaware corporation hold them to the same standards as a director." *In re Verestar*, 343 B.R. at 475. Moreover, "[n]o reason has been suggested why an officer should be held to a higher standard." *Id.* Accordingly, claims against both directors and officers for breach of their duty of care are shielded by ESI's exculpatory clause. *See id.*

No. 3621, 2009 Del. Ch. LEXIS 176, at *21 (Del. Ch. Sept. 30, 2009) (granting motion to dismiss breach of the duty of care claims where the corporation's Certificate of Incorporation contained an exculpatory clause authorized by 8 Del. C. § 102(b)(7)).[44]

## XI. THE TRUST HAS NOT PLAUSIBLY ALLEGED BAD FAITH

The Complaint also fails to allege facts that state a claim that the Lightstone Defendants acted in bad faith. Mere allegations of gross negligence are insufficient to subject defendants to liability for acting in bad faith. *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.), ("Walt Disney III")*, 906 A.2d 27, 64-65 (Del. 2006). Nor is it appropriate to use hindsight to "equate a bad outcome with bad faith." *Stone*, 911 A.2d at 373. Instead, "bad faith" requires a showing of "intentional misconduct or a knowing violation of law." *Walt Disney III*, 906 A.2d at 67; *accord Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240, 243 (Del. 2009) ("[B]ad faith encompasses not only an intent to harm but also intentional dereliction of duty … there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."). Accordingly, the standard for a violation of good faith "is qualitatively different from, and *more culpable* than, the conduct giving rise to a violation of the fiduciary duty of care (*i.e.*, gross negligence)." *Stone*, 911 A.2d at 369 (emphasis added). Thus, because the Trust has failed to meet the stringent standard for pleading gross negligence, its attempt to plead bad faith *ipso facto* fails as a matter of law.

## XII. THE TRUST CANNOT RECOVER PUNITIVE DAMAGES

The Trust improperly seeks punitive damages for breach of fiduciary duty claims. AC ¶¶ 272, 279, 285. Delaware law does not permit an award of punitive damages for a breach of

---

[44] Further, allegations against the Lightstone Defendants cannot be "saved by a conclusory assertion that the directors' acts and omissions were not taken in good faith or involved intentional misconduct or a knowing violation of the law…." *In re Verestar*, 343 B.R. at 473. "The business judgment rule protecting directors from having their decisions second-guessed cannot be overcome by conclusory allegations of bad faith." *Id.*; *Stanziale v. Nachtomi*, 330 B.R. 56, 63 (D. Del. 2004). The same applies to exculpatory provisions. *See In re Verestar*, 343 B.R. at 473.

fiduciary duty. *See Adams v. Calvarese Farms Maint. Corp.*, No. 4262, 2010 Del. Ch. LEXIS 199, at *82 n.204 (Del. Ch. Sept. 17, 2010) ("The Legislature has not authorized punitive damages for a director's breach of fiduciary duty; thus, [plaintiff's] claim for such relief must be denied."); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006) ("Obviously, the court cannot award punitive damages" for a breach of the duty of loyalty.); *Albert v. Alex. Brown Mgmt. Servs.*, No. 04C-05-250, 2004 Del. Super. LEXIS 303, at *21 (Del. Super. Ct. Sept. 15, 2004) (All claims "involving breach of fiduciary duty[] are heard exclusively in Chancery without possibility of punitive damages."). Furthermore, there are no allegations in the complaint of conduct that warrants punitive damages on any of the other claims. Therefore, the Trust's demands for punitive damages must be dismissed.

## XIII. THE TRUST'S AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIM FAILS AS A MATTER OF LAW

The Trust's claim for aiding and abetting breach of fiduciary duty (Count 6) fails for four independent reasons. First, the Trust lacks standing to bring this claim under the *Wagoner* rule. Second, the Trust fails to plead a predicate breach of fiduciary duty. Third, corporate insiders, as the Lightstone Defendants are alleged to be, may not be held liable for aiding and abetting other insiders in purported breaches of fiduciary duty. Fourth, the Trust's allegations are purely conclusory.

### A. The *Wagoner* Rule Bars the Trust's Claim.

The Trust lacks standing to assert a claim alleging that the Lightstone Defendants aided and abetted breach of fiduciary duty. In New York, the Second Circuit's "*Wagoner* rule" denies a bankruptcy trustee standing to bring claims on behalf of the debtor's estate where the debtor itself is an alleged wrongdoer. *See Picard*, 454 B.R. at 29 (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)). The reasoning behind the *Wagoner* rule is well

established: "[b]ecause management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Grumman Olson Indus. v. McConnell (In re Grumman Olson Indus.)*, 329 B.R. 411, 423-24 (Bankr. S.D.N.Y. 2005) (internal quotation marks and citations omitted); *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 86-87 (2d Cir. N.Y. 2000). As a result, a claim against a third party for defrauding a corporation with the cooperation of management does not accrue to the corporation. *Wagoner*, 944 F.2d at 120. Thus, although the common law doctrine of *in pari delicto* "precluding a wrongdoer ... from recovering from another wrongdoer" is an affirmative defense under New York state law, "in federal court prudential considerations deprive a bankruptcy trustee of standing to even bring a claim that would be barred by *in pari delicto*." *Picard*, 454 B.R. at 29 (citing *Wagoner*, 944 F.2d at 118); *see also Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 708-13 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003).

The Trust alleges that the Lightstone Defendants aided and abetted a breach of fiduciary duty by helping "all Defendants" "cause or allow" the three sets of challenged transfers. As set forth above, alleged misconduct by all of the Debtors' directors and officers is imputed to the Debtors, and in turn the Trust as their successor. Under the *Wagoner* rule, therefore, the Trust has no standing to bring claims for aiding and abetting torts, and Count 6 and also Count 10 should be dismissed for lack of subject matter jurisdiction. *See, e.g., Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 826 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094-95 (2d Cir. 1995); *In re Grumman*, 329 B.R. at 423.

### B.    The Trust Fails to Plead Any Predicate Breach of Fiduciary Duty.

To establish a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must plausibly demonstrate an underlying breach of fiduciary duty. *See, e.g., Marino v. Grupo*

79

*Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 613 (S.D.N.Y. 2011).  Thus, if the predicate

breach of fiduciary duty is not sufficiently pled, any corresponding claim for aiding and abetting

that breach fails as a matter of law.  *See Lefkowitz v. Bank of N.Y.*, 676 F. Supp. 2d 229, 263

(S.D.N.Y. 2009) (Because "plaintiff does not plead a cognizable primary fiduciary breach … her

claim for aiding and abetting those purported breaches must also fail.").[45]  Accordingly, because

the Trust has failed to sufficiently plead any breach of fiduciary duty, as discussed above, Counts

5 and 6 must be dismissed for this reason as well.

<blockquote>

**C.    As Alleged Corporate Insiders, the Lightstone Defendants
Cannot Be Liable For Purportedly Aiding and Abetting
<u>Each Other in Breaches of Fiduciary Duty.</u>**

</blockquote>

A further reason that Count 6 fails is that alleged corporate insiders cannot aid and abet

other corporate insiders.  "[A] third-party relationship between the alleged aider and abettor and

the corporation is a necessary element" of an aiding and abetting claim.  *Solow*, 994 F. Supp. at

181, *aff'd*, 163 F.3d 151 (2d Cir. 1998); *see also O'Connell v. Arthur Andersen LLP (In re

AlphaStar Ins. Grp. Ltd.)*, 383 B.R. 231, 272 (Bankr. S.D.N.Y. 2008); *In re Grumman*, 329 B.R.

at 425.  Here, the Trust alleged that all of the Defendants were corporate insiders of the Debtors.

(*See, e.g.*, AC ¶ 3.)  Accordingly, any claim that the Lightstone Defendants aided and abetted

each other or any of the other alleged insiders in purported breaches of fiduciary duty must be

dismissed.

<blockquote>

**D.    <u>The Trust's Allegations Are Conclusory.</u>**

</blockquote>

Count 6 also fails because it is wholly conclusory.  Without an iota of specificity, the

Trust alleges that "any Defendant" aided and abetted "breaches of fiduciary and contractual

duties by one or more of the other Defendants" and that "each Defendant knew that the other

---

[45] *See also Big Apple Consulting USA, Inc. v. Belmont Partners, LLC*, 873 N.Y.S.2d 232 (N.Y. Sup. Ct. 2008)
("This [aiding and abetting] cause of action must fail in the absence of any fiduciary duty being established.").

Defendants' acts and omissions were wrongful and constituted breaches of fiduciary and contractual duties."[46]  (AC ¶¶ 274-75.)  The Amended Complaint does not allege how any given defendant may have done so.

First of all, no claim for aiding and abetting breach of contractual duties exists under New York law.  *See Purvi Enters., LLC v. City of N.Y.*, 62 A.D.3d 508, 509  (1st Dep't 2009); *Talkin, Muccigrosso & Roberts v. Florio, Perrucci, Steinhardt & Fader, LLC*, No. 107605/07, 2009 N.Y. Misc. LEXIS 5302, at *6 (Sup. Ct. Sept. 11, 2009).  Second, "[a]ctual knowledge, as opposed to merely constructive knowledge, is required and a plaintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty."  *Bullmore v. Ernst & Young Cayman Is.*, 45 A.D.3d 461, 464 (1st Dep't 2007); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) (plaintiff must allege facts giving rise to a *strong inference* of defendant's actual knowledge of the underlying harm").

Third, the Trust does not allege any facts in support of its boilerplate allegations that each "Defendant aided, abetted, induced, participated in, or conspired to, commit the breaches of fiduciary and contractual duties by one or more of the other Defendants ...." (AC ¶ 274.)  This defect also requires dismissal of Counts 10 and 11.  "A defendant cannot be held liable for another's intentional tort unless the circumstances of his connection therewith can be alleged in detail from the outset."  *Parrott v. Coopers & Lybrand, L.L.P.*, 263 A.D.2d 316, 334 (1st Dep't 2000) (dismissing claim for aiding and abetting breach of fiduciary duty) (internal quotation marks omitted).

---

[46] Also, no claim for aiding and abetting breach of contractual duties (*see* AC ¶¶ 273-79) exists under New York law.  *See Purvi Enters., LLC v. City of N.Y.*, 62 A.D.3d 508, 509  (1st Dep't 2009); *Talkin, Muccigrosso & Roberts v. Florio, Perrucci, Steinhardt & Fader, LLC*, No. 107605/07, 2009 N.Y. Misc. LEXIS 5302, at *6 (Sup. Ct. Sept. 11, 2009).

The Trust does not allege facts in support of the allegation that the Lightstone Defendants had actual knowledge of, or participated in, another's underlying breach of fiduciary duty. Tellingly, the Trust fails allege who did what for whom. Instead, "All Defendants" are lumped together into a vacuous boilerplate allegation. This is improper and insufficient. *See Steinberg v. Sherman*, No. 07-Civ-1001, 2008 U.S. Dist. LEXIS 37367, at *15 (S.D.N.Y. May 8, 2008) ("[A] plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim."). Because the Trust has failed to plead any facts in support of this boilerplate claim, dismissal is required. *See Parrott*, 263 A.D.2d at 334 (holding that a "cause of action for aiding and abetting breach of fiduciary duty [that] rests merely on conclusory allegations [will] not suffice to sustain a cause of action"); *Roni LLC v. Arfa*, 15 N.Y.3d 826, 827 (2010) (affirming dismissal of plaintiff's aiding and abetting claim, because "conclusory pleadings do not give rise to an inference that the [] defendants knowingly participated in the alleged aiding and abetting of a breach of fiduciary duty by providing substantial assistance").

## XIV. COUNTS 1 AND 2 MUST BE DISMISSED AGAINST ALL PARTIES THAT ARE NOT ALLEGED TO HAVE BEEN DIRECTORS OF CORPORATE TRANSFERORS AT THE TIME ALLEGED ILLEGAL DIVIDENDS WERE PAID

Counts 1 and 2 seek to hold a host of entity defendants liable for authorization of illegal distributions or dividends under sections 160, 173 and 174 of the DCGL and Section 18-607 of the Delaware Limited Liability Company Act ("DLLCA"). These counts must be dismissed for failure to state a claim.

First, entity defendants cannot have liability under section 174 of the DCGL. This statute specifically provides for "[l]iability of directors for unlawful payment of dividend[s] or unlawful stock purchase or redemption." 8 Del. C. § 174. The entities obviously could not have been directors and have been sued improperly here.

82

Second, no claims whatsoever are stated under section 160 of the DCGL. This section prohibits a corporation from "purchas[ing] or redeem[ing] its own shares of capital stock" if its capital is impaired or would be impaired by the redemption. 8 Del. C. § 160. Not one of the Trust's allegations pertains to a capital stock purchase or redemption.

Third, the Trust also has failed to state a claim under Section 18-607(b) of the DLLCA. This statute addresses an improper distribution from a limited liability company to one of its members, requiring the member to return the distribution under certain circumstances. 6 Del. C. § 18-607. Under the plain language of the statute, the Trust must plead that a given defendant was a member of a limited liability company and received a distribution from that company. As yet another consequence of the Trust's calculated decision not to plead which Debtors made which distributions, the Amended Complaint is devoid of the necessary factual allegations to state a claim under Section 18-607(b) of the DLLCA. And from the facts that are alleged, it seems highly improbable that any defendant received a distribution from a limited liability company of which it was a member.

All that remains of Counts 1 and 2 are the illegal dividend or distribution claims alleged against individuals who were directors of corporate Debtors. This portion of the claim fails because it does not meet the "specific proof requirements" of section 174. *See Terr. of the U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 794 (Del. Ch. 2007). Again, the claims fail because of the Trust's contrived use of passive voice to make allegations and failure to allege which Debtor made or funded transfers. There are no allegations: (a) that a given defendant was (b) a director of any given Debtor that is a corporation, (c) that such Debtor issued an illegal dividend, (d) of the reason why the dividend was improper under Delaware corporate law (*i.e.*, whether at the time of each challenged dividend the issuing entity had a surplus), and (e) that the

subject defendant authorized it. Without these particulars, Counts 1 and 2 fail to conform even to basic notice pleading standards and therefore must be dismissed. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555-56.

## XV.    THE TRUST DOES NOT PLEAD A VALID CLAIM FOR WASTE

The Trust's claim for waste (Count 8) is insufficient as a matter of law. Under Delaware law,[47] the "pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging … directors' conflicted loyalties or lack of due care." *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999). To sufficiently plead waste, a plaintiff must allege "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Brehm*, 746 A.2d at 263. Put another way, the challenged transaction must have "either served no purpose or [been] so completely bereft of consideration that the transfer [was] in effect a gift." *Criden v. Steinberg*, No. 17082, 2000 Del. Ch. LEXIS 50, at *9 (Del. Ch. Mar. 23, 2000). As such, the standard for waste is "extreme" and "very rarely satisfied." *In re 3COM Corp. Shareholders Litig.*, No. 16721, 1999 Del. Ch. LEXIS 215, at *12 (Del. Ch. Oct. 25, 1999).

Under this stringent standard, the Trust's allegations do not remotely state a claim for waste. First, because the Trust has not sufficiently pled claims for breach of loyalty or duty of care (*see supra* sections VII, VIII), then *a fortiori* its claim for waste is invalid under the higher applicable standard.

Second, the assets of the Debtors that "all Defendants" supposedly "squandered" (AC at pp. 90-91) cannot include the Floor Certificates because (i) they were never assets of the

---

[47] Because claims for waste of corporate assets, like fiduciary duty claims, are governed by the internal affairs doctrine, Delaware law should apply. *See Lemond v. Manzulli*, No. 05-Civ-2222, 2009 U.S. Dist. LEXIS 50135, at *11 (E.D.N.Y. Feb. 9, 2009); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 549 (D. Del. 2009).

Debtors, (ii) the documents referenced in the Amended Complaint demonstrate that the Debtors did not give up any consideration to entitle them to the Floor Certificates, and (iii) the DL-DW used the Floor Certificates to obtain $22 million cash for the Debtors. *See supra*.

The Series A Unit Payments were payments made pursuant to the Debtors contractual obligations under the Loan Documents, which were negotiated before any of the Defendants allegedly controlled the Debtors and implemented into the contractual framework of the 2007 Transaction. The funds were disbursed by the Mortgage Lender with the agreement of all of the other lenders representing nearly 100 percent of the enterprise-wide debt. Even if, *arguendo*, the transfers were wasteful, the waste was not proximately caused by the Lightstone Defendants.

Furthermore, the Debtors received substantial consideration in exchange for issuing the Series A Securities, an amount in the hundreds of millions of dollars that far exceeds the amount of the subsequent payments. There was no "gift." Likewise, the Debtors received critical management services for years from multiple individuals, including their General Counsel, in exchange for the Management Fee. Thus, the alleged transfers were neither gratuitous nor bereft of consideration. *See Steiner v. Meyerson*, No. 13139, 1995 Del. Ch. LEXIS 95, at *3 (Del. Ch. July 19, 1995) ("If under the circumstances any reasonable person might conclude that the deal made sense, then the judicial inquiry ends."). Obviously the Mortgage Lender also concluded that the transactions made sense because it performed them.

Finally, the Trust's allegations here are utterly conclusory yet again. Without identifying which defendant is supposed to have wasted what on whom, the Trust again resorts to group pleading and alleges that "each of the Defendant[]s" engaged in "irrational squandering of the Debtors' assets" (AC ¶¶ 287-90), and that all Defendants should be jointly and severally liable for the acts of all other Defendants without regard to what role, if any, given defendant played in

any putative incident of waste. This is nothing more than a threadbare recital of a waste cause of action – the sort of pleading that does not survive the business judgment rule. *See White v. Panic*, 783 A.2d 543, 554, n.36 (Del. 2001) ("To prevail on a waste claim … plaintiff must overcome the general presumption of good faith"). Accordingly, Count 8 must be dismissed.

## XVI. ADDITIONAL REASONS THE TRUST'S CLAIMS FOR ACTUAL FRAUD (COUNTS 12 AND 13) MUST BE DISMISSED

In addition to the reasons set forth above, including the Trust's failure to plead facts sufficient to establish standing and the inability of the Trust to assert claims for the benefit of the Mortgage Lender, the Trust's claims alleging actual fraudulent conveyances should be dismissed for failure to allege plausible or specific facts that meet the heightened pleading standard of Rule 9(b), and for failure to allege badges of fraud sufficient to support a reasonable inference of an intent to defraud on the part of any of the Lightstone Defendants. To the contrary, the Amended Complaint and other documents and admissions the Court may consider in adjudicating this motion demonstrate that all of the challenged conveyances were documented and disclosed to creditors. Since the Mortgage Lender caused the transfers, the Trust's intentional fraud claims essentially assert that the Mortgage Lender actively participated in defrauding itself, which of course is nonsensical. It is equally nonsensical to draw an inference that Mr. Lichtenstein and his affiliates would intentionally harm the company he owned, had recently invested hundreds of millions of dollars of his own funds to purchase, and for which he issued a personal guaranty for an additional $100 million that could be triggered by misconduct. The claims simply do not make sense.

In addition, the Lightstone Parties join the Arbor Defendants' additional arguments as to why the Trust's claims for Actual Fraudulent Conveyance, Counts 12 and 13 of the Amended

Complaint, should be dismissed.  *See* Arbor Defendants' Memorandum of Law in Support of Moving Defendants' Motion to Dismiss The Amended Complaint, Point II.

## <u>CONCLUSION</u>

After two years and six complaints, the Trust's allegations still entirely fail to allege facts necessary for its claims to survive.  For all of the above stated reasons, as well as those set forth in co-defendants' memoranda and incorporated herein, and as may be adduced further at the hearing on this matter, the Lightstone Defendants request the Court to dismiss the Complaint in its entirety, with prejudice, and without leave to amend, and grant such other and further relief in their favor as the Court may deem proper.

Dated:  New York, New York
　　　 December 20, 2013

　　　　　　　　　　　　　KASOWITZ, BENSON, TORRES
　　　　　　　　　　　　　 & FRIEDMAN LLP

　　　　　　　　　　　　 By: /s/ *Robert M. Novick*　　　　　　
　　　　　　　　　　　　　　 David M. Friedman
　　　　　　　　　　　　　　 Robert M. Novick
　　　　　　　　　　　　　　 Daniel N. Zinman
　　　　　　　　　　　　 1633 Broadway
　　　　　　　　　　　　 New York, New York 10019
　　　　　　　　　　　　 Tel:  (212) 506-1700
　　　　　　　　　　　　 Fax:  (212) 506-1800

　　　　　　　　　　　　 *Attorneys for the Lightstone Defendants*