**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------

| | |
|---|---|
| In re: | X   Case No. 09-13764 (JMP) |
| EXTENDED STAY, INC., *et al.* | : |
| | :   (Jointly Administered) |
| Debtors. | : |
| | X |

----------------------------------------------------------------

| | |
|---|---|
| FINBARR O'CONNOR, as Trustee for and on behalf of the EXTENDED STAY LITIGATION TRUST, and | : |
| THE EXTENDED STAY LITIGATION TRUST, | :   Adv. P. No. 11-2254 (JMP) |
| Plaintiffs, | :   (Consolidated) |
| -against- | : |
| DL-DW Holdings, L.L.C., *et al.*, | : |
| Defendants. | : |
| | X |

----------------------------------------------------------------

### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOVING DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3683
Fasimile: (212) 698-3599

*Attorneys for Moving Defendants Arbor ESH II, LLC, Arbor Commercial Mortgage, LLC, Atmar Associates, LLC, Glida One LLC, Mericash Funding LLC, Ron Invest LLC, ABT-ESI LLC, Princeton ESH LLC, Guy R. Milone, Jr., Joseph Chetrit, and Joseph Martello*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

REPLY ........................................................................................................2

POINT I      THE AMENDED COMPLAINT FAILS TO MEET THE NOTICE PLEADING STANDARD OF FED. R. CIV. P. 8 ...........................................2

     A.      The Trustee Fails to Adequately Allege the Transfers He Seeks to Avoid.... 3

     B.      The Trustee Cannot "Self-Pierce" the Debtors' Corporate Veils............... 3

POINT II      THE ACTUAL FRAUDULENT CONVEYANCE CLAIMS FAIL AS A MATTER OF LAW .....................................................................7

POINT III      THE TRUSTEE CANNOT AVOID TRANSFERS OF NONDEBTOR PROPERTY ...........................................................................11

POINT IV      THE BANKRUPTCY CODE'S SAFE HARBOR BARS THE TRUSTEE'S CLAIMS AGAINST THE MOVING DEFENDANTS ..........15

     A.      The Preferred Dividends Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e) ...........................................15

     B.      The PERA Payments Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e) ...........................................19

     C.      The LIBOR Certificate Transfers Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e)...............................19

     D.      All State Law Claims are Preempted by Section 546(e)................................21

POINT V      THE CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS FAIL AS A MATTER OF LAW ....................................................23

POINT VI      THE TRUSTEE IS PRECLUDED FROM RECOVERY HEREIN .............23

     A.      The Alleged Transfers Were Ratified by Those Holding Mortgage Facility Claims and Mezzanine Facility Claims .............................................24

     B.      The *Bangor Punta* Doctrine Bars the State Law Claims ................................26

     C.      The Trustee May Only Recover to the Extent the Estate Would be Benefitted...................................................................................................27

POINT VII      THE TRUSTEE LACKS STANDING AND IS EQUITABLY BARRED ...................................................................................28

     A.      The Trustee Lacks Standing to Assert the State Law Claims Under the *Wagoner* Rule .........................................................................................28

     B.      The Trustee Lacks Standing to Assert Claims for (i) Waste; (ii) Conversion; (iii) Aiding, Abetting, Inducing, or Participating in Conversion; and (iv) Conspiracy ...................................................................29

POINT VIII      THE COMMON LAW CLAIMS IN THE AMENDED COMPLAINT ARE ALL DEFECTIVE ..............................................................30

CONCLUSION.......................................................................................31

# TABLE OF AUTHORITIES

**CASES**

*A.W. Lawrence & Co. v. Burstein (In re A.W. Lawrence & Co.)*,
346 B.R. 51 (Bankr. N.D.N.Y. 2006) .............................................................................. 14

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
122 F.3d 130 (2d Cir. 1997).......................................................................................... 4

*AP Servs., LLP v. Silva*,
483 B.R. 63 (S.D.N.Y. 2012)........................................................................................ 22

*Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*,
417 U.S. 703 (1974).............................................................................................. 26, 27

*Begier v. I.R.S.*,
496 U.S. 53 (1990)....................................................................................................... 14

*Bond v. Nat'l Fin. Servs. (In re U.S. Mortg. Corp.)*,
491 B.R. 642 (Bankr. D.N.J. 2013) .............................................................................. 21

*Bond v. Sparks (In re U.S. Mortg. Corp.)*,
492 B.R. 784 (Bankr. D.N.J. 2013) ......................................................................... 21, 22

*Brown v. Nationscredit Comm. Corp.*,
No. 99-CV-592, 2000 WL 887593 (D. Conn. June 26, 2000)....................................... 26

*Case Fin. Inc. v Alden*,
No. 1184-VCP, 2009 Del. Ch. LEXIS 153 (Del. Ch. Aug. 21, 2009)............................. 5

*Cassirer v. Herskowitz (In re Schick)*,
234 B.R. 337 (Bankr. S.D.N.Y. 1999) .......................................................................... 14

*CFTC v. Probber Int'l Equities Corp.*,
504 F. Supp. 1154 (S.D.N.Y. 1981)............................................................................. 26

*Contemporary Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009) ....................................................................................... 21

*Crescent Res. Litig. Trust v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex. 2013).................................................................................... 18

*Daly v. Deptula (In re Carrozzella & Richardson)*,
286 B.R. 480 (D. Conn. 2002) ....................................................................................... 8

*Disenos Artisticos E. Industriales, S.A. v. Costco Wholesale Corp.*,
97 F.3d 377 (9th Cir. 1996) ........................................................................................... 4

*EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*,
467 B.R. 318 (Bankr. D. Del. 2012) ............................................................................. 16

*Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*,
No. 5109-VCS, 2011 WL 1167088 (Del. Ch. Mar. 29, 2011)........................ 16

*Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*,
452 B.R. 467 (Bankr. S.D.N.Y. 2011) ............................................................. 23

*In re ALT Hotel LLC*,
479 B.R. 781 (Bankr. N.D. Ill. 2012) ................................................................ 5

*In re Appalachian Fuels, LLC*,
493 B.R. 1 (B.A.P. 6th Cir. 2013) ..................................................................... 6

*In re Geneva ANHX IV LLC*,
496 B.R. 888 (Bankr. C.D. Ill. 2013) ................................................................ 6

*In re Hechinger Inv. Co.*,
274 B.R. 71 (D. Del. 2002) .............................................................................. 22

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005) .............................................................................. 6

*In re Rehab. of Centaur Ins. Co.*,
158 Ill. 2d 166, 632 N.E.2d 1015 (1994) .......................................................... 5

*In re Trinsum Grp., Inc.*,
460 B.R. 379 (Bankr. S.D.N.Y. 2011) .............................................................. 2

*JP Morgan Chase Bank, N.A. v. Malarkey*,
65 A.D.3d 718, 884 N.Y.S.2d 787 (2009) ........................................................ 5

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.
Holdings Inc.)*,
469 B.R. 415 (Bankr. S.D.N.Y. 2012) ................................................. 16, 17, 22

*Liberty Prop. Trust v. Republic Props. Corp.*,
577 F.3d 335 (D.C. Cir. 2009) .......................................................................... 5

*Lumpkin v. Envirodyne Indus., Inc.*,
933 F.2d 449 (7th Cir. 1991) ............................................................................. 4

*Matulich v. Aegis Commc'ns Grp., Inc.*,
942 A.2d 596 (Del. 2008) ................................................................................. 17

*McCarthy v. Azure*,
22 F.3d 351 (1st Cir. 1994) ................................................................................ 5

*Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*,
470 B.R. 289 (D. Del. 2012) ............................................................................ 17

*Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*,
792 A.2d 920 (Del. Ch. 1999) ......................................................................... 27

*Miller v. CSFB (In re Refco, Inc. Sec. Litig.)*,
No. 07 MDL 1902, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) ........................... 16, 24

*Pergament v. Precision Sounds DJ's, Inc. (In re Oko)*,
395 B.R. 559 (Bankr. E.D.N.Y. 2008) ................................................................................ 4

*Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff Sec.)*
-- B.R. --, 2013 WL 6825468 (S.D.N.Y. Dec. 26, 2013) ................................................ 15

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011) ........................................................................................ 16

*Rahl v. Bande*,
328 B.R. 387 (S.D.N.Y. 2005) ........................................................................................ 30

*Rodriguez v. Boyd (In re Boyd)*,
Bankr. No. 11-51797, 2012 WL 5199146 (W.D. Tex. Oct. 22, 2012) .............................. 6

*Rosen v. Coggins & Harman, P.A. (In re Rood)*,
No. 08-17199, 2012 WL 648230 (D. Md. Feb. 28, 2012), *aff'd*, 2013 WL 55650
(D. Md. Jan. 2, 2013) ....................................................................................................... 4

*SeaQuest Diving L.P. v. S & J Diving Inc. (In re SeaQuest Diving L.P.)*,
579 F.3d 411 (5th Cir. 2009) .......................................................................................... 20

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005) ..................................................................................... 7, 8, 11

*Shearson Lehman Hutton, Inc. v. Wagoner*,
944 F.2d 114 (2d Cir. 1991) ........................................................................................... 28

*Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*,
102 F.3d 223 (6th Cir. 1996) ............................................................................................ 5

*U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*,
301 F.3d 296 (5th Cir. 2002) ............................................................................................ 6

*UCAR Int'l, Inc. v. Union Carbide Corp.*,
No. 00CV1338, 2004 WL 137073 (S.D.N.Y. Jan. 26, 2004), *aff'd,* 119 F. App'x
300 (2d Cir. 2004) ........................................................................................................... 27

*Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
860 F.2d 515 (2d Cir. 1988) ......................................................................................... 6, 7

*United Cont'l Tuna Corp. v. U.S.*,
550 F.2d 569 (9th Cir. 1977) ............................................................................................ 4

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*,
503 B.R. 348, 2014 WL 118036 (Bankr. S.D.N.Y. 2014) ....................................... passim

*Whyte v. Barclays Bank, PLC*,
494 B.R. 196 (S.D.N.Y. 2013) .................................................................................. 21, 22

**STATUTES & OTHER AUTHORITIES**

11 U.S.C. § 101(54)(D) ........................................................................... 15

11 U.S.C. § 546(e) ............................................................................. passim

11 U.S.C. § 548(a)(1) ............................................................... 7, 12, 13, 14

11 U.S.C. § 550(a) ................................................................................... 22

11 U.S.C. § 741(7)(A)(i) ............................................................. 15, 18, 20

Fed. R. Civ. Proc. 8 ................................................................................... 2

1 *Fletcher Cyclopedia of the Law of Private Corporations*, § 41.20 (2013) ........................... 5

Defendants Arbor ESH, ACM, Atmar, ABT-ESI, Glida, Mericash, Princeton, and Ron Invest, Milone, and Chetrit,[1] respectfully submit this reply memorandum of law in further support of their motion to dismiss the Amended Complaint (the "**AC**") herein with prejudice for failure to state a claim on which relief can be granted, in response to the Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss, filed on January 31, 2014 [Dkt. No. 233] (the "**Opp. Mem.**" or "**Opposition Memorandum**").

## PRELIMINARY STATEMENT

The recent *Lyondell* decision by Judge Gerber removes any shred of remaining doubt that the LBO lenders cannot share in any recovery in this action. *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 2014 WL 118036, at *33 (Bankr. S.D.N.Y. 2014). The Trustee cannot recover on behalf of the LBO lenders because the lenders ratified the very transfers that the Trustee now seeks to avoid for their benefit. The LBO lenders participated in structuring every aspect of the transfers at issue: the LBO transaction agreements, the Cash Management Agreement, the Preferred Equity Reserve Account at Wachovia, the LIBOR Floor Certificates, the mortgage debt syndication agreements, the A-1 Series Units, and the BHAC LLC Agreement. As the Court stated in the *Lyondell* case "it is more than sufficient [for preclusion of recovery by ratification of the LBO lenders] here for the LBO lenders to have known – as the documents themselves establish – that they were lending for the purposes of an LBO, and that the proceeds of their loans were going to stockholders." 503 B.R. at 383.

The Trustee concedes, as he must, that the Mortgage Trust (for the benefit of the LBO lender Wachovia) is the primary beneficiary of the Litigation Trust and effectively concedes that the Mortgage Trust is tainted as a claimant. The Trustee, however, seeks to shift the

---

[1]    The definitions used in the Moving Defendant's Memorandum of Law in Support of Moving Defendants' Motion to Dismiss the Amended Complaint, dated December 20, 2013 [Dkt. No. 221] (the "**Moving Brief**") are used consistently herein.

focus to a potential recovery for creditors untainted by having structured the LBO, *i.e.*, M&T and trade creditors, whom the Trustee assures the Court could recover $1 million of the $142.5 million he seeks.

The Trustee ignores that the waterfall provisions of the Litigation Trust agreement preclude recovery by M&T and the trade creditors until the Mortgage Trust is paid in full. That, however, cannot happen because the LBO lenders are barred from any recovery. Thus, the Litigation Trust self-destructs as a plaintiff. The mere presence of a triggering creditor cannot cure this fundamental problem. *See infra* Point VI.

In sum, the Trustee is precluded from any recovery in this matter. For this reason, and for the reasons set forth below, the Amended Complaint should be dismissed with prejudice.

<u>**REPLY**</u>

<u>**POINT I**</u>

**THE AMENDED COMPLAINT FAILS TO MEET**
<u>**THE NOTICE PLEADING STANDARD OF FED. R. CIV. P. 8**</u>

The Moving Defendants demonstrated in the Moving Brief that Rule 8(a)(2) requires that a complaint seeking to avoid and recover transfers must, at a minimum, provide notice of which of the Debtors made each transfer the Trustee seeks to avoid and recover, the date and amount of the transfer, and the other necessary elements of the cause of action. Moving Brief at 12-13 (collecting cases). *See e.g.*, *In re Trinsum Grp., Inc.*, 460 B.R. 379, 388 (Bankr. S.D.N.Y. 2011) (holding that "adequate factual information" to survive a motion to dismiss includes "the transferor and the transferees as well as the amount of each transfer and the year in which each took place."). Group pleading is not allowed. Moving Brief at 13 (collecting cases).

## A. The Trustee Fails to Adequately Allege the Transfers He Seeks to Avoid

The Trustee attempts to dodge his manifest pleading deficiency, asserting that "[e]very transfer (114 in all) is identified [in the AC] by date, recipient, and amount, and often by the source, *i.e.*, whether the transfers were made by [non-Debtor] BHAC Capital IV, from [the Preferred Equity R]eserve [A]ccount, or from LIBOR Floor Certificate proceeds." Opp. Mem. at 119. That is not nearly enough. With one exception,[2] as to each of the Alleged Transfers, the Amended Complaint refers to the Debtors, collectively, as the party making the transfers. BHAC Capital, "the majority shareholder of ESI," made the transfers from the Preferred Equity Reserve Account and is a defendant herein, not one of the Debtors. AC ¶ 26. Similarly, the LIBOR Floor Certificates were not issued or transferred by the Debtors but by the Wachovia-securitized trust that held the Mortgage Note. (AC ¶ 137 ("the lenders agreed to issue . . . Class X-A and X-B certificates from the mortgage securitization[,] collectively, the 'LIBOR Floor Certificates'").) Further, the Trustee does not allege that each of the Debtors was insolvent at all relevant times. The Trustee's aggregation pleading is obviously done because the identification of transferors and transferees would undercut his claims – the transfers at issue were neither transfers by the Debtors nor transfers of Debtor property. *See infra* Point III.

## B. The Trustee Cannot "Self-Pierce" the Debtors' Corporate Veils

The Trustee effectively concedes his failure to allege that each of the Debtor transferors was insolvent or inadequately capitalized, but insists that he can avoid that burden by piercing the Debtors' corporate veils. Opp. Mem. at 60-70. *See e.g.*, AC ¶¶ 211, 220, 228. As alleged in the Amended Complaint, the Trustee's position is that the Debtors should be treated "as a single business enterprise where each entity was the mere instrumentality or alter ego of the others." AC ¶ 198.

---

[2] The one exception is a $5.2 million distribution made by ESAP Portfolio Operating Lessee Inc. (AC ¶ 147.)

Of course, the Trustee does not cite a single case to support the proposition that, standing in the shoes of the Debtors, he can pierce the Debtors' corporate veils for the purpose of asserting claims. There is no support for the Trustee's attempt to benefit from any abuse of the Debtors' corporate organization. *United Cont'l Tuna Corp. v. U.S.*, 550 F.2d 569, 573 (9th Cir. 1977) ("[A]ppellant is seeking to pierce its own veil for its own benefit. Appellant has cited no authority and we have found none which allows such a procedure.").

Veil piercing cannot be used offensively to benefit an entity whose corporate form was misused. *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997); *Pergament v. Precision Sounds DJ's, Inc. (In re Oko)*, 395 B.R. 559, 563 (Bankr. E.D.N.Y. 2008). Yet, this is exactly what the Trustee is attempting to do. No application of veil piercing could allow the Trustee, standing in the shoes of the Debtors, to pierce the veil of an affiliate for the purpose of bringing claims against non-Debtors. The Trustee does not cite a single case supporting his proposed offensive attempt to "self-pierce" because there is none.

The law does not allow a corporate entity to rely on the abuse of its own corporate form to its own benefit. *See e.g.*, *Disenos Artisticos E. Industriales, S.A. v. Costco Wholesale Corp.*, 97 F.3d 377, 380 (9th Cir. 1996) ("Lladro Commercial would have us pierce its own corporate veil. But a corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties. Generally, the corporate veil can be pierced only by an adversary of the corporation, not by the corporation itself for its own benefit."); *see also Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460 (7th Cir. 1991) ("The *alter ego* doctrine is a sword, not a shield, the basis for a cause of action, not a defense."); *Rosen v. Coggins & Harman, P.A. (In re Rood)*, No. 08-17199, 2012 WL 648230, at *4 (D. Md. Feb. 28, 2012) (same), *aff'd,* 2013 WL 55650 (D. Md. Jan. 2, 2013).

Entities cannot disregard their own corporate existence when the corporate form "works to their detriment or disadvantage." 1 *Fletcher Cyclopedia of the Law of Private Corporations*, § 41.20 at 158 (2013); *see, e.g., Liberty Prop. Trust v. Republic Props. Corp.*, 577 F.3d 335, 340 (D.C. Cir. 2009); *Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*, 102 F.3d 223, 226 (6th Cir. 1996) (concluding that Michigan would not permit veil piercing "for the benefit of the corporation or its stockholders"); *McCarthy v. Azure*, 22 F.3d 351, 363 (1st Cir. 1994); *In re Rehab. of Centaur Ins. Co.*, 158 Ill. 2d 166, 173-74, 632 N.E.2d 1015, 1018 (1994) (Illinois law); *JP Morgan Chase Bank, N.A. v. Malarkey*, 65 A.D.3d 718, 721, 884 N.Y.S.2d 787, 791 (2009) (New York law).

Delaware has never recognized any form of "self-piercing."[3]  *Case Fin. Inc. v Alden*, No. 1184-VCP, 2009 Del. Ch. LEXIS 153, at *12 (Del. Ch. Aug. 21, 2009) (noting that no Delaware case had squarely addressed the issue but noting that allowing a plaintiff to pierce its own corporate veil to establish standing to bring a claim on behalf of a subsidiary "would be unusual to say the least").  One Court has labeled this type of claim "inside reverse piercing" and refused to "move[] Delaware law in a direction that Delaware's own courts have not yet gone."  *In re ALT Hotel LLC*, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012). Federal Courts generally reject attempts to venture "beyond the frontiers of established state law," and in the absence of any indication that the Delaware Courts would adopt this disfavored approach, this Court should reject the Trustee's attempt to pierce the Debtors' corporate veils for their own benefit. *Id.,* 479 B.R. at 802-03.

Similarly, there is no support for the Trustee's theory that the Extended Stay Litigation Trust, a post-confirmation litigation trust, can now attempt to avail itself of substantive consolidation.  The Plan provides for "the substantive consolidation of the Debtors *solely for purposes of voting, confirmation and distribution*."  *See* Plan § 6.1

---

[3]      There is no dispute that Delaware law is applicable and controlling for purposes of this motion.  Opp. Mem. at 60.

(emphasis added). The Plan further provides that subject to the restructuring transactions, "(a) all property of each Debtor shall vest in each respective Debtor . . . and (b) each Debtor shall continue to exist after the Effective Date as a separate corporate entity." *Id.*

In light of the Debtors' separate schedules of assets and liabilities and the Plan, the Trustee effectively concedes (Opp. Mem. at 70) that the second prong of *Augie/Restivo* is not satisfied, *i.e.*, the affairs of the debtors were clearly not "so entangled that consolidation [would have] benefit[ted] all creditors." *Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).

The Trustee fails to address, however, his more fundamental problem -- substantive consolidation has no application post-confirmation. Substantive consolidation redefines multiple bankruptcy estates into a single bankruptcy estate and thus is a "proceeding that, by its nature, could arise only in the context of a bankruptcy case." *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *In re Appalachian Fuels, LLC*, 493 B.R. 1, 20 (B.A.P. 6th Cir. 2013) ("Another form of liability unique to bankruptcy is substantive consolidation."). "Substantive consolidation stems from a bankruptcy court's equitable powers and is a remedy unique to bankruptcy, and indeed, does not exist outside of it." *Rodriguez v. Boyd (In re Boyd)*, Bankr. No. 11-51797, 2012 WL 5199146, at *3 (W.D. Tex. Oct. 22, 2012).

Further, the Trustee's "proposed use of substantive consolidation as a sword against [nondebtors] is improper and impermissible." *In re Geneva ANHX IV LLC*, 496 B.R. 888 (Bankr. C.D. Ill. 2013); *see also In re Owens Corning*, 419 F.3d 195, 211, 215 (3d Cir. 2005) ("[S]ubstantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process . . . nor a 'free pass' to spare Debtors or any other group from proving challenges, like fraudulent

transfer claims, that are liberally brandished to scare yet are hard to show."); *Augie/Restivo*, 860 F.2d at 518.

There is no support for the Trustee's *post-confirmation* attempt to use substantive consolidation to reduce his pleading burdens. The Debtors' demonstrated ability to file separate schedules of assets and liabilities and to preserve their separate existence under the Plan eliminated any possible basis for substantive consolidation.

## POINT II

### THE ACTUAL FRAUDULENT CONVEYANCE CLAIMS FAIL AS A MATTER OF LAW

The securities safe-harbor applies to the transfers the Trustee seeks to avoid (Point IV, *infra*) and the only claim not barred by the safe-harbor is for intentional fraudulent conveyance under Bankruptcy Code § 548(a)(1)(A). As a result, the Trustee makes great exertions to plead that the Debtors acted with fraudulent intent in making transfers that were bargained for in advance by the supposedly injured creditors, the LBO lenders. The Trustee's counsel, who have also represented Wachovia in connection with this case, make no effort to explain why Wachovia would have participated in transfers made to defraud Wachovia. Recognizing that the claim makes no sense, the Trustee tries to shed his burden to allege fraud with specificity, arguing that group pleading is allowed when the conduct of corporate directors is at issue, Opp. Mem. at 116-17, and that he is entitled to leniency because as Trustee he does not yet know the facts, Opp. Mem. at 118. This argument ignores the comprehensive Examiner's Report, which is over 400 pages long plus voluminous exhibits. In any event, under any standard, the Trustee cannot plausibly allege that the transferor acted with actual intent to hinder, delay or defraud its creditors. *See* 11 U.S.C. § 548(a)(1)(A).

As demonstrated in the Moving Brief, the Actual Fraudulent Conveyance Claims require "intent to defraud on the part of the transferor." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted). In

*Sharp* the Second Circuit affirmed dismissal of actual fraudulent conveyance claims where the debtor's lender was repaid with the proceeds of a loan fraudulently obtained for that purpose at the urging of the repaid lender. As the Second Circuit held, it is not enough that the transferor is engaged in a fraud, the transfers must be inherently fraudulent and made in connection with the fraudulent scheme. *Id.*; *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 490 (D. Conn. 2002) ("the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor").

In light of this binding authority, the Trustee concedes by silence that transfers in satisfaction of contractual obligations cannot be the basis of an actual fraudulent conveyance claim. Opp. Mem. at 120-22. Instead, the Trustee argues that the Preferred Dividends were not "contractually required to be paid in violation of state law." Opp. Mem. at 120.

The Trustee argues that the Debtors continued to satisfy their obligation to pay the Preferred Dividends even after Weil and Lazard recommended that the dividends be ceased. Opp. Mem. at 34, 121, 128. This assertion is misleading because the only such payment was made from BHAC Capital's Preferred Equity Reserve Account at Wachovia, as the Trustee admits in the Amended Complaint. (*See* AC ¶ 182.) BHAC Capital, a defendant herein, is not and was not a Debtor in these cases. A non-debtor's disbursement of funds held by it in escrow for the benefit of preferred holders is simply not a dividend distribution by the Debtors.

With respect to the Preferred Dividends that were not made from the Preferred Equity Reserve Account, and even assuming that the Trustee was correct (and he is not) that Preferred Dividends were made in violation of state law, they were nonetheless made pursuant to contractual obligation. (AC ¶ 118 ("As part of the LBO, revenue and other cash received for the Debtors' operations were funneled into an integrated cash management account, pursuant to a Cash Management Agreement [that] sought to protect certain lenders

and equity owners by imposing a set waterfall payout structure.")); Goldberg Decl., Ex. E (Cash Management Agreement). Indeed, the Trustee has alleged that "other agreements entered into in connection with the LBO provided that the holders of the Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and *regardless of whether those distributions were in violation of applicable law.*" Original Complaint ¶ 176 (emphasis added). The Trustee does not allege that the contractual obligation to pay Preferred Dividends was conditioned on any debt coverage ratio, indeed he expressly concedes the opposite. (AC ¶ 142 ("The [LBO] loan agreements provided that, *with the exception of distributions to Series A-1 preferred equity*, equity distributions could not be made if the Debt Yield, measured on a quarterly basis, did not exceed 7.75%.")).

As the Examiner Report notes, the Cash Management Agreement required cash generated by the hotel properties to be swept into a Wachovia account and all funds on deposit to be applied pursuant to an agreed waterfall including debt service on the mortgage and mezzanine loans, and "the lesser of $1.25 million or an amount that would yield 8% return to Preferred Equity Holders into the Preferred Equity Subaccount." Examiner Report, at 91-92; *see* AC ¶ 126 and Ex. B; *see also* BHAC LLC Agreement, § 5.11 (mandating that BHAC Capital maintain a $20 million cash reserve for the purpose of funding unpaid cash distributions to the Series A-1 Unit Holders); AC ¶ 182 (the "'Preferred Equity Reserve Account' was created at the LBO's closing as 'security' for certain equity holders").

The Trustee cannot convert constructive fraud or insolvency dividend claims into actual fraud claims by simply reciting that the Debtor knowingly made the transfer. Some plausible basis must be pleaded to support an inference that the Debtors were acting with intent to defraud, and there is no such basis here.

Here, "the Complaint is devoid of any allegations of fact supporting an intention to actually injure creditors (and in particular, to hinder delay and defraud them), as contrasted to allegations evidencing an intention on the part of [] corporate officers to enrich themselves, whatever the consequences." *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 2014 WL 118036, at *33 (Bankr. S.D.N.Y. 2014) (dismissing actual fraudulent conveyance claims and distinguishing "pleading of facts evidencing an intention to injure creditors" from a mere "intent to enrich oneself"). At most the Trustee asserts that the Debtors continued "to pay dividends until shortly before filing for bankruptcy . . . [and] emptied out the [Preferred Equity R]eserve [A]ccount[] for the Series A-1 owners one month after counsel had warned the Debtors' 'independent' directors that a Chapter 11 petition was under contemplation." Opp. Mem. at 121. The Amended Complaint concedes that when the Debtors' retained professionals advised that the Preferred Dividends should be suspended, the Board, which included the individual defendants herein, voted unanimously (with one abstention) to suspend the dividends. (AC ¶ 175.) Thus, the Preferred Dividends were contractually required and paid until professionals advised the Board to suspend them due to the Debtors' financial condition and thereafter only from the non-debtor Preferred Equity Reserve Account.

Similarly, the Amended Complaint makes clear that the 25% Note Payments and the LIBOR Floor Certificate Payments were required by contract. (AC ¶ 184 ("The board then unanimously resolved to pay off the 25% Note by transferring the LIBOR Floor Certificates . . . to the holders of the 25% Note lenders."); AC ¶ 232 ("the LIBOR Floor Certificates were used to pay principal and interest owed on the 25% Note").) The Trustee now seems to deny that the proceeds of the $22 million loan (the 25% Note) to DL-DW were used for the benefit of the Debtors and that the LIBOR Floor Certificates were used to make payments on the 25% Note. Opp. Mem. at 121. However, that is exactly what is pled in the Amended

Complaint. (AC ¶ 152-55 (alleging that the $22 million was used, with other funds, to pay off the "9.15% Notes" and that those notes "were marked as assumed obligations of the 'new' Debtors" at LBO closing).) Simply stated, no inference of fraud can plausibly be pled in connection with the payment of notes and other contractual obligations.

The proceeds of the $11 million loan (a portion of the $22 million loan) the Moving Defendants made to DL-DW were used to satisfy a matured and defaulted obligation of the Debtors. DL-DW in turn pledged the LIBOR Floor Certificate to secure the 25% Note. (AC ¶ 155). As a result, there was no plausible fraudulent intent, and consistent with common sense and the Trustee's own allegations, the transfers were used to make payments that directly benefited the Debtors by reducing their outstanding debt.

The Trustee is unable to explain how his fraud theories are any different than those rejected in *Sharp* and *Lyondell*. The preferred dividends to the Series A-1 Unit Holders were, according to the Amended Complaint, contractual obligations of the Debtors, established at LBO closing. Similarly, the proceeds of the 25% Note were, pursuant to the Amended Complaint, used to satisfy a matured and defaulted obligation of the Debtors and the LIBOR Floor Certificates proceeds were used to make payments on that note. (AC ¶ 155). Even if the Debtors were engaged in a balance-sheet fraud, and that is not plausibly alleged, there was nothing fraudulent about these payments.

## POINT III

## THE TRUSTEE CANNOT AVOID TRANSFERS OF NONDEBTOR PROPERTY

The Trustee repeatedly concedes in the Amended Complaint that the LIBOR Floor Certificates, and any proceeds of those securities, were not transfers of the Debtors' property. (AC ¶¶ 137-38, 156, 184-87, 164, 168, 174). Similarly, the Preferred Equity Reserve Account was the property of a non-debtor, BHAC Capital. (BHAC LLC Agreement, § 5.11). Thus, in the Moving Brief, the Moving Defendants demonstrated that these non-debtor

transfers may not be avoided because they are not transfers "of an interest of the *debtor in property*, or any obligation . . . incurred by the debtor."  11 U.S.C. § 548(a)(1) (emphasis added).

The Trustee states in his Opposition Memorandum that the largest of the "[t]hree sets of post-LBO transfers" at issue are the proceeds of the LIBOR Floor Certificates.  Opp. Mem.at 2.  The Trustee now implies that the Debtors transferred the LIBOR Floor Certificates, arguing that "the insiders arranged for [the LIBOR Floor Certificates] belonging to the Debtors to be transferred to a Defendant entity controlled by the Defendants."  Opp. Mem. at 2.  However, this assertion contradicts the Amended Complaint and elsewhere in the Trustee's brief he concedes that "[t]he Debtors never received the LIBOR Floor Certificates, even though they made the pertinent concessions and all payments under the loan agreements" to the non-party LBO lenders.  Opp. Mem. at 32.

The Amended Complaint alleges that the mortgage and mezzanine lenders who financed the LBO had difficulty selling their certificated mortgage and mezzanine debt.  (AC ¶¶ 136-37).  In connection with negotiated modifications to the mortgage and mezzanine interests, the LIBOR Floor Certificates were issued by the LBO lenders directly to DL-DW. (*Id.* ¶¶ 137-39).  "In exchange for the borrowers' consent to these accommodations, *the lenders agreed to issue to the Debtor borrowers (or their designees)* [the LIBOR Floor Certificates] from the mortgage securitization."  AC ¶ 137 (emphasis added).  Thus, the Amended Complaint alleges that the Debtors made the "pertinent concessions and all payments under the loan agreements" in exchange for issuance of the LIBOR Floor Certificates by the LBO lenders but concedes that "[t]he Debtors never received the LIBOR Floor Certificates," and instead they "were issued and transferred directly to DL-DW, the ultimate equity owner of the Debtors."  AC ¶ 138.  DL-DW is a defendant in this action and not a Debtor.

A fraudulent conveyance must be predicated on a transfer by a debtor "of an interest of the debtor in property," and thus the lenders' transfer of the LIBOR Floor Certificates to DL-DW, DL-DW's payments on the Floor Bond Certificates, and BHAC Capital's payments from the Preferred Equity Reserve Account cannot be avoided by the Debtors -- they do not involve transfers by the Debtors and do not involve transfers of the Debtors' property.  11 U.S.C. § 548(a)(1).  Nor can payments by DL-DW or BHAC Capital be deemed subsequent transfers because no initial transfer of the Floor Bond Certificates or the Preferred Equity Reserve Account is alleged.  Even if DL-DW or BHAC Capital were somehow liable to the Debtors on a theory other than avoidance, transfers to the Arbor Defendants cannot be re-imagined as subsequent transfers of the Debtors' property.

The Trustee twists and turns to create a plausible argument that the Debtors came close enough to owning the LIBOR Floor Certificates that he can plead a viable fraudulent conveyance claim against DL-DW and subsequent transfer claims against the Arbor Defendants and others for the proceeds of the certificates.  Where a debtor makes a transfer of property in exchange for inadequate consideration, the debtor's avoidance claim is to recover the transferred "interest of the debtor in property."  11 U.S.C. § 548(a)(1).  Thus, there is a fatal defect in the Trustee's theory: where a debtor transfers an interest in property (here the loan concessions and payments to the LBO lenders) and the transferee (here, the LBO lenders) gives value to a third party (here the Debtors' designee DL-DW), any transfer avoidance claim of the debtor is against the transferee (the LBO lenders) not against the third-party (DL-DW).  To the extent the LBO lenders (including Wachovia) should have delivered the LIBOR Floor Certificates to the Debtors rather than to the Debtors' designee DL-DW, the claim would be against the LBO lenders to avoid what the debtor did transfer, *i.e.*, "pertinent concessions and all payments under the loan agreements."  AC ¶ 138.

At most, the transfer the Trustee seeks to avoid is the designation of DL-DW as the recipient of the LIBOR Floor Certificates, but that "designation" did not transfer anything to DL-DW; nowhere is there any allegation that DL-DW was a third party beneficiary of the agreement between the Debtors and Wachovia or that DL-DW was in contractual privity with respect to the designation. Thus, other than hyperbole, the Trustee simply fails to point to any interest of the Debtors in property that the Debtors transferred to DL-DW. Whatever the Debtors did transfer in connection with the issuance of the LIBOR Floor Certificates was transferred to the LBO lenders. Even if there is some cognizable claim to trace subsequent transfers, the initial transfer must be avoided, and no basis for such avoidance is alleged. Indeed, the Trustee's alleged value deficiency actually destroys the Trustee's claim to the proceeds of the LIBOR Floor Certificates – his complaint is that the Debtors never got the LIBOR Floor Certificates, not that the Debtors transferred the certificates for inadequate compensation.

Neither the LIBOR Floor Certificates nor the Preferred Equity Reserve Account is alleged to be property of the Debtors' estates. Bankruptcy Code § 548(a)(1) (providing for avoidance of transfers made *by the debtor* "of an interest of the debtor in property"); *see A.W. Lawrence & Co. v. Burstein (In re A.W. Lawrence & Co.)*, 346 B.R. 51, 56 (Bankr. N.D.N.Y. 2006). A trustee must demonstrate that the debtor had legal title to the property and control over its use. *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999); *see Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) (taxes collected or withheld are not property of the estate because the debtor does not own an equitable interest in property he holds in trust for another). The Trustee's attempt to allege an avoidance claim concerning the Floor Bond Certificates and the Preferred Equity Reserve Account fails on multiple levels -- the Debtors neither transferred anything to the Moving Defendants nor did the Debtors own what was allegedly transferred.

**POINT IV**

**THE BANKRUPTCY CODE'S SAFE HARBOR BARS THE
TRUSTEE'S CLAIMS AGAINST THE MOVING DEFENDANTS**

The Preferred Dividends, the PERA Payments, the Floor Bond Payments, the 25%
Note Payments and the LIBOR Floor Certificate Payments were all made "in connection
with" multiple securities contracts including the LBO transaction agreements, the LIBOR
Floor Certificates, the mortgage debt syndication agreements, the A-1 Series Units and the
BHAC LLC Agreement. *See Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff Sec.)*, --
B.R. --, 2013 WL 6825468, at *9 (S.D.N.Y. Dec. 26, 2013) ("[T]he Court is not persuaded
that a given transfer may be 'in connection with' only the agreement that authorizes the
transfer. Reading 'in connection with' as 'related to' – rather than, *e.g.*, 'required by' or
'authorized by' – implies that a given transfer may be related to multiple underlying
circumstances and agreements.").

**A.      The Preferred Dividends Were Transfers Made in Connection With A Securities
Contract Protected by Section 546(e)**

The Trustee does not dispute, in his Opposition Brief, that the Preferred Dividends are
"transfer[s]" made by a "financial institution" within the meaning of the securities contract
safe harbor provision (*see, e.g.*, AC ¶ 172 (the Preferred Dividends were paid "either by wire
or by transfers"), ¶ 208 (defining the distributions related to payments to Series A-1, A-2 and
A-3 Unit Holders as the "Dividend Transfers")), and payment of dividends clearly satisfies
the definition of the term transfer. *See* 11 U.S.C. § 101(54)(D).

The Trustee instead contends that Preferred Dividends were not made "in connection
with a securities contract." Opp. Mem. at 42-50. A "securities contract" as defined in section
741(7) of the Bankruptcy Code and "[t]he plain language of Section 741(7) is very broad in
its application and encompasses virtually any contract for the purchase or sale of securities,

any extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guarantee agreements." *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 438 (Bankr. S.D.N.Y. 2012); *Picard v. Katz*, 462 B.R. 447, 451-52 (S.D.N.Y. 2011); *Miller v. CSFB (In re Refco, Inc. Sec. Litig.)*, No. 07 MDL 1902, 2009 WL 7242548, at *3 n.4 (S.D.N.Y. Nov. 13, 2009).

The Trustee repeatedly asserts that each of the Preferred Dividends "was a true dividend, albeit one that was part of a broader LBO transaction" and that the payments were "pure, post-LBO dividends." Opp. Mem. at 44. With respect to the A-1 Series Units, at least, this assertion is untrue. The Preferred Dividends were paid to the "A-1 Series Units Holders," and the Trustee does not dispute that the A-1 Series Units are securities. (AC ¶ 208); Opp. Mem. at 46. Nor does the Trustee dispute that the A-1 Series Units were issued pursuant to the BHAC LLC Agreement, a contract. (*See* BHAC LLC Agreement, §§ 1.120; 3.03(g)). Indeed, the Trustee concedes that the Preferred Dividends on the A-1 Series Units were "mandated by the LLC operating agreement for BHAC Capital IV." Opp. Mem. at 47.

The Trustee further contends that neither the A-1 Series Units nor the BHAC LLC Agreement is a "securities contract." Opp. Mem. at 46. This is nonsensical. Since the Trustee does not dispute that the A-1 Series Units are securities, he cannot seriously contest that the BHAC LLC Agreement pursuant to which they were issued is a securities contract. The only case the Trustee cites on this point is inapposite. *See EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 323 (Bankr. D. Del. 2012) (holding that payments made in connection with letter of credit that served as a credit enhancement for certain bonds were not made in connection with a securities contract.) Further, under applicable Delaware law, the Series A-1 Units themselves are securities contracts because "a preferred stockholder's rights 'are contractual in nature.'" *Fletcher Int'l, Ltd. v. Ion*

*Geophysical Corp.*, No. 5109-VCS, 2011 WL 1167088, at *4 (Del. Ch. Mar. 29, 2011) (quoting *In re Appraisal of Metromedia Int'l Group, Inc.,* 971 A.2d 893, 899 (Del. Ch. 2009)); *Matulich v. Aegis Commc'ns Grp., Inc.,* 942 A.2d 596, 600 (Del. 2008).

The Trustee's attempt to distinguish *Lehman v. JPMorgan* is similarly off base. Opp. Mem. at 49. The Trustee concedes, as he must, that the case stands for the proposition that the statutory definition of securities contract is extremely broad, and broadly construed. *Lehman Bros. Holdings Inc. v. JPMorgan Chase, N.A., Inc. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 438 (Bankr. S.D.N.Y. 2012). However, the Trustee ignores that the case supports the proposition that the BHAC LLC Agreement is a securities agreement and simply argues that the case does not drag into the safe harbor every payment made on a security. Opp. Mem. at 49-50.

The Trustee implies that if the Preferred Dividends had been paid at the LBO closing, instead of just agreed to be paid pursuant to the Cash Management Agreement, he would concede that they were paid pursuant to a "securities contract." Opp. Mem. at 44 (attempting to distinguish *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 302 (D. Del. 2012)). The Trustee argues, however, that because the Preferred Dividends are "post-LBO dividends they were simple returns on equity." Opp. Mem. at 44. The Trustee cites no authority for the proposition that there is a temporal requirement in Section 546(e) requiring that *transfers must be made at the time or contemporaneous with* the securities contract. The law is to the contrary: "[t]he 'in connection with' requirement of Section 546(e) does not contain any temporal or existential requirement that a transfer must be 'in connection with' then-outstanding legal exposure. Indeed, Section 546(e) does not include any language that refers either to exposure or timing." *In re Lehman*, 469 B.R. at 442. The Trustee's invitation to add a temporal requirement to the safe harbor provision should be rejected.

As a variant on the Trustee's proposed "contemporaneous exchange" limitation to the safe harbor, he argues that the Preferred Dividends could not have been in connection with a securities contract because the Debtors subsequently ceased making the required payments, *i.e.*, the "board voted in November 2008 to *halt* dividends due to the [Debtors'] possible insolvency." Opp. Mem. at 45 (emphasis in original). The fact that the dividends could be and were halted has nothing to do with whether the BHAC LLC Agreement is a securities contract and the Trustee provides no authority or logic to the contrary.[4] Even if the agreement had expressly provided for cessation of the Preferred Dividends, that would be of no moment. *See* 11 U.S.C. § 741(7) (securities contract is defined to include "an option to purchase or sell any such security" notwithstanding that option rights expire if not timely exercised.)

The Trustee continues his attempt to separate the BHAC LLC Agreement and the Cash Management Agreement from the LBO in his discussion of the *Crescent* case, where the court found that distribution of a dividend to Duke Energy was both a settlement payment and a transfer in connection with a securities contract. *Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464, 467-77 (W.D. Tex. 2013). The Trustee concedes that payments made as "consideration for an LBO-type acquisition of a business [] necessarily involved the exchange and sale of securities." Opp. Mem. at 50. However, the Trustee then strangely concludes that the facts in *Crescent* were "the polar opposite of the facts at issue here." *Id.* But there is no such distinction -- the Series A-1 Units were issued as part of the LBO Transaction and the Amended Complaint makes this clear. (AC ¶ 142 ("The [LBO] loan agreements provided that, *with the exception of distributions to Series A-1 preferred equity*, equity distributions could not be made if the Debt Yield" requirement was not met.).) This

---

[4] The Trustee also argues that the Series A-2 and A-3 non-preferred dividends were not permitted by the governing loan documents due to post-LBO debt yield levels. Opp. Mem. at 46. The Arbor Defendants held only the Series A-1 Units and thus leave this argument to others.

cannot be distinguished from the situation in *Crescent*. In both cases, the securities at issue were issued in connection with a larger LBO transaction. Indeed, it is lunacy for the Trustee to suggest that the payments to Blackstone, the huge net winner in the LBO Transaction, are protected by the safe harbor while the agreed payments to the "new money" losers in the LBO remain subject to claw-back.

Thus, the section 546(e) safe harbor bars the avoidance of the Preferred Dividends.

**B.      The PERA Payments Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e)**

The Trustee does not address that the safe harbor bars avoidance of the PERA Payments made from the Preferred Equity Reserve Account to the A-1 Series Units Holders pursuant to the BHAC LLC Agreement. (*See* BHAC LLC Agreement, § 5.11). The PERA Payments satisfy the requirements for the safe harbor of section 546(e) for the same reasons that the Preferred Dividends are protected.

**C.      The LIBOR Certificate Transfers Were Transfers Made in Connection With A Securities Contract Protected by Section 546(e)**

The Trustee makes the overheated argument that the LIBOR Floor Certificates were not issued in connection with a securities contract because they were "in spite of a securities contract" and "contrary to and not in connection with the underlying agreements." Opp. Mem. at 50. These accusations are nowhere in the Amended Complaint -- the Trustee does not offer a single citation to the Amended Complaint in the three pages of his brief covering this argument. Opp. Mem. at 50-52. Indeed, the Trustee never even deigns to identify what contract was supposedly breached.

The Amended Complaint alleges that the mortgage and mezzanine lenders who financed the LBO had difficulty selling their certificated mortgage and mezzanine debt. (AC ¶¶ 136-37.) Thus, "the Debtor borrowers entered into a letter agreement amendment to the loan agreements dated August 31, 2007, that adjusted terms regarding application of the

proceeds from prepayments to make the debt more palatable to potential buyers." AC ¶ 137. In connection with negotiated modifications to the mortgage and mezzanine interests, the LIBOR Floor Certificates were issued by the lenders directly to DL-DW. (*Id.* ¶¶ 137-39). "In exchange for the borrowers' consent to these accommodations, *the lenders agreed to issue to the Debtor borrowers (or their designees)* [the LIBOR Floor Certificates] from the mortgage securitization." AC ¶ 137 (emphasis added).

Thus, the Amended Complaint is utterly inconsistent with the Trustee's new theory that the LIBOR Floor Certificates were issued in violation of any contract.

The LIBOR Floor Certificates were transferred "in connection with a securities contract" because they were transferred in connection with "a contract for the purchase, sale, or loan of a security . . . a mortgage loan, any interest in a mortgage loan . . . or mortgage loans or interests therein." 11 U.S.C. § 741(7)(A)(i). The Trustee concedes that "the LIBOR Floor Certificates are securities – a self evident and obvious fact that is not in dispute." Opp. Mem. at 52. However, he ignores that the interests created in the mortgage and mezzanine loans were also securities and that the Mortgage Lenders' securitization of the mortgage debt resulted in the issuance of securities to investors.[5] Thus, the LIBOR Floor Certificates were plainly issued in connection with a securities contract, the syndication of the mortgage debt. The Trustee tries to set the bar low enough that he can clear it, contending that "the LIBOR Floor Certificates were supposed to be consideration for the loan modification and never an actual part of the securitization." Opp. Mem. at 52. However, the LIBOR Floor Certificates were transferred *in connection with* the securitization – that is what the Amended Complaint says and that is enough.

---

[5] According to the Debtor's Disclosure Statement [Dkt. No. 1028], "[s]ubsequent to the closing of the [LBO], the Mortgage Lenders sold their interests in the Mortgage Debt, and received in exchange therefore certificates representing ownership of the beneficial interests in a vehicle . . . holding the Mortgage Debt and the collateral therefore. In turn, certain investors bought those interests . . . which represent beneficial interests in the Trust." (Disclosure Statement at 27). In addition, according to the Disclosure Statement, the Mezzanine Lenders held "100% of the issued and outstanding membership interests in certain of the Debtors." (*Id.* at 28). Those membership interests are also obviously securities. *See SeaQuest Diving L.P. v. S & J Diving Inc. (In re SeaQuest Diving L.P.)*, 579 F.3d 411, 418 (5th Cir. 2009).

The transfer of the LIBOR Floor Certificates by the LBO lenders to DL-DW also qualifies as a settlement payment. (Original Complaint, ¶¶ 159-60). The Trustee's contention that "the securities transaction must have some existence beyond the transfer itself" is erroneous. *See Enron*, 651 F.3d at 334 (settlement payment should be interpreted as "the transfer of cash or securities made to complete a securities transaction." (citation omitted)). In any event, the Amended Complaint alleges a complete securities transaction, not an isolated transfer. (AC ¶¶ 137-38.)

All of the LIBOR Certificate Transfers were made from the proceeds of the LIBOR Floor Certificates (AC ¶ 156) and thus all of those transfers are shielded from avoidance by section 546(e) as discussed above.

## D.      All State Law Claims are Preempted by Section 546(e)

The State Law Claims must be dismissed as preempted. *See Whyte v. Barclays Bank PLC*, 494 B.R. 196, 200 (S.D.N.Y. 2013) (Congress's prohibition on avoiding transfers shielded by the safe harbor "cannot be avoided by simply re-labeling avoidance claims as [state law] unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless." (internal quotations marks and citation omitted)); *Bond v. Sparks (In re U.S. Mortg. Corp.)*, 492 B.R. 784, 816-17 (Bankr. D.N.J. 2013) (dismissing, as preempted by Section 546(e), claims for conspiracy, aiding and abetting civil conspiracy and fraud, and conversion); *Bond v. Nat'l Fin. Servs. (In re U.S. Mortg. Corp.)*, 491 B.R. 642, 675 (Bankr. D.N.J. 2013) (same).

The Trustee effectively concedes that if the safe harbor applies, his claims for illegal dividends, state law fraudulent conveyance, and unjust enrichment would be dismissed. Opp. Mem. at 54. *See Contemporary Indus. Corp. v. Frost,* 564 F.3d 981, 988 (8th Cir. 2009) ("Through its state law claims, [the debtor] seeks to recover the same payments we have already held are unavoidable under § 546(e) . . . [the debtor's] state law claims must fail"); *In*

*re Hechinger Inv. Co.*, 274 B.R. 71, 96-97 (D. Del. 2002) (section 546(e) safe harbor prohibited fraudulent transfer claims and preempted claim for unjust enrichment). *Accord AP Servs., LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012).

However, the Trustee ignores that the balance of his claims are also duplicative of the avoidance claims; exactly what Judge Rakoff admonished the trustee for in *Whyte*, *supra*. In *Lehman*, 469 B.R. at 450, state law claims were not preempted because they were unlike classic constructive fraud claims, and had more in common with actual fraud claims. Here, in contrast, the allegations of the State Law Claims are virtually the same as the allegations underlying the avoidance claims, and the Amended Complaint's actual fraud claims are wholly insufficient and implausible. Where state law claims seek the same relief and rely on allegations that are similar to claims barred by section 546(e), courts hold that the state law claims are preempted. *See AP Servs.*, 483 B.R. at 71 n.65; *U.S. Mortgage*, 492 B.R. at 817.

The Trustee adopts the defective reasoning of *AP Services*, arguing that claims for breach of fiduciary duties are not preempted by the safe harbor because claims for breach of fiduciary duties seek money damages which relief supposedly would not implicate the policy underlying section 546(e) to protect settled securities transactions. 483 B.R. at 71-72. Respectfully, this reasoning is flawed because under section 550 of the Bankruptcy Code when a fraudulent transfer is avoided, the court may order the return of the property transferred or the value thereof. 11 U.S.C. § 550(a). Indeed, the Trustee seeks money damages on all of his claims. Here, requiring the return of the Preferred Dividends and the LIBOR Floor Certificate Transfers would most certainly unsettle closed securities transactions. The Trustee's argument would result in all parties to an LBO being protected by section 546(e) except the directors who approved it. Thus, Blackstone and the LBO lenders who actually benefitted from the LBO would be protected, but the directors who received none of the transfers would be left on the hook. That cannot be the law.

Accordingly, the Court should dismiss all of the State Law Claims as preempted by section 546(e) of the Bankruptcy Code.

**POINT V**

**THE CONSTRUCTIVE FRAUDULENT
CONVEYANCE CLAIMS FAIL AS A MATTER OF LAW**

The Trustee does not dispute that South Carolina law applies to his constructive fraudulent transfer claims, that South Carolina law does not recognize constructive fraud claims, and that South Carolina law limits avoidance claims to actual fraud and gratuitous transfers. Opp. Mem. at 126. The Amended Complaint alleges that the Preferred Dividends and the PERA Payments were made pursuant to contractual arrangements put in place at the time of the LBO and thus are not gratuitous. (AC ¶¶ 5, 118, 155-56.) The Trustee counters that these transfers were nonetheless made without consideration, ignoring that payments in satisfaction of contractual commitments, present or antecedent debts, are considered made for reasonably equivalent value. *See Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 481-82 (Bankr. S.D.N.Y. 2011); *Walker v. Sonafi Pasteur a/k/a Aventis (In re Aphton Corp.)*, 423 B.R. 76, 89 & n.50 (D. Del. 2010). The balance of the Trustee's avoidance claims are inherently defective for the reasons set forth above and in the Moving Brief and should be dismissed.

**POINT VI**

**THE TRUSTEE IS PRECLUDED FROM RECOVERY HEREIN**

The Trustee concedes that "the Mortgage Trust is the 'first and ***primary***' beneficiary of the Litigation Trust." Opp. Mem. at 37-38 (emphasis in original). The Trustee effectively concedes that the Mortgage Trust (Wachovia) is tainted as a claimant herein, but argues that "M&T is a perfectly valid creditor with no taint of having been involved in the LBO, as are the trade creditors." Opp. Mem. at 38. The Trustee then goes on to claim that the quantified amounts sought in the Amended Complaint are $143,459,012 and the "Mortgage Trust's

maximum possible recovery [is] $142.5 million." Opp Mem. at 38. Thus, the Trustee assures the Court, there is a potential recovery for those untainted by having structured the LBO of recovering a whopping $1 million. Opp. Mem. at 38.

However, the Trustee ignores that under the waterfall provisions of the Litigation Trust Agreement, the Indenture Trustee cannot recover until the Mortgage Trust has recovered the referenced $142.5 million. *See* Lefkovits Decl., Ex. A to ESI Settlement Agreement [Dkt. No. 1160] (describing the tiered distributions). Simply put, the Litigation Trust Agreement precludes recovery by anyone else until the mortgage lenders are paid. However, those lenders are barred from any recovery because they participated in structuring the LBO, the issuance of the Series A-1 Units, the creation of the Preferred Equity Reserve Account at Wachovia (created to make the PERA Payments, *i.e.*, required distributions on the Series A-1 Units) (AC ¶ 142, 182), the establishment of the Cash Management Agreement (which mandated the payments of the Preferred Dividends) (Original Complaint, ¶ 176), and the issuance of the LIBOR Floor Certificates (AC ¶ 137). *See* Moving Brief at 51-53.

Thus, the Trustee has failed to identify any compensable damages. See *Lyondell*, 503 B.R. at 348, 2014 WL 118036, at *27 ("hold[ing] that to the extent the Creditor Trust asserts fraudulent transfer claims as the assignee of LBO lenders, such claims must be dismissed"); *Crescent*, 500 B.R. at 483 (limiting the plaintiff litigation trust's potential recovery to amounts to be distributed to creditors other then the lenders involved in the allegedly "tainted" LBO); *In re Refco*, 2009 WL 7242548, at *11 (trustee could not avoid and recover allegedly fraudulent transfers for the benefit of a lender, since the lender had authorized those very payments in connection with financing the transferor's tender offer.)

**A.    The Alleged Transfers Were Ratified by Those Holding Mortgage Facility Claims and Mezzanine Facility Claims**

The Trustee grudgingly concedes that Wachovia "serv[ed] as a conduit for [the dividend] payments to be made through the cash management account it administered," that

"Wachovia [agreed] at the time of the LBO to a payment waterfall that *permitted* payment of dividends," and that the "waterfall provided the means" for the payment of the dividends. Opp. Mem. at 83 (emphasis in original). In fact, the Trustee has alleged much greater involvement by the LBO lenders, *i.e.*, that the Cash Management Agreement mandated the payment of the Preferred Dividends, and was created and required by the lenders in connection with the LBO. *See* Original Complaint, ¶ 176 ("other agreements entered into in connection with the LBO provided that the holders of the Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law"); *see also* Cash Management Agreement, § 3.4(g); AC ¶¶ 118-19. Indeed, the Debtors' Cash Management Agreement, structured in connection with the mortgage loan agreement, required that cash generated by the hotels be swept into a Wachovia account to be used to pay the LBO loans as well as the Preferred Dividends. (AC ¶ 126, Ex. B.)

The Trustee now attempts to minimize the lenders' involvement in the issuance of the LIBOR Floor Certificates, conceding only that "Wachovia Capital Markets, LLC merely acted as the conduit that held the [LIBOR Floor C]ertificates and was directed to transfer them to DL-DW" and "that Wachovia sent the certificates to DL-DW per instructions from Defendants." Opp. Mem. at 84. However, the Amended Complaint alleges something much more substantial -- that the LIBOR Floor Certificates were issued by the LBO lenders in exchange for an accommodation to adjust the terms of the LBO debt. (AC ¶ 137 ("In exchange for the borrowers' consent to these accommodations, the lenders agreed to issue to the Debtor borrowers (or their designees) [the LIBOR Floor Certificates].").) Furthermore, it is clear that it was the lenders that "issued and transferred directly" to DL-DW the LIBOR Floor Certificates. (*Id.* ¶ 138).

As in the *Lyondell*, *Crescent*, and *Refco* cases cited directly above, the Trustee cannot

sue on behalf of the LBO lenders because the lenders ratified and/or made the very transfers

that the Trustee now seeks to avoid for their benefit. As the Court stated in the *Lyondell* case:

> The Court has difficulty seeing how the Creditor Trust could plausibly be alleging that any LBO Lender was ignorant of the fact that it was lending for the purpose of financing an LBO, and that LBO proceeds would then go to stockholders – especially since … the loan documents required loan proceeds to be used for that purpose.
>
> That is more than sufficient to establish the requisite participation and ratification, which in the context here, requires no more than that knowledge. While more nuanced knowledge might be necessary to establish ratification in other contexts, it is more than sufficient here for the LBO lenders to have known – as the documents themselves establish – that they were lending for the purposes of an LBO, and that the proceeds of their loans were going to stockholders.

503 B.R. at 348, 2014 WL 118036 at *28-29. That logic and the Court's holding are equally

applicable here. The Trustee cites *Lyondell* but makes no attempt to distinguish it and does

not cite a single case allowing avoidance recovery by lenders who were contemporaneously

aware of the transfers sought to be avoided.[6]

## B.  The *Bangor Punta* Doctrine Bars the State Law Claims

The Trustee proposes a cramped reading of *Bangor Punta*, arguing that it "applies

only to claims arising out of *pre-sale* misconduct for which new shareholders, who suffered

no injury at the time the events occurred, nonetheless seek redress." Opp. Mem. at 74

(emphasis in original) (citing *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S.

703 (1974)). The Trustee ignores that *Bangor Punta* more broadly holds that equity

precludes an entity from asserting any claim when the real beneficiaries of the suit could not

---

[6]     The Trustee's reliance on *CFTC v. Probber Int'l Equities Corp.*, 504 F. Supp. 1154 (S.D.N.Y. 1981) and *Brown v. Nationscredit Comm. Corp.*, No. 99-CV-592, 2000 WL 887593, at *1 (D. Conn. June 26, 2000) is misplaced. In *Probber*, the court found that ratification did not occur where the respondent signed documents in anticipation of making a loan, but "the plan (and the documents) never became effective." 504 F. Supp. at 1159. The *Probber* court recognized that if the contemplated transaction had occurred it "might have led to ratification precluding [lender's] recovery of his property." *Id.* at 1163. In *Nationscredit*, the court dismissed plaintiffs' fraudulent transfer claim against a lender where (1) plaintiffs failed to allege that the lender was a transferee, (2) the court did not "f[i]nd any cause of action for allegedly 'directing and/or ratifying' a fraudulent transfer," and (3) plaintiffs' only evidence was inadmissible hearsay heard outside a closed door meeting, without "evidence of financial agreements or the like." 2000 WL 887593, at *7. Here, the Trustee does not assert any fraudulent conveyance claims against the LBO lenders but seeks to avoid, for the lenders' benefit, transfers that they approved in advance.

bring the suit themselves. *See, e.g., Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 930 (Del. Ch. 1999) (dismissing breach of fiduciary duty and fraudulent conveyance claims); *See e.g., UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00CV1338, 2004 WL 137073, at *5 (S.D.N.Y. Jan. 26, 2004) (dismissing claim to recoup stock repurchase transfers and dividends), *aff'd,* 119 F. App'x 300 (2d Cir. 2004); *Midland Food*, 792 A.2d at 930 (dismissing unjust enrichment and fraudulent conveyance claims).

The Trustee's entire *Bangor Punta* argument is a variant of his all-purpose "post-LBO transfers" distinction. That is a distinction without a difference. While it is true that the Arbor Defendants arrived on the scene after the LBO lenders had already helped structure the LBO, that actually defeats the Trustee's claims. Any recovery in this case would allow the LBO lenders to benefit from "unwinding" the very transactions they structured (*i.e.*, the Cash Management Agreement providing for the funding of the Preferred Dividends and the transfer of the LIBOR Floor Certificates). The *Bangor Punta* doctrine precludes that result.

## C. **The Trustee May Only Recover to the Extent the Estate Would be Benefitted**

The Trustee concedes that most, if not all, of any recovery in this matter would be for the LBO lenders through the Mortgage Trust. (Opp. Mem. at 38 ("Plaintiffs' potential recovery amply exceeds the Mortgage Trust's maximum possible recovery of $142.5 million, with a $1 million excess from just the quantified numbers" in the AC)). The Trustee contends that there is at least some possibility that less than 1% of any recovery could be left over for other creditors and that this is enough. (Opp. Mem. at 38, 80-81).

However, the Trustee's expansive interpretation of the "triggering creditor" standing rules goes too far. The Litigation Trust was established for the benefit of the Litigation Trust Beneficiaries. (Lefkovits Decl., at 56, § 1.1(a)). As a result of the Litigation Trust Agreement waterfall provisions, the unsecured creditors and Indenture Trustee can recover

nothing until the mortgage lenders are paid in full. The LBO lenders are precluded from recovery and thus there can be no recovery under the terms of the Litigation Trust.

## POINT VII

### THE TRUSTEE LACKS STANDING AND IS EQUITABLY BARRED

**A.     The Trustee Lacks Standing to Assert
the State Law Claims Under the Wagoner Rule**

The Trustee does not contest that knowledge of the supposed fraud he alleges is imputed to the Debtors, and that he stands in the shoes of the Debtors, and thus that he "has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991); *see* Opp. Mem. at 73-74. The Trustee's only argument in defense of his position is that "[a]ll of the Defendants in this action are alleged to have been dominant directors, officers and other controlling persons and entities that are responsible as insider fiduciaries for the harm they proximately caused the Debtors." Opp. Mem. at 73.

The Trustee does not dispute, of course, that he alleges the Debtors' *management's role* in the Alleged Transfer – the Complaint is replete with such allegations. (*See e.g.,* AC ¶¶ 119, 124 125, 129, 143, 192.) Instead, the Trustee sweepingly argues that all of the defendants were also insiders. The Amended Complaint, however, is inconsistent with the assertion that the Moving Entities were insiders. The Moving Entities never owned any voting equity in the Debtors, and the Trustee does not argue otherwise. Opp. Mem. at 73. Some of the Moving Entities, *i.e.,* Arbor ESH and Princeton, owned Series A-1 Units and Common A-1 Units in defendant BHAC Capital. Arbor ESH also owned Common J Units. *See* BHAC LLC Agreement, Schedule A (Goldberg Decl., Ex. A). The Series A-1 Units, Common A-1 Units and the Common J Units were non-voting except for extraordinary actions. *See* BHAC LLC Agreement, §§ 3.03(f)(i), (g); 3.11(c)(i), 3.07(e). The Series A-1

Units included a right to appoint one member to BHAC Capital's board (*id.*) and ESI's board (*id.* § 4.01(g)) under certain circumstances. *Id.* The boards of BHAC Capital and ESI, however, were required to have a minimum of four or five members. *See id.* § 4.01(c), 4.01(g). The Trustee does not offer any explanation of how it is plausible that non-voting members are insiders based only on a right to appoint, at most, a minority board member.

The Amended Complaint alleges that ACM, Arbor ESH and ABT are affiliated (AC ¶¶ 57, 68) and that Mericash is affiliated with "Arbor," which is not defined. (AC ¶ 70.) The Amended Complaint alleges that Glida and Ron Invest were members of BHAC Capital but Glida and Ron Invest only owned Series A-1 Units that did not grant any control rights over BHAC Capital and thus ESI. *See* Waiver And Consent Agreement (Goldberg Decl., Ex. C (approving transfer from Arbor ESH Series A-1 Units and Common A-1 Units to Glida and Ron Invest)).

Similarly, the Amended Complaint alleges that Princeton and Atmar were members of DL-DW and through that interest exercised control over BHAC Capital and ESI. Once again, the Trustee ignores that Princeton and Atmar held minority, non-voting interests in DL-DW. Princeton and Atmar each owned 5 Common J units in DL-DW. *See* DLDW LLC Agreement, Goldberg Decl., Ex. D. The Common J Units had no voting rights except for certain extraordinary actions, and no right to appoint directors. *See* DLDW LLC Agreement, § 3.11(e). Other than bare bones and unsubstantiated allegations of control, there is nothing pled to support the Trustee's assertion that the Moving Entities are insiders of the Debtors.

For this reason, the Court should dismiss all of the State Law Claims as against the Moving Entities.

**B.    The Trustee Lacks Standing to Assert Claims for (i) Waste; (ii) Conversion; (iii) Aiding, Abetting, Inducing, or Participating in Conversion; and (iv) Conspiracy**

The Trustee concedes that his claims for (i) waste; (ii) conversion; (iii) aiding, abetting, inducing, or participating in conversion; and (iv) conspiracy are not referenced in

the Examiner's Report. However, the Trustee asserts that these claims are similar enough to those referenced in the Litigation Trust Agreement that he should be allowed a "pass." Opp. Mem. at 76 ("[t]hese claims are essentially alternatively pled claims for breach of fiduciary duty and fraudulent transfer . . . [a]s it is undisputed that fiduciary duty and fraudulent transfer claims were referenced in the Examiner's Report, these claims therefore were transferred to the Trust").

The Trustee's plea for leniency should be rejected. The Litigation Trust Agreement defines the "Litigation Trust Assets" as "(i) all claims and causes of action of the Debtors or the Debtors in Possession under sections 502(d), 542 through 551, and 553 of the Bankruptcy Code, and (ii) any other potential claims, causes of actions, charges, suits or rights of recovery *referenced in the Examiner's Report*." (Plan, § 1.89). It is undisputed that the Examiner's Report does not reference corporate waste, conversion, or aiding, abetting, inducing, or participating in conversion or conspiracy. The Litigation Trust Agreement could have been drafted to include the language that the Trustee now seeks to incorporate, *i.e.*, to include "claims referenced in the Examiner's Report *or similar claims*." However, the Litigation Trust Agreement does not contain the italicized phrase and the Court should not effectively amend the agreement to supply it. *See Rahl v. Bande*, 328 B.R. 387, 401-03 (S.D.N.Y. 2005) (dismissing claims asserted under a litigation trust agreement because "courts are not permitted to add or rewrite terms of a contract under the guise of interpretation when the term is clear and unambiguous"). Thus, the Trustee does not have standing to bring Counts Eight, Nine, Ten and Eleven.

## POINT VIII

### THE COMMON LAW CLAIMS IN THE AMENDED COMPLAINT ARE ALL DEFECTIVE

The Trustee's common law claims are all defective and should be dismissed for the reasons set forth above and as set forth in Point VIII of the Moving Brief.

## CONCLUSION

For the foregoing reasons, Defendants Arbor ESH II, LLC, Arbor Commercial Mortgage, LLC, Atmar Associates, LLC, Glida One LLC, Mericash Funding LLC, Ron Invest LLC, ABT-ESI LLC, Princeton ESH LLC, Guy R. Milone, Jr., Joseph Chetrit, and Joseph Martello respectfully request that the Court dismiss the Amended Complaint in its entirety, with prejudice.

Dated: New York, New York.
     February 21, 2014

DECHERT LLP

By: _____
    Gary J. Mennitt
    Shmuel Vasser

1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
(212) 698-3599 (fax)
gary.mennitt@dechert.com
shmuel.vasser@dechert.com

*Attorneys for Defendants Arbor ESH II, LLC, Arbor Commercial Mortgage, LLC, Atmar Associates, LLC, Glida One LLC, Mericash Funding LLC, Ron Invest LLC, ABT-ESI LLC, Princeton ESH LLC, Guy R. Milone, Jr., Joseph Chetrit, and Joseph Martello*