UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| EXTENDED STAY, INC., *et al.*, | Case No. 09-13764 (RG) |
| Reorganized Debtors. | (Jointly Administered) |
| FINBARR O'CONNOR, as Trustee for and on behalf of the EXTENDED STAY LITIGATION TRUST, and | Adv. Proc 11-2254 (RG) (Consolidated) |
| THE EXTENDED STAY LITIGATION TRUST, | |
| Plaintiffs, | |
| v. | |
| DL-DW Holdings, L.L.C., *et al.*, | |
| Defendants. | |

**LIGHTSTONE DEFENDANTS' REPLY IN FURTHER SUPPORT OF
MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT
TO FED. R. BANKR. P. 7012(b) AND FED. R. CIV. P. 12(b)(1) AND (b)(6)**

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
David M. Friedman
Robert M. Novick
Michele L. Angell
Andrew R. Kurland
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for the Lightstone Defendants*

# TABLE OF CONTENTS

**Page**

Introduction To Reply ......................................................................................... 1

Reply .................................................................................................................... 7

I.    Reply Regarding Global Issues Relevant To All Claims. ............................... 7

    A.    The Identity of the "Lightstone Defendants" and the Seriousness of the Trust's Continued Lumping of All "Defendants" .................................. 7

    B.    The Role of the Mortgage Lender as a Principal Actor in the Transfers. ............ 10

    C.    Judge Peck Preserved All of the Lightstone Defendants' Arguments. ................ 13

    D.    Objection to the Trust's Inappropriate Use of the Examiner's Report. ............... 15

II.    Reply To Arguments Regarding Specific Claims. ......................................... 17

    A.    The Trust Cannot Disregard the Debtors' Separateness to Create Triggering Creditors and Insolvency. ................................................... 17

        1.    The Trust Cannot Disregard the Debtors' Separateness Under Delaware Law. ...................................................................... 17

            a.    Reverse Veil Piercing Is Improper Under Delaware Law ........... 17

            b.    The Amended Complaint Does Not Allege Facts that Could Satisfy the Delaware Standard Even for Forward Veil Piercing .................................................................... 22

        2.    The Trust Did Not and Cannot Plead Grounds for Substantive Consolidation. .................................................................. 25

    B.    The Fraudulent Conveyance Claims Must Be Dismissed. ................................. 32

        1.    The Mortgage Lender Cannot Benefit Under 11 U.S.C. § 550 Because It Consented to and Participated in the Transactions ................ 32

        2.    Avoidance of the Transfers Provides No Direct or Indirect Benefit to the Estate ...................................................................... 37

        3.    The Trust Has Not Refuted That Its Claims Are Precluded By the One-Satisfaction Rule as a Result of Its Settlement With Blackstone. ...................................................................... 46

4.      The Alleged Transfers Cannot Be Recovered Because the Property, as the Mortgage Lender's Collateral, Would Not Have Been Available to Pay Unsecured Creditors Had the Transfers Not Occurred.................................................................................. 48

5.      Section 546(e) Bars the Claims for Recovery of the Floor Certificates and the Series A Unit Payments. ......................... 50

C.      There Is No Claim for Breach of Fiduciary Duties to Creditors. ....................... 50

D.      The Trust Has Not Properly Pled a Claim for Breach of Contractual Duties. ..... 52

E.      However, If the Contractual Claim Survives, the Fiduciary Duty Claims Must Be Dismissed as Superfluous..................................................... 53

F.      The Trust's Intentional Fraudulent Conveyance Claims Fail.............................. 54

G.      The Trust's Breach of Fiduciary Duty Claims are Barred by an Exculpatory Clause in ESI's Certificate of Incorporation. ...................................................... 56

H.      The Trust's Unjust Enrichment Claim Fails as a Matter of Law......................... 57

I.      The Trust's Waste Claim Must be Dismissed Because the Trust has Not Adequately Pled a Claim for Corporate Waste................................................... 58

J.      The Trust's Conversion Claims Must be Dismissed........................................... 60

Conclusion .................................................................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Access Cardiosystems, Inc.*,
404 B.R. 593 (Bankr. D. Mass. 2009) .................................................................57

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
34 F.3d 800 (9th Cir. 1994) .................................................................... 38, 41

*In re Acushnet River & New Bedford Harbor Proceedings*,
675 F. Supp. 22 (D. Mass.1987) ........................................................................28

*Adelphia Recovery Trust v. Bank of America, N.A.*,
390 B.R. 80 (S.D.N.Y. 2008) ............................................................................37

*Adelphia Recovery Trust v. HSBC Bank USA*,
634 F.3d 678 (2d Cir. 2011) ..............................................................................32

*Allard v. Flamingo Hilton (In re Chomakos)*,
69 F.3d 769 (6th Cir. 1995) ...............................................................................43

*In re ALT Hotel, LLC*,
479 B.R. 781 (Bankr. N.D. Ill. 2012) .........................................................*passim*

*In re Am. HomePatient, Inc.*,
298 B.R. 152 (Bankr. M.D. Tenn. 2003) ...........................................................44

*AP Services LLP v. Silva*,
483 B.R. 63 (S.D.N.Y. 2012)..............................................................................57

*ASARCO LLC v. Ams. Mining Corp.*,
382 B.R. 49 (S.D. Tex. 2007) .................................................................. 4, 19, 20

*Balaber-Strauss v. Murphy (In re Murphy)*,
331 B.R. 107 (Bankr. S.D.N.Y. 2005) ...............................................................40

*Barber v. McCord Auto Supply (In re Pearson Indus.)*,
178 B.R. 753 (Bankr. C.D. Ill. 1995) .................................................................49

*Begier v. Internal Revenue Serv.*,
496 U.S. 53 (1990) .............................................................................................48

*In re BH S & B Holdings LLC*,
420 B.R. 112 (Bankr. S.D.N.Y. 2009) .......................................................... 20, 23, 24, 25

*Blair v. Infineon Technologies AG,*
    720 F. Supp. 2d 462 (D. Del. 2010) .................................................................18

*Blaustein v. Lord Balt. Capital Corp.,*
    No. 6685-VCN, 2012 Del. Ch. LEXIS 126 (Del. Ch. May 31, 2012) ..................53

*Buchwald v. Renco Group, Inc.  (In re Magnesium Corp. of Am.),*
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ...............................................................51

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.*
*(In re M. Fabrikant & Sons, Inc.),*
    2009 Bankr. LEXIS 3606 (Bankr. S.D.N.Y. Nov. 10, 2009) ..............................43

*Calpine Corp. v. Rosetta Res., Inc. (In re Calpine Corp.),*
    377 B.R. 808 (Bankr. S.D.N.Y. 2007) ....................................................37, 38, 41

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.,*
    491 B.R. 335 (S.D.N.Y. 2013)............................................................................23

*Cascade Energy & Metals Corp. v. Banks,*
    896 F.2d 1557 (10th Cir. 1990)....................................................................21, 22

*Case Fin. Inc. v. Alden,*
    No. 1184-VCP, 2009 Del. Ch. LEXIS 153 (Del. Ch. Aug. 21, 2009) ...........20, 22

*CFTC v. Probber Int'l Equities Corp.,*
    504 F. Supp. 1154 (S.D.N.Y. 1981) ...................................................................37

*Chemical Bank New York Trust Co. v. Kheel,*
    369 F.2d 845 (2d Cir. N.Y. 1966).......................................................................26

*Congress Credit Corp. v. AJC Int'l,*
    186 B.R. 555 (D.P.R. 1995)................................................................................49

*Contemporary Indus. Corp. v. Frost,*
    564 F.3d 981 (9th Cir. 2009) ..............................................................................57

*Cooper Development Co. v. Friedman,*
    92 Civ. 7572, 1994 U.S. Dist. LEXIS 1814 (S.D.N.Y. Feb. 22, 1994)................57

*Crescent Res. Litig. Trust v. Duke Energy Corp.,*
    500 B.R. 464 (W.D. Tex. 2013)..................................................................*passim*

*CVC Claims Litig. LLC v. Citicorp Venture Capital, Ltd.,*
    03 Civ. 7936 (DAB), 2006 U.S. Dist. LEXIS 31395 (S.D.N.Y. May 18, 2006)....................54

*Estate of Daily v. Title Guar. Escrow Serv., Inc.,*
    178 B.R. 837 (D. Haw. 1995) .......................................................................20, 21

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723,766 (Bankr. S.D.N.Y. 1992)........................................................................27

*Eastgroup Properties v. S. Motel Ass'n, Ltd*,
  935 F.2d 245 (11th Cir. 1991) ......................................................................................30

*F.D.I.C. v. Colonial Realty Co.*,
  966 F.2d 57 (2d Cir. 1992) ............................................................................................30

*Fed. Refinance Co. v. Klock*,
  352 F.3d 16 (1st Cir. 2003)............................................................................................49

*First Nat'l Bank v. Rafoth (In re Baker & Getty Fin. Servs.)*,
  974 F.2d 712 (6th Cir. 1992) ........................................................................................27

*Fletcher v. Atex*,
  68 F.3d 1451 (2d Cir. 1995) ..........................................................................24, 25, 29

*Floyd v. IRS*,
  151 F.3d 1295 (10th Cir. 1998)..............................................................................21, 22

*In re Ford*,
  54 B.R. 145 (Bankr. W.D. Mo. 1984) ..........................................................................27

*In re FoxMeyer Corp.*,
  290 B.R. 229 (Bankr. D. Del. 2003) .......................................................................24, 25

*Gale v. Bershad*,
  No. 15714, 1998 Del. Ch. LEXIS 37 (Del. Ch. Mar. 3, 1998) ....................................53

*Hansen v. MacDonald Meat Co. (In re Kemp Pacific Fisheries, Inc.)*,
  16 F.3d 313 (9th Cir. 1994) ..........................................................................................49

*Harbor Fin. Partners v. Huizenga*,
  751 A.2d 879 (Del. Ch. 1999)........................................................................................58

*In re I.R.C.C., Inc.*,
  105 B.R. 237 (Bankr. S.D.N.Y. 1989) ..........................................................................27

*Jurista v. Amerinox Processing, Inc.*,
  No.12-3825, 2013 U.S. Dist. LEXIS 44057 (D.N.J. Mar. 28, 2013)....................................15

*Kelly v. Blum*,
  No. 4516-VCP, 2010 Del. Ch. LEXIS 31 (Del. Ch. Feb. 24, 2010)....................................53

*Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.)*,
  265 B.R. 524 (Bankr. S.D.N.Y. 2001) ..........................................................................43

*In re Kroh Bros. Dev. Co.*,
    117 B.R. 499 (W.D. Mo. 1989) ............................................................26

*Kupetz v. Wolf*,
    845 F.2d 842 (9th Cir. 1988) ............................................................55

*Kuroda v. SPJS Holdings, L.L.C.*,
    971 A.2d 872 (Del. Ch. 2009).............................................................60

*Lasky v. Shearson Lehman Bros., Inc.*,
    139 F.R.D. 597 (S.D.N.Y. 1991) ........................................................16

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...............................................26

*In re Lewellyn*,
    26 B.R. 246 (Bankr. S.D. Iowa 1982) ...............................................26

*MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*,
    675 F.3d 530 (5th Cir. 2012) ............................................................47

*McCloskey v. Wells Fargo Bank Wis. (In re Art Unlimited, LLC)*,
    No. 07-C-54, 2007 U.S. Dist. LEXIS 66479 (E.D. Wis. Sept. 6, 2007) ...................48, 49, 55

*In re Merrill Lynch & Co.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...............................................16

*MicroStrategy Inc. v. Acacia Research Corp.*,
    No. 5735-VCP, 2010 Del. Ch. LEXIS 254 (Del. Ch. Dec. 30, 2010)...................................21

*Miller v. Forge Mench P'ship*,
    No. 00 Civ. 4314 (MBM), 2005 U.S. Dist. LEXIS 1524 (S.D.N.Y. 2005) ...........................49

*Moore v. Bay*,
    284 U.S. 4 (1931)...............................................................................37

*In re Morris Commc'ns NC, Inc.*,
    914 F.2d 458 (4th Cir. 1990) ............................................................43

*Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.*,
    424 B.R. 95 (Bankr. S.D.N.Y. 2010) .................................................51

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
    No. 10-CV-4145 (KMK), 2013 U.S. Dist. LEXIS 141032
    (S.D.N.Y. Sept. 27, 2013)..............................................................20, 24

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
    537 F.3d 168 (2d Cir. 2008) ..............................................................23

*In re Newcomb*,
    744 F.2d 621 (8th Cir. 1984) ......................................................................................48

*Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*,
    222 B.R. 417 (Bankr. S.D.N.Y. 1998) ........................................................................48

*Nordberg v. Continental Illinois Nat'l Bank & Trust Co. of Chicago (In re Topcor)*,
    2002 U.S. App. LEXIS 28756 (5th Cir. Oct. 28, 2002) ..............................................35

*North Am. Catholic Educ. Prog. Foundation, Inc.* v. *Gheewalla*,
    930 A.2d 92 (Del. 2007) .....................................................................................51, 52

*Ochre LLC v. Rockwell Architecture Planning & Design*,
    No. 12 CIV. 2837, 2012 U.S. Dist. LEXIS 172208 (S.D.N.Y. Nov. 28, 2012) ......9

*Phelan v. Local 305 of United Ass'n of Journeymen*,
    973 F.2d 1050 (2d Cir. 1992)......................................................................................46

*Plan Comm. v. Clark (In re Bank Bldg. & Equip. Corp. of Am.)*,
    158 B.R. 138 (E.D. Mo. 1993)....................................................................................48

*Protas v. Cavanagh*,
    No. 6555-VCG, 2012 Del. Ch. LEXIS 88 (Del. Ch. May 4, 2012)...................58, 59

*Questrom v. Federated Dep't Stores, Inc.*,
    84 F. Supp. 2d 483 (S.D.N.Y. 2000)..........................................................................44

*In re Refco, Inc. Secs. Litig. v. CSFB*,
    2009 U.S. Dist. LEXIS 129944 (S.D.N.Y. Nov. 13, 2009)..........................32, 35, 38

*Ring v. Bergman (In re Bergman)*,
    293 B.R. 580 (Bankr. W.D.N.Y. 2003)......................................................................54

*S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp., Ltd.*,
    181 F.3d 410 (3d Cir. 1999) ......................................................................................15

*Samuels v. Air Transport Local 504*,
    992 F.2d 12 (2d Cir. 1993) .........................................................................................15

*Schupper v. Edie*,
    193 Fed. App'x 744 (10th Cir. 2006)..........................................................................16

*Soroof Trading Dev. Co. v. GE Microgen, Inc.*,
    283 F.R.D. 142 (S.D.N.Y. 2012)................................................................................23

*Sparaco v. Lawler, Matusky, Skelly Engineers LLP*,
    313 F. Supp. 2d 247 (S.D.N.Y. 2004).........................................................................46

*Spartan Tube & Steel v. Himmelspach (In re RCS Engineered Prods. Co.),*
 102 F.3d 223 (6th Cir. 1996) .............................................................22

*Stanziale v. Nachtomi,*
 No. 01-Civ-403, 2004 U.S. Dist. LEXIS 15664 (D. Del. Aug. 6, 2004) ...............................57

*Steinberg v. Sherman,*
 No. 07-Civ-1001, 2008 U.S. Dist. LEXIS 37367 (S.D.N.Y. May 8, 2008).......................9, 56

*Stone v. Ritter,*
 911 A.2d 362 (Del. 2006) ...............................................................57

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*
 906 A.2d 168 (Del. Ch. 2006)...............................................................52

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.),*
 464 B.R. 606 (Bankr. S.D.N.Y. 2012) .............................................................41

*U.S. Bank National Association as Trustee for Registered Holders of Wachovia Bank*
 *Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates,*
 *Series 2007-ESH v. Lightstone Holdings, Inc.,*
 2013 N.Y. Misc. LEXIS 5203, 2013 N.Y. Slip. Op. 32875(U)
 (Sup. Ct. N.Y., Nov. 7, 2013) ...............................................................1

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),*
 860 F.2d 515 (2d Cir. 1988) ...............................................................*passim*

*United States v. Bliss,*
 108 F.R.D. 127 (E.D. Mo. 1985) ...............................................................29

*In re Verestar, Inc.,*
 343 B.R. 444 (Bankr. S.D.N.Y. 2006) .............................................................27

*Vichi v. Koninklijke Philips Electronics N.V.,*
 62 A.3d 26, 49 (Del. Ch. 2012)...............................................................19

*Vintero Corp. v. Corporation Venezolana De Fomento (In re Vintero Corp.),*
 735 F.2d 740 (2d Cir. 1984) ...............................................................37

*In re W.R. Grace & Co.,*
 468 B.R. 81 (D. Del. 2012)...............................................................47

*In re Walt Disney Co. Derivative Litig.,*
 906 A.2d 27 (Del. 2006) ...............................................................52, 59

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.),*
 No. 10-4609 (REG), 2014 Bankr. LEXIS 159 (Bankr. S.D.N.Y. Jan. 14, 2014)...........*passim*

*Wellman v. Wellman*,
933 F.2d 215 (4th Cir. 1991) ...................................................................37

*Whiteford Plastics Co. v. Chase Nat'l Bank*,
179 F.2d 582 (2d Cir. 1950) ...................................................................37

*In re WorldCom, Inc.*,
No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003).........................27

*In re WRT Energy Secs. Litig.*,
1999 U.S. Dist. LEXIS 3883 (S.D.N.Y. Mar. 29, 1999) .....................................16

*In re Yellowstone Mountain Club, LLC*,
436 B.R. 598 (Bankr. D. Mont. 2010).........................................32, 40

*Zunshine v. Giddens (In re MF Global Holdings)*,
No. 12 Civ. 4139 (AJN), 2013 U.S. Dist. LEXIS 4718 (S.D.N.Y. Jan. 11, 2013)................47

## Statutes

6 Del. C. § 1307(a)...............................................................................40

6 Del. C. § 1308(b)...............................................................................40

11 U.S.C. § 550 .............................................................................*passim*

11 U.S.C. § 550(a) .........................................................................37, 38

Del. Code Ann. Tit. 6, § 18-1101(c) ...............................................52

## Other Authorities

47 Am. Jur. 2d Judgments § 808 (2013) ...........................................47

Fed. R. Bankr. P. 7012(b)........................................................................1

Fed. R. Civ. P. 12(b) ...................................................................1, 6, 15

Fed. R. Civ. P. 8(a)...............................................................................16

Restatement (Third) of Torts § 25 (2000) ........................................47

The Lightstone Defendants[1] submit this memorandum in further support of their motion to dismiss the Amended Complaint.

## INTRODUCTION TO REPLY

From the inception of this lawsuit, the claims against the Lightstone Defendants (and others) were defective on their face. Despite massive discovery that preceded the filing of the lawsuit, the Amended Complaint – the seventh filed by the Trust[2] – still suffers from fatal infirmities. Recognizing its inability to state viable claims based on the facts it has pled, the Trust attempts to rewrite history and rewrite the law. However, The Trust's claims remain a muddle that irresponsibly accuse all 26 defendants of being equally responsible for all challenged transactions and claims, deliberately fail to allege which Debtors and which creditors were purportedly injured and how, and sweep causation and damages under the rug. Rather than clarify its claims, the Trust's Memorandum in Opposition to Defendants' Motions to Dismiss ("Opposition Brief"[3]) does the opposite, arguing from numerous "allegations" that are not in the Amended Complaint, string-citing irrelevant cases, continuing to decline to allege which parties allegedly did or did not play which roles in the transactions, and misconstruing many of the Lightstone Defendants' arguments to avoid having to respond to them, all in an unfortunately disrespectful tone.

---

[1] Capitalized terms used herein and not otherwise defined are intended to have the meanings set forth in the Lightstone Defendants' Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(1) and (b)(6), and Memorandum of Law in Support Thereof ("Lightstone Opening Brief").

[2] At least two additional complaints were filed on behalf of the Mortgage Lender itself. *See U.S. Bank National Association as Trustee for Registered Holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH v. Lightstone Holdings, Inc.,* 2013 N.Y. Misc. LEXIS 5203, 2013 N.Y. Slip. Op. 32875(U) (Sup. Ct. N.Y., Nov. 7, 2013) (dismissing Mortgage Lender's claims sounding in fraud as "demonstratively false," "utterly baseless" and "frivolous").

[3] Cited as "Opp. Brief."

Although invited (and required) to do so since 2011, the Trust has not pled that any specific Debtor, or even classes of Debtors, made or funded any of the challenged transfers; has not pled that any given Debtor was insolvent at the time of the transfers; and has not pled that any Debtor other than ESI, which sits at the holding company level, has unpaid creditors other than LBO lenders. As a consequence, as the Trust has all but conceded, the only way for the claims to survive is if the Trust can merge all 75 of its own predecessors *nunc pro tunc* to 2007. Whether the Trust can disregard the entity separateness of its own predecessors is thus a gating issue that the Trust cannot overcome for a multitude of reasons.

To begin with, the Trust misstates and misapprehends the relevant law of substantive consolidation. Mere allegations of common control and management fall far short of satisfying the pleading requirements for either substantive consolidation or veil piercing. To substantively consolidate entities in the Second Circuit, the Trust must show either that creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit, or that the affairs of the debtors are so entangled that it would be impossible or unduly expensive to separate them out. The Complaint does not contain allegations that creditors dealt with the Debtors as a single economic unit, and any such allegation would be flatly contradicted by the loan documents to which over 99% of the creditors were parties, as well as numerous filings in the chapter 11 cases. (The Lightstone Defendants did not address this prong of the *Augie/Restivo* test in their moving papers because there are no allegations in the Amended Complaint that invoke it.) The Amended Complaint also does not allege that there was any confusion or uncertainty with respect to which Debtors owned which assets, nor could there could have been;

all or substantially all of the Debtors' material assets had recorded titles. There are no allegations that the Debtors' books and records were not accurate.[4]

Second, the Trust also misapprehends the law of veil-piercing. The Trust asserts that it can disregard entities merely on the basis of alter-ego allegations. As discussed below, however, alter-ego allegations are but one of two elements required to disregard corporate separateness. A plaintiff also must show fraud or fraud-like injustice in the use of the corporate form.

Third, the Trust has not made any factual allegations that, if proven, could support veil-piercing or substantive consolidation even if the legal standards are as slack as the Trust incorrectly portrays them to be. The Trust's allegations, although restated many different ways, all amount to the same thing: that like every midsized, large and very large commercial enterprise, the Extended Stay hotel chain had common management and utilized a cash management account (required by the lenders). If such allegations were sufficient for disregarding business entities' separate existences, the entirety of corporation and limited liability company law may as well not exist. In fact, it would probably have been actionable if the Debtors *had* been operated by 75 entirely independent boards and management groups, as the Trust argues was required to preserve their corporate separateness, because that would have made for absurdly inefficient corporate governance and management, greatly increased management and overhead expenses for no business purpose, and threatened the value of the "Extended Stay" brands which lies in maintaining a consistent and predicable hospitability experience throughout the chain. Seventy-five Debtors with separate five-member boards would have amounted to 375 directors making

---

[4]  The Trust's only allegation relating to the Debtors' records is that there were not "specific general ledger codes" for mezzanine interest payments (Amended Complaint ¶ 194) but, as admitted in prior complaints, every mezzanine loan payment was fully accounted for down to the last dollar. *See* Prior Amended Complaint (Kurland Decl. Ex. A) at Exhibits A and H thereto. (References to "Kurland Decl. Ex." are to the exhibits attached to the Declaration of Andrew R. Kurland dated December 20, 2013 and submitted in support of the Lightstone Opening Brief.)

decisions.  (The Debtors did, in fact, have twenty-five independent board members distributed throughout their enterprise in addition to the alleged "insiders.")

Fourth, the Lightstone Defendants have argued that the Trust cannot substantively consolidate the Debtors because that would amount to a collateral attack on the Plan and Confirmation Order.  The Trust's response that a court in 2014 can consolidate the Debtors into a single entity *nunc pro tunc* to 2007 when their continuing separate existence was so-ordered in 2010 is nonsensical.  Equally meritless is the Trust's response that the Examiner's musings about the possibility of consolidation somehow trump the plain language of the Plan and Confirmation Order.

Fifth, in any event, as discussed in the Lightstone Opening Brief, Delaware does not recognize reverse veil piercing – holding *subsidiaries* (the Mortgage Borrowers that had assets) liable for the debts of their *shareholders* (Mezzanine Borrowers or, eleven entities away, holding company ESI).  The Trust cites to *ASARCO*,[5] but this, the single, out-of-jurisdiction, decision that has held otherwise throughout the history of Delaware corporation law, does not compel a different conclusion because it was wrongly decided.  It is not up to an out-of-state bankruptcy court to create new Delaware law that contradicts Delaware's statutes and strong public policies.

Even if the Court could find that the Amended Complaint can surmount all of those hurdles to consolidation, there is a second gating issue that the Trust cannot overcome: its claims must be dismissed because the Trust beneficiaries – the LBO lenders – consented to and/or participated in all of the challenged transfers.  The Trust's response to this is three-fold.  First, it argues that the lenders could not have "ratified" any transactions because the transactions occurred after the banks had already signed on the dotted line for the 2007 Transaction.  This is

---

[5] *ASARCO LLC v. Ams. Mining Corp.*, 382 B.R. 49, 69 (S.D. Tex. 2007).

just a semantic game: a creditor is not only precluded from recovering from proceedings relating to transactions that it ratifies after the fact, but also those it consents to in advance or participates in directly. The lenders consented to the Series A Unit Payments in advance through their agreement to (and insistence upon) the Cash Management Agreement that provided for the payments; they consented to the Series A Unit Payments as well as the Management Fees in advance through their exercise of rights to approve or disapprove the Debtors' annual budgets; and they negotiated and agreed to, as well as performed, the agreement to transfer the Floor Certificates from the Wachovia Mortgage Trust to any party of the Debtors' choosing in exchange for loan modifications they desired. All of these facts are admissions in the Trust's complaints or appear from the face of the loan documents. The Trust argues that the Mortgage Lender's "only role in the transfers at issue was to serve as a conduit bank entity," but that is demonstrably false.

Third, the Trust attempts to avoid dismissal by relying on the platitude that a transfer may be recovered in full even if it exceeds the amount needed to repay the "triggering" creditors that afford standing (the "Moore Rule"). The Trust's reliance on the Moore Rule is misplaced. As this Court reaffirmed last month in *Lyondell*,[6] the general principle established by the Moore Rule is still subject to the well-established rule that creditors that participated in or consented to a transaction may not benefit from any recoveries arising from that transaction and damages must be limited accordingly. In addition, the Trust ignores the argument that the Trust may not recover any further amounts from the Defendants because its $10 million settlement with Blackstone is sufficient to pay in full all alleged non-LBO creditors enterprise-wide, such that further recoveries from the remaining Defendants would violate the "single satisfaction rule."

---

[6] *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, No. 10-4609 (REG), 2014 Bankr. LEXIS 159, at *95 (Bankr. S.D.N.Y. Jan. 14, 2014).

In addition, the Trust's opposition has failed to refute many other points in the Motions to Dismiss. As discussed below and in other Defendants' replies, these include that:

- Contrary to the Trust's assertions, the law in this district and circuit provides that section 546(e) precludes a plaintiff from bringing state law claims that seek the same relief as a fraudulent transfer claim that is subject to the safe harbor of section 546(e). This includes all state law avoidance claims and most, if not all, of the Trust's other claims.

- The Trust admits that the Floor Certificates are securities, and alleges that they were issued as part of an agreement in which the Debtors allegedly gave up consideration in exchange for the securities, but claims that the section 546(e) safe harbor does not apply if the alleged consideration given for the securities was in the form of loan modifications. This is unsupported and contrary to law. Consideration does not have to be in-kind.

- The Trust argues that section 546(e) does not apply to the Floor Certificate transfer because the transfer "was contrary to and not in connection with the underlying agreements." Opp. Brief at 50. Putting aside that there is no legal authority supporting the Trust's theory, the face of the alleged agreement demonstrates that the Trust's argument is baseless. The alleged agreement shows that the only value, if any, given by the Debtors was their concurrence to a loan modification requested by the lenders. *See* Kurland Decl. Ex. L. If the Trust believes that the Debtors did not receive reasonably equivalent value in exchange for the loan modifications they gave the lenders, their fraudulent transfer claims lie against the lenders, not the Defendants.[7]

- There is no independent cause of action for breach of fiduciary duties to creditors. The Trust has mistakenly relied upon law that permitted creditors of an insolvent debtor to assert breach of fiduciary duty claims *derivatively on behalf of the estate* – the same claims the Trust is already asserting directly in a different count of the Amended Complaint. The creditors themselves do not have direct claims, and even if they did, the estate would not have standing to assert them.

- The Trust has confused the Lightstone Defendants' arguments under the Second Circuit's *Wagoner* rule. The Lightstone Defendants have not argued that *Wagoner* bars claims against insiders. The Amended Complaint alleges that each of the Defendants is an insider, but that if not, that they are liable for aiding and abetting. The Trust's claim for aiding and abetting must be dismissed as a matter of law because: (i) to the extent the Defendants are insiders, they cannot be liable for aiding and abetting each other, and (ii) to the extent they are not insiders, *Wagoner*

---

[7] That said, we believe it would be entirely proper for the Court to determine in the context of a Rule 12(b) motion that the alleged loan concession was purely an inter-lender accommodation and no reasonable inference can be drawn that any of the Debtors gave up any value.

and principles of *in pari delicto* prohibit a corporation, or one standing in its shoes, from bringing claims against third parties for aiding and abetting the corporation in its own alleged misconduct.

- The Lightstone Defendants moved to dismiss the Trust's claims for breach of contractual duties of care, loyalty and good faith because the Trust never so much as identified a contract. In its opposition, the Trust implies that the contracts are the respective Debtors' operating agreements. If so, Delaware law requires the Trust's claims for breach of fiduciary duty to be dismissed as duplicative of the contractual claims.

- The Trust has not pled intentional fraud or bad faith by the Defendants. Every alleged transfer was a transfer of property that otherwise would have constituted the Mortgage Lender's collateral, not property on which unsecured creditors could have levied, and was made with the Mortgage Lender's knowledge and consent. There can be no intentional fraud or bad faith under such circumstances.

The Trust also has failed to demonstrate that the Motions to Dismiss should not be granted as to all of the Trust's remaining claims as set forth below.

## REPLY

## I.     REPLY REGARDING GLOBAL ISSUES RELEVANT TO ALL CLAIMS.

While we reply to the Trust's arguments in turn below, some points that inform all of the arguments need to be made first.

### A.     The Identity of the "Lightstone Defendants" and the Seriousness of the Trust's Continued Lumping of All "Defendants".

On the first page of the Lightstone Opening Brief, the "Lightstone Defendants" are defined and identified as the entities DL-DW, Lightstone Holdings, LLC, The Lightstone Group, LLC, Lightstone Commercial Management, BHAC and Park Avenue Funding, LLC, and as the individuals David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, and Joseph Teichman. *See* Lightstone Opening Brief at 1 n.1. In its Opposition Brief, the Trust expressly acknowledged this – but then immediately redefines the "Lightstone Defendants" and "Lightstone" to include an additional entity, PGRT ESH Inc. ("PGRT"). Opp. Brief at 1 n.1. As a result, when the

Lightstone Defendants, PGRT and the Trust refer to the "Lightstone Defendants" in their arguments, they are now referring to non-identical sets of parties.

The undersigned attorneys do not represent PGRT, which has appeared in this proceeding through its own separate counsel. Allegations regarding distributions to PGRT are not allegations of distributions to the "Lightstone Defendants." Conversely, there are no allegations that any of the individual Defendants other than Mr. Lichtenstein controlled or owned PGRT (an allegation we would intend to contest if the action is not summarily dismissed). Similar concerns apply with equal force to the Trust's failure to distinguish between the Lightstone Defendants, the Arbor Defendants and the HVM Defendants, between each individual Defendant, and between individuals and entity defendants. It is highly inappropriate to use terms defined out of "convenience" to manufacture the appearance of claims, such as by contending that "Defendants received" a transfer that indisputably did not go to all of them[8], or that "Defendants" took some action that indisputably could not have been performed jointly by all of them.[9] Not only does this make it impossible to understand who is accused of having done what, it misleads.

To be clear, the Amended Complaint does *not* contain any specific factual allegations to support any of the following:

---

[8] *E.g.*, "[S]ubstantial funds and assets worth in excess of $139 million pass[ed] upstream to the insider Defendants" (Opp. Brief at 30); "The LIBOR Floor Certificates had paid out at least $74.3 million to Defendants." (*Id.* at 32); "Defendants received at least $74.3 million in direct payments on the LIBOR Floor Certificates" (*Id.* at 33); Series A-2 and A-3 dividends "were made to, for the benefit of, or at the direction of the Lightstone and Arbor Defendants" (*Id.* at 46-47).

[9] *E.g.*, "Defendants wrongfully assigned away the Debtors' right to own the LIBOR Floor Certificates" (Opp. Brief at 9); "Defendants concealed" defaults from the lenders and reported "false performance levels." (*Id.* at 23-24); the Debtors' management team was "controlled by Defendants" (Opp. Brief at 26; *see also* Amended Complaint ¶¶ 192, 194); "the Defendants disregarded all semblance of legal formality regarding the corporate status of the Debtors and affiliated entities." (Opp. Brief at 27); Defendants violated "numerous loan covenants" (without any allegation as to which Defendants, if any at all, were bound by loan covenants) (*Id.* at 31); "Defendants knew full well from the outset how lucrative the LIBOR Floor Certificates were, which, no doubt, accounts for Defendants' diversion in the first place" (*Id.* at 32); and "they [all Defendants] recorded the LIBOR Floor Certificates at a value of approximately $25 million." (*Id.*)

- That any transfers were made directly to any of the individual Lightstone Defendants;

- That any transfers were made for the benefit of Messrs. Owen, de Vinck and Teichman;

- That Messrs. Owen, de Vinck and Teichman owned any of the entity Defendants or invested in the Debtors;

- That any Series A Unit Payments were transferred by the Debtors to any of the Lightstone Defendants except BHAC;

- That any of the Lightstone Defendants are affiliated with any of the Arbor Defendants except to the extent that certain (not all) of them had invested in the Debtors;

- That Lightstone Holdings, LLC, The Lightstone Group, LLC, Lightstone Commercial Management or any of the individual Lightstone Defendants owned or controlled Arbor ESH II L.L.C., Arbor Commercial Mortgage, L.L.C., Princeton ESH L.L.C., Atmar Associates, L.L.C., Glida One LLC, Ron Invest LLC;

- That any of the individual Arbor Defendants were affiliated with or controlled Defendants Lightstone Holdings, LLC, The Lightstone Group, LLC, Lightstone Commercial Management or the individual Lightstone Defendants.

As discussed in the Lightstone Opening Brief, "[w]here a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each of the defendants. . . . A plaintiff cannot merely 'lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" *Ochre LLC v. Rockwell Architecture Planning & Design*, No. 12 CIV. 2837, 2012 U.S. Dist. LEXIS 172208, at *16-17 (S.D.N.Y. Nov. 28, 2012) (quoting *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001)). *See also Steinberg v. Sherman*, No. 07-Civ-1001, 2008 U.S. Dist. LEXIS 37367, at *15 (S.D.N.Y. May 8, 2008) ("[A] plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim."). It should be apparent that conforming strictly with pleading requirements is essential because the Trust is abusing group pleadings to create a mirage of claims against

parties against whom it could not state a *prima facie* case if it obeyed federal pleading requirements.

**B.      The Role of the Mortgage Lender as a Principal Actor in the Transfers.**

The Trust asserts that "Wachovia's only role in the transfers at issue was to serve as a conduit bank entity that the Defendants directed" to make payments, and criticizes the Lightstone Defendants for "mischaracterizing Wachovia (or the Mortgage Lender as described in Lightstone's memorandum) as the chief bad actor . . . when Wachovia and its affiliate in fact served only as passive conduits."  Opp. Brief at 4.  The Trust's judicial admissions and the loan documents demonstrate just the opposite:

a.      Wachovia, together with Bear Stearns and Bank of America, arranged for and provided all of the Debtors' "LBO" financing, the mortgage loan of $4.1 billion as well as the ten mezzanine loans totaling $3.3 billion.  *See* Intercreditor Agreement (Kurland Decl. Ex. I) at 1-2; *see also, e.g.*, Mortgage Loan Agreement (Angell Decl. Ex. 1)[10] at 1; Mezzanine A Loan Agreement (Angell Decl. Ex. 2) at 1.  Any other holders of the LBO debt are their subsequent transferees.

b.      After the closing of the 2007 Transaction, the entirety of the Mortgage Loan was transferred to Wachovia Large Loan Inc.  *See, e.g.*, Opp. Brief at 3 n.4.

c.      Wachovia Large Loan Inc. then transferred the Mortgage Loan to the entity the Plaintiff mysteriously refers to only as the "Mortgage Trust."  The actual entity is the "Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH" (the "Wachovia Mortgage Trust").  *See* Objection of U.S. Bank National Association, As Successor Trustee [for the Wachovia Mortgage Trust], With Respect to the

---

[10]  Declaration of Michele L. Angell dated February 21, 2014 and filed herewith (the "Angell Decl.").

Debtors' Motion Pursuant to Bankruptcy Rule 2004 Authorizing Discovery (D.I. 524), dated

November 6, 2009 [Ch. 11 Docket No. 558] (the "Trustee Discovery Objection," Angell Decl.

Ex. 3) at ¶ 6; *see also* Opp. Brief at 3 n. 4. As far as the Lightstone Defendants are aware, the

Mortgage Lender is still the Wachovia Mortgage Trust.

   d.   Wachovia was the initial Servicer of the Mortgage Loan for the Wachovia

Mortgage Trust. *See* Trustee Discovery Objection ¶ 6; Opp. Brief at 3 n.4. The current servicer

is thus Wachovia's successor-in-interest in that role.

   e.   Wachovia also was the initial Special Servicer of the Mortgage Loan for

Wachovia Mortgage Trust (*see id.*), and hence the current Special Servicer is Wachovia's

successor-in-interest as to that role. The Special Servicer, of course, is not the actual creditor but

the agent acting for the Wachovia Mortgage Trust.

   f.   The Mortgage Lender held a security interest and lien on each of the

Extended Stay hotel properties. *See* Mortgage Loan Agreement § 3.1.2.

   g.   At all times from the closing of the 2007 Transaction through the

bankruptcy petition date, the Cash Management Agreement ("CMA"), a contract executed in

connection with and integrated into each of the loan agreements, controlled the collection of all

revenues generated by the hotels and disbursements for all expenses, including operating

expenses, taxes, management fees, and debt service. *See* CMA (Kurland Decl. Ex. F) §§ 3.1, 3.4,

4.1; *see also* Amended Complaint ¶¶ 118, 126. Wachovia agreed to the terms of the Cash

Management Agreement on behalf of every tier of Mortgage and Mezzanine debt, representing

well over 99% of the Debtors' creditors. *See* CMA. The Cash Management Agreement provided

for Series A Unit Payments to be made in accordance with the waterfall contained in the Cash

Management Agreement. *See* Amended Complaint ¶¶ 118, 126, 133, 180. Hence, Wachovia, as

the Mortgage Lender and all of the Mezzanine Lenders, agreed in advance to permit Series A Unit Payments to be made in accordance with the Cash Management Agreement when it agreed to (and, indeed, required) the Cash Management Agreement.

h.      Wachovia served as the Agent under the Cash Management Agreement. *See* CMA at 2. Accordingly, it controlled the flow of funds out of the Cash Management Account.

i.      The Cash Management Account was explicitly designated "for the Benefit of Wachovia." CMA § 2.2; Prior Amended Complaint ¶ 116; Fraudulent Transfer Complaint ¶ 113; Fiduciary Duty Complaint ¶ 194. In addition, the Cash Management Account was maintained at Wachovia. Prior Amended Complaint ¶ 116; Fraudulent Transfer Complaint ¶ 113; Fiduciary Duty Complaint ¶ 194.

j.      Importantly, Wachovia held a security interest in all of the funds on deposit in the Cash Management Account and also in the additional clearing accounts established pursuant to the Cash Management Agreement. *See* CMA § 4.1.39. Thus, the Series A Unit Payments and the Management Fees were the Wachovia Mortgage Trust's cash collateral, not property available to satisfy claims of unsecured creditors.

k.      The loan documents gave the Mortgage Lender the right to review and approve or reject the Debtors' annual operating budgets. *See* Mortgage Loan Agreement (Angell Decl. Ex. 1) § 5.1.11(e); *see also* Prior Amended Complaint ¶ 146. If a proposed budget was rejected by the Mortgage Lender, the Property Owners and Non-Property Owner Borrowers were required to revise the budget until it satisfied the Mortgage Lender. *See* Mortgage Loan Agreement § 5.1.11(e). Thus, the Mortgage Lender had this additional contractual veto and control over the Debtors' use of their assets, including cash.

l.       The Mortgage Lender exercised its rights to control the budget and engaged in negotiations with the Debtors over the budget that lasted for months.  *See* Prior Amended Complaint ¶ 193-195; Fraudulent Transfer Complaint ¶ 190-192; Fiduciary Duty Complaint ¶ 270-272.

m.       The Floor Certificates were not obligations of any of the Debtors but derivative securities issued by the Wachovia Mortgage Trust.  The letter agreement that the (litigation) Trust alleges gave Debtors the right to cause the Floor Certificates to be transferred from the Wachovia Mortgage Trust to any party of their choosing was negotiated with the Mortgage Lender and agreed to by the Mortgage Lender, and then the transfer of the Floor Certificates in accordance with that agreement was performed by the Mortgage Lender.  *See* Amended Complaint ¶ 137; Letter Agreement (Kurland Decl. Ex. L).  In light of the foregoing, Trust's attempt to give the "Mortgage Trust" a separate identity from Wachovia while portraying Wachovia as a mere bystander to the transfers is disingenuous.

C.       **Judge Peck Preserved All of the Lightstone Defendants' Arguments.**

The Trust asserts, with feigned indignity, that the Lightstone Defendants are "taking advantage of Judge Peck's retirement" to assert arguments that the Court already rejected.  Opp. Brief at 5, 37.  This is false and, tellingly, the Trust does not point to anything in particular in the record that supports its assertion.  While the Lightstone Defendants objected to the Motion to Amend the Complaint on the grounds that the Trust's claims are futile, the Lightstone Defendants' futility objections were overruled *without prejudice* on the grounds that they should instead be reserved for and adjudicated in the context of a motion to dismiss.  Judge Peck was clear about that (emphases supplied):

> That said, understand that my mind set going into this is that I'm going to
> grant the amendment without prejudice to any of your substantive
> arguments and that we're going to re-boot everything. We'll re-boot the

complaint and **we'll re-boot and re-fashion your objections to the complaint in the form of a dispositive Motion to Dismiss.**

I'm going to permit the amendment **without prejudice to your rights or the rights of any other Defendant to raise any and all appropriate arguments in a Motion to Dismiss** that I assume will be re-done, re-cut, to meet the allegations of the amended complaint.

*    *    *

I'm going to let [the Trust file an Amended Complaint] and I'm not going to simply preemptively say that you're right about anything**. I'm saying that to you now with the understanding that I may agree with you completely later**, but I'm not going to agree with you today, because the – the purpose here is to have a merits based assessment of the claims and I'm going to give the benefit of the doubt to the Plaintiff in all cases until we have a dispositive motion. **. . .** I'm letting you know now you've lost [the Motion to Amend], but in a kind and gentle way **that doesn't in any way take away your substantive arguments later.**

*    *    *

By the way, nothing that I've said is designed to dignify in any respect any of the allegations of the amended complaint.

Nov. 13, 2013, Hearing Tr. (Schatzow Decl. Ex. 2) at 15, 19-20.[11]

Other than permitting the Trust to file the Amended Complaint, which the Lightstone Defendants obviously recognize, what arguments of the Lightstone Defendants were supposedly rejected by Judge Peck?  The record is clear that he wanted the Lightstone Defendants, and any other Defendants, to present their arguments in the context of a dispositive motion and that all arguments were preserved.

Neither are the Lightstone Defendants seeking to relitigate the lenders' decision to replace the Trustee, to cause the Trust to hire the Mortgage Lender's continuing counsel, to turn over control of the Trust and this litigation to the Mortgage Lender, or to settle with Blackstone for an amount sufficient to provide full redress to all unsecured creditors (yet, an amount that is too low

---
[11] References to "Schatzow Decl. Ex." are to the Declaration of Michael Schatzow submitted by the Trust.

to provide creditors other than the Mortgage Lender with any hope of obtaining any proceeds from this litigation). These decisions and actions of the Mortgage Lender and the Trust are now part of the history of these cases, and the Trust and Mortgage Lender must live with whatever consequences flow from them.

### D. Objection to the Trust's Inappropriate Use of the Examiner's Report.

In its opposition to the Motions to Dismiss, the Trust recites dozens of factual allegations, factual conclusions and legal conclusions from the Examiner's Report that do not appear in the Amended Complaint. The Trust argues that "the Examiner's Report provides ample support for the validity of Plaintiffs' claims. Thus, rather than descend into a mind-numbing debate over which documents and facts are citable, Plaintiffs will rely on (1) the allegations of the current Complaint; (2) the Examiner's Report; and (3) documents addressed in the complaints." Opp. Brief at 41.

The law is clear, however, that in reviewing a Rule 12(b)(6) motion, a court may only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. *See Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir. 1993); *S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). While the Court can take judicial notice of the existence of the Examiner's Report – that it was written, that it was filed – the Examiner's Report was not attached to the Amended Complaint, nor are its contents matter of which judicial notice may be taken. *See Jurista v. Amerinox Processing, Inc.*, No.12-3825, 2013 U.S. Dist. LEXIS 44057, at *4-5 (D.N.J. Mar. 28, 2013).

Accordingly, the Court should not consider the Trust's factual recitations that are based on the Examiner's Report and not found in the Amended Complaint, such as are set forth through the Opposition Brief, but solely limit its analysis to the facts pled in Amended Complaint. *See id.* Indeed, to do otherwise would not only be procedurally incorrect, but patently unfair, because

without knowing which of the thousands of statements in the Examiner's Report the Trust adopts, the defendants would have even less notice than they do now of what the Trust's claims are and the grounds upon which they rest.

The Trust could, theoretically, have opted to attach the Examiner's Report to its Amended Complaint and have its contents incorporated into the Complaint. *See In re WRT Energy Secs. Litig.*, No. 96 Civ. 3610 (JFK), 1999 U.S. Dist. LEXIS 3883 (S.D.N.Y. Mar. 29, 1999) (court can consider an Examiner's Report attached to the Complaint in a Rule 12(b)(6) motion). However, that nonetheless also would have been inappropriate here, because incorporating 435 pages of the Examiner's opinions and conclusions, replete with dense exhibits, referenced documents, and vast swaths of material that has subsequently become irrelevant and out-of-date, would be a clear violation of Federal Rule of Civil Procedure 8(a), which mandates that pleadings shall consist of a "short and plain statement of the claim[.]" *See, e.g.*, *In re Merrill Lynch & Co.*, 272 F. Supp. 2d 243, 268 (S.D.N.Y. 2003) (complaint spanning 112 pages and 424 paragraphs is in clear violation of Rule 8(a); *Lasky v. Shearson Lehman Bros., Inc.*, 139 F.R.D. 597, 598-99 (S.D.N.Y. 1991) (complaint failed to comply with Rule 8(a)'s "short and plain statement" requirement because it spanned 73 pages and contained 302 separate paragraphs). It is not the role of either the court or the defendant to sort through voluminous exhibits to construct plaintiff's causes of action. *Schupper v. Edie*, 193 Fed. App'x 744, 746 (10th Cir. 2006).

Of course, if the Examiner's Report had been made a part of the Amended Complaint, as opposed to an auxiliary source of extra-Complaint allegations for the Trust to cherry-pick as needed, then at least it would be a two-way street, and the numerous statements by the Examiner that undermine the Trust's claims and litigation positions would be deemed its judicial admissions. For example, that the Servicer for the Mortgage Loan (initially Wachovia) controlled

the Cash Management Account and made the waterfall disbursements from that account (Examiner's Report at 120); that Wachovia pressured Mr. Lichtenstein to hire defendant Mr. DeLapp because Wachovia thought his presence would make it easier for LBO lenders to sell off their debt (*id.* at 131-32); that the Examiner concluded that claims could be pled to avoid the lenders' claims (*id.* at 315); that there was a valuation that valued the Debtors at over $8.16 billion – significantly more than their debt – performed within a month of the time period that the Trust is claiming the Debtors were so deeply insolvent that even the structurally senior Mortgage Borrowers were insolvent (*id.* at 48); and that there were at least twenty-five independent, non-insider directors who sat on the various Debtors' various boards (*id.* Ex. III-E-1 (Angell Decl. Ex. 4)). The Trust cannot have unilateral use of the Examiner's Report only for select helpful allegations. Accordingly, the Lightstone Defendants request the Court to disregard factual allegations recited in the Trust's Opposition Brief that do not appear in the Amended Complaint in adjudicating the Motions to Dismiss.

## II.   REPLY TO ARGUMENTS REGARDING SPECIFIC CLAIMS.

### A.   The Trust Cannot Disregard the Debtors' Separateness to Create Triggering Creditors and Insolvency.

The Trust has failed to overcome any of the numerous arguments set forth in the Motions to Dismiss as to why the Trust cannot disregard the Debtors' separateness.

#### 1.   The Trust Cannot Disregard the Debtors' Separateness Under Delaware Law.[12]

##### a.   Reverse Veil Piercing Is Improper Under Delaware Law.

As discussed in the Lightstone Opening Brief, the Court should reject the Trust's attempt to pierce the Debtors' corporate veils to make the subsidiary Mortgage Borrowers liable for mezzanine debt or parent company ESI's $4 million of unpaid creditors, because Delaware law

---

[12]   The parties agree that Delaware law governs the veil piercing claims. *See* Opp. Brief at 60.

has not recognized and would not recognize "reverse veil piercing," notwithstanding that a single Texas case held otherwise.

The Trust argues that it does not seek reverse veil piercing, but conventional, upward veil piercing. Opp. Brief at 61. The Trust reasons that "the sole objective here is to allow the subsidiaries to reclaim assets wrongfully taken upstream by the parents and insiders." *Id*. The Trust completely misapprehends the entire concept of veil piercing and its relevance to this action. Veil piercing is "a tool of equity" used "to disregard the existence of a corporation and impose liability on the corporation's individual principals and their personal assets." *Blair v. Infineon Technologies AG*, 720 F. Supp. 2d 462, 469 (D. Del. 2010). Conventional, or forward, veil piercing is used "to hold shareholders, who would otherwise have no liability for corporate debts, liable for those debts." *ALT Hotel, LLC v. Diamondrock Allerton Owner, LLC (In re ALT Hotel, LLC)*, 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012). Reverse veil piercing is used to hold the corporation liable for the debts of a shareholder or corporate insider. *Id*.

Without reverse veil piercing, the Trust cannot properly bring its fraudulent transfer claims, among others, because the Trust seeks to deem creditors of the shareholder ESI and the Mezzanine Borrowers to be creditors of the subsidiary Mortgage Borrowers for the dual purposes of retroactively making the Mortgage Borrowers insolvent and creating triggering creditors.[13]

---

[13] The Trust says in its Opposition Brief – but did not allege in its Amended Complaint – that the Mortgage Borrowers were insolvent at all relevant times dating back to 2007. This is implausible at best. The Trust previously admitted that upon the closing of the 2007 Transaction, the Mortgage Borrowers had approximately $4.1 billion of debt (Prior Amended Complaint ¶ 109; Fraudulent Transfer Complaint ¶ 106; Fiduciary Duty Complaint ¶ 188), and thereafter the Debtors "los[t] billions of dollars of value" (Prior Amended Complaint ¶ 1; Fraudulent Transfer Complaint ¶ 1). Yet the assets of the Mortgage Borrowers were sold for approximately $4 billion in July 2010 on a forced-liquidation basis, at the trough of the Great Recession, more than three years after the 2007 Transaction, and more than 16 months after the last challenged transfer occurred. (Prior Amended Complaint ¶ 236; Fraudulent Transfer Complaint ¶ 233; Fiduciary Duty Complaint ¶ 109). These allegations demonstrate that the Mortgage Borrowers were solvent ($4 billion sale proceeds plus "billions" lost is greater than $4.1 billion of debt). The Opposition Brief also baldly alleges that that the Mortgage Borrowers have unpaid trade creditors, but they are never identified and there are no such allegations in the Amended Complaint. In any event, it is indisputable that

18

That is textbook reverse veil piercing, and one does not need to be a "corporate law maven" (Opp. Brief at 62) to understand the issue, which is critical to the Trust's claims.

The Trust's conjecture of insolvency is based upon the $3.3 billion of Mezzanine Debt. The obligation to pay the Mezzanine Debt belonged to the Mezzanine Borrowers, the indirect shareholders of the Mortgage Borrowers. However, the Mezzanine Borrowers could not possibly have been the source of the alleged transfers because they did not own the hotel properties, nor did they have any other business assets or operations. Prior Amended Complaint ¶ 112; Fraudulent Transfer Complaint ¶ 110. Seeking to hold the subsidiary Debtors liable for their shareholders' debts is reversing-veil piercing.

In the Lightstone Opening Brief, Lightstone argued that because the Trust's claims are predicated on reverse veil piercing, they must fail because, among other reasons, Delaware "has never recognized any form of reverse piercing." *ALT Hotel*, 479 B.R. at 802. In response, the Trust cites a single case, *ASARCO LLC v. Ams. Mining Corp.*, 382 B.R. 49, 68 (S.D. Tex. 2007), in which a court held, on the basis of its own speculation, that Delaware law would permit reverse veil piercing. The Trust summarily asserts that "the proper course" is to follow *ASARCO*, but does not provide any rationale for doing so. In fact, *ASARCO* is ill-reasoned and should not be given any persuasive value.

First of all, any assumption that Delaware courts would permit reverse veil piercing is unfounded because Delaware is renowned for having a strong policy in favor of respecting the corporate form. *See Vichi v. Koninklijke Philips Electronics N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012) ("Delaware courts take the corporate form and corporate formalities very seriously . . . [and] [t]his Court will disregard the corporate form only in the exceptional case.") (internal citations and

---

trade creditors can receive no recovery from the litigation because they are subordinated to at least $3.5 *billion* of lender debt under the Litigation Trust waterfall.

quotations omitted); *Case Fin. Inc. v. Alden*, No. 1184-VCP, 2009 Del. Ch. LEXIS 153, at *13

(Del. Ch. Aug. 21, 2009) (same). As the more recent *ALT Hotel* court correctly explained:

> [T]he general tenor of Delaware corporate law suggests [that reverse veil piercing's] acceptance would be doubtful. Delaware has an exceptionally strong policy of respecting the corporate form. . . . The Courts of Delaware therefore do not easily pierce the corporate veil, even when the piercing claim is a conventional one. . . . Reverse piercing, a step beyond the conventional, would cut against the grain of what has rightly been called the conservative nature of Delaware veil-piercing law.

*ALT Hotel*, 479 B.R. at 802 (internal citations and quotations omitted). *See also Estate of Daily v. Title Guar. Escrow Serv., Inc.*, 178 B.R. 837, 844 (D. Haw. 1995) (affirming bankruptcy court's refusal to extend veil piercing to include reverse veil piercing on ground that state courts have historically been reluctant to pierce the corporate veil).

Courts in this district also have acknowledged Delaware's strong policy of respecting the corporate form. *See In re BH S & B Holdings LLC*, 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009) ("[i]n general, the corporate form is <u>sacrosanct</u> and courts will not disturb it to hold shareholders of a corporation, or members of an LLC, liable . . . [p]ersuading a Delaware court to disregard the corporate entity is a difficult task.") (emphasis added); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, No. 10-CV-4145 (KMK), 2013 U.S. Dist. LEXIS 141032, at *21 (S.D.N.Y. Sept. 27, 2013) (Delaware courts especially take the corporate form very seriously and will disregard it only in the exceptional case). Thus, Delaware policy weighs strongly against speculating that Delaware courts would permit reverse veil piercing. This alone is adequate grounds to reject reverse veil piercing. *See ALT Hotel*, 479 B.R. at 807; *Estate of Daily*, 178 B.R. at 844.

Second, the Trust makes another unjustifiable assertion that "[a]bsent any Delaware case law distinguishing between normal veil-piercing and reverse veil-piercing, the proper course, as *ASARCO* recognized, is to assume that no such distinction exists." Opp. Brief at 62. That is

factually incorrect. The Delaware Chancery Court has expressly recognized the distinction between forward and reverse veil piercing, and, moreover, that to permit the latter would be to create new law. *See MicroStrategy Inc. v. Acacia Research Corp.*, No. 5735-VCP, 2010 Del. Ch. LEXIS 254, at *48 n.90 (Del. Ch. Dec. 30, 2010) ("I also note that . . . if I pierced ARC's corporate veil to attribute the parent's actions to its subsidiary, I would create new law by doing something that no other Delaware court has ever done: hold a subsidiary liable for its parents' actions through a reverse piercing of the corporate veil").

Third, reverse piercing implicates a serious policy concern that distinguishes it from conventional veil piercing cases: holding a corporation liable for shareholders' debts prejudices all other shareholders who did not engage in the culpable conduct. *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1577 (10th Cir. 1990). "[T]o the extent that the corporation has other non-culpable shareholders, they obviously will be prejudiced if the corporation's assets can be attached directly. In contrast, in ordinary piercing cases, only the assets of the particular shareholder who is determined to be the corporation's alter ego are subject to attachment." *Id*. *See also Floyd v. IRS*, 151 F.3d 1295, 1299 (10th Cir. 1998) (same); *Estate of Daily*, 178 B.R. at 844 (same). The distinction between forward and reverse piercing, therefore, is not merely an academic issue; to recognize reverse piercing is to open the door to new prejudices to innocent parties, which runs contrary to notions of equity and which the Delaware courts have not blessed.

Fourth, with all due respect to this Court, it would be impertinent for a Federal court, especially one sitting in New York, to innovate new Delaware state law. The *ALT Hotel* court concluded, "it would be inappropriate for this court, an Illinois bankruptcy court, to find that Delaware would recognize inside reverse veil piercing, moving Delaware law in a direction that Delaware's own courts have not yet gone." 479 B.R. at 803. "State courts, not federal courts, are

the place for innovations in state law." *Id*. Other courts have reached the same conclusion. *See Floyd*, 151 F.3d at 1298 (declining to permit reverse veil piercing under Kansas law because "alter ego for purposes of reverse veil piercing must be answered by state law"); *Cascade Energy*, 896 F.2d at 1577 (refusing to permit reverse veil piercing under Utah law absent authorization from Utah courts); *Spartan Tube & Steel v. Himmelspach (In re RCS Engineered Prods. Co.)*, 102 F.3d 223, 225-26 (6th Cir. 1996) (refusing to expand Michigan veil piercing principles absent authorization from state courts).

There is a further reason not to recognize reverse piercing in this particular case. The Trust would also need to stretch Delaware law to permit it to reverse-pierce the veils of *its own predecessors*. As discussed in Lightstone's Opening Brief, the Delaware Chancery Court recently observed that permitting a party to pierce its own veil (as opposed to a third party seeking to hold a shareholder liable for a subsidiary's debt to that third party) "would be unusual to say the least." *Case Fin.*, 2009 Del. Ch. LEXIS 153, at *12. The Trust did not respond to this argument.

For all the foregoing reasons, the Court should follow *ALT Hotel* in adhering to Delaware's strong policy in favor of respecting the corporate form, and decline to craft new exceptions to Delaware's statutory corporate law.

> **b.  The Amended Complaint Does Not Allege Facts that Could Satisfy the Delaware Standard Even for Forward Veil Piercing**

As discussed in the Lightstone Opening Brief at 44-45, even if this were a forward-piercing case, the Amended Complaint would not satisfy pleading requirements because it does not plead that the Debtors' corporate form was in and of itself an instrumentality for fraud. Instead, the Trust insists that the Court apply the "instrumentality or alter ego" test for veil piercing, arguing that "the alter ego theory of liability does not require any showing of fraud." Opp. Brief at 62-63. However, the case law both in this circuit and in Delaware is clear that the

alter ego theory of liability also requires a plaintiff to plead some form of fraud or injustice separate and apart from the underlying claim.

"Delaware courts have built on [the alter ego] analysis and require an element of fraud to pierce the corporate veil." *Mason v. Network of Wilmington, Inc.*, No. 19434-NC, 2005 Del. Ch. LEXIS 99, at *10 (Del. Ch. July 1, 2005); *see Blair*, 720 F. Supp. 2d at 470 ("This court has required an element of fraudulent intent in its alter ego test"); *Case Fin.*, 2009 Del. Ch. LEXIS 153, at *13-14 ("Demonstrating that one company is an alter ego of another, however, is not that easy. . . . There must also be an element of fraud to justify piercing the corporate veil."); s*ee also Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice.") (internal citations and quotations omitted).

The courts in this district also hold that a Delaware veil piercing claim requires a showing of fraud or injustice. As stated by the Second Circuit, the second prong of the alter ego test (the test that the Trust urges the Court to adopt) asks whether there was an "overall element of injustice or unfairness." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (internal citations and quotations omitted). This court explained that "the requisite injustice or unfairness . . . is also not simple in nature but rather something that is *similar in nature to fraud or a sham.*" *BH S & B Holdings*, 420 B.R. at 134 (emphasis added). *See also Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 347 (S.D.N.Y. 2013) ("a veil piercing claim must allege that (1) the parent exercised complete domination and control over the subsidiary . . . *and* (2) the corporate form was used to perpetrate some form of injustice or fraud") (internal citations and quotations omitted) (emphasis added); *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 151 (S.D.N.Y. 2012) ("Delaware law also

require[s] an element of fraudulent intent in its alter ego test").  Although Lightstone may not have used the word "injustice" in its Opening Brief, the difference between fraud and injustice in this context is "largely superficial . . .  fraud or something like it is required."  *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003) (internal citation and quotation omitted).  *See also Nat'l Gear & Piston*, 2013 U.S. Dist. LEXIS 141032, at *38 ("Plaintiff must plead something like fraud, including plaintiff's reliance and defendant's intent to deceive.") (internal citations and quotations omitted).

Furthermore, "the fraud or similar injustice . . . must, in particular, be found in the defendant's use of the corporate form."  *BH S & B Holdings*, 420 B.R. at 134.  "The plaintiff must plead facts showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud."  *Id*. at 140.  In other words, "the underlying cause of action, at least by itself, does not supply the necessary fraud or injustice.  To hold otherwise would render the fraud or injustice element meaningless. . . ."  *Id*.  *See also Nat'l Gear & Piston*, 2013 U.S. Dist. LEXIS 141032, at *33-34 ("To satisfy [the unfairness or injustice] element of a veil-piercing attack, a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form.  In other words, the corporation effectively must exist as a sham or shell through which the parent company perpetrates injustice. . . . Moreover, it is well established that a plaintiff's underlying cause of action alone is insufficient to satisfy the injustice requirement.").

The Trust primarily relies on *In re Buckhead Am. Corp.*, in support of its proposition that no element of fraud or injustice is required. 178 B.R. 956 (D. Del. 1994).  However, *Buckhead* is no longer good law.  As the above authorities show, Delaware law now requires fraud or injustice to sustain a veil piercing claim.  The Trust also cites *Fletcher v. Atex*, 68 F.3d 1451 (2d Cir. 1995) (affirming dismissal of alter-ego claims for failure to state a claim) for the proposition that under

an alter ego theory there is no requirement of a showing of fraud. However, *Fletcher*, also a nearly 20 year old decision, did state that there is at least a requirement that the plaintiff show that an "overall element of injustice or unfairness . . . [is] present," *id.* at 1457 – a distinction from fraud that is "largely superficial," *Foxmeyer*, 290 B.R. at 236, and "is similar in nature to fraud or a sham." *In re BH S & B Holdings LLC*, 420 B.R. at 134.

The Amended Complaint contains no allegations that the Debtors used their corporate form to perpetuate a fraud or injustice. Nor could it. The lenders, holding well over 99 percent of the total enterprise-wide debt, were expressly aware of the Debtors' corporate structure and required the Debtors to maintain this corporate structure. *See* Amended Complaint ¶ 196. Furthermore, the Debtors were formed and organized into a mezzanine structure long before the 2007 Transaction by persons other than the defendants. *Id.* ¶¶ 106, 108, 116. In its opposition, in an apparent desperate attempt to plead injustice, the Trust repeats its allegations that the Debtor disregarded the corporate form, violated loan agreements and paid illegal dividends. *See* Opp. Brief at 66. Those are not allegations that the Debtors used the corporate form to perpetuate fraud or injustice. Therefore, even if Delaware law were to recognize reverse veil piercing, the Trust has not alleged facts that would state a claim.

## 2. The Trust Did Not and Cannot Plead Grounds for Substantive Consolidation.

The Trust next proceeds to argue that its allegations satisfy the *Augie/Restivo* "single economic unit" test. *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515 (2d Cir. 1988). They do not. The *Augie/Restivo* test requires proof that either "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit" or that "the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id.* at 518.

Applying the Second Circuit's balancing test as articulated by the court in *Augie/Restivo*, courts within the Second Circuit (and elsewhere) have ordered substantive consolidation in cases where creditors have shown that they *justifiably* relied on the assets and credit of a group of entities or the credit of a parent when dealing with its subsidiary. Also, the fact that a few creditors may have believed that they were dealing with a single entity is not sufficient to merit consolidation. *Augie/Restivo*, 860 F.2d at 519 (denying substantive consolidation because it would have been inconsistent with the reasonable expectations of each debtor's major creditors notwithstanding that certain trade creditors believed they were dealing with a single entity).

The second prong of the test, poor or nonexistent recordkeeping of separate assets and liabilities and inter-company transactions, is one of the more common reasons why courts in the Second Circuit impose substantive consolidation. When the commingling of affiliates' assets, liabilities and their business affairs are so "hopelessly entangled" that segregation is either prohibitively expensive or impossible, courts can grant substantive consolidation:

> [I]n the rare case such as this, where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all.

*Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966); *see also In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 779-80 (Bankr. S.D.N.Y. 1997); *In re Kroh Bros. Dev. Co.*, 117 B.R. 499, 501 (W.D. Mo. 1989); *In re Lewellyn*, 26 B.R. 246, 251 (Bankr. S.D. Iowa 1982).

The Second Circuit stressed that the extent of entanglement of assets and records between the companies must be substantial:

> Resort to consolidation in such circumstances [involving commingling of assets and business functions], however, should not be Pavlovian. Rather substantive consolidation should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets. . . . Commingling, therefore, can justify

substantive consolidation only where the time and expense necessary even to attempt to unscramble them are so substantial as to threaten the realization of any net assets for all the creditors.

*Augie/Restivo*, 860 F.2d at 519 (citations omitted).  Indeed, one of the reasons the court in *Augie/Restivo* denied substantive consolidation was that the assets and records of the entities involved were not hopelessly intermingled.  *Id.*  In that case, while business functions were somewhat commingled, each company's real property and equipment were traceable, and each company's inventory, liabilities, and receivables were identifiable.  *Id.  See also First Nat'l Bank v. Rafoth (In re Baker & Getty Fin. Servs.),* 974 F.2d 712, 720 (6th Cir. 1992) (interrelationships of debtors must be "hopelessly obscured" to merit consolidation); *In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, at *108-09 (Bankr. S.D.N.Y. Oct. 31, 2003) (substantive consolidation is appropriate "when it would be so costly and difficult to untangle the [d]ebtors' financial affairs, such that doing so is a 'practical impossibility'" or "that it is not possible to create accurate financial data for each legal entity."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992) (debtors operated as single enterprise *and* establishing allocation of liability "would be a Herculean task consuming years of costly professional services, thereby draining significant amounts of value" from the debtors' estates); *In re I.R.C.C., Inc.*, 105 B.R. 237, 243 (Bankr. S.D.N.Y. 1989) (consolidation ordered where books and records of the debtors "were in disarray" making it impossible to determine financial status of individual entities); *In re Verestar, Inc.*, 343 B.R. 444, 462-63 (Bankr. S.D.N.Y. 2006) (denying consolidation where no allegations of financial entanglement or creditor confusion); *In re Ford*, 54 B.R. 145, 147-48 & n.6 (Bankr. W.D. Mo. 1984) (evidence of commingled corporate and personal funds in corporate bank account, common use of funds, and common responsibility for loans was still insufficient for substantive consolidation).

There are no allegations in the Amended Complaint that creditors were confused as to whom their obligors were (which is why the Lightstone Defendants did not address the first prong of the *Augie/Restivo* test in their moving papers). Nor could there be. Over 99% of the claims against all of the Debtors are financing claims. The financing documents contained numerous provisions demonstrating that the lenders knew, and in fact were contractually required, to rely only on the credit of their respective obligators. *See, e.g.*, Intercreditor Agreement (Kurland Decl. Ex. I). The Mezzanine Lenders also entered into a stipulation that was so-ordered by the Court that preserved the structural tiers of debt. *See* Stipulation and Order (Kurland Decl. Ex. N). No creditor has alleged that it was confused as to who its obligor was (nor has the Trust made any such allegation), and any such allegation would be laughable because the identity of each lender's respective obligor is stated on the first page of its respective credit agreement, among many other places.

The Trust's consolidation and veil-piercing allegations, although restated many different ways, all add up to only two benign assertions: that the Debtors used a cash management account and were under common control. The allegations do not even touch upon the issue of whether creditors were confused about who their respective obligors were. The allegations also are wholly insufficient to demonstrate that the Debtors' economic affairs were so hopelessly entangled that it would have been impossible or unduly expensive to disentangle them. To the contrary, courts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system. *See, e.g.*, *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 34 (D. Mass.1987) (without "considerably more," "a centralized cash management system . . . where the accounting records always reflect the indebtedness of one entity to another, is not the equivalent of intermingling funds" and is insufficient to justify disregarding the

corporate form.); *United States v. Bliss*, 108 F.R.D. 127, 132 (E.D. Mo. 1985) (cash management system indicative of the "usual parent-subsidiary relationship"). *See also Fletcher*, 68 F.3d at 1459 (a cash management system "is consistent with sound business practice").

Here, the Trust has not alleged that the Debtors failed to keep an accounting of their respective assets and liabilities. The assets – consisting almost entirely of hotel properties – had publicly recorded titles. Furthermore, the Trust's complaints demonstrate that the Debtors had precise records of their (rather *de minimis*) trade payables (Prior Amended Complaint ¶ 227; Fraudulent Transfer Complaint ¶ 224), precise records of the payments made to the lenders, including each tier of mezzanine lenders (Prior Amended Complaint ¶¶ 244-245, Ex. H), and records of all transfers to alleged insiders and equity holders that the Trust has alleged. We are aware of no authorities that have substantively consolidated debtors that were engaged in a legitimate business on the basis of such vacuous allegations as those the Trust has made here.

The Trust also has failed to provide a convincing response to why substantive consolidation is not barred by the Confirmation Order. It ordered that:

> (a) all property of each Debtor shall vest in each respective Reorganized Debtor, free and clear of all Claims, Liens, Liabilities, encumbrances, charges and other interests and (b) each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporate and bylaws (or other formation documents) in effect before the Effective Date.

*See* Confirmation Order ¶ 14 (Kurland Decl. Ex. D at pp. 34-35 of 141); Plan § 6.1 (Kurland Decl. Ex. D at pp. 97-98 of 141).

The Trust's argument that the Plan and Confirmation Order only address the Debtors' separateness from the date of the Confirmation Order forward and that courts generally have the power to order substantive consolidation *nunc pro tunc* (Opp. Brief at 71) completely misses the

point. Under the doctrine of substantive consolidation, the assets and liabilities of different entities are merged to create a consolidated entity similar to a corporate merger. *See Augie/Restivo*, 860 F.2d at 518; *see also F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 58-59 (2d Cir. 1992); *Eastgroup Props. v. S. Motel Ass'n, Ltd*, 935 F.2d 245, 248 (11th Cir. 1991). All eggs are scrambled. If the Debtors were to be substantively consolidated *nunc pro tunc* to 2007, how, then, could it be possible for the Debtors to revert to separate entities with their own respective properties in 2010? The Debtors would have had to form new business entities and figure out some methodology for ladling out the eggs among them. Even though the Confirmation Order only spoke as to the Plan Effective Date forward, there is no way for a court in 2014 to merge the Debtors *nunc pro tunc* to 2007 without violating the Confirmation Order that provides that the Debtors are separate entities on and after July 2010. Substantive consolidation, if it is even conceivable under these circumstances, therefore has to be a collateral attack on the Plan and Confirmation Order.

Substantive consolidation is also precluded by the "ESI Settlement" approved by the Court. As the Lightstone Defendants explained in their Opening Brief, ESI, the only Debtor liable for the M&T Bonds, was excluded from the Plan and, instead, negotiated the ESI Settlement with the Plan Debtors. In approving the ESI Settlement, the Court "ORDERED that the ESI Settlement represents a fair, prudent and reasonable compromise of the controversies resolved therein and is in the best interests of the Debtors' estates and ESI's estate, and their respective creditors." *See* Order Pursuant to Bankruptcy Rule 9019 Approving a Settlement Agreement Between Extended Stay Inc. and Remaining Debtors [Ch. 11 Docket No. 1170] (Kurland Decl. Ex. M.) at 3. Thus, separateness of ESI, its estate, and its "respective creditors" from those of the other Debtors during the course of negotiations that had occurred *prior* to Plan

confirmation was expressly recognized in a prior order of the Court. Once again, it is impossible for the Debtors to be substantively consolidated *nunc pro tunc* to 2007 if they also had separate creditor constituencies and arm's length discussions, as found by this Court, in 2010, even before the Plan was confirmed. The Trust's Opposition Brief does not address the Rule 9019 Order.

Finally, the Trust argues that substantive consolidation is not precluded by the Plan and Confirmation Order because, the Trust posits, "any other potential claims, causes of actions, charges, suits or rights of recovery referenced in the Examiner's Report" are unaffected by the Plan and Confirmation Order. Opp. Brief at 68 n.16. In other words, if there is a conflict between the April 8, 2010 Examiner's Report and the Court's Confirmation Order or the confirmed Plan, it is the Examiner's Report that governs, according to the Trust. That is not how the documents work. The Plan and Confirmation Order general release provisions expressly carve-out from the releases "any claims constituting Litigation Trust Assets." However, the Plan and Confirmation Order did not state that each Debtor shall continue to exist as a separate entity "except to the extent the examiner opined to the contrary." *See* Confirmation Order § 43 (Kurland Decl. Ex. D at pp. 48-49 of 141); Plan § 10.10 (Kurland Decl. Ex. D at pp. 114-115 of 141). Conversely, the Examiner's Report identified claims against the lenders, including the Mortgage Lenders (*see* Examiner's Report at 315) ("the Examiner believes claims could be pled to avoid the incurring of debt and transfers to the Lenders), but those claims were *not* preserved but, rather, were released by the Plan and Confirmation Order. Confirmation Order at § 44 (Kurland Decl. Ex. D at p. 49 of 141); Plan at § 10.12 (Kurland Decl. Ex. D at pp. 114-115 of 141). If, as the Trust claims, all (putative) claims identified in the Examiner's Report are unaffected by the Plan and Confirmation Order, the claims against Mortgage Lender also would have survived. Thus, the Trust's theory that the express provisions of the Plan and Confirmation

Order providing for the continued separateness of each Debtor are somehow nullified by the Examiner's Report is not reasonable.  For all of these reasons, the Trust is unable to consolidate the Debtors and its claims must be dismissed for lack of standing.

**B.      The Fraudulent Conveyance Claims Must Be Dismissed.**

The Trust's arguments as to why the fraudulent conveyance claims should not be dismissed are flawed and insufficient to prevent dismissal of those claims.

### 1.      The Mortgage Lender Cannot Benefit Under 11 U.S.C. § 550 Because It Consented to and Participated in the Transactions.

As Judge Gerber reiterated just last month, "creditors who are participants in an alleged fraudulent transfer, or who have ratified it, cannot then seek to have that transfer avoided." *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, No. 10-4609 (REG), 2014 Bankr. LEXIS 159, at *94 (Bankr. S.D.N.Y. Jan. 14, 2014) (citing *Adelphia Recovery Trust v. HSBC Bank USA*, 634 F.3d 678, 691 (2d Cir. 2011)); *see also In re Refco, Inc. Secs. Litig. v. CSFB*, No. 09 Civ. 2885 (GEL), 2009 U.S. Dist. LEXIS 129944, at *44-46 (S.D.N.Y. Nov. 13, 2009) ("*Refco*") (lender "was heavily involved in structuring the transaction . . . . [lender's] intimate involvement in the transaction . . . is more than enough to disqualify [lender] as a legitimate creditor of the . . . estate . . . . [Lender] cannot be the triggering creditor, because it was a material participant in the alleged fraudulent transaction."); *In re Yellowstone Mountain Club, LLC*, 436 B.R. 598, 678 (Bankr. D. Mont. 2010) (refusing recovery to original lender who was complicit in the fraudulent transfer, as well as syndicate lenders "who have speculated on a monumental award against" the plaintiff).

The Trust does not seem to debate the proposition that a creditor loses its ability to share in avoidance recoveries by consenting to an avoidable transfer, but it denies that the lenders "ratified" the challenged transfers on the grounds that they occurred after the 2007 Transaction

had closed. This is a smokescreen, because the lenders, through Wachovia as the initial holder of both the Mortgage and Mezzanine Debt, consented to and agreed to all of the challenged transfers *in advance*.

The Mortgage Lender, whether directly or through its related-party predecessors and agents (all of whom were Wachovia entities; *see* § I.B, above), executed all of the loan documents, including the Cash Management Agreement, in capacities that included as initial lender on the Mortgage Loan and initial lender on all ten Mezzanine Loans. A Wachovia entity then became the agent for, holder of, and lien holder in, the Cash Management Account, which was authorized, required and created pursuant to the Cash Management Agreement. *See* CMA (Kurland Decl. Ex. F) at 2, § 2.2. The Cash Management Agreement mandated the accumulation of all revenue generated by the properties into a single account, and also dictated to whom and in what priority funds must (not may) be disbursed. *See* Amended Complaint ¶¶ 118, 126; CMA §§ 3.1, 3.4. The Cash Management Agreement required the creation of an account that was "for the Benefit of Wachovia" (CMA § 2.2) and was always held at Wachovia. Prior Amended Complaint ¶ 116; Fraudulent Transfer Complaint ¶ 113; Fiduciary Duty Complaint ¶ 194.

In addition, the Cash Management Agreement established that all funds collected in the Cash Management Account were subject to the "continuing security interest" of Wachovia in its capacity as both lender and agent. *See* CMA §§ 5.1(a), (b). That is, all of the cash that funded the Series A Unit Payments and the Management Fees were made from the Mortgage Lender's collateral, not out of funds that would have been generally available to satisfy the claims of unsecured creditors if the transfers had not occurred.

The disbursement of funds collected in the Cash Management Account was controlled by section 3.4 of the Cash Management Agreement, its "waterfall" provision. *See* Amended

Complaint ¶ 126; CMA § 3.4. This section, in conjunction with section 4.1, specifies the circumstances under which, and order of, the disbursements that are to be made, including payments for taxes, insurance, debt service, operating expenses, management fees, and dividends, among others. *See* CMA § 3.4. The Mortgage Lender (and Wachovia in all of its other capacities too), therefore not only had advance knowledge of these payments, it was a party to the contract that authorized and required them.

Furthermore, the loan documents provided the Mortgage Lender with the right to review and approve or reject the Debtors' annual operating budgets. *See* Mortgage Loan Agreement § 5.1.11(e); *see also* Prior Amended Complaint ¶ 146; Fraudulent Transfer Complaint ¶ 143; Fiduciary Duty Complaint ¶ 223. If a proposed budget was rejected by the Mortgage Lender, the Property Owners and Non-Property Owner Borrowers were required to revise the budget until it satisfied the Mortgage Lender. *See* Mortgage Loan Agreement § 5.1.11(e). This process took months. *See* Prior Amended Complaint ¶¶ 193-195; Fraudulent Transfer Complaint ¶¶ 190-192; Fiduciary Duty Complaint ¶¶ 270-272.

Finally, as the Trust admitted in the Amended Complaint, the Mortgage Lender also consented to permit the Floor Certificates to be transferred to *any* party the Debtors designate, which includes non-Debtors. *See* Amended Complaint ¶ 137; Kurland Decl. Ex. L (alleged Letter Agreement allowing modification of the loans "[i]n exchange for, and effective upon, Lender delivering to Borrower *and/or its designees ownership* of the [Floor Certificates] . . . ." (emphasis added).

In light of all this, it is difficult to comprehend how the Trust, which is controlled by the Mortgage Lender and shares its counsel, can argue that the Mortgage Lender had not consented to the challenged transfers. Creditors are considered to have consented to allegedly fraudulent

transfers when the transfers were accomplished pursuant to the terms of a credit agreement with the complaining creditor. *See Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464, 479 (W.D. Tex. 2013) ("*Crescent*") ("consent, ratification, or estoppel" prevented lenders from being triggering creditors, because lenders "participated in the . . . [t]ransaction with full knowledge of the transaction they helped design," and after closing "continued to bless the deal" by disclosing its terms in syndication offerings and amending credit agreement); *Refco*, 2009 U.S. Dist. LEXIS 129944, at *45-46 (finding payments made to equity holders could not be recovered by a trustee to benefit the creditor who funded and ratified those payments with knowledge of the alleged underlying fraud).

Creditors can also consent to alleged fraudulent transfers in advance, and after having given their consent cannot subsequently challenge them. In *Nordberg v. Continental Illinois Nat'l Bank & Trust Co. of Chicago (In re Topcor)*, No. 02-10322, 2002 U.S. App. LEXIS 28756 (5th Cir. Oct. 28, 2002), for instance, the Fifth Circuit upheld a bankruptcy court's finding that the trustee could not challenge an alleged fraudulent transfer because the creditor attempting to recover the transfer had affirmatively consented to it pursuant to the terms of a loan agreement. *See id.* at *11-12. The debtor had used the funds to pay past-due interest payments it owed a different lender. *Id.* The loan agreement said that the funds in question could be used as "working capital," and the bankruptcy court found sufficient evidence in the record to conclude that payment of past-due interest was an acceptable use of these funds pursuant to the terms of the agreement. *Id.* at *12. Accordingly, the creditor was found to have consented to the transfer in advance, as evidenced by the terms of the loan agreement itself, and the transfer became unavoidable. *Id.*

Likewise, in *Lyondell*, Judge Gerber explained the rationale for why creditors cannot challenge transfers when they previously consented to them or ratified them: "Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it." *Lyondell*, 2014 Bankr. LEXIS 159, at *95. The posture and facts of *Lyondell* are very similar to the case at bar. There, a trust was tasked pursuant to a plan of reorganization with attempting to recover distributions received by former Lyondell equity holders stemming from Lyondell's leveraged buyout, as the trust had claimed that these distributions rendered Lyondell insolvent and were therefore avoidable. *See id.* at *10-11. These distributions were an essential part of the *Lyondell* LBO, and were funded by the lenders who provided the financing for the LBO to occur. *See id.* That was "more than sufficient to establish the requisite participation and ratification, which in the context here, requires no more than knowledge," especially considering the distributions were called for in the agreements which formed the foundation of the buyout. *Id.* at *100. Judge Gerber concluded by noting, "[t]he Court has difficulty seeing how the Creditor Trust could plausibly be alleging that any LBO Lender was ignorant of the fact that it was lending for the purpose of financing an LBO, and that LBO proceeds would then go to stockholders – especially since . . . the loan documents required loan proceeds to be used for that purpose." *Id.* at *99.

The Trust cannot deny the lenders had advance knowledge of the transfers in question for the same reasons. The lenders here expressly authorized the Series A Unit Payments by agreeing to the Cash Management Agreement, the Mortgage Lender (if not others as well) expressly authorized the transfer of the Floor Certificates to a non-debtor party by negotiating and agreeing to an agreement that permitted such a transfer, and either implicitly or expressly authorized the Management Fees through the exercise of the contractual right to approve and disapprove the

Debtors' annual budgets. It is thus plain from the Trust's admissions and the loan documents that the lenders consented in advance to all of the challenged transfers.[14]

### 2. Avoidance of the Transfers Provides No Direct or Indirect Benefit to the Estate.

The avoidance powers of an estate representative cannot be used where creditors cannot possibly benefit from the proceeding. *See, e.g.*, *Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*, 735 F.2d 740 (2d Cir. 1984) (lien avoidance proceeding); *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582 (2d Cir. 1950) (prohibiting debtor from commencing an avoidance action that could not benefit creditors). This principle has also been applied in fraudulent conveyance proceedings under the Bankruptcy Code, which cannot be maintained where they would only benefit a debtor. *Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir. 1991) *cert. denied*, 502 U.S. 925 (1991); *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80 (S.D.N.Y. 2008) (plaintiff lacked standing to pursue post-confirmation avoidance action because all debtors' creditors had already been paid in full with interest); *Calpine Corp. v. Rosetta Res., Inc. (In re Calpine Corp.)*, 377 B.R. 808, 812-13 (Bankr. S.D.N.Y. 2007).

While the Moore Rule, articulated in *Moore v. Bay*, 284 U.S. 4 (1931), provides, as a general proposition, that if one triggering creditor exists with an unsecured claim of any amount, an entire challenged transfer can be avoided, that does not mean that the entire amount or any of it may be *recovered*. "[T]he power to avoid is not the same as the power to recover." *Crescent*, 500 B.R. at 481. Section 550 limits recovery to that which is "for the benefit of the estate." 11 U.S.C. § 550(a). As the Trust's own cited case explains, "a right under section 544(b) to avoid transfers

---

[14] The Trust's reliance on *CFTC v. Probber Int'l Equities Corp.*, 504 F. Supp. 1154 (S.D.N.Y. 1981) is misplaced. In that case a common criminal conned an individual out of certain of his possessions, including a collection of gold coins. The Court held that the victim could not have ratified or consented to the conduct because the victim had neither actual nor constructive knowledge, nor reason to know, of the con man's entirely fraudulent intentions. *See id.* at 1163. In stark contrast, the Mortgage Lender was fully aware of all the circumstances under which each transfer that is now complained of was to be made.

in excess of the amount of unsecured claims does not lead inexorably to the conclusion that [debtor] may actually recover every transfer avoidable . . . . recovery is governed by section 550(a), which enables the corporation to pursue section 544(b) actions where recovery will accrue for the benefit of the estate." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 811 (9th Cir. 1994) (quotation omitted).

"The determination of whether a recovery would benefit the estate is done on a case-by-case basis." *Calpine*, 377 B.R. at 814 (citations omitted). In *Crescent*, on facts that are on all fours with those at bar, the district court acknowledged the authority of the Moore Rule, but held that *recovery* under sections 544(b)(1) and 550(a) was limited to the amount of claims of the unsecured creditors who were not involved with the transactions at issue. *Crescent*, 500 B.R. at 481-83. The *Crescent* trust sought to avoid alleged intentional and constructive fraudulent transfers of over $1.2 billion resulting from a formation and sale agreement and accompanying a credit agreement secured by liens and mortgages. *Id*. at 468, 470. The trust beneficiaries were divided into two creditor groups: (i) "Class A" creditors who had $279 million in claims against the debtor that were not based on the transaction at issue, and (ii) "Class B" creditors, the original lenders in the transaction and their successors, whose had $961 million of claims. *Id*. at 469. Similarly to the *Lyondell* and *Refco* courts, the *Crescent* court easily disposed of the "Class B" creditors' purported avoidance rights, explaining, "[t]o allow the Trust to step into the original lenders' shoes and set aside the billion dollar transfer as fraudulent would bail out the lenders who knew the terms of their own deal . . . . Congress may be in the business of bailing out banks, but this Court is not." *Id*. at 480. The Trust here has failed to recognize that the general rule that a trustee may avoid a transfer that exceeds the amount needed to repay unsecured creditors does not

extend so far as to allow avoiding and recovering a transfer to an extent that provides a distribution to creditors who participated in or consented to the transaction.

The *Crescent* court then moved on to what is a central question raised by the Motions to Dismiss here: "whether the presence of Class A creditors – entities with no direct connection to the term loan proceed distribution – justifies rewarding the Class B creditors with funds they could never recover on their own." *Crescent*, 500 B.R. at 483. The court found that it did not, because there was "no equitable basis for allowing such a recovery in this case." *Id.* The court explained:

> When the original lenders provided [the debtor] with $1.2 billion, they had full knowledge those funds would leave [the debtor] and flow directly to [transferee] . . . . Under the terms of this nonrecourse loan, the lenders were entitled to take ownership of the [debtor's] enterprise and its substantial real estate holdings in the event of a default. As a result of the . . . bankruptcy, the lenders have received the benefit of their bargain: the confirmed Plan gives the Class B creditors [their collateral] . . . .
>
> If the Trust is allowed to recover the $961 million of the term loan proceed transfer destined for the Class B creditors–a group of creditors who all derive their interest in the estate from the original lenders–the banks' high risk investment will pay off in the form of a massive windfall. Not only will the banks (and their successors) walk away with ownership of [the debtor] and several hundred million dollars in loan payments, they will recoup the bulk of the loan they made with full knowledge of the risk. In essence, the lenders will have stolen [the debtor] . . . and will face no prospect of liability for their actions because the Plan expressly released them from all claims. Having made off like bandits, the banks will no doubt continue to engage in reckless lending behavior, satisfied the courts will intervene to save them from their bad bets in the future.

*Id*. at 482. There is, however, a quantitative difference between *Crescent* and the within action. In *Crescent*, the Court grappled with the possibility of allowing $279 million of non-lender claims to provide a recovery for $961 million of lender claims. Here, there are only $4 million of non-lender claims (assuming, *arguendo*, that there could be entity consolidation and that no credit is given for the Blackstone settlement) versus over *$3.4 billion* of LBO lender claims.

Notably, the court in *Crescent* reached its decision despite finding that the transferee, too, had unclean hands, because "fraudulent transfer law is designed to be 'remedial rather than punitive.'" *Id*. at 482 n.11 (quoting *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994)) (bracket omitted)[6]; *see also Balaber-Strauss v. Murphy (In re Murphy)*, 331 B.R. 107, 121, 126 (Bankr. S.D.N.Y. 2005) (in liquidating case, and on the specific facts before the court, trustee was limited to avoiding transfer only to extent necessary to satisfy claims; if transfer was completely avoidable and recoverable, all claims would be paid in full and a "substantial surplus" would remain)*; Yellowstone*, 436 B.R. at 677-78 (precluding recovery for the original lender and other pre-petition lenders); *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5, 27-28 (Bankr. D.N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) (because "equity guards against windfalls in general," amount of recovery on a section 544 claim may be equitably adjusted).

The Mortgage Lender's collateral was sold at auction and the Mortgage Lender collected the proceeds, less a tiny percentage carve-out that served as bargain-basement consideration for a release absolving the Mortgage Lender (like the *Crescent* lenders) of liability for complicity in the 2007 Transaction and subsequent transactions. It got the benefit of the bargain it struck when it financed the 2007 Transaction. All in all, the Mortgage Lender has been paid approximately $3.9 billion of the $4 billion it was owed, while the Defendants' interests were wiped out. Thus, even if the Court disagrees with the Lightstone Defendants' contention that no party other than the

---

[6] The *Crescent* court noted that the North Carolina fraudulent conveyance statutes, applicable there via section 544(b), limit a creditor to recovering the *lesser* of the value of the asset transferred or the amount necessary to satisfy the creditor's claim. 500 B.R. at 483 (citing N.C. Gen. Stat. §§ 39-23.7(a)(1), 39-23.8(b)). The Trust neglects to allege which state's law it is suing under. However, both New York and Delaware have limitations similar to North Carolina, *see* N.Y. D.C.L. § 278; 6 Del. C. §§ 1307(a)(1), 1308(b), whereas South Carolina does not recognize constructive fraudulent transfer claims at all except for purely gratuitous transfers. *See* S.C. Code Ann. § 27-23-10.

Wachovia Mortgage Trust stands to benefit from this litigation, the Court should follow *Crescent* and dismiss the claims to the extent they seek any recovery beyond, at most, $4 million.[15]

Courts indeed have read section 550 to allow recoveries beyond the literal amount of unsecured claims when creditors indirectly benefit from the recoveries, typically situations in which creditors receive new debt or equity in a reorganized debtor, the value of which necessarily increases along with any improvement to the financial health of the company due to avoidance. But this is not such a case. The Trust has not attempted to articulate any benefit to the estate that would be derived from avoiding and recovering transfers for the purpose of funneling the proceeds to complicit lenders.

Rather, the Trust rests on cases that stand for the general "indirect benefit" proposition without regard to whether they have any relation to the facts here. The Trust's cases are in fact inapposite. In *Acequia* (Opp. Brief at 81), the Ninth Circuit found that recovery beyond the amount of unpaid claims would indirectly benefit the estate by securing performance of the debtor's obligations under its reorganization plan, including continued payment on a long-term note. *Acequia*, 34 F.3d at 812. The Trust's other "benefit to the estate" authorities are similarly irrelevant to the facts here. *See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 464 B.R. 606, 610, 615 (Bankr. S.D.N.Y. 2012) (the tort plaintiffs' taking the bulk of their possible recovery in the form of proceeds of a lawsuit made it possible for debtors to distribute stock of the reorganized companies to general unsecured creditors cleansed of legacy liabilities, a clear benefit that counsel acknowledged); *Calpine*, 377 B.R. at 814-15 (where several classes of unsecured

---

[15]  However, as discussed below, the Trust can no longer seek $4 million, or any amount, from the Defendants because the Trust has already recovered more than that through the Blackstone Settlement. Further recoveries would violate the "one satisfaction rule."

creditors would receive an equity stake in the reorganized company it was "not beyond purview" that recovery could benefit the estates).

The Trust has failed to aver what indirect benefit to the estates here possibly could be realized from recovering tens or hundreds of millions of dollars beyond the amount needed to pay all unsecured creditors in full, and giving it all to the Mortgage Lender. As the plaintiff, it was the Trust's responsibility to plead these critical allegations. Because it could not, the Trust misconstrues the Moore Rule to argue that if one triggering creditor exists, lenders (as opposed to the estate) who are disqualified from asserting or sharing in fraudulent claims may reap a windfall. That is not the law.

Furthermore, as argued in the Lightstone Opening Brief, the damages the Trust can recover in this action, drawing all reasonable inferences in its favor, will be insufficient to pay the Mortgage Lender's Tier I claim under the Litigation Trust Agreement such that there is no potential benefit for any unsecured creditors. In its Opposition Brief, the Trust somehow adds up its damage claims to equal $143.5 million, rather than the $139 million set forth in the Amended Complaint and represented to the Court at the January 31, 2014 hearing on the Motion to Amend the Complaint. (Schatzow Decl. Ex. 1 at p.5). In response to the Motions to Dismiss, the Trust somehow found an extra $4.3 million in order to claim that there is an outside chance of a small distribution to someone other than the Mortgage Lender. (It seems to be double counting a payment that was made in respect of the Floor Certificates to get there.)

The Lightstone Defendants do not ask the Court to value the Floor Certificates at this stage of the case, let alone to accept the Lightstone Defendants' contentions as to their value. However, it is clear that the Trust's *ad damnum* must add up to an amount considerably lower than the $143.5 million it claims, because the Trust (i) neglected to reduce its claims by even so

much of the value in exchange received by the Debtors that appears within the four corners of the complaints, and (ii) did not value the Floor Certificates by any legally or economically recognized methodology when it simply employed hindsight to add up all the payments they yielded without applying any discounts for time and (very high) risk.

Whether a transfer is a fraudulent conveyance is measured as of the time of the conveyance, not some later time. *See Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 770-71 (6th Cir. 1995) (the time that counts is when the bet is placed, not when the bet is won or lost); *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("The critical time is when the transfer is made. Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given.") (citation omitted); *see also Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, No. 07-02780, 2009 Bankr. LEXIS 3606, *39 (Bankr. S.D.N.Y. Nov. 10, 2009) ("The fraudulent nature of each transfer, including the value that the transferor received, must be determined at the time of the transfer . . . ."); *Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 532 (Bankr. S.D.N.Y. 2001) ("[T]he focus of the reasonably equivalent value analysis is the value of the property at the time of the transaction.") *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 107 n.76 (Bankr. S.D.N.Y. 1999) (*even if stock subsequently appreciated*, the only relevant value is the value at the time of the transfer).

Whatever value experts eventually may ascribe to the Floor Certificates, their value at the time of the conveyance cannot be the aggregate amount of all future payments they would eventually yield. That is like saying a $1,000 face amount 10% bond with a 10 year maturity is worth $2,000 because that is the total sum it will pay over its lifetime. That is not how one values

a security or any other asset. Valuing a revenue-producing asset on the basis of its future cash flows requires estimating the terminal value (the amount to be realized upon future disposition of the asset), discounting the future cash flows and terminal value to present values using an appropriate discount rate, and adding the present values of the future cash flows and the terminal value. *Questrom v. Federated Dep't Stores, Inc.*, 84 F. Supp. 2d 483, 489 (S.D.N.Y. 2000) *aff'd*, 2 F. App'x 81 (2d Cir. 2001).[16] Discount rate "is the rate of return to a provider of capital to compensate for the time value of their money and the risk inherent in the investment." *In re Am. HomePatient, Inc.*, 298 B.R. 152, 176 (Bankr. M.D. Tenn. 2003) *aff'd*, 420 F.3d 559 (6th Cir. 2005). Because the Floor Bonds only produced cash flow if and while LIBOR rates drop below the LIBOR floor, a significant risk discount must be applied to account for that, in addition to ordinary risk discounts for such risks as a potential borrower default. In valuing the Floor Bonds, the Trust has applied no discounts of any kind. We of course do not suggest that reaching a conclusion about value is appropriate for a motion to dismiss, but it is beyond cavil that the Trust's $74 million damage claim is far too high as a matter of law.[17]

The Lightstone Opening Brief also cited multiple authorities – nearly a full page of them – that hold that the lawful dates for valuing transferred property for purposes of measuring the amount that may be recovered under section 550 are either the date of transfer or the date of judgment, more commonly the former. *See* Lightstone Opening Brief at 54-55. The Trust alleged that the value of the Floor Certificates on or near their alleged date of transfer was $25 million, not $74 million or $78 million. The Trust did not respond with any contrary or distinguishing

---

[16] The terminal value of the Floor Certificates is zero because it was a derivative instrument that did not carry any right to a principal payment upon maturity, only a right to receive a highly contingent slice of the interest payments on the Mortgage Debt for a limited period of time.

[17] The Trust's example of a Picasso that appreciates in value and is resold is not even analogous because that is a transaction-sale valuation, whereas the Trust computed its $74 million value based on cash flows.

authorities by hurling invective and making a fallacious claim that "[n]o cases are cited for this astonishing [and "ludicrous" and "preposterous"] argument, and for good reason." Opp. Brief at 78. The Lightstone Opening Brief speaks for itself.

Finally, the Amended Complaint and its predecessors demonstrate that millions of dollars of value were received in return for the challenged transfers. The Trust claims that there is "no record" of any services having been provided in exchange for a $1 million annual Management Fee paid to or for the benefit of Mr. Lichtenstein (*See* Amended Complaint ¶¶ 188-189; Opp. Brief at 35). Yet the Amended Complaint explicitly admits:

> As Chairman, CEO, and President of the entities within the "Extended Stay Hotels family of companies," Lichtenstein had general supervisory authority over the daily business operations and affairs of those companies and was empowered to give counsel and advice to the board of directors on all subjects concerning the welfare of those companies and the conduct of their business.
>
> Lichtenstein was also a director, Chairman of the board of directors, CEO, and President of some sixty-five Debtor entities and affiliates listed above.
>
> \*     \*     \*
>
> Lichtenstein regularly attended and, in most cases, chaired all meetings of the "Extended Stay Hotels family of companies" board of directors as a director, the Chairman, President, and CEO of those companies, including, without limitation, board meetings that were held on the following dates: November 15, 2007; February 14, 2008; May 15, 2008; August 14, 2008; November 13, 2008; December 11, 2008; December 16, 2008; December 23, 2008; January 6, 2009; January 15, 2009; January 27, 2009; January 29, 2009; February 10, 2009; February 25, 2009; March 3, 2009; March 11, 2009; March 17, 2009; April 21, 2009; April 28, 2009; May 14, 2009; May 20, 2009; June 12, 2009; and June 14, 2009.

Amended Complaint ¶¶ 36-37. Clearly services were provided in return for the fee according to the Trust's admission. This is not Defendants' "lawyer's say-so" but the Trust's.

The Amended Complaint (and the prior complaints) also allege that the Debtors received at least $22 million in value as a result of the transfer of the Floor Certificates from Wachovia to DL-DW. *See* Amended Complaint ¶ 154 (Debtors received $22 million loan plus $10.6 million

additional funds from DL-DW); Amended Complaint ¶ 155 (the $22 million was used to repay

certain "9.15% Notes" that were obligations of the Debtors); *id.* (the loan was secured by DL-

DW's pledge of the Floor Certificates; the income generated by the Floor Certificates rather than

Debtors' own funds went to pay all interest and principal on the loan); ¶ 184 (the Floor

Certificates, rather than assets of the Debtors, were used to repay the loan). Needless to say, any

recovery the Debtors could obtain for the transfer of the Floor Certificates would have to be offset

by the value of the loan payments obtained through the transfer and pledge of the Floor

Certificates which the Amended Complaint shows, directly benefitted the Debtors.

To reiterate, the Lightstone Defendants are not asking the Court to accept their valuations

on a motion addressed to the pleadings, but it must be recognized that as a matter of law, even if

the Trust were to succeed on all of its claims, it would recover far less than $139 million, an

insufficient amount to fund a distribution to anyone but the Mortgage Lender (for whom the Trust

cannot recover anything for the reasons stated above), because the Trust's method of computing

its damage claims is inflationary and legally frivolous.

### 3. The Trust Has Not Refuted That Its Claims Are Precluded By the One-Satisfaction Rule as a Result of Its Settlement With Blackstone.

Because, as discussed above, the Trust cannot recover on behalf of the lenders, the Trust is

left with only the $4.1 million of unpaid unsecured claims for whose benefit a fraudulent

conveyance may be recovered. The $10 million the Trust already recovered from its settlement

with Blackstone far exceeds that amount. It is beyond cavil that "[a] plaintiff may not recover

twice for the same injury." *Phelan v. Local 305 of United Ass'n of Journeymen*, 973 F.2d 1050,

1063 (2d Cir. 1992) (citing *Ostano Commerzanstalt v. Telewide Systems*, 880 F.2d 642, 649 (2d

Cir. 1989) (double recovery puts plaintiffs in better position than had they not been injured)); *see*

*Sparaco v. Lawler, Matusky, Skelly Engineers LLP*, 313 F. Supp. 2d 247, 250, 255 (S.D.N.Y.

2004) (finding no viable claim against defendant where plaintiff already had been compensated for any damages by settlement with another party); *see also Zunshine v. Giddens (In re MF Global Holdings)*, No. 12 Civ. 4139 (AJN), 2013 U.S. Dist. LEXIS 4718, at *11 (S.D.N.Y. Jan. 11, 2013) (recognizing the "longstanding rule that a plaintiff is not entitled to recover more than once for the same injury."); *In re W.R. Grace & Co.*, 468 B.R. 81, 174 (D. Del. 2012) ("claimants should not be able to recover more than once for their injuries") (quotation marks omitted); 47 Am. Jur. 2d Judgments § 808 (2013) ("A person . . . can gain but one satisfaction, even though that person may pursue numerous possible avenues of relief simultaneously . . . . a claimant is only entitled to one payment of its loss and . . . an injured party should not be allowed to recover more than once for the same wrong."); Restatement (Third) of Torts § 25 (2000) ("payment of the full amount of recoverable damages constitutes a satisfaction of the plaintiff's rights against all tortfeasors legally responsible for the plaintiff's indivisible injury.").

The Trust already has recovered $10 million as a result of pursuing its claims.[18]  That amount covers all non-LBO debt at all Debtors.  The Trust can only recover for its unsecured creditors once, and it has.  It cannot continue suing, avoiding, and recovering transfer after transfer on the basis of (at most) approximately $4 million of triggering creditors.  *See MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530, 534 (5th Cir. 2012) (trustee's avoidance rights cease when avoidance will no longer benefit the estate under § 550).  Thus, the fraudulent conveyance claims – as well as all other of the Trust's baseless claims purportedly asserted on behalf of or for injury to unsecured creditors – should be dismissed in their entireties.

---

[18]  Over the Defendants' objections, the Trust used group pleading to lump Blackstone together with all the remaining Defendants before they settled.

4. **The Alleged Transfers Cannot Be Recovered Because the Property, as the Mortgage Lender's Collateral, Would Not Have Been Available to Pay Unsecured Creditors Had the Transfers Not Occurred.**

The transfers challenged by the Trust also cannot be avoided because the conveyed property would have been part of the Mortgage Lender's collateral had it not been conveyed, and would not have been available to satisfy unsecured creditors' claims. "To be avoided, a transfer must deprive the debtor's estate of something of value which could otherwise be used to satisfy creditors." *Plan Comm. v. Clark (In re Bank Bldg. & Equip. Corp. of Am.)*, 158 B.R. 138, 140 (E.D. Mo. 1993); *In re Newcomb*, 744 F.2d 621, 626-27 (8th Cir. 1984). The Supreme Court has made clear that when "the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated." *Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 427 (Bankr. S.D.N.Y. 1998) (quoting *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58 (1990)).

Applying this principle, the district court in *McCloskey v. Wells Fargo Bank Wis. (In re Art Unlimited, LLC)* affirmed a bankruptcy court's decision dismissing an avoidance action where the assets transferred "were fully encumbered by bank liens, which would make the assets unavailable to unsecured creditors in a subsequent liquidation." *McCloskey v. Wells Fargo Bank Wis. (In re Art Unlimited, LLC)*, No. 07-C-54, 2007 U.S. Dist. LEXIS 66479, at *30 (E.D. Wis. Sept. 6, 2007). The opinion reasoned that "courts have 'long held that to be avoidable, transfers must result in a depletion or diminution of the debtor's estate.'" *Art Unlimited*, 2007 U.S. Dist. LEXIS 66479, at *29 (quoting *In re Smith*, 966 F.2d 1527, 1535 (7th Cir. 1992)). Under this "'diminution of estate' doctrine . . . a transfer is not avoidable unless it 'diminishes directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great

a percentage as the favored one.'" *Art Unlimited*, 2007 U.S. Dist. LEXIS 66479, at *28-29

(quoting *Hansen v. MacDonald Meat Co. (In re Kemp Pacific Fisheries, Inc.)*, 16 F.3d 313, 316

(9th Cir. 1994), quoting 4 COLLIER ON BANKRUPTCY P 547.03, at 547-26 (15th ed. 1993))

(brackets omitted).

"[A] transfer of fully encumbered property . . . puts no otherwise available assets beyond

the grasp of an unsecured creditor.  That principle makes good sense: whether or not the debtor

effects a transfer, the accumulated security interests will prevent an unsecured creditor from

reaching and applying the overencumbered property." *Fed. Refinance Co. v. Klock*, 352 F.3d 16,

25 (1st Cir. 2003) (applying Uniform Fraudulent Conveyance Act) (emphasis in original); *see*

*also Miller v. Forge Mench P'ship Ltd.*, No. 00 Civ. 4314 (MBM), 2005 U.S. Dist. LEXIS 1524,

at *14-15 (S.D.N.Y. Jan. 31, 2005) ("a creditor's remedy in a fraudulent conveyance action [in

New York] is limited to reaching the property which would have been available to satisfy the

[claim] had there been no conveyance . . . .  Absent any such equity in the assets conveyed, an

unsecured creditor lacks standing to challenge the conveyance as fraudulent"; lender was

undersecured by $2.5 million "and thus dwarfed" the plaintiff's $445,000 unsecured claim)

(quotations omitted); *Congress Credit Corp. v. AJC Int'l*, 186 B.R. 555, 559-60 (D.P.R. 1995)

(dismissing avoidance action because it would not benefit estate under section 550 where

judgment creditor had a lien on all the potential proceeds); *Barber v. McCord Auto Supply (In re*

*Pearson Indus.)*, 178 B.R. 753, 765 (Bankr. C.D. Ill. 1995) (as secured creditors "had valid prior

liens on the inventory, any recovery would accrue to their benefit and not the benefit of unsecured

creditors.  Therefore, there would be no benefit to the estate . . .").

The Trust has alleged that the Debtors conveyed $62 million of Series A Unit Payments,

$3 million of Management Fees, and property of the Wachovia Mortgage Trust that it alleged to

have had a value of $25 million at the time of conveyance, for a total alleged value of $90 million. The Mortgage Lender's deficiency claim according to the Litigation Trust waterfall is $143.5 million, excluding interest and fees that might have accrued if it was oversecured (and recovers under Trust Tier III). Accordingly, from the perspective of unsecured creditors, the alleged conveyances did not diminish the Debtors' estates or their recoveries, and therefore cannot be avoided.

5. **Section 546(e) Bars the Claims for Recovery of the Floor Certificates and the Series A Unit Payments.**

The Lightstone Defendants renew their arguments, set forth in the Lightsome Opening Brief, that the section 546(e) safe harbor precludes the Trust's claims to avoid the transfers of the Floor Certificates and the Series A Unit Payments, and preempts all of the Trust's state law claims that seek to recover the same payments that are unavoidable under section 546(e), including its claims for unjust enrichment, unlawful dividends, and conversion. The Trust has now conceded that all of its claims simply are restated avoidance claims. *See* Opp. Brief at 61 ("the sole objective here is to allow the subsidiaries to reclaim assets wrongfully taken upstream by the parents and insiders"). Therefore, they are all precluded by section 546(e). The Lightstone Defendants also join in the arguments respecting the applicability of section 546(e) to the Trust's claims set forth in the Arbor Defendants' Reply Brief.

C. **There Is No Claim for Breach of Fiduciary Duties to Creditors.**

Count Seven of the Amended Complaint alleges a separate, independent cause of action for "Breaches of Fiduciary Duties Owed to Creditors." Amended Complaint at 89-90. In response to the Motions to Dismiss, the Trust has conceded that under Delaware law creditors of an insolvent corporation have no standing to assert direct claims against corporate directors for breach of fiduciary duty. Opp. Brief at 85. However, the Trust argues incongruously that claims

for breach of fiduciary duty to *creditors* were "owned" by the Debtors prepetition, and subsequently transferred to the Trust. *See id.* at 86.

In asserting that the Trust can bring a breach of fiduciary duty claim on behalf of the creditors (Count Seven) separate and apart from its breach of fiduciary duty claim on behalf of the Debtors (Count Five), the Trust once again misconstrues Delaware law. In *North Am. Catholic Educ. Prog. Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007), the Delaware Supreme Court held that "the creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against the corporation's directors." *Id.* at 94. Creditors may only assert that the directors' conduct "operate[d] to *injure the firm* in the first instance by reducing its value, injuring creditors only indirectly *by diminishing the value of the firm.*" *Id.* at 102 (emphasis added) (internal quotation omitted). *See also Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 424 B.R. 95, 101 (Bankr. S.D.N.Y. 2010) ("Although officers and directors of an insolvent corporation are said to owe fiduciary duties to the corporation's creditors, this means only that the creditors have become the primary risk bearers of poor corporate decision-making"); *Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 759 (Bankr. S.D.N.Y. 2009) (fiduciary duty claims "remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets. The reason for this bears repeating – the fact of insolvency does not change the primary object of the director's duties, which is the firm itself") (internal citations and quotations omitted).

In other words, creditors have *derivative* standing only to assert *that the corporation was injured* as a result of its directors' breach of fiduciary duty. *Gheewalla*, 930 A.2d at 102. The Trust, standing in the shoes of the Debtors, has alleged directly that the Debtors were injured as a result of the directors' alleged breaches of duties. Amended Complaint ¶¶ 260-72. This is the same claim asserted directly that creditors, under some circumstances, could be permitted to assert derivatively. The Trust does not get to assert the same claim twice, once directly and a second time double-derivatively by round-tripping the right to assert the claim first to creditors and then back again. The claim for breach of fiduciary duties is, at best, the main fiduciary duty claim (Count 5) under a different name, and at worst it is complete nonsense.[19] It should be dismissed.

### D. The Trust Has Not Properly Pled a Claim for Breach of Contractual Duties.

Count Five of the Amended Complaint alleges "Breach of Fiduciary and Contractual Duties of Care, Loyalty and Good Faith." Amended Complaint at 83-88. The Lightstone Defendants moved to dismiss the claim for breach of contractual duties on the grounds that the Amended Complaint does not identify the contract as to which it alleges any of the Lightstone Defendants were parties, let alone breached. *See* Lightstone Opening Brief at 68. The Trust responds that under Delaware law there is a statutorily implied covenant of good faith and fair dealing imposed on management of every corporation and Delaware LLC. Opp. Brief at 88. So perhaps we are now expected to infer that the mysterious contracts that are the subject of Count Five are the Debtors' operating agreements. The Trust refers us only to Del. Code Ann. Tit. 6, § 18-1101(c), which says that an LLC agreement may not eliminate the implied contractual

---

[19] If creditors did have direct claims, the Trust certainly would lack standing to assert them. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006) ("The U.S. Supreme Court established that bankruptcy trustees and litigation trusts formed as part of reorganization plans do not have standing to bring direct claims belonging to creditors under the federal bankruptcy statute.") (citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972)).

covenant of good faith and fair dealing, and two cases without explaining their relevance. Opp. Brief at 88. We still are left to guess blindly which Defendants are alleged to have breached which agreements with which Debtors.

However, the Trust's sketchy explanation still does not cure the fatal pleading deficiency. "To state a claim of breach of the implied covenant of good faith and fair dealing, a party must allege [1] a specific implied contractual obligation, [2] a breach of that obligation by the defendant, and [3] resulting damage to the plaintiff." *Kelly v. Blum*, No. 4516-VCP, 2010 Del. Ch. LEXIS 31, at *59 (Del. Ch. Feb. 24, 2010) (internal citations and quotations omitted) (cited in Opp. Brief at 88-89). *See also Blaustein v. Lord Balt. Capital Corp.*, No. 6685-VCN, 2012 Del. Ch. LEXIS 126, at *15 (Del. Ch. May 31, 2012) (same). The Trust has not identified "a specific implied contractual obligation" or even a specific contract, how any alleged defendant breached that obligation, or how the counter-party to the obligation was damaged. It is hard to fathom how any Defendant, let alone all of them, might have breached some implied duty of good faith and fair dealing running, for example, to ESAP Mezz 8 L.L.C or to ESH/MSTX GP L.L.C. and caused damage to that entity. Accordingly, the Trust has not stated a claim for breach of contractual duties and this much of Count Five must be dismissed. *See Kelly*, 2010 Del. Ch. LEXIS 31, at *59 (dismissing claim for breach of implied covenant of good faith and fair dealing because the plaintiff did not identify "any specific implied contractual obligation").

**E.  However, If the Contractual Claim Survives, the Fiduciary Duty Claims Must Be Dismissed as Superfluous.**

Because the Trust asserts a claim for breach of contractual duties of care, loyalty and good faith, Delaware law requires that the fiduciary duty claims that arise out of the same set of alleged facts must be dismissed as superfluous. *See Gale v. Bershad*, No. 15714, 1998 Del. Ch. LEXIS 37, at *22 (Del. Ch. Mar. 3, 1998) ("To allow a fiduciary duty claim to coexist in parallel with an

implied contractual claim [for breach of good faith and fair dealing], would undermine the primacy of contract law over fiduciary law . . . . Stated differently, because the contract claim addresses the alleged wrongdoing by the Board, any fiduciary duty claim arising out of the same conduct is superfluous); *CVC Claims Litig. LLC v. Citicorp Venture Capital, Ltd.*, 03 Civ. 7936 (DAB), 2006 U.S. Dist. LEXIS 31395, at *19-20 (S.D.N.Y. May 18, 2006) (applying Delaware law and dismissing plaintiff's breach of fiduciary duty claim because the "Plaintiff's claim of breach of fiduciary duty . . . [was] based on the same operative facts as Plaintiff's claims of breach of contract and implied covenant of good faith and fair dealing"). The Trust's contractual and fiduciary duty claims are based on identical alleged facts and contained in a single count. Thus, if the Trust maintains its contract-based claim, the breach of fiduciary duty claim should be dismissed.

      **F.**    **The Trust's Intentional Fraudulent Conveyance Claims Fail.**

As set forth in the Lightstone Opening Brief (at 86-87) and in Arbor's Opening Brief (at 16-26), the Trust has failed to plead any facts under the required Rule 9(b) heightened pleading standard (or otherwise) and the Trust's intentional fraud claims must be dismissed. As discussed above, the Mortgage Lender is the only party whose interests were affected by the challenged transfers, because the transferred property was, or would have been, its collateral, and the Mortgage Lender had full disclosure of the transactions, consented to them and participated in them. "Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it." *Lyondell*, 2014 Bankr. LEXIS 159, at *95; *see also Crescent*, 500 B.R. at 480 (lenders who knew the terms of their deal could not be "hoodwinked" by it; "To . . . set aside the billion dollar transfer as fraudulent would bail out the lenders who knew the terms of their own deal and have never asserted they were defrauded in any way."); *Ring v. Bergman (In re Bergman)*, 293 B.R.

580, 586 (Bankr. W.D.N.Y. 2003) ("an intent to defraud is conclusively negatived by the emphasis that both the transferor and the transferee placed on making full disclosure of that transfer to all three of the analysts consulted toward obtaining a bank loan"); *see also Kupetz v. Wolf*, 845 F.2d 842, 850 n.16 (9th Cir. 1988) ("fraudulent conveyance statutes were designed to protect creditors from secret transactions by debtors . . . . Future creditors may not complain when they knew or could easily have found out about the transaction"; refusing to find even constructive intent where LBO was well-publicized and trustee did not claim that any future creditors were unaware of the debtor's financial dealings).

Thus, the Trust's argument that it pled "badges of fraud" (Opp. Brief at 122-25) misses the point. "Badges of fraud" go to the issue of a defendant's intent, not the other elements of an intentional fraud claim. There is no fraudulent transfer claim, regardless of circumstantial "badges" of intent, when the sole creditor whose interests arguably were affected by the transfers knew of, consented to and participated in the transfers at issue.

Moreover, the "diminution of estate" doctrine, discussed above, under which a conveyance cannot be set aside if the assets transferred would not have been available to satisfy unsecured claims anyway, applies with equal force in intentional fraud cases. *See Art Unlimited,* 2007 U.S. Dist. LEXIS 66479, at *30. There, the trustee alleged that transfers were made with actual intent to hinder and delay unsecured trade creditors. *Id*. at *19. The trustee argued that, notwithstanding the fully encumbered nature of the assets transferred, the court should examine the parties' intent. *Id*. at *30. The court disagreed because the scheme resulted in no loss to the debtor's estate. *Id*. at *34-35. The court explained that "[b]ankruptcy law falls in the category of civil law . . . . In contrast to criminal law, the civil law is defined as a compensatory scheme, focusing on damage rather than on blameworthiness." *Id*. at *34 (quotation, ellipses and brackets

omitted).  Here too, even if the challenged transfers somehow constituted actual fraud (they did not), the only assets conveyed were the Mortgage Lender's own collateral that would not be available to satisfy any purported unpaid triggering creditor claims anyway, and the fraudulent conveyance claims fail.

### G.     The Trust's Breach of Fiduciary Duty Claims are Barred by an Exculpatory Clause in ESI's Certificate of Incorporation.

In moving to dismiss the Trust's duty of care claim against ESI's directors and officers (the only defendants who would have such duties), the Lightstone Defendants explained that the claim is barred by an exculpatory provision in ESI's certificate of incorporation.  *See* Lightstone Opening Brief at 76.  The Trust responds that the claims fall under exceptions to the exculpation for claims for breaches of the duty of loyalty, acts or omissions not in good faith and any transaction from which the director derives an improper benefit.  Opp. Brief at 96.  This argument is defective.

First, as discussed above, the Trust has not properly alleged a claim for self-dealing against any director with respect to any transaction because it did not allege which individual authorized which action for which entity.  *See Steinberg*, 2008 U.S. Dist. LEXIS 37367 at *15 ("[A] plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim.").

Second, the Trust has failed to allege which directors received what improper personal benefits, other than to make the implausible (in fact impossible) mass allegation that all Defendants diverted all of the challenged transfer to the mutual control and benefit of all of them. *See, e.g.*, Amended Complaint ¶ 4 ("insider Defendants diverted valuable assets . . . to their control and benefit"); *id.* ¶ 265(a) ("Causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable Defendants and, upon information and belief, in some cases, to himself").

Finally, the Trust has not even remotely alleged any facts that would give rise to a finding of bad faith. The standard for a violation of good faith is "qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (*i.e.*, gross negligence)." *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006). *See also Stanziale v. Nachtomi*, No. 01-Civ-403, 2004 U.S. Dist. LEXIS 15664, at *5 (D. Del. Aug. 6, 2004) (complaint must set forth "well-pleaded facts establishing that the directors acted out of self-interest"). Here, the Trust has not even alleged that the Lightstone Defendants engaged in grossly negligent conduct, because the Lightstone Defendants were simply complying with the Debtors' contractual obligations. [20] Because the Trust has not even properly alleged gross negligence, *a fortiori*, allegations of bad faith must fail. Therefore, none of the exceptions to the exculpation apply and the exculpation bars the Trust's breach of fiduciary duty claim.

### H.     The Trust's Unjust Enrichment Claim Fails as a Matter of Law.

The Trust's unjust enrichment claim (Count Four) must be dismissed for a number of reasons. First, it is precluded by section 546(e) with respect to the Floor Certificate transfer and Series A Unit Payments. *See AP Services LLP v. Silva*, 483 B.R. 63, 68-69, 71 (S.D.N.Y. 2012) (section 546(e) bars state common law claims such as unjust enrichment, aiding and abetting and conversion when the underlying facts show that the plaintiff seeks to undo a transaction otherwise insulated by section 546(e)); *see also Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th

---

[20]  Observing duties or exercising rights permitted – and here required – by contract does not constitute gross negligence, self-dealing or bad faith. *See Cooper Development Co. v. Friedman*, 92 Civ. 7572, 1994 U.S. Dist. LEXIS 1814, at *13 (S.D.N.Y. Feb. 8, 1994) (granting defendant's motion for summary judgment on a breach of fiduciary duty claim because "where the partnership agreement expressly authorized defendant to enter into a competing venture, it cannot be a breach of [defendant's] duties under that agreement to do exactly what he was authorized to do"); *see also In re Access Cardiosystems, Inc.*, 404 B.R. 593, 697 (Bankr. D. Mass. 2009) *aff'd*, 488 B.R. 1 (D. Mass. 2012) (under Massachusetts law, "[plaintiff] cannot argue that the [defendants] were constrained by fiduciary obligations to refrain from exercising their rights pursuant to the Stockholders Agreement . . . [t]hey exercised their rights in good faith").

Cir. 2009) (allowing recovery on unjust enrichment and illegal or excessive shareholder distribution claims "would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section").

Second, by improperly using group pleading, the Trust has not alleged which defendant was unjustly enriched. A Lightstone Defendant could not have possibly been enriched by a transfer to Arbor. For that matter, one Lightstone Defendant is not enriched by a transfer to another Lightstone Defendant.

Third, as discussed in Lightstone's Opening Brief, it cannot be plausibly alleged that Mr. Lichtenstein was "enriched." Mr. Lichtenstein personally lost hundreds of millions of dollars of his own money as a result of his investment in Extended Stay. Lightstone Opening Brief at 8.

I.      **The Trust's Waste Claim Must be Dismissed Because the Trust has Not Adequately Pled a Claim for Corporate Waste.**

The Trust's corporate waste claim (Count Eight) must also be dismissed because the Amended Complaint does not meet the Delaware corporate waste claim standard, which requires that transfers of corporate assets must be completely gratuitous. *See Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999) ("The pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as 'unfair' as a result of the directors' conflicted loyalties or lack of due care."). "Valid waste claims typically lie where there has been a transfer of corporate assets that serves no corporate purpose, or for which no consideration at all is received." *Protas v. Cavanagh*, No. 6555-VCG, 2012 Del. Ch. LEXIS 88, at *35 (Del. Ch. May 4, 2012) (emphasis added) (citation omitted). "Where, however, the corporation has received *any* substantial consideration and where the board has made a good faith judgment that in the circumstances the transaction was

worthwhile, a finding of waste is inappropriate, even if hindsight proves that the transaction may have been ill-advised." *Id.* (emphasis added) (citation and internal quotations omitted).

First, the Management Fees, by the Trust's own admission in the Complaint, were paid in exchange for at least some management services. *See, e.g.*, Amended Complaint ¶¶ 36, 37.

Second, the alleged dividend payments which were required under the Cash Management Agreement and at least the Series A Units as well, cannot constitute the basis for a claim for corporate waste as a matter of law. The Delaware Supreme Court has held that "[t]he payment of a contractually obligated amount cannot constitute waste, unless the contractual obligation is itself wasteful." *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 74 (Del. 2006). The Debtors' issuance of securities and entry in its financing agreements including the Cash Management Agreement, while an unfortunate business decision in retrospect, were not gratuitous and wasteful.

Finally, the alleged transfer of the Floor Certificates from the Wachovia Mortgage Trust to DL-DW also fails to meet either requirement for corporate waste. The Trust admits in the Amended Complaint that (1) the Floor Certificates were pledged to secure the loan and were used to make interest payments and (2) the Debtors received $22 million as consideration in exchange for the certificates. *See* Amended Complaint ¶ 154 (Debtors received $22 million loan plus $10.6 million additional funds from DL-DW); *id.* ¶ 155 (the loan was secured by DL-DW's pledge of the Floor Certificates; distributions on Floor Certificates rather than Debtors' own funds were used to pay interest on the loan); *id.* ¶ 184 (Floor Certificates, rather than assets of the Debtors, were used to repay the loan while the Debtors retained the loan proceeds). Additionally, the Debtors had the contractual right to cause the Floor Certificates to be transferred to any party of

its choosing. *See supra*. Furthermore, all the Debtors gave up was some "loan concessions" that cost the Debtors nothing and therefore did not waste anything.

Even assuming, *arguendo*, that the Trust can allege a proper waste claim, the Trust has still not alleged which defendant wasted which assets. *See, e.g.*, Amended Complaint ¶ 184 ("Each of the Defendants' acts or omission . . . constituted a waste of assets of the Debtors") (emphasis added). Yet again, the Trust relies on impermissible group pleading to try to save its claims. Additionally, for the reasons set forth above, the waste claims are factually identical to the Debtors' fraudulent conveyance claims, and therefore barred by section 546(e). The Lightstone Defendants also join in the Arbor Defendants' arguments that claims for waste are not part of property that was transferred to the Trust under the Plan.

**J.      The Trust's Conversion Claims Must be Dismissed.**

The Trust's conversion claims (Counts Nine, Ten and Eleven) also must be dismissed. Conversion is a "distinct act of dominion wrongfully exerted over the property of another, in denial of the plaintiff's right, or inconsistent with it." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (emphasis added) (internal quotation omitted). As discussed above, the allegations in the Amended Complaint and the loan documents show that the Management Fees were paid in exchange for services rendered, the Debtors were contractually obligated to make the alleged dividend payments, and the Debtors gave up nothing but valueless "loan concessions" in exchange for the benefits of the right to transfer the Floor Certificates to DL-DW. Therefore, the Trust's conversion claims must be dismissed. In addition, the Lightstone Defendants join their co-Defendants' arguments that the conversion claims are barred by section 546(e), and that they are not among the claims transferred to the Trust under the Debtors' Plan.

## CONCLUSION

For the above stated reasons, those set forth in the Lightstone Defendants' moving papers, and those offered by other Defendants, and as may be adduced further at the hearing on this matter, the Lightstone Defendants request the Court to dismiss the Amended Complaint in its entirety, with prejudice and without leave to amend, and grant such other and further relief in their favor as the Court may deem proper.

Dated: New York, New York
February 21, 2014

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

By: /s/ *Robert M. Novick*
     David M. Friedman
     Robert M. Novick
     Michele L. Angell
     Andrew R. Kurland
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
 Facsimile: (212) 506-1800
*Attorneys for the Lightstone Defendants*